1       UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF MISSISSIPPI
2        OXFORD DIVISION

3

UNITED STATES OF AMERICA     PLAINTIFF

4

5

VS.           NO. 3:21CR107

6

7

JAMARR SMITH, THOMAS IROKO AYODELE,
8 AND GILBERT McTHUNEL, II    DEFENDANTS

9

10      TESTIMONY OF TODD MATNEY
11   EXCERPT FROM MOTION TO SUPPRESS HEARING

12

    BEFORE HONORABLE SHARION AYCOCK
13    UNITED STATES DISTRICT JUDGE

14

      Oxford, Mississippi
15      January 31, 2023

16

17

     APPEARANCES NOTED HEREIN

18

19

20

21

22

23 Court Reporter:  PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
        Federal Official Court Reporter
24        911 Jackson Avenue East
        Oxford, MS  38655
25

APPEARANCES:

For the Government:  ROBERT J. MIMS, Esquire
U.S. Attorney's Office
900 Jefferson Avenue
Oxford, MS  38655

For the Defendant
 Smith:  GOODLOE T. LEWIS, Esquire
Hickman, Goza & Spragins, PLLC
P.O. Drawer 668
Oxford, MS  38655-0668

For the Defendant
 Ayodele:  WILLIAM F. TRAVIS, Esquire
8619 Highway 51 North
Southaven, MS  38671

For the Defendant
 McThunel:  PAUL A. CHINICHE, Esquire
Chiniche Law Firm, PLLC
P.O. Box 1202
Oxford, MS  38655-1202

* * * * *

**THE COURT:**  Mr. Mims, you may call your first witness.

**MR. MIMS:**  Your Honor, I call Todd Matney.

And, Your Honor, for the record, our other witness we're going to call is Stephen Mathews, and he has stepped out of the courtroom now as we are beginning.  So he will not be in here during Mr. Matney's testimony.

**THE COURT:**  Thank you.

(OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

**TODD MATNEY, GOVERNMENT'S WITNESS, AFTER BEING DULY 3SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

BY MR. MIMS:

**Q.**   Inspector Matney, would you state and spell your name for the record, please?

**A.**   Yes, sir.  It's Todd Matney.  T-o-d-d.  M-a-t-n-e-y.

**Q.**   And your title would be inspector as in postal inspector; correct?

**A.**   Yes, sir.

**Q.**   Okay.  Inspector Matney, who are you employed by?

**A.**   United States Postal Inspection Service.

**Q.**   How long have you been employed with the postal inspection service?

**A.**   Since 2017.

**Q.**   All right.  Who were you with before postal inspection

1    service?

2    **A.**    Prior to postal inspection service, I was working with

3    the Office of Inspector General for the United States Postal

4    Service.

5    **Q.**    Okay.  Fair to say that one side of the house -- the OIG

6    investigates internal problems?

7    **A.**    Internal, yes, sir.

8    **Q.**    And the side of the house you work on now, the postal

9    inspection service, is external crime, such as the one we're

10   dealing with today; right?

11   **A.**    Yes, sir.

12   **Q.**    Okay.  How long have you been a federal agent altogether?

13   **A.**    Nineteen years.

14   **Q.**    Prior to that, what kind of law enforcement experience do

15   you have?

16   **A.**    I was local law enforcement for about ten and a half

17   years prior to that.

18   **Q.**    Where at?

19   **A.**    Southaven Police Department.

20   **Q.**    Okay.  What was your position in 2018?

21   **A.**    2018, I was with the United States Postal Inspection

22   Service in Oxford, Mississippi.

23   **Q.**    What territory did you cover?

24   **A.**    The northern part of the state.

25   **Q.**    I'm sorry?

**A**.    Northern part of the state.

**Q**.    Okay.  So let's talk for a minute about your training.
Tell the Court, if you would, what training did you receive as
a federal agent?

**A**.    In 2004, I was hired with the United States Secret
Service.  I went through a Federal Law Enforcement Training
Center, which I think was approximately 11 weeks.  After that,
went through the United States Secret Service Academy in
Beltsville, Maryland.  That was approximately 17 weeks.  And
then with the OIG, I went through initial training with them,
which was approximately two weeks; and with the United States
Postal Inspection Service, another week of initial training,
basic investigations.

**Q**.    So, every step of the way, you've had some initial
training at the beginning to start with, more intensive, you
know, week-long or multi-week training; correct?

**A**.    Yes, sir.

**Q**.    What about annual training?  Do you also -- in your job,
your law enforcement career, have you had to do any kind of
annual refresher type training?

**A**.    Yes, sir.  With the inspection service, there's -- I want
to say there's approximately 18 hours of online training and
annual training that we are supposed to complete.

**Q**.    Okay.  What training or experience do you have with
search warrants?

1 **A.** Extensive. Just from local law enforcement, being a
2 local investigator, to becoming a federal agent, depending on
3 the type of nexus investigations that we had doing search
4 warrants for each case or whatever case is necessary.
5 **Q.** You mentioned local law enforcement. Did you do search
6 warrants back when you were with Southaven PD?
7 **A.** Yes, sir.
8 **Q.** Have you done them ever since you've been a federal agent
9 as well?
10 **A.** Yes, sir.
11 **Q.** Any idea how many search warrants you have obtained in
12 your career?
13 **A.** No, sir. A lot.
14 **Q.** Would it be fair to say that some of the training that
15 you have had over the years has been on search warrants, of
16 what you have to do legally to obtain a search warrant?
17 **A.** Yes, sir. Not only that, but experience from doing the
18 search warrants as well as conferring with other, you know,
19 federal agents and supervisors.
20 **Q.** So, when you do a search warrant, do you often, just all
21 by yourself, fill out an affidavit and go see a judge?
22 **A.** No, sir.
23 **Q.** Who all do you consult with? How does that work usually?
24 **A.** Usually what we'll do is we'll confer as a team, talk
25 about the information in the case, go to the supervisor, make

1  sure that we're including everything we're supposed to, and we
2  review everything prior to submitting it to the -- excuse me --
3  the Assistant U.S. Attorney that we're working with the case
4  on.
5  **Q.**  Okay.  So let's talk about this robbery that occurred at
6  the Lake Cormorant post office February 5th of 2018; is that
7  correct?
8  **A.**  Yes, sir.
9  **Q.**  Did you participate in that investigation?
10 **A.**  Yes, sir.
11 **Q.**  How did you get involved in it?
12 **A.**  We were called out after the robbery occurred by the
13 supervisor.
14 **Q.**  Okay.  What was your role in the investigation?
15 **A.**  Initially, it was to make the scene and assist whatever I
16 could, and then, within the week, my supervisor assigned me as
17 the lead for the case.
18 **Q.**  Okay.  Who was your supervisor?
19 **A.**  Stephen Mathews.
20 **Q.**  And where was Stephen assigned at that time?  Where was
21 his office?
22 **A.**  His office was in Mobile.
23 **Q.**  That's in Alabama; right?
24 **A.**  Yes, sir.
25 **Q.**  So just tell the Court, if you would, in general about

1    the robbery.  Just in simple terms, what happened that day?

2    We're going to get into the specifics here in a few minutes,

3    but what happened?

4    **A.**    Okay.  So we were called.  Apparently, there was a driver

5    that was making a delivery at a post office, and he was robbed

6    as he was making that delivery.  He -- fortunately, you know,

7    he wasn't hurt too bad.  Apparently, he was hit with a pistol

8    and then called the police and needed some medical attention.

9    **Q.**    Okay.  You say a driver.  Let me ask you, what hours

10   would the Lake Cormorant post office be open?  Is it open all

11   day long?

12   **A.**    No, sir.  It's, like, a half day post office.  It's a

13   small post office.

14   **Q.**    Okay.  And approximately what time did this robbery

15   occur?

16   **A.**    It was -- I don't know exactly what time it was.

17   **Q.**    Okay.  Let me ask you a question.  I'm going to get

18   sidetracked for a second here because of the answer to this

19   question.

20   **A.**    Okay.

21   **Q.**    In summer of 2018 -- is that right?  Have I got the year

22   correct? --

23   **A.**    Yes sir.

24   **Q.**    -- did you have an on-the-job injury?

25   **A.**    Summer of 2019.

1    **Q.**    Summer of 2019?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  Just in brief -- we're not going to get into great

4    details on it, but it was a significant injury, wasn't it?

5    **A.**    Yes, sir.  I was in a -- I was in a firearms instructor

6    course in Maryland -- I mean -- excuse me -- Delaware, and an

7    inspector standing next to me shot me with a 12-gauge shotgun.

8    **Q.**    Okay.  Shot you in your foot?

9    **A.**    Yes, sir.

10   **Q.**    And it caused a pretty extensive injury?

11   **A.**    Yes, sir.

12   **Q.**    As a result of that, have you taken some medication --

13   are you on some medication or have you taken medication over

14   the years in relation to that?

15   **A.**    Yes, sir.  I had three -- three major surgeries and two

16   major infections due to it.

17   **Q.**    Okay.  Has that medication or anything else related to

18   that caused some memory difficulty?

19   **A.**    Somewhat, yes, sir.

20   **Q.**    Okay.  So, if I ask you details about what time this

21   robbery occurred, if you can't answer that, do you believe that

22   may be caused partly by your medication?

23   **A.**    Partly, yes, sir.

24   **Q.**    Okay.  It was something you would have known five years

25   ago; right?

1    **A.**    Yes, sir.

2    **Q.**    And it would be in your reports; correct?

3    **A.**    Yes, sir.

4    **Q.**    Okay.  So, at the time the robbery occurred, the post

5    office was closed.  Is that fair to stay?

6    **A.**    Yes, sir.

7    **Q.**    So who is it that's getting robbed?

8    **A.**    Mr. Cobbs.  He was the driver of the delivery truck.

9    **Q.**    And what's his job?  What is Mr. Cobbs doing?

10   **A.**    He drives the delivery truck from post office to post

11   office and does pick-ups and drop-offs of packages.

12   **Q.**    Okay.  Where does he deliver it to?

13   **A.**    To --

14   **Q.**    Where's he going ultimately?  Where's he taking all of

15   this mail?

16   **A.**    Ultimately back to the post office.

17   **Q.**    Which one?

18   **A.**    The main post office in Memphis.

19   **Q.**    In Memphis?

20   **A.**    Yes, sir.

21   **Q.**    That's where all the mail is collected and goes to;

22   correct?

23   **A.**    Yes, sir.

24   **Q.**    Okay.  So he has a route up there that includes Lake

25   Cormorant on his way to Memphis; right?

1   **A.**   Yes, sir.

2   **Q.**   At the end of the day picking up mail?

3   **A.**   Yes, sir.

4   **Q.**   Okay.  Do you remember how many stops he makes along that

5   route?

6   **A.**   No, sir.  There's several.

7   **Q.**   Okay.  Has he made some stops before he gets to Lake

8   Cormorant?

9   **A.**   Yes, sir.

10   **Q.**   All right.  So, when he gets to Lake Cormorant, he gets

11   robbed; correct?

12   **A.**   Correct.

13   **Q.**   And what do they take?  They're not taking his wallet,

14   are they?

15   **A.**   No, sir.

16   **Q.**   What is the robber taking?

17   **A.**   Registered mail.

18   **Q.**   Okay.  Why is the registered mail important?

19   **A.**   Because it contains money.

20   **Q.**   What kind of money does it contain?

21   **A.**   Cash.

22   **Q.**   Is that the receipts the post offices collect during the

23   day?

24   **A.**   Yes, sir.

25   **Q.**   Can that be a significant amount of money?

1   **A**.    Yes, sir.

2   **Q**.    In fact, do you happen to recall approximately -- if you

3   don't, it's fine, but do you happen to recall how much money

4   was taken in this case?

5   **A**.    Approximately, it was 67, 68,000.

6   **Q**.    Okay.  So, at the very beginning of your investigation,

7   when you and your colleagues go out there to start your

8   investigation, what information did you have at that time?

9   **A**.    Only what Mr. Cobbs had given us.

10  **Q**.    Okay.  Was he able to identify who assaulted him?

11  **A**.    No, sir.

12  **Q**.    Okay.  Were there any other eyewitnesses that you recall

13  in the area?

14  **A**.    At the time, we didn't know initially.  Apparently, there

15  was one person.

16  **Q**.    Okay.  What -- just in general, what do you remember that

17  one person seeing?

18  **A**.    Just -- just the -- the truck and the robbery occurring.

19  **Q**.    Okay.  So let me ask you this.  Did you also have a

20  video?

21  **A**.    Yes, sir, we did.  Later on, we discovered there was a

22  farm office, the gentleman that owned the land around the post

23  office, and he had extensive surveillance equipment/video

24  cameras around his building, and one of the cameras actually

25  had an entire view of the post office.

1  **Q.**   Okay.  You and I watched that video the other day in

2  preparing for this hearing, didn't we?

3  **A.**   Yes, sir.

4  **Q.**   Okay.  We're going to play that video in a minute.  I

5  want to talk a little bit about it before we do.  Before we get

6  into what you saw on the video, what did the post office

7  eventually do to further its investigation in November of 2018?

8  **A.**   We issued a search warrant.

9  **Q.**   Okay.  What kind of search warrant are we talking about?

10 **A.**   So what we did is -- we were having a problem identifying

11 the individuals.  Based on the video surveillance we saw, it

12 appeared that the gentleman that robbed Mr. Cobbs was using a

13 cell phone in the video.  We saw mannerisms and physical

14 movement that indicated that he probably had a cell phone on at

15 the time.

16 **Q.**   Okay.

17 **A.**   So we issued a search warrant to Google to determine,

18 based on the radius around the post office, if there was any

19 kind of information that could be extracted from Google to

20 determine that a cell phone was being used in that area at that

21 time of the robbery.

22 **Q.**   Is that what we call a geofence search warrant?

23 **A.**   Yes, sir.

24 **Q.**   And is the purpose of that to identify who might be

25 present at the scene of a robbery?

1    **A.**    Yes, sir.

2    **Q.**    Had you ever before this sought a geofence search warrant

3    before?

4    **A.**    No, sir.  Never.

5    **Q.**    Did you work with other agents in securing this geofence

6    search warrant?

7    **A.**    Yes, sir.

8    **Q.**    Who all did you work with?

9    **A.**    Stephen Mathews.

10   **Q.**    Okay.  Did y'all collaborate on the affidavit?

11   **A.**    Yes, sir.

12   **Q.**    But you're the one that signed the affidavit; correct?

13   **A.**    Correct.

14   **Q.**    Is that because you were here local, the one that's

15   closest to the judge?

16   **A.**    Yes, sir.

17   **Q.**    Plus, you were the lead agent; right?

18   **A.**    Yes, sir.

19   **Q.**    Let me ask you, did you -- did you consult with the U.S.

20   Attorney's Office before seeking this warrant?

21   **A.**    Yes, sir.

22   **Q.**    And that would be me that you consulted with; correct?

23   **A.**    Yes, sir.

24   **Q.**    So what do you typically have to show?  I'm just talking

25   search warrants in general.  What do you typically have to show

1  to be able to obtain a search warrant?

2  **A.**  Probable cause.

3  **Q.**  Okay.  And you put that probable cause in an affidavit;
4  correct?

5  **A.**  Correct.

6  **Q.**  In this situation, in this search warrant, did you and
7  Inspector Mathews put probable cause in your affidavit?

8  **A.**  Yes, sir.

9  **Q.**  Did you base part of that on the video?

10  **A.**  Yes, sir.

11  **Q.**  Now, I'm going to -- like I said, we're going to watch
12  the video here in just a second, but before we do, just off the
13  top of your head, what do you recall seeing on the video as you
14  watched it?

15  **A.**  There were several different points of the video.
16  Initially, it looked like, as he was walking up, he had his
17  hand to his left ear, his left hand up, his elbow pointed out.
18  Looked like he had a cell phone up to the side of his head.

19      There was another portion where he was squatted down
20  behind the building after the robbery.  And it looked like he
21  had pulled something out, and he was looking at his hand in
22  front of him as he was squatted down next to the building.

23      There was another portion where he was reaching in his
24  pockets like he was getting ready to pull something out.

25      Another portion, too, where he walked up to the building

1  prior to the robbery, and he moved to an open area in front of

2  bricks at the corner of the building, and it looked like he may

3  have been on his phone at that time as well.

4  **Q.**  When you say "he," are you talking about the assailant?

5  **A.**  The assailant, yes, sir.

6  **Q.**  Okay.  Did you see anybody else in the video that you

7  thought might have been involved in the robbery?

8  **A.**  Yes, sir.  We saw a white SUV that dropped him off.  You

9  can see that in the video at the beginning.  And then, also,

10  there was another car that seemed to be, like, a visual witness

11  or some kind of assistance, because they pulled up

12  simultaneously to Mr. Cobbs being out there at the post office,

13  parked across the road from it, making unusual moves with the

14  car and trips back and forth past the post office during the

15  robbery.

16  **Q.**  Can you describe this car?

17  **A.**  It was a red small -- looked like a Hyundai type vehicle.

18  **Q.**  Okay.  So, from your review of the video, it appears that

19  you have three participants; right?

20  **A.**  Yes, sir.

21  **Q.**  You've got the person driving the white SUV that drops

22  off the assailant?

23  **A.**  Correct.

24  **Q.**  You've got the assailant?

25  **A.**  Yes.

1  **Q.**   And you've got a lookout in a red car?

2  **A.**   Yes, sir.

3  **Q.**   Okay.

4       **MR. MIMS:**  Let's go ahead and pull up the video.

5       Your Honor, if we may, we're going to pull up the

6  video to play.

7       Your Honor, I will go ahead at this point, before we

8  get started, and offer the video into evidence as Government's

9  Exhibit G-1.

10       **THE COURT:**  Any objection?

11       **MR. CHINICHE:**  No objection, Your Honor.

12       **THE COURT:**  Very well.  It will be received.

13     (EXHIBIT NO. G-1 ADMITTED INTO EVIDENCE.)

14       **THE COURT:**  And I'm assuming -- how do counsel --

15  defense counsel wish to do this?  Are you going to designate

16  witnesses to where I ask all of you for cross-examination, or

17  just one of you, or do all of you consent to the introduction

18  of the video?

19       **MR. CHINICHE:**  Your Honor, I think we're in agreement

20  as to the evidence.  And we've already discussed with Mr. Mims

21  what we all anticipate.  I think -- I don't know that we all

22  need separate objections.  We all may have some questions.

23       **MR. LEWIS:**  Yes.

24       **THE COURT:**  If one of you stand up and answer my

25  question, I'm going to proceed unless somebody else stands up

1  and says, "Well, I disagree."

2        **MR. LEWIS:**  That is fine.

3        **MR. MIMS:**  Your Honor, for the record, what we're

4  putting into evidence -- we have a video that goes from, like,

5  5:00 to 6:00.  We may even have one on here that goes after

6  that.  It's really irrelevant to this.

7        For purposes of what we're playing here for the Court,

8  Ms. Bailey has kind of cut down the clip to right before the

9  white SUV first comes into view until the very end when the

10  white SUV leaves the view.  That's the key part here.  That's

11  what we're showing, but, actually, what we're putting into

12  evidence will also include the entire video.

13        **THE COURT:**  Okay.

14        **MR. MIMS:**  Your Honor, I would also note that at the

15  bottom of the screen, there's a time.  Right here (indicating)

16  it says 6:38, and, of course, that's not the time of day.  That

17  means it's 6 minutes 38 seconds into -- from the start of the

18  video.  So, on the record, the time -- we're referencing that

19  time from when the video started, if that makes sense.

20        **THE COURT:**  Yes, sir.

21  **BY MR. MIMS:**

22  **Q.**  All right.  Before we play this, let me just ask you,

23  Inspector Matney, what are we looking at here?

24  **A.**  This is the post office in the upper left corner there.

25  **Q.**  You're talking about the brick -- the brick building we

1  see on the upper left part of the screen?

2  **A.**  Yes, sir.

3  **Q.**  Okay.  And this is there at Lake Cormorant; correct?

4  **A.**  Correct.

5  **Q.**  And this is coming from the -- from the farm shop right

6  across the street?

7  **A.**  Yes, sir.

8  **MR. MIMS:**  Your Honor, there is a little audio.  We're

9  really not going to use it because the only thing you can

10  hear -- for our purposes, it's probably not relevant.  You do

11  hear a little bit of screaming during the assault, but it's

12  really not important.  And you hear a train later on.  So we

13  may not actually have the audio playing.  The video is really

14  the more important part.

15  **THE COURT:**  Is that acceptable to defense counsel?

16  **MR. LEWIS:**  Yes, Your Honor.

17  **THE COURT:**  Thank you.

18  **MR. MIMS:**  All right.  Ms. Bailey, if you would go

19  ahead and play the video.

20  **BY MR. MIMS:**

21  **Q.**  Agent -- or, Inspector Matney, I'm just going to ask you

22  a few questions as we go along.  We may just watch for a while,

23  and at times I may point out something and ask you a question.

24  **A.**  Yes, sir.

25  (PLAYING VIDEO, EXHIBIT NO. G-1.)

1  **MR. MIMS**: All right. I tell you what, let's back up.

2  Before we start here, let's back up. Let's catch it where the

3  truck first comes into view, unless I missed it, you know,

4  coming from right to left. Let's go to about the five-minute

5  mark. All right. Let's start from there.

6  Your Honor, we backed it up to the five-minute mark.

7  **BY MR. MIMS:**

8  **Q.** All right. Inspector Matney, what do we see there?

9  **A.** The white SUV coming into the picture.

10 **Q.** Okay. That's the first time we see anybody suspected of

11 this robbery; is that correct?

12 **A.** Correct.

13 **Q.** And it drives on off to the left of the post office;

14 correct?

15 **A.** Correct.

16 **MR. MIMS**: All right. Let it go just a few more

17 seconds. All right. Pause it right here.

18 (PAUSED VIDEO.)

19 **BY MR. MIMS:**

20 **Q.** Inspector Matney, what are we seeing right here?

21 **A.** You see the white SUV stop and the individual get out of

22 the white SUV and start walking towards the post office.

23 **Q.** That's the assailant, though, we see get out?

24 **A.** Yes, sir.

25 **Q.** Now, what are fixing to see -- we're going to play it

1  here in a second.  Before we do, what are we fixing to see from

2  this assailant?

3  **A**.   As he walks up to the back of that building, you're going

4  to see his left arm go up.

5  **Q**.   Okay.  Describe for the Court -- show the Court what you

6  see in the video with your own arm.

7  **A**.   Sure.  From this -- from this video, it appears that he

8  has his hand up to his ear and elbow's out (demonstrating).

9  **Q**.   Okay.  Now, you can't see an actual cell phone in this

10  video, can you?

11  **A**.   No, you cannot.

12  **Q**.   But you see his hand up to his ear?

13  **A**.   Correct.

14  **Q**.   And that hand stays there for several minutes, doesn't

15  it?

16  **A**.   Correct.  For several seconds, yeah.

17  **Q**.   Well, more than several seconds.  I'm going to -- we're

18  at the -- we're at the 6:51 mark here.  Actually, if we watch

19  this video, in my notes, it looks like to the 9:50 mark.

20  **A**.   Oh, yes, sir.

21  **Q**.   But let's watch and see.  That's what we're looking for.

22     (PLAYING VIDEO.)

23  **BY MR. MIMS:**

24  **Q**.   He's going to walk behind the post office; right?

25  **A**.   Right.

1           **THE COURT:** Can I stop you a minute?

2           **MR. MIMS:** Yes, ma'am.

3           **THE COURT:** Can you go back -- I know the affidavit

4 indicates that the affiant saw him get out of the truck, and I

5 just want to see if you can actually see that or just see him

6 walking.

7           **MR. MIMS:** Let's back up a few seconds. All right.

8 Let's pause it right there for a second.

9       (PAUSED VIDEO.)

10           **MR. MIMS:** Your Honor, I would just note that, as you

11 saw it, you could see the door open and close right there in

12 the corner of that. We can back it up if we need to.

13           **MR. LEWIS:** Your Honor, excuse me. I object to

14 counsel testifying.

15           **THE COURT:** Yes. Mr. Mims, back it up for me and let

16 me see it.

17           **MR. MIMS:** Okay.

18           **THE COURT:** That light pole is giving me trouble.

19           **MR. MIMS:** All right. Before we play it -- and I know

20 this is partly argument. I'm not trying to testify. I'm just

21 going ahead and skipping ahead to argument while we're here.

22 If -- what you're looking at is, you can see the door open and

23 close right before the truck pulls forward and the guy starts

24 walking.

25           **THE COURT:** Okay.

1    **MR. MIMS**:  You can kind of see his mirror there.  Go

2  ahead.

3      (PLAYING VIDEO.)

4        **THE COURT**:  Proceed.

5  **BY MR. MIMS**:

6  **Q.**    All right.  Agent Matney, what do we see the white SUV

7  doing at this point?

8  **A.**    Driving off away from the post office.

9  **Q.**    All right.  Now, what do you see with the assailant?

10 **A.**    As he's walking to the back, you can see his arm up to

11 his -- his hand up to his head, his left arm.  And, at this

12 point, it seems that he still has his hand up to his head.

13        **THE COURT**:  Y'all stop just a second.

14      (PAUSED VIDEO.)

15        **THE COURT**:  Would you prefer that I ask to rewind it

16 as we go and look at it as we go --

17        **MR. MIMS**:  Sure.

18        **THE COURT**:  -- or keep my mouth shut and let y'all

19 finish and then ask my questions?

20        **MR. MIMS**:  I'm good either way, Your Honor.  I'm fine

21 with stopping while we're here and let's talk about it.

22        **MR. CHINICHE**:  I would agree, Your Honor, what's

23 easiest for the Court.

24        **THE COURT**:  Okay.  Rewind it and let me see, then, as

25 he comes around the building.

1　　　**MR. MIMS**:  Your Honor, and, too, we can also zoom in.

2　The problem, when you zoom in, it doesn't get any clearer.

3　It's kind of blurry when you zoom in, but we can do that too.

4　　　**THE COURT**:  I wondered if you could.  I actually -- so

5　I'm clear, I looked at the video yesterday.  Okay?  So I'm

6　familiar with it.  I want to see what you point out, Mr. Mims.

7　Counsel, I want to see what you point out.  It obviously takes

8　an interpretation of the video to get to the facts stated in

9　the affidavit.  Okay?

10　　　**MR. MIMS**:  Your Honor, as far as pointing out, you

11　have to look closely, certainly.

12　　　**THE COURT**:  I get that.

13　　　**MR. MIMS**:  You can see the elbow better when he's not

14　right in front of the bricks.  When he's more off to the side,

15　you've got the lighter background.

16　　　**THE COURT**:  Yes, sir.

17　　　**MR. MIMS**:  But you can, if you look close, see it for

18　at least a three-minute period up until right before the truck

19　pulls up.  Then you see him go back behind the building, and

20　you don't see the hand up to the ear.

21　　　**THE COURT**:  And you're telling me -- because I was

22　hoping you were going to be able to zoom this in better today.

23　So zooming does not assist me?

24　　　**MR. MIMS**:  We'll do it and try.  I just -- when I try

25　to zoom in or even take still shots, it's blurry.  It doesn't

1   necessarily clear anything up.

2   **THE COURT:**  Okay.  If you would, rewind that a bit.

3   (PLAYING VIDEO.)

4   **THE COURT:**  Stop it, please.

5   (PAUSED VIDEO.)

6   **THE COURT:**  Mr. Mims, which arm do you contend --

7   **MR. MIMS:**  The left arm.

8   **THE COURT:**  -- that he's holding a cell phone?

9   **MR. MIMS:**  Your Honor, the left arm.

10  **THE COURT:**  Okay.

11  **MR. MIMS:**  He's walking towards us, but it's his --

12  it's his left arm.

13  **THE WITNESS:**  May I add, before he comes around that

14  corner, that's the best time that you can see that his elbow is

15  pointing towards the building.  Right before he comes around

16  this corner.

17  **MR. MIMS:**  Let's back up one more time.  Right there.

18  Let's start from right there.

19  (PLAYING VIDEO.)

20  **A.**   As he's approaching, you can now see the elbow up.  Right

21  there (indicating).

22  **BY MR. MIMS:**

23  **Q.**   By contrast, you can see his right arm down --

24  **A.**   Correct.  Swinging --

25  **Q.**   -- towards the ground?

1  **A.**    -- next to his body.

2         **THE COURT:**  Stop, please.

3      (PAUSED VIDEO.)

4         **THE COURT:**  Does the government contend he's still on

5  his phone at this point?

6         **MR. MIMS:**  I do, Your Honor.

7         **THE COURT:**  Thank you.  Proceed.

8      (PLAYING VIDEO.)

9         **MR. MIMS:**  I don't know what happened.  We lost

10  something.

11         **THE COURT:**  We did.

12      (PAUSE IN PROCEEDINGS.)

13      (PLAYING VIDEO.)

14         **MR. MIMS:**  Let's pause it right there for a second.

15      (PAUSED VIDEO.)

16  **BY MR. MIMS:**

17  **Q.**    Inspector Matney, as you saw the -- and we can back it up

18  if we need to again -- as you see the assailant walk back

19  around behind the back edge, could you still see his left arm

20  to his ear?

21  **A.**    Can you back it up one more time?

22         **MR. MIMS:**  Let's back it up just for a few seconds.

23  Keep going.  There we go.

24  **A.**    I was holding off commenting because I wasn't sure you

25  guys had video yet.

1 **BY MR. MIMS:**

2 **Q.** Yeah. Let's watch it.

3     (PLAYING VIDEO.)

4 **A.** Yes, sir. At this point, it does. Now, it looks like,

5 once he gets around that corner, he makes a turn to the left.

6 He spins back around.

7     This is where Mr. Cobbs is driving his truck towards the

8 post office.

9     **THE COURT:** Can I ask you to stop just a moment?

10     (PAUSED VIDEO.)

11     **THE COURT:** Could the affiant explain to me the door

12 entrances at the back? I'm seeing the jutted out part of the

13 building that he's behind now.

14     **THE WITNESS:** Yes, ma'am.

15     **THE COURT:** Could you -- like, where are the entry

16 points to the back?

17     **THE WITNESS:** Yes, ma'am. Could you rewind it so the

18 truck is not in the way and I'll explain?

19     (PLAYING VIDEO.)

20     **THE WITNESS:** Right there is fine.

21     (PAUSED VIDEO.)

22     **THE WITNESS:** So that is a dock area right there.

23 It's a concrete area. It's covered. To the right is a door up

24 against the back of that building, and that's the entrance into

25 the post office.

1　BY MR. MIMS:

2　**Q.**　Inspector Matney, you're talking about on the left side

3　at the very back of the building but on the right side --

4　**A.**　Yes, sir.　It's to the right side of the dock, the

5　covered area.　There's a door.

6　**Q.**　Okay.　Because the front door of the post office for

7　customers is what we see at the very front --

8　**A.**　Correct.

9　**Q.**　-- that column there?

10　**A.**　Correct.

11　**Q.**　But the back is where -- is where Mr. Cobbs would go in

12　and get the mail bag for the evening?

13　**A.**　Correct.　Yeah.　He has a key to the back for delivery

14　and pick-ups.

15　**Q.**　Okay.

16　　　　**THE COURT:**　Thank you.

17　　(PLAYING VIDEO.)

18　**A.**　At this point, Mr. Cobbs exits the truck.

19　BY MR. MIMS:

20　**Q.**　Now, we see the red car pulling in.　Is that the red car

21　you believe was involved?

22　**A.**　Yes, sir.

23　**Q.**　What do we see it doing right here?

24　**A.**　It slowed -- it slowed down as it approached the post

25　office -- as the truck was backed into the back of the post

1  office, and then it accelerated and went over the railroad
2  tracks.  And you can see it taking a slight right and then
3  taking a left, doing a U-turn, and then coming back across the
4  tracks.

5  Mr. Cobbs is walking to the front of the post office.  I
6  was told there's a deposit box in front that he checks when he
7  does his deliveries and pick-ups.  And the vehicle that was a
8  lookout comes past -- appears to be a lookout comes past.

9  **Q.**  Now, that red car comes back into view in a minute or
10  two, doesn't it?

11  **A.**  Yes sir.

12  **Q.**  Is this the red car we see coming back?

13  **A.**  Yes, it is.  You'll see it back up into the parking lot
14  across the street from the post office.

15  **Q.**  And meanwhile --

16  **A.**  At the same time the robbery is occurring, Mr. Cobbs is
17  getting into an altercation with the individual.  It looks like
18  at this point you can see where the individual sticks his hand
19  out towards Mr. Cobbs.  Looks like he may be holding a gun.

20  **MR. MIMS:**  Now, let's pause it for one second.  And we
21  may need to back up.

22  (PAUSED VIDEO.)

23  **BY MR. MIMS:**

24  **Q.**  There's a lot going on in this at one time, depending on
25  where you're looking.

1   **A.**    Correct.

2   **Q.**    Can you still see the rear of the red car in this screen?

3   **A.**    Yes.

4   **Q.**    Where is it at?

5   **A.**    It's in the front of the building to the right.

6   **Q.**    Okay.

7       **MR. MIMS:** And, Your Honor, if we need to back it up,

8 because if you're watching the altercation, you may not see the

9 red car. Do we need to back it up?

10       **THE COURT:** Yes, sir.

11       **MR. MIMS:** Let's back it up for just a second.

12       And, Your Honor, I would ask you just to watch the red

13 car.

14       Okay. That's good.

15     (PLAYING VIDEO.)

16       **MR. MIMS:** Let's just let it play for a minute, and

17 let's focus on the red car, and then we'll come back and

18 focus -- and back up and focus on the assault.

19 **BY MR. MIMS:**

20   **Q.**    Now, you can see -- what's the red car doing?

21   **A.**    It's slowly backing up.

22   **Q.**    Okay. That little store there, is that store open, or

23 was it open in 2018? Do you remember?

24   **A.**    I believe so.

25   **Q.**    And, now, as the truck pulls forward, what does the red

1 car do?

2 **A.** Pulls off.

3 **Q.** Okay. That's the last time we see the red car, isn't it?

4 **A.** Yes, sir.

5    **MR. MIMS**: All right. Let's back up for a minute to

6 the 12:50 mark.

7    Your Honor, we're going to back up and pick up

8 again -- that's good right there -- with the assault.

9 **BY MR. MIMS:**

10 **Q.** Now, is that the assailant we still see at the back of

11 the --

12 **A.** Yes, sir.

13    **MR. MIMS**: Let's back up for one second. Go back to

14 about the 13:30 mark, and I want you to pause it right at

15 13:34. Right there (indicating).

16   (PAUSED VIDEO.)

17 **BY MR. MIMS:**

18 **Q.** What do you see right there, Inspector Matney?

19 **A.** You see the truck pulling off. The back door of the

20 truck is open approximately two to three feet.

21 **Q.** Okay.

22 **A.** You see the assailant in the very back of the post

23 office, what appears to be either a white satchel or white box.

24 He's standing next to that -- that box.

25 **Q.** What's the position of the assailant's hands and arms?

1  **A.**  At this point, it looks like he may be reaching in his
2  pockets.

3  **Q.**  Okay.  Can you tell anything at all as we watch it?
4  We're going to back up in a minute and roll through it again,
5  but I want you to watch his hand and watch his head, and just
6  tell me if you see anything as far as his hand and his head and
7  what he may be doing.

8      **MR. MIMS**:  Let's back up a couple of seconds and then
9  let it roll on through this.  Here we go.

10    (PLAYING VIDEO.)

11  **A.**  Right -- just prior to him bending over, you can see his
12  left hand go up to his ear.  When you rewind that, you'll see
13  it again.

14  **BY MR. MIMS:**

15  **Q.**  I'm looking more at his right hand.  I don't see his left
16  hand going up to his ear.

17  **A.**  Okay.

18  **Q.**  Now, let's let -- we're going to skip on through.  I'm
19  going to ask you something else.  In a second, we'll see him
20  walk out of the screen; is that right?

21  **A.**  There he goes, yes, sir.

22  **Q.**  All right.  And now do we see the assailant coming back
23  in the screen?

24  **A.**  Correct.  Now he squats down, and at this point is where
25  I saw his hand go out in front of him, and he looks down at it.

1  There it is.  Right there (indicating).

2  **Q.**  Okay.  What does that appear to you, in your opinion, as

3  you watch this that he's doing?

4  **A.**  It appears that he's looking at something in his hand.

5  Could be a cell phone.  Could be looking at a text message.  I

6  don't know.

7  **Q.**  And you don't know for certain what he's doing, do you?

8  **A.**  No.

9  **Q.**  Okay.  But it appears he may be using his cell phone?

10  **A.**  It's indicative of that type of movement that that's

11  probably what he's doing.

12  **Q.**  When you were watching this video before preparing the

13  affidavit, did other inspectors in your agency watch this same

14  video?

15  **A.**  Yes.

16  **Q.**  Did y'all talk together about what y'all saw?

17  **A.**  Yes.

18  **Q.**  Was there a difference in opinion in what you're seeing?

19  **A.**  No.

20  **Q.**  Okay.  Now we see the assailant walk --

21  **A.**  Walked off.

22  **Q.**  -- out of the screen; right?

23  **A.**  Walked out of the screen.

24  **Q.**  Okay.  That's the last time we see the assailant, isn't

25  it?

1   **A**.   Yes, sir.

2     (PAUSED VIDEO.)

3   **BY MR. MIMS:**

4   **Q**.   So, while we're waiting on the last video with the part

5   with the white SUV, in your affidavit, you stated, "It appears

6   that the assailant was possibly using a cell phone."

7   **A**.   Possibly, yes, sir.

8   **Q**.   What did you base that on?

9   **A**.   The movement of the individual, based on experience,

10   based on how normal people, including myself, hold the cell

11   phone or look at a cell phone.

12   **Q**.   And were there specific things you saw on this video that

13   you -- that you could point to and say, "It looks like here.

14   It looks like there"?  What did you see?

15   **A**.   Yes, sir.  I mean, at different points, it looked like

16   his elbow was up.  His hand was to the left side of his head.

17   **Q**.   Okay.

18   **A**.   The other portion is, as he's walking around the

19   building, he puts his hand up to his head really quick at the

20   back of the building.  The other part is where he squatted down

21   after the robbery and he has his hand out, and you can visually

22   see his hand out in front of him.

23     (PLAYING VIDEO.)

24   **BY MR. MIMS:**

25   **Q**.   Okay.  Now, we've got the train coming across the tracks

1    right now; correct?

2    **A**.    Correct.

3    **Q**.    And the white SUV is actually on the other side of the

4    tracks, isn't it?

5    **A**.    Yes.

6    **Q**.    Inspector Matney, what do we see here?

7    **A**.    The white SUV coming back in the picture.

8    **Q**.    Which direction is he headed?

9    **A**.    The same direction as the assailant was walking.

10   **Q**.    Now, we don't see the assailant get in the SUV?

11   **A**.    Correct.

12   **Q**.    And if we kept watching this, in another minute or so, we

13   would see the white SUV coming back from left to right?

14   **A**.    Yes, sir.

15          **MR. MIMS**:    Ms. Bailey, let's go back to about the 6:50

16   mark, and I want to zoom in.  That's good.  Let's zoom before

17   we get to playing.  Or let's back up a little bit more if we

18   need to and let's watch this kind of zoomed in as best we can

19   on that upper left corner.

20          Your Honor, I thought we'd just watch a couple of key

21   parts kind of zoomed in where we can kind of compare them with

22   the zooming.  That's good.  Let's -- keep going.

23          Let's go ahead and skip ahead to about the 9:25, 9:30

24   mark.  Back it up just a little bit before he walks around the

25   corner.  There we go.  Let's go from right there.

1    All right. Ms. Bailey, if you will, let's go ahead
2    and fast-forward to about the 13:55 mark. Okay. There we go.
3    That's good.

4    All right. Thank you, Ms. Bailey.

5    Your Honor, anything else we need to look at on the
6    video right now while we're here? Or, otherwise, I was going
7    to proceed.

8    **THE COURT:** Would you take me back to 13:33? Okay.
9    Thank you.

10   (STOPPED VIDEO.)

11   **BY MR. MIMS:**

12   **Q.**   Inspector Matney, did you present the affidavit to the
13   magistrate judge, Judge Percy?

14   **A.**   Yes, sir.

15   **Q.**   Okay. He signed the warrant; correct?

16   **A.**   Yes, sir.

17   **Q.**   After he signed the warrant, what did you do?

18   **A.**   At that point, I submitted to Google.

19   **Q.**   How does that process work?

20   **A.**   It -- it's electronic. You have to go through their
21   website -- or it's not really a website. It's, like, a
22   portal -- and submit information that you are law enforcement.
23   You have to use a .gov e-mail address, and you submit the
24   documentation. You scan it, send it to them, and then they
25   start working on it.

1   **Q**.   What information did you receive first -- from Google is

2   what I'm talking about -- after submitting it?

3   **A**.   First was to identify what devices, if any, were in that

4   area at the time of the robbery.

5   **Q**.   And do you recall how many devices hit?

6   **A**.   Three different devices hit, yes, sir.

7   **Q**.   And some of them had multiple hits; correct?

8   **A**.   Yes, sir.

9   **Q**.   Okay.  So that's step one of the process; right?

10   **A**.   Correct.

11   **Q**.   What did you do after that?

12   **A**.   After that --

13   **Q**.   I'm sorry.  Let me back up one second.  When Google first

14   sends you the devices that hit, they don't provide any

15   identifiers, do they?

16   **A**.   No, sir.

17   **Q**.   It's completely anonymous; right?

18   **A**.   Right.

19   **Q**.   Okay.  What do you do then after step one?  What did you

20   do here?

21   **A**.   It's to identify -- to see if we can identify the

22   device -- the -- excuse me -- the connection between the

23   devices and the --

24   **Q**.   Okay.

25   **A**.   -- people that own the phones.

1  **Q.**   So what did you do next as far as with Google after the

2  first step?

3  **A.**   After the first step, we reviewed the devices.  Then we

4  submitted step two.

5  **Q.**   How do you do that?  Do you again go through the Google

6  portal?

7  **A.**   Yes, sir.

8  **Q.**   Okay.  Did you get any information back in step two?

9  **A.**   Yes, sir, we did.

10  **Q.**   Okay.  And then what did you do after that?

11  **A.**   Then we proceeded with step three.

12  **Q.**   And in step three, what are you seeking?

13  **A.**   Step three indicated what the -- who the devices belonged

14  to.

15  **Q.**   Step three is where you get the actual information on

16  whose devices?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  And did you submit the stuff -- or the request for

19  step three?

20  **A.**   Yes, sir.

21  **Q.**   You do that through the portal?

22  **A.**   Yes, sir.

23  **Q.**   Did that -- did that information then come back after you

24  had gotten hurt?

25  **A.**   It came back -- I left for training, I believe, on the

1  9th of June --

2  **Q.**  Okay.

3  **A.**  -- 2019.  It came back on the 10th while I was in

4  training.

5  **Q.**  Okay.

6  **A.**  And then on the 11th is when I was shot.

7  **Q.**  Okay.  So did Stephen Mathews then take that information

8  and continue with the case?

9  **A.**  Yes, sir.

10  **Q.**  All right.  Let me ask you this question.  Was --

11  everything that's set forth in that affidavit that you signed,

12  was it true and correct to the best of your knowledge?

13  **A.**  Yes, sir.

14  **Q.**  And did you follow the legal process as far as

15  interacting with Google as you understood it to be?

16  **A.**  Yes, sir.

17          **MR. MIMS:**  Inspector Matney, I have no further

18  questions.

19          **THE COURT:**  Mr. Chiniche, cross-examination.

20          **MR. CHINICHE:**  Yes, Your Honor.

21                    **CROSS-EXAMINATION**

22  BY MR. CHINICHE:

23  **Q.**  Good morning, Mr. Matney.

24  **A.**  Morning, sir.

25  **Q.**  Is it Inspector Matney?

1  **A.**   Yes, sir.

2  **Q.**   You mentioned to Mr. Mims that you had extensive

3  experience getting search warrants; is that right?

4  **A.**   Yes, sir.

5  **Q.**   And you've been in federal law enforcement for 19 years?

6  **A.**   Yes, sir.  Almost 19.

7  **Q.**   And so you have familiarity with this process?

8  **A.**   Yes, sir.

9  **Q.**   You have applied for search warrants and filled out

10 affidavits to obtain search warrants?

11 **A.**   Yes, sir.

12 **Q.**   What kinds of -- well, have you gotten search warrants on

13 houses?

14 **A.**   Yes, sir.

15 **Q.**   Have you gotten search warrants on cars?

16 **A.**   Yes, sir.

17 **Q.**   Have you gotten search warrants on cell phones?

18 **A.**   Yes, sir.

19 **Q.**   Have you gotten search warrants on cell towers?

20 **A.**   Anything that encompasses a cell phone, yes, sir.

21 **Q.**   Okay.  Have you searched -- have you gotten search

22 warrants on cell phones to search photographs?

23 **A.**   Yes, sir.

24 **Q.**   And you told Mr. Mims that the importance of going to a

25 magistrate judge is to establish probable cause.  That's the

1   one thing you've got to have; is that right?

2   **A.**   Yes, sir.

3   **Q.**   And, in fact, when you -- when you fill out an affidavit

4   or an application for a search warrant, you've got to indicate

5   to the judge -- and, in this case, a magistrate judge; right --

6   **A.**   Yes, sir.

7   **Q.**   -- that you've got -- you're telling him or her that

8   you've got probable cause?

9   **A.**   Right.

10  **Q.**   And you're establishing to that judge what the probable

11  cause is factually; right?

12  **A.**   Yes, sir.

13  **Q.**   And so if you've got to -- a search warrant has two

14  things.  Mr. Mims brought up one, which is you've got to have

15  probable cause?

16  **A.**   Yes, sir.

17  **Q.**   But the second thing is you've got to have particularity

18  with where that search warrant -- the target of that search

19  warrant or the asset that you're seeking to obtain; right?

20  **A.**   Particularity meaning?

21  **Q.**   With respect to that asset.  I'm just calling it an

22  asset.  So, if it's a house, you can't just say, "I want to go

23  search a house in Lake Cormorant."  You've got to give an

24  address; right?

25  **A.**   Correct.  An address and a description of the house, yes,

1   sir.

2   **Q.**   And in your affidavit, you have to put your source of

3   information, and sometimes that's -- am I right?

4   **A.**   Yes, sir.

5   **Q.**   Sometimes that source of information is an agent.  It can

6   be yourself.  It can be other agents.  Right?

7   **A.**   Yes, sir.

8   **Q.**   Sometimes that source of information has to be just an

9   eyewitness to something; right?

10  **A.**   (Nods head up and down.)

11  **Q.**   And sometimes that source of information is a

12  confidential informant; right?

13  **A.**   Yes, sir.

14  **Q.**   And if it's a confidential informant, you've got to

15  ensure to the judge that this informant is reliable and he or

16  she's been proven to be reliable in the past; isn't that right?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  And so, when you get a search warrant on a home,

19  let's say in Lake Cormorant, you've got to describe the

20  address, don't you?

21  **A.**   Yes, sir.

22  **Q.**   You have to describe the color of the home?

23  **A.**   Yes, sir.

24  **Q.**   You have to describe, if you know, how many bedrooms are

25  in there; right?

1    **A.**    (Nods head up and down.)

2    **Q.**    And if you and other agents get a search warrant on a

3    home at, say, 123 Main Street and you arrive at that home and

4    you notice once you arrive that there is a building -- an

5    outbuilding, a shed in the back, you can't search that shed,

6    can you?  Not until you get another search warrant?

7    **A.**    Correct.

8    **Q.**    Okay.  And that's because that back shed wasn't known to

9    you at the time you applied for the search warrant; right?

10   **A.**    Yes, sir.

11   **Q.**    And so, legally, you've got to go get a second search

12   warrant or a subsequent search warrant to be able to search

13   that outbuilding?

14   **A.**    Yes, sir.

15   **Q.**    And then, at that point, you've got to have probable

16   cause, and you've got to state with particularity the building

17   you want to search or seize; isn't that right?

18   **A.**    Yes, sir, but there's some exceptions to that.  I mean,

19   if we say on the property -- any buildings on the property

20   within -- located within the range of that house, you know,

21   that may be included in the search warrant, but it's not -- not

22   necessarily the case all of the time.

23   **Q.**    Yes.  Yes.  I agree.

24   **A.**    Yes, sir.

25   **Q.**    And so, when you are seeking a search warrant on a phone,

1  you've got to be particular about that phone.  You've got to --

2  if you're going to the magistrate and you want to search

3  Mr. Smith's iPhone 14, you've got to put that in the search

4  warrant application, don't you?

5  **A**.  Yes, sir.

6  **Q**.  And you've got to indicate to the magistrate judge that

7  there's a reason why you want to get into that iPhone 14.  In

8  other words, you've seen it as part of the crime or you have a

9  confidential informant that is indicating to you Mr. Smith,

10  every time he orders drugs from California, he uses his iPhone

11  14, right?

12  **A**.  Yes, sir.  And we're -- so I'm clear, we're speaking

13  about having possession of the phone and wanting to get inside

14  of it; correct?

15  **Q**.  Well, even if you don't have possession of that phone.

16  If you want to -- if you want to seize a phone or if you know

17  that there was a phone that was used by a particular suspect,

18  you've got to be specific; right?

19  **A**.  Yes, sir.

20  **Q**.  Okay.  And you name that phone.  You give as many

21  particular aspects of the asset you're going after to search;

22  right?

23  **A**.  Yes, sir.

24  **Q**.  Okay.  And so this burglary at the Lake Cormorant post

25  office occurred February 5th, 2018?

1    **A.**    Yes, sir, I believe.

2    **Q.**    On or about.  And, at that time, you and other agents

3    really had no suspects other than --

4    **A.**    Yes, sir.

5    **Q.**    Is that right?  You had what Mr. Cobbs, the victim, was

6    telling you --

7    **A.**    Yes, sir.

8    **Q.**    -- right?  And then later you all learn that there may

9    have been an eyewitness; is that right?

10   **A.**    Yes, sir.

11   **Q.**    Is that how the timeline goes?  You talked to Mr. Cobbs.

12   The next break in the case was you learned that there was an

13   eyewitness or --

14   **A.**    I think that was after we discovered the video.

15   **Q.**    The video?

16   **A.**    Yes, sir.

17   **Q.**    Can you give me a timeline on when you discovered the

18   video?

19   **A.**    I think it was within a day or two after the robbery.

20   **Q.**    Okay.

21   **A.**    It may have been sooner.  I'm sorry.

22   **Q.**    Okay.  So after you had the video -- and you obtained the

23   video from a nearby business --

24   **A.**    Yes, sir.

25   **Q.**    -- is that right?

1   **A.**   The farm -- it's a farm office.

2   **Q.**   Farm office?

3   **A.**   Yes, sir.

4   **Q.**   And then when did you obtain or learn about a potential

5   eyewitness?

6   **A.**   Oh, we learned about that from -- well, I believe it was

7   after the video -- we viewed the video.

8   **Q.**   Okay.  And so was the -- was learning about the

9   eyewitness before or after the geofence warrant?

10   **A.**   Before.

11   **Q.**   Okay.  All right.  And then you went and got a geofence

12   warrant; is that right?

13   **A.**   Yes, sir.

14   **Q.**   We're going to talk about that in a minute.

15   **A.**   That was on down the road, though.  That was a little

16   ways past the initial investigation.

17   **Q.**   That was in November --

18   **A.**   Correct.

19   **Q.**   -- 2018 --

20   **A.**   Right.

21   **Q.**   -- right?  And so, after you got the geofence warrant and

22   you told Mr. Mims it came back, it identified two devices or

23   three devices?

24   **A.**   Three devices.

25   **Q.**   You got a response from Google that identified three

1  devices?

2  **A**.    Right.

3  **Q**.    And of those three, I believe the file says you and other

4  agents narrowed it down to two; is that right?

5  **A**.    Yes, sir.

6  **Q**.    And then, once you had identifiers, once those two

7  devices were identified with account users, you later went and

8  got other Google warrants; right?

9  **A**.    Yes, sir.  I -- Stephen Mathews did.  He did the second

10  search warrant.

11  **Q**.    Right.  And so Stephen Mathews got subsequent Google

12  search warrants that eventually, in the government's position,

13  identified Defendant Smith and Defendant McThunel; is that

14  right?

15  **A**.    Yes, sir.

16  **Q**.    Is that the timeline that I've got?  Okay.  All right.

17  But we're here for the purposes of today of the Google -- of

18  the geofence warrant.  You understand?

19  **A**.    Yes, sir.

20  **Q**.    Okay.  All right.

21        **MR. CHINICHE:**  Your Honor, if I may use the ELMO.

22  **BY MR. CHINICHE:**

23  **Q**.    Well, Mr. Matney, let me ask you this.  You filled out an

24  affidavit -- Application for a Search Warrant in this case

25  November 8th, 2018.  Do you agree with that?

1    **A.**    Yes, sir.

2          **MR. CHINICHE:**  Your Honor, may I approach the witness?

3          **THE COURT:**  You may.

4    **BY MR. CHINICHE:**

5    **Q.**    Mr. Matney, will you take a look at this document.  It is

6    part of the record at Document 74-2.

7          **THE WITNESS:**  Your Honor, may I request to get my

8    glasses?  I left them over there.  I'm sorry.

9          **THE COURT:**  Yes, sir.

10         **THE WITNESS:**  Thank you.  Okay.  I'm sorry.

11   **BY MR. CHINICHE:**

12   **Q.**    Mr. Matney, do you see that document, and do you

13   recognize that document?

14   **A.**    Yes, sir.

15   **Q.**    And what is it, please, for the Court?

16   **A.**    It's the Affidavit in Support of the Search Warrant

17   Application.

18         **MR. CHINICHE:**  Your Honor, at this time, may I publish

19   this to the witness and to the Court?

20         **THE COURT:**  Yes.  To be clear, this is the affidavit

21   for the geofence warrant?

22         **MR. CHINICHE:**  Yes, Your Honor.

23         **THE COURT:**  Okay.  Yes.  Thank you.

24   **BY MR. CHINICHE:**

25   **Q.**    Mr. Matney, this is your Affidavit in Support of the

1  Search Warrant; is that right?

2  **A.**  Yes, sir.

3  **Q.**  Okay.  And it is -- it contains an Exhibit B, I believe,

4  but this is an eight-page document with your signature down at

5  the bottom November 8th, 2018; is that right?

6  **A.**  Yes, sir.

7  **Q.**  And you signed that in front of Judge Percy --

8  **A.**  Yes, sir.

9  **Q.**  -- is that right?  Okay.  And then you attached what's

10  called -- or Attachment A indicating the subject accounts and

11  the execution of the warrant; is that right?

12  **A.**  Yes, sir.

13  **Q.**  And you give the geographical box of your geofence

14  location?

15  **A.**  Yes, sir.  Longitude and latitude.

16  **Q.**  Okay.  And you used this affidavit to get the geofence

17  warrant in question; is that right?

18  **A.**  Yes, sir.

19  **Q.**  All right.  And so, in this warrant, you indicate what

20  your experience is; right?

21  **A.**  Yes, sir.

22  **Q.**  The jurisdiction that you -- and the authority you have

23  to issue that warrant; is that right?

24  **A.**  Yes, sir.

25  **Q.**  And this was your first geofence warrant?

1    **A.**    Correct.

2    **Q.**    And you and Stephen Mathews worked on this, the language

3    that's in here; is that right?

4    **A.**    Yes, sir.

5    **Q.**    Okay.  And so, in the background section, you indicate to

6    Judge -- to Judge Percy that you seek information regarding a

7    cellular telephone, mobile telephone, and you explain that's a

8    handheld device; is that right?

9    **A.**    Yes, sir.

10   **Q.**    Then you include in Paragraph 7 that Google is a company

11   with which -- that provides electronic communications to its

12   subscribers; is that right?

13   **A.**    Correct.

14   **Q.**    Including e-mail services.  You indicate in here that

15   "Google allows subscribers to obtain e-mail accounts at the

16   domain name gmail.com or google.com.  Subscribers obtain an

17   account by registering that with Google."  Is that right?

18   **A.**    Yes, sir.

19   **Q.**    "A subscriber using the provider's service can access his

20   or her e-mail account from any computer connected to the

21   Internet"?

22   **A.**    Yes, sir.

23   **Q.**    You indicate in Paragraph 8 that Google has developed a

24   system for collecting location data, not only for Android users

25   but non-Android devices, "if the device is registered to a

1  Google account and the user has location services enabled."  Is

2  that right?

3  **A.**   Yes, sir.

4  **Q.**   So I take it that this is language that you all are

5  getting from -- probably from other agents in the field.  I

6  mean, you didn't come up with this language.  This is something

7  you're borrowing from the government at large; is that right?

8  **A.**   Yes, sir.  We're conferring with other people.

9  **Q.**   Right.  And this is a fairly new technology that you all

10  are employing in November of 2018; is that right?

11  **A.**   Correct.

12  **Q.**   Is it fair to say, Inspector, that at the time you went

13  to get this search warrant that you weren't real familiar with

14  the technology or the science behind how this information is

15  obtained?

16  **A.**   Yes, sir.  That's correct.

17  **Q.**   Okay.  It's kind of learning as you go; is that right?

18  **A.**   Yes, sir.

19  **Q.**   You indicate that "Location data can assist investigators

20  in understanding a fuller geographic picture and timeline and

21  may tend to identify potential witnesses as possibly

22  inculpating or exculpating account owners."  Right?  That's all

23  in there; is that right?

24  **A.**   Correct.

25  **Q.**   And so you're asking -- you've drawn in the exhibit a

1    geographic location.  You're asking -- you're sending some GPS

2    coordinates, and you're asking for devices that are within that

3    geographical area; is that right?

4    **A.**    Yes, sir.

5    **Q.**    Okay.  That's -- you do have an understanding of that;

6    right?

7    **A.**    Yes, sir.

8    **Q.**    You understand that that's what you're hoping to obtain?

9    **A.**    Right.  That's the area that we put in there when we

10   requested from Google the information.

11   **Q.**    Right.  So here comes the probable cause statement.

12   We've got to establish probable cause; right?  And so you put

13   in the facts and circumstances that you want Judge Percy to

14   rely on before he issues this geofence warrant; is that right?

15   **A.**    Yes, sir.

16   **Q.**    And in the Probable Cause Statement, you talk about the

17   date of the crime, February 5th.  It happened around 5:25.

18   You're including information from the victim, right, victim

19   Cobbs, which you've seen on video; is that right?

20   **A.**    Yes, sir.

21   **Q.**    You identify -- you identify a maroon Hyundai Elantra and

22   you identify a large white SUV, a GMC Yukon; is that right?

23   **A.**    Yes, sir.

24   **Q.**    And then here in Paragraph 16, "Postal inspectors

25   conducted a detailed review of the video surveillance, and it

1 appears the robbery suspect is possibly using a cellular device
2 both before and after the robbery occurs."

3 **A.** Yes, sir.

4 **Q.** Now, that is -- Paragraph 16, that is typed by you or by
5 you and Stephen Mathews; is that right?

6 **A.** Correct.

7 **Q.** That's not form language; right?

8 **A.** Correct.

9 **Q.** Okay. Couple of questions. Did you show Judge Percy the
10 video that you were relying on when you went to him to get this
11 application signed?

12 **A.** No, sir.

13 **Q.** Okay. So Judge Percy relied just on what I've got here
14 in front of me; is that right?

15 **A.** Yes, sir.

16 **Q.** Okay. The -- and I want to make sure that the victim,
17 Mr. Cobbs, he doesn't indicate to you at all that there's a
18 cell phone involved by the assailant, does he?

19 **A.** No, sir.

20 **Q.** Okay. And it's nowhere in -- it's nowhere in a statement
21 that he gave or a report that you all have for Mr. Cobbs that
22 the assailant used a cell phone?

23 **A.** Correct.

24 **Q.** Okay.

25 **A.** But it was indicative during the video, too, that he was

1    nowhere near when we saw the assailant using -- when we

2    possibly thought the assailant was using a cell phone.

3    **Q.**   To be clear, the only suggestion that the assailant used

4    a cell phone is what you saw or you perceived to observe in the

5    video?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  So there's no other source.  It's just what we saw

8    and what the Court has seen this morning?

9    **A.**   Correct.

10   **Q.**   And then in -- here in Paragraph 21, you indicate -- and

11   this is from the Evidence, Fruits, and Instrumentalities.  I

12   realize this is a form, but you indicate, "The information

13   sought from Google regarding the subject accounts, specified in

14   Section II of Attachment A to the proposed warrant."

15        All right.  So let me stop there.  What you're saying is

16   the information sought from Google is in Section II of

17   Attachment A.  So, if I flip to Attachment A, I've got

18   Attachment A, Section I.  It's this -- this is the subject of

19   your warrant or application; is that right?

20   **A.**   Yes, sir.

21   **Q.**   Okay.  "To the proposed warrant, will identify which

22   cellular devices were near the location where the robbery took

23   place and may assist law enforcement in determining which

24   persons were present or involved with the robbery under

25   investigation.  The requested information includes:  Location

1  information.  All location data, whether derived from GPS data,

2  cell site/cell tower triangulation, and precision measurement

3  information, such as timing advance or per call measurement

4  data and Wi-Fi location, including the GPS coordinates."

5      So, in here, you're asking Google to provide location

6  information, all location data; is that right?

7  **A.**   Yes, sir.

8  **Q.**   All location.  You're not limiting it in any way; is that

9  right?

10 **A.**   I think it's related back to the Attachment A in the

11 previous Paragraph 21 that says within the parameters that we

12 set forth.

13 **Q.**   Sure.

14 **A.**   Yes, sir.

15 **Q.**   I understand.  It's within that parameters?

16 **A.**   Yes, sir.

17 **Q.**   And we can proceed under that understanding.  But you're

18 asking for all location data, all location data that Google has

19 in its system that it has obtained, whether derived from GPS,

20 cell tower triangulation, Wi-Fi location, or what's called

21 precision measurement information; is that right?

22 **A.**   Yes, sir.  Within the parameters that we set forth, yes,

23 sir.

24 **Q.**   Within the parameters, right.  And then you indicate,

25 "Each device corresponding to the location data to be provided

1  by Google will be identified only as a numerical identifier,

2  without any further content or information identifying the user

3  of a particular device.  Law enforcement will analyze this

4  location data to identify users who may have witnessed or

5  participated in the subject offenses and will seek any

6  additional information regarding those devices through further

7  legal process."  Is that right?

8  **A.**    Yes, sir.  That's correct.

9  **Q.**    So you're telling Judge Percy in this application,

10 "Judge, I need all location data."  Now, it's -- it's with

11 respect to the four corners of this geofence that I, Inspector

12 Matney, has drawn?

13 **A.**    Yes, sir.

14 **Q.**    And it's for a time frame, 5:00 p.m. Central to 6:00 p.m.

15 Central, on February 5th; right?

16 **A.**    Yes, sir.

17 **Q.**    And you're indicating to him that, once I get the

18 location information of all of this data that is going to

19 include every device that fits this criteria, once I get that

20 information, I'm not going to know who owns the account.  I'm

21 not going to be able to identify suspects; right?

22 **A.**    Correct.

23 **Q.**    But we're going to take that data, and we will come back

24 to the Court, and we will get, through further legal process --

25          **MR. MIMS:**  Your Honor, I object.  He's added into the

1  question "come back to the Court."  That's not what it says.

2  **THE COURT:**  It is not what it says, but you are free

3  to cross-examine.

4  **BY MR. CHINICHE:**

5  **Q.**  Okay.  You indicate "Law enforcement will analyze this

6  location to identify users who have witnessed or participated

7  in the subject and will seek any additional information

8  regarding those devices through further legal process."

9  All right.  What did you mean by that sentence?

10 **A.**  Basically whatever process we have to go through,

11 whatever Google requests for us to do in order to obtain

12 additional information.

13 **Q.**  But did you under -- didn't you understand that you were

14 going to get more data than the number of suspects?

15 **A.**  That was our hope, yes, sir.

16 **Q.**  And you understood that the -- or maybe you didn't.  I

17 don't know.  You tell me -- that the initial data that you were

18 going to get wasn't going to be anonymous?

19 **A.**  I'm not aware of their process and how they reveal the

20 information that we're requesting --

21 **Q.**  Okay.

22 **A.**  -- until -- until I get it.

23 **Q.**  Okay.  But you understood that -- in this application to

24 Judge Percy that you were -- you wanted a certain amount of

25 data; that it was going to be anonymous; and that through

1   further legal process, you would narrow it down. Right?

2   **A.**   I didn't indicate how much information we were

3   requesting. Just requesting information that fit within those

4   parameters.

5   **Q.**   Okay. And so we get to the conclusion. And this

6   application or affidavit was approved on November the 8th,

7   2018; is that right?

8   **A.**   Yes, sir.

9   **Q.**   There's another document that we have used in the motion

10   to suppress.

11        **MR. CHINICHE:**  Mr. Mims.

12      (CONFERRING OFF THE RECORD.)

13   **BY MR. CHINICHE:**

14   **Q.**   Inspector Matney --

15   **A.**   Yes, sir.

16   **Q.**   -- we've got Paragraph 21 here, and then this is -- this

17   is Document 74-4. This is part of an exhibit, Mr. McInvaille's

18   report. And this is Information, Number II. And I realize you

19   didn't draw this, but have you seen this? Do you understand --

20   **A.**   Yes, sir, I have.

21   **Q.**   Do you understand what's indicated here? Step 1, Step 2,

22   and Step 3; is that right?

23   **A.**   Yes, sir.

24   **Q.**   Is that right?

25   **A.**   Yes, sir.

| 1  | **MR. MIMS**:  Excuse me one second.  If I might just |
|----|--------|
| 2  | clarify just to make sure that everybody's on the same page. |
| 3  | What Mr. Chiniche is putting up there actually comes from the |
| 4  | search warrant.  It's part of their expert report, but that II, |
| 5  | Information to be Provided by the Provider, is part of the |
| 6  | search warrant.  Yes, ma'am.  I just wanted to make sure we |
| 7  | were all looking at the same thing. |
| 8  | **MR. CHINICHE**:  Thank you, Mr. Mims. |
| 9  | **BY MR. CHINICHE:** |
| 10 | **Q.**  And so, Inspector Matney, 74-4 here and this portion |
| 11 | underneath Figure 1, that is -- that is a copy of the search |
| 12 | warrant that you actually issued to Google for the geofence; is |
| 13 | that right? |
| 14 | **A.**  Correct. |
| 15 | **Q.**  So this is language that you typed up because you put in |
| 16 | the parameters between 5:00 p.m. Central Time and 6:00 p.m. |
| 17 | Central Time; right? |
| 18 | **A.**  I did not type it up, but, yes, sir, that is correct |
| 19 | information. |
| 20 | **Q.**  Okay.  You sent it to Google through the portal; right? |
| 21 | **A.**  Yes, sir. |
| 22 | **Q.**  And is there a reason why there's -- there's more |
| 23 | language in the actual search warrant than you applied for when |
| 24 | you went to Magistrate Percy? |
| 25 | **A.**  I think, as an investigation goes, you're trying to |

1  narrow down the information that you're looking for, and that's

2  why it got more detailed as we went.

3  **Q.** Okay. But you agree that these are two different -- two

4  different written documents; is that right?

5  **A.** Yes, sir.

6  **Q.** Okay. All right. So, in 74-4, we see the location

7  information you're asking Google to provide, and then also in

8  Step 1, "Any user and each device corresponding to the location

9  data to be provided."

10  All right. We've got Step 2 and Step 3. And I realize

11  this is -- this is delineated for our purposes. It's what

12  we've been talking about. But, Inspector Matney, I want to

13  know if you agree that you all skipped Step 2 and went to --

14  straight to Step 3; is that right?

15  **A.** No, sir. We did Step 2.

16  **Q.** You did Step 2? So Step 1 is, in essence, getting the

17  raw data. Would you agree with that?

18  **A.** Yes, sir.

19  **Q.** Okay. Step 2 says, "For those accounts identified as

20  relevant to the ongoing investigation." So that means for

21  accounts identified as relevant. That means that you identify

22  as relevant or law enforcement identifies as relevant; right?

23  **A.** Through the analysis of the provided records that we

24  received, yes, sir.

25  **Q.** "And upon demand, the provider shall provide additional

1  location history outside of the predefined area -- shall

2  provide additional location history outside of the predefined

3  area for those relevant accounts to determine the path of

4  travel.  This additional location history shall not exceed

5  60 minutes plus or minus the first and last timestamp

6  associated with the account in the initial data set.  The

7  purpose of path of travel contextual location points is to

8  eliminate outlier points where, from the surrounding data, it

9  becomes clear the reported points are not indicative of the

10 device actually being within the scope of the warrant."

11      That's Step 2; right?

12 **A.**  Yes, sir, that's Step 2.

13 **Q.**  All right.  So "for those accounts identified as relevant

14 to the ongoing investigation through an analysis of provided

15 records."  That means you or your agents determined that are

16 relevant through the provided records in Step 1 that are

17 anonymous?

18 **A.**  They're identified as device numbers.  They're not -- so,

19 yeah, we don't have the information to back up the cell phone,

20 but they are identified as a number.

21 **Q.**  They're identified as a number?

22 **A.**  Yes, sir.

23 **Q.**  The date and the time is provided --

24 **A.**  Yes, sir.

25 **Q.**  -- by Google?  And they draw a radius.  We'll explain

1    later; right?

2    **A.**    Yes, sir.

3    **Q.**    And they indicate whether they're within the geofence or

4    without the -- or outside of the geofence, don't they?

5    **A.**    Yes, sir.

6    **Q.**    Okay.  So you're obtaining data that -- from Google

7    that's outside of the geofence; isn't that right?

8            **MR. MIMS:**  Your Honor, I object to the question.

9    That's not accurate as to what Google does.  That's something

10   more to get into with the expert later, but that's -- Google

11   does not provide them information that's outside the geofence.

12           **MR. CHINICHE:**  Your Honor, I would --

13           **THE COURT:**  It's overruled.  You may ask your

14   question.

15   **BY MR. CHINICHE:**

16   **Q.**    What is your understanding, Agent Matney?

17   **A.**    My understanding is that, when we request the

18   information, we request it within the parameters, and also, as

19   you see in that portion, it says to determine path of travel.

20   So, at that point, we -- it's a possibility that it could be

21   outside of those parameters at that time.

22   **Q.**    Exactly.  Thank you.  Thank you.  And so you, as agents,

23   once you get this raw data and the path of travel, assists you

24   in figuring out who was at that location; right?

25   **A.**    Indicated by what was within the parameters at the time,

1  yes, sir.

2  **Q**.   Right.  But there's a -- but you recognize the

3  possibility that some of the data is outside the geofence.

4  Step Number 3, "For those accounts identified as relevant to

5  the ongoing investigation through an analysis of provided

6  records, and upon demand, the provider shall provide the

7  subscriber's information for those relevant accounts to include

8  the subscriber's name" --

9  **A**.   Sir, can you move the sheet?  I'm sorry.

10  **Q**.   I'm sorry.

11  **A**.   Thank you.

12  **Q**.   Step 3 is the money step.  That's where you get, right,

13  the subscriber's name, e-mail address, the services subscribed

14  to -- so if it's an AT&T, C Spire; right? -- the last six

15  months of IP history and the SMS account number and the

16  registered IP address; right?  Step 3 is the money -- that's

17  where you get the identifiers, the account holder for that

18  particular device?

19  **A**.   Related to the device ID, yes, sir.

20  **Q**.   Right.  Okay.  So my question is if -- you indicate to

21  Judge Percy that "Law enforcement" -- that's you -- "will

22  analyze the location data to identify users who may have

23  witnessed or participated in the subject offense and will seek

24  additional information regarding those devices through further

25  legal process."

1       So what I'm telling you is, we all know that you -- you

2  obtained anonymous data in Step 1, and then you obtained the

3  account e-mail address, the subscriber's name in Step 3; right?

4  **A**.  Yes, sir.

5  **Q**.  You obtained Step 3 information, and you did so without

6  further legal process?

7       **MR. MIMS**:  Your Honor, again, I'm going to object.

8  That goes to a legal conclusion of what this says.  It's to

9  further the process.  That's part of our issues.  It's really

10  not the agent's factual issue.  It's a legal argument between

11  the government and the defense.

12       **MR. CHINICHE**:  Okay.  I'm not going to concede that

13  point but --

14  **BY MR. CHINICHE**:

15  **Q**.  Inspector Matney, you received a letter from Google,

16  right, dated May 30th, 2019?

17  **A**.  Yes, sir.

18  **Q**.  And this -- this is Google's response; right?  And this

19  is -- this is -- is this the Step 2 --

20  **A**.  Yes, sir.

21  **Q**.  -- that you obtained that was on your computer right

22  before you got injured?

23  **A**.  Correct.

24  **Q**.  Okay.  All right.  This letter from Google indicates that

25  they are responding to the search warrant dated November 8th,

1  2018; isn't that correct?

2  **A.**  Yes, sir.

3  **Q.**  So you only got one geofence warrant; isn't that correct?

4  **A.**  Yes, sir.

5  **Q.**  And you did so on November 8th, 2018 --

6  **A.**  Correct.

7  **Q.**  -- is that right?  So you got a response from Google

8  without further legal process; right?  Because you only got one

9  geofence warrant November 8th, 2018; isn't that correct, Agent?

10  **A.**  Yes, sir.  The warrant was on November 8th.

11  **THE COURT:**  I'm sorry.  I didn't hear your response.

12  **THE WITNESS:**  Yes, ma'am.  The warrant was on

13  November 8th.

14  **THE COURT:**  Okay.  I might ask you to speak a little

15  closer to the microphone too.

16  **THE WITNESS:**  Yes, ma'am.

17  **BY MR. CHINICHE:**

18  **Q.**  Okay.  So, although this is a rural area, there are other

19  businesses in the -- at this intersection; right?

20  **A.**  Yes, sir.

21  **Q.**  We've got a farm business where you obtained a video;

22  right?

23  **A.**  Yes, sir.

24  **Q.**  We saw -- in addition to the white SUV and the red

25  Hyundai Sonata --

1   **A.**   Elantra.

2   **Q.**   We're not conceding that's what it is, but if you say

3   that's what it is.  So, in addition to those two cars, we see

4   other vehicles passing through; right?

5   **A.**   Correct.

6   **Q.**   On the video, I saw a gentleman walking around the

7   building.

8   **A.**   At the very beginning?

9   **Q.**   At the very beginning.

10  **A.**   Yes, sir.

11  **Q.**   He was a white gentleman; right?  The victim, Mr. Cobbs,

12  he had a cell phone based on his own admission to you, didn't

13  he?

14  **A.**   Yes, sir.

15  **Q.**   And he indicated that, right after the assault, he called

16  his wife, and then he called U.S. Postal Service?

17  **A.**   Yes, sir.

18  **Q.**   But none of those individuals that I just mentioned came

19  back as a hit on your geofence warrant, did it?

20  **A.**   No, sir.

21  **Q.**   And we've got businesses nearby.  None of those came

22  back, did they?

23  **A.**   Yes, sir.  But I'm not aware if anybody was in those

24  businesses at the time.

25  **Q.**   Okay.  So do you understand -- and if you don't, that's

1  fine -- that the geofence warrant is very -- I'm sorry -- the

2  geofence warrant for Google to return back data, we're talking

3  about a population of people; right?  We're talking about

4  people that, number one, have cell phones; right?

5  **A.**    (Nods head up and down.)

6  **Q.**    They've got to have a cell phone.  If they don't have a

7  cell phone, the geofence doesn't work; is that right?

8  **A.**    Correct.

9  **Q.**    Not only do they have to have a cell phone, but they have

10  to have a Google account that's accessed or utilized on that

11  cell phone; right?

12  **A.**    Correct.

13  **Q.**    Now, once they have a Google account, they have to have

14  the ability for location services; right?

15  **A.**    Selected on your phone, yes, sir, from what I understand.

16  **Q.**    It has to be accessible; right?

17  **A.**    Yes, sir.

18  **Q.**    But you didn't put any of that in your application to

19  Judge Percy, did you?

20  **A.**    No, sir.

21  **Q.**    And that's because y'all didn't know who it was.  You

22  didn't have account names.  You didn't have account numbers.

23  Right?

24  **A.**    That's incorrect.  It wasn't because I didn't know who it

25  was.  It was simply because that was the process that we

1   determined we needed to request information via the search

2   warrant.

3   **Q.**   I know. But if you're going to Judge Percy and you're

4   telling him that you need a geofence warrant, you're not being

5   particular. Because what you could say is -- what you have to

6   say, the defense argues, is you have got to be particular about

7   that warrant.

8       You've got to tell Judge Percy that we -- the suspect

9   we're identifying, he's got a cell phone, he's got Google on

10   that cell phone, he's got location services enabled on that

11   cell phone, and we believe it was part of the crime. Not just

12   that he used his cell phone.

13       Because you knew in the video -- you knew before you got

14   the video that Agent -- that the victim, Cobbs, he had a cell

15   phone. So your warrant is vague, was it not?

16   **A.**   It was particular in how we requested the information

17   based on the lat and long of the area that we were looking at.

18   **Q.**   Right. You knew where a crime had been committed?

19   **A.**   Yes, sir.

20   **Q.**   And you could draw a box around that?

21   **A.**   Correct.

22   **Q.**   But that's all you had. Unlike in the situation when

23   you're going to get a cell phone, you get -- you get the make,

24   the model, the serial number. I've seen serial numbers in

25   search warrants. I've seen the telephone number. You know,

1  we've got all kinds of information.

2      But in this warrant, your application to Judge Percy was,

3  I need all data that returns a hit within this four corners of

4  a geofence, and then, once I get that data, I'll come back --

5  well, that's a dispute -- but through further legal process, we

6  will narrow it down.

7      Because, in some cases, you can go to -- can you not --

8  you can go to the magistrate and say, "Jamarr Smith was

9  involved in this crime or Gilbert McThunel was involved in this

10 crime, we believe, and here's his account number.  We need all

11 of the data from his e-mail address.  And his e-mail address is

12 such and such at gmail.com."  Right?

13 **A**.   Only if we indicate probable cause with that information.

14 **Q**.   Exactly.  But you didn't have probable cause with respect

15 to the geofence other than a crime was committed within the

16 four area corners of this geofence; right?

17 **A**.   Right.  We didn't have a specific phone at a certain

18 time.  We were -- we were basing it on the video that we saw.

19 **Q**.   But there's no way you could tell by looking at the video

20 that the suspect had a Google account, location services turned

21 on, et cetera, that would give you an indication of why you

22 need this information from Google?

23 **A**.   It was probable cause, yes, sir.

24 **Q**.   Well, yeah.  I mean, you've got to have a crime that's

25 been committed.  Otherwise, you can't get a warrant.  I get

1   that.

2   **A.**   Yes, sir.

3   **Q.**   Yeah.  The geofence -- let's just be clear, too, for the

4   Court.  The geofence only returns devices.  It doesn't indicate

5   communication, does it?  It doesn't record phone calls, does

6   it?

7   **A.**   Correct.

8   **Q.**   You can't tell whether that phone was making phone calls

9   or texts or anything; right?

10  **A.**   Correct.

11  **Q.**   It's just a device location?

12  **A.**   Based on the geofence request, yes, sir.

13  **Q.**   Right.

14          **MR. CHINICHE:**  Your Honor, if I may have just a

15  moment.

16          **THE COURT:**  Yes, sir.

17     (CONFERRING OFF THE RECORD.)

18          **MR. CHINICHE:**  I have no further questions.  Thank

19  you.

20          **THE COURT:**  Any questions, Mr. Lewis?

21          **MR. LEWIS:**  I'm just going to ask a couple, Your

22  Honor, if I may.

23                    **CROSS-EXAMINATION**

24  **BY MR. LEWIS:**

25  **Q.**   Hi, Inspector Matney.  Goodloe Lewis.  Let me make sure I

1    understand.  You did use some sort of form for this affidavit

2    that you gave to the judge; correct?

3    **A.**    I'm sorry.  What do you mean, sir?

4    **Q.**    Like a go-by?

5    **A.**    Yes, sir.

6    **Q.**    Okay.  So somebody else had done one.  You took that,

7    pulled out what you needed, and put into your affidavit;

8    correct?

9    **A.**    Well, Stephen Mathews did.

10   **Q.**    Okay.  He prepared the affidavit?

11   **A.**    Yes, sir.  We reviewed it together prior to taking it to

12   the judge.

13   **Q.**    Had you been told that you needed to have in the

14   affidavit for a geofence warrant that a suspect was using a

15   phone at the time?

16   **A.**    I believe we reached out to people for assistance, other

17   inspectors, other law enforcement agencies, to determine the

18   best tool to use to find information.

19   **Q.**    And they told you it was important to have in that

20   affidavit that somebody was using a phone at the time of the

21   crime?

22   **A.**    Yes, sir.  That was part of the requirement for the

23   search warrant.

24   **Q.**    Just a few more questions just to make sure I'm clear.

25   As Mr. Chiniche asked you, what Google would send back to you

1  would not tell you if somebody was using the phone or texting,

2  in other words, making a phone call or texting at the time;

3  correct?

4  **A.**   Correct.

5  **Q.**   All it would tell you is whether they had location

6  services activated; correct?

7  **A.**   It would indicate a device, yes, sir.

8  **Q.**   Had location services?

9  **A.**   Had location services.

10 **Q.**   You had no idea whether any of these suspects had

11 location services activated at anytime; correct?

12 **A.**   No, sir.

13 **Q.**   Okay.  Do you remember the names of these other

14 inspectors who you watched the video with?

15 **A.**   The video was -- it was viewed in different locations and

16 discussed over the phone as well, but, I mean, initially, it

17 was Inspector Dwayne Martin and I that went and recovered --

18 excuse me -- the video.

19 **Q.**   Well, you said that you had some assistance in

20 interpreting the video.  I just want to know the names of who

21 assisted you in interpreting the video.

22 **A.**   No, I had no assistance in interpreting the video.  That

23 was my own interpretation.

24 **Q.**   Okay.

25        **MR. LEWIS:**  Thank you, Your Honor.

1         **THE COURT:** Mr. Travis?

2         **MR. TRAVIS:** No questions. Thank you, Your Honor.

3         **THE COURT:** Thank you.

4         Mr. Mims, redirect?

5         **MR. MIMS:** Yes, ma'am.

6            **REDIRECT EXAMINATION**

7  **BY MR. MIMS:**

8  **Q.** Inspector Matney, I just have a few follow-up questions.

9  Let's go back to the topic of particularity for a second. I'm

10  going to use -- I'm going to use my copy here because I've

11  drawn some lines on it, but this, again, is the Affidavit in

12  Support of Search Warrant that you submitted; correct?

13  **A.** Correct.

14  **Q.** Okay. And in that affidavit, in Introduction, does it

15  say you were seeking Application for a Search Warrant for

16  information maintained on servers controlled by Google?

17  **A.** Correct.

18  **Q.** Okay. And it says for location data associated with a

19  particular location at a particular time as set forth in

20  Section I, Attachment A; correct?

21  **A.** Correct.

22  **Q.** And then in Section I, Attachment A, that's where, again,

23  it says the warrant is directed to Google; right?

24  **A.** Correct.

25  **Q.** And it applies to content and other information within

1   the provider's possession, control, and custody; right?

2   **A.**   Yes, sir.

3   **Q.**   Within the geographical region.  And that's this box that

4   you've drawn around the post office; right?

5   **A.**   Yes, sir.

6   **Q.**   Okay.  So that's what you're searching.  You're searching

7   what -- does Google have information within this box?

8   **A.**   Correct.

9   **Q.**   Now, the search warrant -- this is a copy of the Search

10  and Seizure Warrant signed by Judge Percy; right?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  And as part of it was this Document 74-2 that was

13  part of the record here, which is your affidavit with the

14  Attachment A at the back; right?

15  **A.**   Yes, sir.

16  **Q.**   Okay.  There's also -- as we see in Attachment A, there

17  is paragraph Roman Numeral I.  There's also in it -- I think it

18  was just maybe inadvertently left off of the document attached

19  to the court file in this motion, but this Roman Numeral II,

20  was that not part of the same affidavit?

21  **A.**   Yes, sir.

22  **Q.**   Okay.  And that's what actually sets forth the three-step

23  process that you were asked about earlier; correct?

24  **A.**   Yes, sir.

25  **Q.**   So, all of this, this that includes Roman Numeral II,

1  that was all part of the affidavit --

2  **A.**  Yes, sir.

3  **Q.**  -- that was presented to Judge Percy; correct?

4  **A.**  Correct.

5  **Q.**  That he signed off on the warrant?

6  **A.**  Correct.

7  **Q.**  Okay.  Was this information submitted to Google as part

8  of the portal?  What do you send to Google?

9  **A.**  The search warrant.

10  **Q.**  Okay.  Do you do just the search warrant, or do you also

11  send them the part of Attachment A?

12  **A.**  Part of Attachment A as well.

13  **Q.**  Because they have to have Attachment A to see the box;

14  right?

15  **A.**  Yes sir.  The parameters of longitude and latitude.

16  **Q.**  And Attachment A also includes this Roman Numeral II;

17  correct?

18  **A.**  Yes, sir.

19  **Q.**  And in response to that, you got back over time three

20  responses; right?

21  **A.**  Yes, sir.

22  **Q.**  Now, the first response -- and I don't -- I can't find

23  the actual letter.  It's back at the office.  Apparently, I

24  didn't clip it to this.  But the first response you get from

25  Google has the initial hits; right?

1   **A.**   Yes, sir.

2   **Q.**   But they're anonymous; right?

3   **A.**   I'm sorry.  They're --

4   **Q.**   They're anonymous?

5   **A.**   Yes, sir.

6   **Q.**   No identifiers?

7   **A.**   Correct.

8   **Q.**   Okay.  And then, in Step 2, you get the letter that was

9   referred to earlier.  This is dated May 30th; is that right?

10   **A.**   Yes, sir.

11   **Q.**   And then in Step 3 is the letter dated June 10th.  And

12   that's where you get the actual information of whose devices

13   these belong to; right?

14   **A.**   Yes, sir.

15   **Q.**   And that is all based on one search warrant; right?

16   **A.**   Correct.

17   **Q.**   That you presented to Google?

18   **A.**   (Nods head up and down.)

19   **Q.**   Yes?

20   **A.**   Based on the information, yes, sir, that they supplied

21   me.

22   **Q.**   And that was signed off on by Judge Percy?

23   **A.**   Yes, sir.

24        **MR. MIMS:**  Your Honor, may I have one second to confer

25   with co-counsel -- or opposing counsel over here?

1      **THE COURT:**  Yes.

2      (CONFERRING OFF THE RECORD.)

3      **MR. MIMS:**  Your Honor, this page here that I have on

4   the screen that's marked Roman Numeral II, that's actually part

5   of the affidavit.  It's part of Attachment A.  I think it was

6   just inadvertently left off of the Exhibit 70 -- what number

7   was it?  70 -- Document Number 74-2, part of the motion.

8      And, Your Honor, because that's part of that same

9   affidavit and part of that same Attachment A, I would like to

10  include this as Government's Exhibit G-2.

11     **MR. CHINICHE:**  No objection.

12     **THE COURT:**  Thank you.  That's quite important.

13     So, in the affidavit in Paragraph 21, I think for the

14  first time I see reference to Section II of Attachment A.  And

15  it's your contention that the document that I, frankly, have

16  attached to the search warrant is, in fact, supposed to be

17  attached to the affidavit?

18     **MR. MIMS:**  Yes, Your Honor.

19     (CONFERRING OFF THE RECORD.)

20     **MR. MIMS:**  Your Honor, I'm going to put the exhibit

21  sticker on the back so that we can copy the front.

22     Is that what you were asking?

23     **MR. CHINICHE:**  Yes.

24     (EXHIBIT NO. G-2 ADMITTED INTO EVIDENCE.)

25     **MR. MIMS:**  Okay.  Your Honor, I have no further

1  questions of Inspector Matney.

2  **THE COURT:** So the affidavit has been admitted. The
3  search warrant has not; is that correct?

4  **MR. MIMS:** Your Honor, the search warrant is already
5  in the record as an attachment to their motion.

6  **THE COURT:** Their motion.

7  **MR. MIMS:** And that was Document 74-2.

8  **THE COURT:** For clarification, is the search warrant a
9  one-page document with no attachments to it?

10  **MR. MIMS:** Well, actually, Your Honor, I misspoke a
11  minute ago. It's the affidavit that is Document 74-2. The
12  search warrant -- I'm not certain if it's --

13  **MR. LEWIS:** Your Honor, I believe what -- yes, the
14  search warrant is a one-page document. The search warrant
15  references the application as an attachment, and so it did get
16  kind of jumbled up in the record. But I believe that's
17  correct, what I just said, and, therefore, that page that
18  didn't make it into the -- that actually should have been on
19  the back of the application which is attached to the search
20  warrant, if that helps.

21  **THE COURT:** Thank you. Okay.

22  **MR. MIMS:** And, Your Honor, we also, of course, have
23  the G-1, but since we're probably going to use it again, I'm
24  just going to let Ms. Bailey continue to maintain it for now.

25  **COURTROOM DEPUTY:** So G-2 is just this one page?

1          **MR. MIMS**:  Yeah, just one page is G-2.

2          And, Your Honor, we have no further questions of

3    Inspector Matney.

4          **THE COURT**:  Counselors, if you will give me just a

5    second, I want to review some of my notes.

6          Let me ask you about the availability of our witnesses

7    this afternoon.  Obviously going to take this afternoon.  Is

8    this witness available this afternoon?

9          **MR. MIMS**:  Yes, Your Honor.

10         **THE COURT**:  And your expert is available this

11   afternoon?

12         **MR. CHINICHE**:  Yes, Your Honor.

13         **MR. MIMS**:  And, Your Honor, I have one more witness

14   too, and he's available as well.

15         **THE COURT**:  Okay.  Good.

16         Counselors, I want to ask him some questions, but I

17   will give you both an opportunity to follow up.

18         Mr. Matney, I can't place my hands on it right now,

19   but somewhere in the documentation I see notes that refer to

20   perhaps you had some phone conversations with Google after you

21   received the list of device numbers; is that correct?

22         **THE WITNESS**:  Yes, ma'am.  That's correct.

23         **THE COURT**:  Can you explain those phone conversations

24   and the questions and what, if anything, that -- in those

25   conversations, what did that lead to?

1    **THE WITNESS:**  Yes, ma'am, I remember.  It was a -- it
2    was a phone conversation I had with them after I received the
3    initial information of the device IDs to determine what they
4    needed next and how I needed to proceed with the information
5    that I was requesting.

6    **THE COURT:**  None of that's in writing?

7    **THE WITNESS:**  No, ma'am.

8    **THE COURT:**  Okay.

9    **THE WITNESS:**  Other than the e-mails that I sent to
10   Stephen Mathews advising him that I received the information
11   and was proceeding.

12   **THE COURT:**  Is it my understanding that you received
13   information back on three devices?  You narrowed it to two, but
14   when you -- when Step 3 was performed by Google, did you
15   actually get information on all three devices?

16   **THE WITNESS:**  Yes, ma'am.  That was my understanding,
17   but at that point, that was when I was in training.  So that
18   was something that Stephen Mathews received.

19   **THE COURT:**  Do you know why they sent you three pieces
20   of information on three identified device numbers versus the
21   two that it had been narrowed to in Step 2?

22   **THE WITNESS:**  Yes, ma'am.  Because there were three
23   device IDs that were indicated within the parameters of the
24   initial step.

25   **THE COURT:**  And why did you narrow to two?

1　　　　　　**THE WITNESS**:　That's going to be Stephen Mathews.　I
2　know the answer to that, but it was him that received that
3　information.　I was told that one of them indicated it was not
4　an individual.　It belonged to a company.

5　　　　　　**THE COURT**:　From your perspective, can you tell me why
6　this case took from 2018 until 2023?

7　　　　　　**THE WITNESS**:　I think the longest part was the
8　investigation -- initial investigation.　We -- we did searches
9　of video within businesses within the area.　We conferred with
10　local law enforcement.　We -- we talked to witnesses.　We did
11　surveillance, up until the point where we finally -- it was
12　determined that this was a route that we could take to find
13　additional information.　It wasn't until nine months later
14　after the initial investigation that we determined that
15　information.

16　　　　　　Also, as that information was coming the second and
17　third phase, that's when I left for training, and that's when I
18　was shot.　So when I was pulled out, I think it took time for
19　everybody to gather the information from my case to proceed.

20　　　　　　**THE COURT**:　The affidavit indicates that you're
21　seeking -- under Paragraph 21A, that you're seeking "all
22　location data, whether derived from GPS, cell site/cell tower
23　triangulation, or precision measurement."　Do you know the
24　source of where the information of the three devices actually
25　came from?

1    **THE WITNESS:** No, ma'am, I don't know how Google came

2  up with that information.

3    **THE COURT:** Okay. In light of my questions, do you

4  have any questions of him, Mr. Mims?

5    **MR. MIMS:** Your Honor, I do not. I would state that

6  you asked him a question as to why did this take from 2018 to

7  2023. Certainly, as to the length of the investigation, Agent

8  Matney -- or Inspector Matney can answer that if he can. Part

9  of the delay was based on charging decision in the U.S.

10  Attorney's Office. That might be a better question for me if

11  the Court wants to hear it at the appropriate time.

12    **THE COURT:** Okay. Any questions from any three of you

13  in light of my questions?

14    **MR. CHINICHE:** No, Your Honor.

15    **THE COURT:** Thank you.

16    **MR. TRAVIS:** No thank you, Your Honor.

17    **THE COURT:** Okay. So I'm not going to finally

18  discharge you in case you need to return to the witness stand.

19  So I don't want you to have any conversations with anybody

20  about your testimony.

21    **THE WITNESS:** Yes, ma'am.

22    **THE COURT:** Okay. But you're released. You may step

23  down. Thank you.

24    **THE WITNESS:** Thank you.

25    * * * * *

CERTIFICATE

I, Phyllis K. McLarty, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Mississippi, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing 82 pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Witness my hand, this 16th day of February, 2023.

/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Federal Official Court Reporter