1                  UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF MISSISSIPPI
2                      OXFORD DIVISION

3

UNITED STATES OF AMERICA           PLAINTIFF
4

5

VS.                       NO. 3:21CR107
6

7

JAMARR SMITH, THOMAS IROKO AYODELE,
8  AND GILBERT McTHUNEL, II        DEFENDANTS

9

10
               TESTIMONY OF SPENCER McINVAILLE
11       EXCERPT FROM MOTION TO SUPPRESS HEARING

12
           BEFORE HONORABLE SHARION AYCOCK
13           UNITED STATES DISTRICT JUDGE

14
                Oxford, Mississippi
15                 January 31, 2023

16

17
              APPEARANCES NOTED HEREIN
18

19

20

21

22

23  Court Reporter:      PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
                   Federal Official Court Reporter
24               911 Jackson Avenue East
                   Oxford, MS  38655
25

APPEARANCES:

For the Government:   ROBERT J. MIMS, Esquire
                     U.S. Attorney's Office
                     900 Jefferson Avenue
                     Oxford, MS  38655

For the Defendant
 Smith:              GOODLOE T. LEWIS, Esquire
                     Hickman, Goza & Spragins, PLLC
                     P.O. Drawer 668
                     Oxford, MS  38655-0668

For the Defendant
 Ayodele:            WILLIAM F. TRAVIS, Esquire
                     8619 Highway 51 North
                     Southaven, MS  38671

For the Defendant
 McThunel:           PAUL A. CHINICHE, Esquire
                     Chiniche Law Firm, PLLC
                     P.O. Box 1202
                     Oxford, MS  38655-1202

```
 1                           *  *  *  *  *

 2           THE COURT:  Counselors, do you need to take a short

 3   break before you start?  You ready?

 4           MR. LEWIS:  I'm ready if you are.

 5           THE COURT:  Okay.  I'm ready.

 6           MR. LEWIS:  Your Honor, the defense calls Spencer

 7   McInvaille.

 8       (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

 9           COURTROOM DEPUTY:  Thank you.  You may take the stand.

10       SPENCER McINVAILLE, DEFENDANTS' WITNESS, AFTER BEING

11         DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

12                        DIRECT EXAMINATION

13   BY MR. LEWIS:

14   Q.   Can you state your name for us, please?

15   A.   Yes.  Spencer McInvaille.  Last name is

16   M-c-I-n-v-a-i-l-l-e.

17   Q.   What do you do for a living?

18   A.   I work for Envista Forensics.  We're a forensic

19   consulting firm.

20   Q.   And we're going to get into a little more detail, but

21   what do you do for Envista Forensics?

22   A.   So I'm a technical lead.  I work over a few examiners.  I

23   also work a caseload myself.  I deal with various types of

24   digital evidence, from cell phones to geolocation, various

25   disciplines within that group.
```

1 **Q**.    And so we've designated you as an expert in digital

2 forensics and geolocation analysis.  So why don't you just

3 generally tell us what that is.

4 **A**.    Sure.  So digital forensics revolves around us getting

5 data and evidence off of most digital devices or services that

6 retain these forms of data.  So that could be a cell phone,

7 third parties like Google GPS locations, from ankle monitors,

8 or from those devices.  So analyzing, then, that data that we

9 retrieve to render opinions based on the locations and the

10 activities that occur around those technologies.

11 **Q**.    And how those technology companies store and produce that

12 kind of data; right?

13 **A**.    Right.  So understanding the processes behind that, how

14 they gather this data, what it's used for and its application,

15 you know, now from the private side, to the end user, to here

16 in the courtroom.

17 **Q**.    And so what -- just briefly, what's your education and

18 experience in digital forensics and geolocation analysis?

19 **A**.    Sure.  Prior, I was a law enforcement officer.  I did

20 that for eight and half years.  The last four years

21 approximately working violent crimes.  During that time, I

22 began to deal with digital evidence for our group.  I was

23 dealing with phones and mobile location, geolocation evidence.

24      So I've continued to learn not only on the job but as

25 well as various trainings and certifications over the years.

1  And I've now been with Envista for coming on six years now, and
2  we continue our education into these areas constantly.

3  **Q.**   So something came along a few years ago called the
4  geofence warrant.  You're familiar with that?

5  **A.**   That's correct.

6  **Q.**   And so, you know, again, you don't have to go into a lot
7  of detail, but how did you get involved in dealing with
8  geofence warrants?

9  **A.**   So the geofence warrant itself is mainly a process and --
10  you know, a piece of legal process that's being used to query a
11  set of data from Google in a specific way.

12       Now, the data that's being retained there is based on our
13  common data types that we would use prior to that type of
14  warrant being used.  So cellular data, WiFi connections,
15  Bluetooth, GPS, those types of measurements that get taken.
16  It's now aggregated, though, based on this particular service
17  from Google.

18  **Q.**   And so have you been accepted as an expert --

19       **THE COURT:**   Excuse me.  I ask you to slow down --

20       **THE WITNESS:**   Yes, ma'am.

21       **THE COURT:**   -- for the court reporter.

22       **THE WITNESS:**   Yes.

23  **BY MR. LEWIS:**

24  **Q.**   Have you been accepted as an expert in the field of
25  digital forensics and geolocation analysis?

1    **A.**    Yes.  I've testified about 42 times, I believe, in state
2    and federal court.

3    **Q.**    And you, in fact, testified in the *USA versus Chatrie*
4    case in Virginia, which pertained to the same kind of warrant
5    we're talking about here today; correct?

6    **A.**    Yes.  I have testified twice in the Eastern District of
7    Virginia for federal court as well as the -- I believe it's the
8    Middle District of Florida in Tampa for geofence warrants, as
9    well as various state courts.  I believe about ten times total
10   for location history and geofence warrants.

11   **Q.**    And you were -- you were accepted as an expert in those
12   courts; is that correct?

13   **A.**    That's correct.

14          **MR. LEWIS:**  Your Honor, I would tender Mr. McInvaille
15   as an expert in digital forensics and geolocation analysis.

16          **MR. MIMS:**  No objection.

17          **THE COURT:**  Okay.  So he is accepted as an expert in
18   digital data for geolocation analysis.

19   **BY MR. LEWIS:**

20   **Q.**    Mr. McInvaille, you prepared a report; is that correct?

21   **A.**    I did.

22   **Q.**    And we've attached it to our motion and provided it to
23   the Court.  I'm just going to ask you, what -- what information
24   did you rely on in giving the opinions that you are giving here
25   today?

1   **A**.   Sure.  So I will, of course, want the geofence warrant so

2   that I can understand which process for that request was used

3   in this particular matter, the -- all of the responses from

4   Google as that pertains to that warrant.  Generally, I will get

5   case, you know, documentation, general discovery that provides

6   some details as well.  So all of those together.

7   **Q**.   And so let's just talk about Google for a minute.  Why

8   does Google collect somebody's location history?

9   **A**.   So that's probably the key here, is that this warrant

10   cannot be accomplished or at least you cannot locate anyone

11   with this warrant without this specific service called location

12   history.  It commonly gets confused with the location services

13   like the actual permissions that you give at the device base

14   level.

15        This is an accounts letting settle -- excuse me --

16   accounts level setting that is allowing you to gather your own

17   location information and store it to your specific account.  So

18   it is separate of letting your phone know, hey, this is where I

19   am so I can navigate places, thing like this.  This is an

20   actual service of Google rather than a specific, like, switch.

21        So I kind of use it as this analogy of power inside of

22   your house.  When you flip the switch on and off, that's those

23   location history -- or -- excuse me -- location services that

24   people are talking about, when you put your phone in airplane

25   mode or allow it to gather information to be used.  That has to

1   be on, of course, for location history to operate.  That is a

2   separate service from Google, meaning the actual power it flows

3   through so you can turn it on or turn it off, that gets

4   gathered.

5   **Q.**    Does Google collect this information so it can help the

6   government solve crimes?

7   **A.**    No.  They -- they have labeled this as a service to the

8   user akin to their journal.

9   **Q.**    Right.  So explain that a little bit.  So what do you

10  mean by journal?

11  **A.**    So it stores within the account.  So, within your Google

12  account that you have, your Gmail account, what it's storing is

13  not only your location history, if you've allowed it to do this

14  operation, it's storing your Google searches, so both voice and

15  text searches, as well as your location history, and then any

16  other information that you're allowing it to gather.  It

17  aggregates that within your -- within your account.

18  **Q.**    And does Google also -- start over.  Would Google also

19  like to sell you an ad, would like to use it for advertising?

20  **A.**    They do, but the actual service of location history

21  does -- is not an -- is not an ad-based service actually.  It

22  is more for the user experience.

23          If you've ever gotten into your vehicle in the morning to

24  go to work but it realizes that you like to stop by a

25  particular place to get coffee every day because you constantly

1 do that, this data set that is being created because you're
2 allowing it to is now what is prompting your phone to say, hey,
3 do you want to stop by and get coffee this morning?  If so,
4 this is the best route to go.

5 **Q.**   Okay.  So let's kick over to a geofence warrant and talk
6 about -- and you're familiar with the warrant we have in this
7 case?

8 **A.**   I am.

9 **Q.**   Let's talk about what this warrant is asking Google to
10 do.  Go ahead.

11 **A.**   So, generally, in a warrant, if you have a Google account
12 and you are looking for information regarding that account, we
13 would draw up a search warrant that says, Google, we want to
14 know about goodloelewis@gmail.com.  And we want location
15 history.  We want e-mails, IP logs, whatever we decide we need
16 based on the investigation, based on what we know about that
17 account.

18      In this instance, because we don't know the specific
19 account that's being requested, the government is outlining a
20 three-step process that allows you to eventually get to that
21 point, even without knowing who you're looking for.  So, in
22 this instance, to find the person, we need that they have a
23 phone; they need a Gmail account; and then they need location
24 history turned on.  That's the very first part that has to
25 happen.

1    Once the warrant is applied to that and begins to search

2  that sphere of that group of people, that bucket of data, in

3  the first step, what it's going to return is that document that

4  we've seen over and over again.  I believe G-2 maybe was the

5  document that outlines the device ID, the estimated location,

6  and then, obviously, some details about that location, but

7  that's the extent of the information that is received.

8  **Q.**   All right.  So let's stop there.  So here's G-3 actually.

9  Is that what you were just talking about?

10  **A.**   Right.  So, once that request is made, this is the very

11  first step in this process, is learning the anonymized, with

12  air quote, information that is being provided for -- for the

13  data retrieved.

14  **Q.**   Right.  Because we're about to start using probably my

15  least favorite word ever, de-anonymize.  Okay.  My mouth was

16  not made to say that word.

17      Okay.  So -- but let's talk about this Step 1.  Okay?

18  Based upon your knowledge, your experience, where is Google

19  keeping the information that they go to get this Step 1

20  information?

21  **A.**   So, commonly, it's referred to as the Sensorvault where

22  this data is stored.  It is a large repository of users' data.

23  The device identifiers are an important piece of that, because

24  within your Google account, you can have multiple devices

25  capturing this data at any given time.  So, as a result, in

1  this big bucket of data, you have individual device IDs, and

2  then there are locations to go along with it.

3  What this warrant in Step 1 is asking Google to do is to,

4  you know, essentially kind of draw this box within their system

5  and say whose data falls within this group.  As a result of

6  that request, they have to search that entire bucket of data.

7  They can't just look at individual accounts.

8  **Q.**  Okay.  So now we're kind of getting to the point.  How

9  many accounts does Google typically search in these situations?

10  **A.**  This is a 2018 incident.  Google estimates that it was

11  approximately 592 million accounts that had to be searched to

12  determine if you fit into a particular box or circle or

13  whatever polygon is drawn.

14  **Q.**  Okay.  And so how does Google decide if one of these

15  accounts falls into the box?

16  **A.**  So, going back to G-3, I believe is what you said it was,

17  if you look within G-3, the key piece that returns this user's

18  data as responsive to the warrant are the latitude and

19  longitude coordinates that are provided.  So, as long as that

20  point there -- oh, excuse me.  I think I drew on the screen.

21  As long as those points fall within the geofence, then it is

22  returned as responsive.

23  You've -- I don't know if you've seen yet as far as what

24  shows up in the data, but around that reference point, we will

25  then draw a circle around that particular point using that

1   map's display radius to the right, which is in meters.  So that

2   is a circle that gets drawn over that reference point.

3   **Q.**   Okay.  So I'm going to show you then.  This is Figure 5

4   from your report, Page 7 of 36.  And so, yeah, does Google

5   actually search the box?

6   **A.**   So, no, they have to search the entire data set just to

7   see which devices fall within the parameters of the box.  So

8   the search is not limited to the -- to the box.  The return is

9   limited to the box, if that makes sense.

10  **Q.**   Okay.  So show -- tell the Court what you're showing here

11  on Figure 5.

12  **A.**   Okay.  So, within that data set that you see in G-3, this

13  is one of those points.  And so, for example, the center point

14  of this blue circle is likely somewhere in there (indicating).

15  It's probably just to the right of that.  It looks a little off

16  from where I just put it, but it's very close to that.  Since

17  that center point falls within the square, that piece of data

18  is returned in that G-3-piece of paper.

19          The important piece to note there is, when they give you

20  the map's display radius, that's kind of their error radius

21  around that estimation that they have made.  The device can be

22  anywhere within that circle.  So it could be within the shaded

23  area that's in the geofence, but it could also be outside of

24  the geofence.

25          In the particular way that this warrant was drafted, it

1   allowed for -- as long as the center point falls within the

2   geofence, that that data is returned.  There's other ways that

3   you can ask for this to be done, but this is the way that it

4   was done here.

5   **Q.**  Okay.  So -- all right.  So let's continue on.  After --

6   wait.  Have you explained everything you need to explain about

7   how we get this Step 1 data in G-3?

8   **A.**  Correct.  I have.

9   **Q.**  Okay.  All right.  So what happens next?

10   **A.**  So, as it states in the warrant, you will -- law

11   enforcement will analyze this data that's being provided.  So

12   we will take each of those points that are being labeled in

13   G-3, we'll map those out, and start -- and begin to look at,

14   where were these positioned at?  What times were they

15   positioned in those locations?  And then what can I determine

16   from that?

17      Based on that analysis, there's going to be subsequent

18   requests being made to Google or demands made to Google for

19   further data.  So the next step here would be to get what's

20   called contextual data.

21   **Q.**  Okay.  Go ahead.  What's that?

22   **A.**  So contextual data -- the reason they call it that is for

23   that very reason.  It provides context.  So now you are going

24   to see -- rather than just limited to a specific geographical

25   area within that box, we're now going to see generally what you

1  will see as devices travel from one place to the geofence and

2  then leave that geofence or remain within there the entire

3  time.  But what it does, it provides more information.

4  **Q.**  Okay.  And then what happens next?

5  **A.**  So, then, again, you will complete an analysis of that

6  data, then see if that changes anything.  The judge asked

7  earlier about narrowing.  Typically, through the analysis of

8  each of these, you will see narrowing occur.

9      People will decide that, hey, I had three in the

10  beginning.  As a result of the first three sets of -- you know,

11  the first three data points that I see in the beginning, I only

12  need two of those moving on because -- let's say it's based on

13  the time frame or where they're positioned that you say, well,

14  I don't think this person is relevant so I'm not going to

15  include them in the subsequent request.

16      So then, as you move to Step 2, same thing.  You can make

17  another choice and determine, hey, I don't even need this other

18  person anymore because I figured out that they live across the

19  street.  Whatever that is.

20      Step 3, now we will make the decision who do we want to

21  reveal their -- you know, your word "de-anonymize."

22  **Q.**  Okay.  And that's when they get the specific names on the

23  accounts and proceed on from there with other investigative

24  techniques; correct?

25  **A.**  That's right.  So, from my understanding of the process

1  that was gone through here is that, in Step 1, three devices

2  were returned.  In Step 2, three devices received more

3  contextual data.  And Step 3, all three were revealed for their

4  subscriber information.

5  **Q.**  Okay.  All right.  So let's discuss something I think is

6  already clear but maybe use an example about how Google did

7  this process that might help the Court.

8  Did this warrant ask for any -- the identity -- start

9  over.  Did this warrant identify any specific account names

10  that it was requesting information for?

11  **A.**  No.  Again, this is an unknown search.  You are asking

12  Google to search all of the data that they have available in

13  hopes to identify someone.

14  **Q.**  So let's give us -- since this is a post office, let's

15  use an analogy that there is something in a post office box in

16  the post office that the government wants to know.

17  **A.**  Okay.

18  **Q.**  How does this warrant work in relation to that concept

19  there?

20  **A.**  So, in this instance, rather than say, hey, I want P.O.

21  box number, you know, 400 at the -- I don't know what the zip

22  code is for Oxford, but let's just say whatever the zip code is

23  for Oxford.  That would be a specific request for a box at one

24  location.  Essentially what you're saying here is that I know

25  someone has a P.O. box, and as a result, we need to search the

1  P.O. boxes to find, let's just say, some package that we're
2  looking for.

3        In this instance, rather than just search the boxes
4  within one post office within Oxford, this is going to require
5  the post office to search all of their post office boxes,
6  California, Virginia, North Carolina, and even if you went
7  overseas to, let's say, an APO where they're delivering stuff
8  to soldiers in wherever, we've got to check those too, because
9  that's what's happening here.  It's all of the accounts that
10 they have, not just a specific one.

11 **Q**.   All right.  We talked about this language in the warrant
12 application -- well, it's in the warrant and the warrant
13 application -- about -- and I'll just read it under Step 1.
14 "Law enforcement will analyze this location data to identify
15 users who may have witnessed or participated in the subject
16 offenses and will seek any additional information regarding
17 those devices through further legal process."  Did I read that
18 correctly?

19 **A**.   Yes, sir, you have.

20 **Q**.   And you have reviewed the information that went to Google
21 that's been provided by the government; correct?

22 **A**.   I have.

23 **Q**.   And you have reviewed the information that came back
24 to -- from Google to the government; correct?

25 **A**.   That's right.

1   **Q**.   Have you seen -- were there any other warrants issued

2   pertaining to further legal process to do Step 2 and 3?

3   **A**.   No, not in this instance.  It was all revolving around

4   the November 8th search warrant.  This is a common piece of

5   language that I see in geofence warrants.  It's showed up in

6   other warrants in the past as well.

7   **Q**.   Okay.  In this particular case, why didn't the government

8   just ask for location history for somebody's -- somebody's

9   account?

10   **A**.   Again, they -- I believe it's been testified they didn't

11   know which account to -- to ask for.

12   **Q**.   Okay.  Now, this hasn't come up yet, and I don't know

13   that the government does think this is analogous, but let's

14   talk about it for a minute.  There's something called "tower

15   dump."  Okay.  What is a tower dump?

16   **A**.   So, in a tower dump, what we're asking the cell phone

17   providers to do is to tell us who communicated on a certain set

18   of towers.

19       So generally what we're looking at is -- for instance,

20   here at the post office, there is a certain set of cell phone

21   towers for all of the carriers that are going to be positioned

22   in that area that provide service to that specific location.

23   You're then going to ask those carriers to tell you who

24   communicated on those towers during a specific time frame.

25   That way you can begin to identify the numbers that were in

 1    that general area in making communications.

 2    **Q.**    So what's the difference between what the government is

 3    doing here with this geofence warrant and a tower dump?

 4    **A.**    So the tower dump is actually restricted as far as the

 5    search to that specific location.  The records pertaining to

 6    those particular towers are being searched.  So those

 7    particular towers only cover a finite area.

 8          As a -- you know, kind of on the flip side of that, for

 9    the Google warrants, because that data is not stored in a way

10    that allows you to search it based on a specific geographic

11    area, you're then having to make that search across the full

12    range of data for all of the accounts to find who was in

13    that -- that given area.

14    **Q.**    Okay.

15              **MR. LEWIS:**  Bear with me a moment, Your Honor.

16              **THE COURT:**  Uh-huh.

17          (CONFERRING OFF THE RECORD.)

18    **BY MR. LEWIS:**

19    **Q.**    This came up earlier, and just so maybe there's -- this

20    is clear, the information sought by this warrant, does that --

21    does the information Google returned tell you if somebody was

22    making a phone call within the geofence at any given time?

23    **A.**    No, it does not.  This only provides location information

24    for the devices.

25    **Q.**    Does it indicate if somebody is sending a text to

1    somebody within that period of information?

2    **A**.    Just locations. That is it.

3    **Q**.    Okay. So, I mean, you know, does -- okay. So, in this

4    particular case, did it return these three devices because

5    somebody was making a phone call or texting within that

6    particular fence?

7    **A**.    No. Location history will collect passively. It

8    commonly can collect several times a minute. So, no, this

9    happens just because the device is on.

10    **Q**.    Okay. All right.

11         **MR. LEWIS**: Thank you, Your Honor. That's all the

12    questions I have.

13         **THE COURT**: Do either of the other defendants' counsel

14    wish to question the expert?

15         **MR. TRAVIS**: No questions. Thank you, Your Honor.

16         **MR. CHINICHE**: Yes, Your Honor.

17                   **DIRECT EXAMINATION**

18    **BY MR. CHINICHE**:

19    **Q**.    So, Mr. McInvaille, when Google got the search warrant

20    from the inspectors in this case, if -- if I had a Google

21    account, Google got into my account; is that right?

22    **A**.    That's correct.

23    **Q**.    And if Mr. Charlie has a Gmail account, Google got into

24    his account; is that right?

25    **A**.    That would be true for every -- and that's for every

1  circle or square or geofence that you draw within a warrant.

2  That happens either one time or multiple times for each

3  warrant.  So for every warrant that comes through.

4  **Q.**    Every warrant.  So if law enforcement gets a geofence

5  warrant in Tampa, Florida, a geofence, and I've got a Gmail

6  account, Paul Chiniche in Oxford, Google is going through my

7  account?

8  **A.**    That's correct.  They would determine if your account has

9  any locations that fall within the parameters of that geofence

10  warrant in Tampa.

11  **Q.**    And you estimated -- how many accounts did Google go

12  through with respect to this particular search warrant?

13  **A.**    So Google estimated in 2018 that 592 million users use

14  location history, and that's the amount that would be searched

15  to facilitate the response.

16  **Q.**    And where do you get that information from?

17  **A.**    I worked a case in California, the *Dawes* case, D-a-w-e-s.

18  In that matter, a Google employee responded to a request that

19  we had made to ask how many accounts were affected by the

20  search.

21        **MR. CHINICHE:**  Thank you.  I have no further

22  questions.

23        **THE COURT:**  Okay.  Cross-examination, Mr. Mims?

24        **MR. MIMS:**  Yes, Your Honor.

25                    **CROSS-EXAMINATION**

1    **BY MR. MIMS:**

2    **Q.**    Good afternoon, Mr. McInvaille.

3    **A.**    Afternoon.

4    **Q.**    Before we get into this case in detail in a minute, I

5    just want to go back and ask you a few questions about you.

6    This is the first chance I've had to meet you and really ask

7    you questions.  Have you ever worked for Google?

8    **A.**    No, I have not.

9    **Q.**    Okay.  Have you ever personally submitted a geofence

10   warrant to Google?

11   **A.**    No, sir, I have not.

12   **Q.**    Okay.  What training do you have in Google's operations

13   and procedures?

14   **A.**    I don't have any training.  I just have experience from

15   the cases that I've worked.

16   **Q.**    The cases you've worked.  Explain to me what cases that

17   you've worked.  You're talking about as an expert witness?

18   **A.**    That's correct.

19   **Q.**    Okay.  But you're not talking about as a law enforcement

20   officer?

21   **A.**    We made Google requests in law enforcement as well.  My

22   knowledge of location history comes from -- from both of those.

23   **Q.**    I'm sorry.  Well, let me ask you -- so do you have law

24   enforcement experience?

25   **A.**    Yes, I do.

1  **Q.**   Tell me about that.

2  **A.**   I did eight and a half years at the Lancaster County

3  Sheriff's Office in South Carolina.  I held various titles

4  during that time.  The last four or so years, I worked in

5  violent crime investigations.

6  **Q.**   Okay.

7  **A.**   During that time, I dealt with -- I did all of our mobile

8  phones, cell location, geolocation type evidence prior to

9  coming to Envista.

10 **Q.**   When did you leave there?

11 **A.**   2017.

12 **Q.**   All right.  Did you ever seek any geofence warrants when

13 you were working in South Carolina in law enforcement?

14 **A.**   No.  At the time, that wasn't -- it actually wasn't a

15 widely known technique.

16 **Q.**   Okay.

17 **A.**   It wasn't until a few -- sometime after that that they

18 began to come out.

19 **Q.**   Okay.  So, when I asked you about experience or training

20 in Google's operations and procedures, you talked about, "Well,

21 I know something from my law enforcement experience."  That has

22 nothing to do with their procedures on geofence warrants

23 because you weren't doing them back then; right?

24 **A.**   So the submission for location history accounts or those

25 requests is the same through the portal as you've heard

1    described before.  The process for the geofence, no, was not

2    for law enforcement.

3    **Q.**   Well, and you used a good word there that I was about to

4    use.  "Process."  You understand maybe the process of how you

5    submit things through the legal portal at Google; right?

6    **A.**   Yes, I understand the process.

7    **Q.**   But as far as -- what I'm wanting to know is, on the

8    other side of the house, inside the walls of Google, do you

9    have any training and experience on how they store things and

10   how they do things?

11   **A.**   No, I do not.

12   **Q.**   Mr. McInvaille, how much are you getting paid for your

13   time?

14   **A.**   I'm a salaried employee with our company.

15   **Q.**   Well, my understanding is that, when defendants hire an

16   expert such as you in this case, they have to pay you; right?

17   **A.**   If I worked for myself, yes, they would be paying me, but

18   they're not.  They're not paying me.  They pay my company.

19   **Q.**   They pay your company.  Well, let me ask it this way.

20   How much is your company getting paid for your time?

21   **A.**   I believe it's $250 an hour.

22   **Q.**   Okay.  And I know you mentioned it earlier, but I just

23   want to make sure I have it right.  How many times -- well, you

24   didn't mention this particularly.  How many times have you been

25   designated as an expert before?

1    **A.**    About 42 times, I believe.

2    **Q.**    All right.  And that's the same number of times you said

3    you've testified in court; correct?

4    **A.**    That's correct.  Or testified in total.

5    **Q.**    Right.  So not necessarily in court.  Some may be in a

6    deposition?

7    **A.**    Correct.

8    **Q.**    Do you know how many times you would have testified in

9    court?

10   **A.**    30 some odd -- some odd times.

11   **Q.**    In all of these 42 times total, have you ever testified

12   before on geofence warrants specifically?

13   **A.**    Yes.

14   **Q.**    How many times?

15   **A.**    Three times in federal court and a handful in state

16   court.  I'm not sure of the exact number of just geofence.

17   **Q.**    One of those times, in fact, was in the *Chatrie* case;

18   right?

19   **A.**    That's correct.  Twice.

20   **Q.**    Okay.  So twice in the same case?

21   **A.**    That's right.

22   **Q.**    And that's the case out of the -- is it the Eastern

23   District of Virginia?

24   **A.**    That's right.

25   **Q.**    That's really one of the earliest reported decisions on

1 geofence warrants, isn't it?

2 **A.** Yes. The earliest federal district court level, yes.

3 **Q.** There's really not much federal case law on this, is

4 there?

5 **A.** There's not. They're currently being litigated.

6 **Q.** And in the *Chatrie* case in which you testified as an

7 expert for the defendants; right?

8 **A.** Yes.

9 **Q.** That's one in which the Court said that the good faith

10 exception applies and therefore denied the motion to suppress;

11 correct?

12 **A.** I believe that's correct.

13 **Q.** So, Mr. McInvaille, I want to see if we can agree on a

14 few things. I know we're on opposite sides of this case here,

15 but a lot of times I like to try to see if we can find some

16 common ground and agree on a few things.

17 First of all, Google is certainly capable of determining

18 what devices are located within a geofence; right?

19 **A.** They can estimate it, yes.

20 **Q.** I'm sorry?

21 **A.** It's an estimation, but, yes, they can do it.

22 **Q.** Okay. And would you agree with me this information is

23 beneficial to law enforcement in determining who may have been

24 present at the scene of a crime?

25 **A.** You said it's beneficial?

1  **Q.**  Yes.

2  **A.**  I think it's useful, yes.

3  **Q.**  In fact, FBI and other law enforcement agencies, they

4  have used geofence information to find people who have been

5  kidnapped or find runaway children or find terrorists, even, or

6  other criminals?  Would you agree that FBI and law enforcement

7  agencies have used these to -- used geofences to find that

8  information?

9  **A.**  They could have.

10  **Q.**  In fact, since about 2018, geofences are used quite

11  frequently, aren't they?

12  **A.**  They're becoming more common, yes.

13  **Q.**  Well, more common.  In fact, wouldn't you agree with me

14  that Google gets tens of thousands of these geofence warrants

15  each year?

16  **A.**  That's probably true.

17  **Q.**  Okay.  And when I say "get them," I'm talking about

18  actually gets them and complies with them, not that it's been

19  rejected or it's been refused by the Court.  I'm talking about

20  geofence warrants that are used -- submitted and information is

21  used to help in a case like I'm using.

22  **A.**  That's probably true.

23  **Q.**  Okay.  Now, Google does this through location

24  information; right?

25  **A.**  Location history, yes.

1 **Q.** Location history.  Thank you.  I appreciate the

2 clarification because I know that's a term that I think you've

3 used in your report is location history; right?

4 **A.** That's right.  That's the specific product that is being

5 searched.

6 **Q.** Okay.  So location history -- first of all, that is

7 information that Google gathers from its subscribers to various

8 Google apps and programs; right?

9 **A.** So, yes, you're allowing Google to collect this and store

10 to your account.

11 **Q.** Google meaning the customer.  Me as a Google user, my

12 phone.  If I use Google Maps, for example, and if I enable

13 location history, I am providing information to Google; right?

14 **A.** So you don't actually have to use the application.  As

15 long as you have location history enabled, it will collect.

16 **Q.** Correct.  If I enable?

17 **A.** If you enable location history, yes.

18 **Q.** When I first get a phone, location history is not

19 enabled, is it?

20 **A.** No.  The -- well, your -- when you initially get an

21 account, no, it is not.

22 **Q.** Okay.  In other words, I have to agree to enable location

23 history on my account?

24 **A.** Right, because you're making an account level decision.

25 So it's -- you're making a decision to store your information

1　to your specific account.

2　**Q.**　But that's a decision that I voluntarily make to share

3　that information with Google?

4　**A.**　So it's not so much that you're sharing with Google.　You

5　are storing with Google.　It's kind of like your -- if you have

6　a mini storage unit or something, you are storing your

7　belongings within that account.

8　**Q.**　Okay.　So let me ask you -- I know you were asked some

9　questions earlier about analogies.　Let me make one for you.

10　　　　If you say I'm storing that location in Google -- let's

11　say you are Google, and let's say that my location history is

12　written on this piece of paper.　Instead of me keeping it in my

13　file cabinet, I'm giving it to you to put in your file cabinet;

14　right?

15　**A.**　Correct.

16　**Q.**　And you're putting it in a file cabinet there at your --

17　at your business, not in my house; right?

18　**A.**　Correct.　It's a separate storage.

19　**Q.**　Okay.　And that's what we call a Sensorvault; is that

20　right?

21　**A.**　That's correct.

22　**Q.**　All right.　I'm learning a lot in this case because I --

23　I'm not a technological person.　So it's taking a little while

24　to catch on to all of this.

25　　　　The Sensorvault -- I think of that as kind of an

1  electronic file cabinet basically at Google's headquarters.  Is

2  that fair to say?

3  **A**.    It's probably similar, yes.

4  **Q**.    Okay.  Now, I can use my phone to make phone calls, send

5  texts, search the web, all of that, without location services

6  or location history turned on; is that right?

7  **A**.    That's correct.  You can.

8  **Q**.    Okay.  So location services or location history, that may

9  just be a convenience to me as a consumer.  There may be things

10  that I use that it's a little more convenient to me if I have

11  it turned on; right?

12  **A**.    Right.  It is a product.  Just like you have a house and

13  not have Internet.  You don't have to have it, but you may want

14  it.

15  **Q**.    Well, for example, sometimes when I'm traveling, if I

16  don't have location services turned on and I want to -- I'm in

17  a strange place and I want to look at a map, I have to open up

18  Google Maps and actually kind of scroll around and find, okay,

19  I'm in Destin, Florida.  Where's my road?  Where am I going?

20  Right?

21  **A**.    Yes.

22  **Q**.    But if I have location services turned on, when I hit

23  Google Maps, it pops up and shows me where I am.  It makes it

24  easier to use; right?

25  **A**.    Right.  And you can do that separate of location history

1  as well.

2  **Q.**  Sure.  But I -- in other words, I don't have to do that.

3  I can do it the hard way if I want to; right?

4  **A.**  If you'd like to.

5  **Q.**  Now, Google also uses this location information as well,

6  though.  They do sell ads using this information that I've

7  provided Google to store in their Sensorvault; right?

8  **A.**  So, actually, there's other portions of data that they

9  gather for those.  Location history is not one of those

10  products.

11  **Q.**  So my understanding is, when Google gets a geofence

12  search warrant, it looks in its Sensorvault, it's electronic

13  storage, to pull the requested info -- information; is that

14  right?

15  **A.**  That's correct.

16  **Q.**  In other words, I described this as kind of an electronic

17  file cabinet.  Google, when it's get a geofence warrant, I

18  picture it physically as opening up a drawer and digging

19  through papers.  It's doing it electronically obviously, but

20  it's looking at information it stores at its building at its

21  headquarters; correct?

22  **A.**  Right.  And rather than go to your -- you know, to your

23  filing cabinet and your particular folder of information, it's

24  got to search that entire file cabinet, yes.

25  **Q.**  But it's all information that I, as a user and consumer,

1    have given to Google to store?

2    **A.**   Yes.   It's -- again, you are storing that data with

3    Google.

4    **Q.**   Sure.   There's no -- there's no documentation or contract

5    or anything like that that when I give it to Google to store

6    that says, by the way, Google, you are not allowed to share

7    this with anybody anytime, is there?

8    **A.**   It's held under your account with a username and pass

9    code.   So I don't -- I don't know if there is any document that

10   specifically says that, but it's not just, you know, free

11   hanging out there.   It's stored within the account.

12   **Q.**   So, once Google gets the geofence search warrant and it

13   searches its Sensorvault for the information, it then sends

14   anonymous data to law enforcement of only devices within the

15   box so-to-speak; right?

16   **A.**   With those it estimates, yes.

17   **Q.**   Law enforcement then can review that data and they can

18   select which devices are relevant and ask for additional

19   information if they want to; correct?

20   **A.**   That's right.   That's what the process outlines.

21   **Q.**   Okay.   Now, you were describing a while ago, I think, a

22   process of how Google searches their Sensorvault, that they

23   have to look through everything to see who's in the box.   And

24   I'm -- I'm dumbing it down a lot --

25   **A.**   I understand.

1    **Q.**    -- I know, but they're digging through everything in this

2    Sensorvault to see who's in the box; right?

3    **A.**    Correct.

4    **Q.**    When they do that, they don't look to see where everyone

5    is.  They only look to see who's in the box?

6    **A.**    Again, who falls within those parameters.

7    **Q.**    I'm going to come back to this idea here in just a

8    minute, but I want to -- I want to pause for a second and look

9    at this briefly.  So, assuming that February 5th of 2018 I had

10   location history turned on on my own phone, Google would have

11   that information stored in their Sensorvault; right?

12   **A.**    Correct.

13   **Q.**    So -- but when Google looks in their Sensorvault in

14   relation to this search warrant, they don't look to see where

15   Robert Mims was on that day.  Nobody knows where Robert Mims

16   was at 5:00 on that day.  It only knows whether I was in the

17   box or not in the box; correct?

18   **A.**    Correct.  They just search your account to see if it's in

19   the box.

20   **Q.**    Okay.  Now, would you agree with me that a geofence

21   warrant won't necessarily pick up everybody who's physically in

22   a box?

23   **A.**    No.  Because, again, there's so many -- there's a few

24   different criteria that have to be met for it to occur.  That's

25   why, as described earlier, you don't see the victim and

1  other -- the other people, is that it's -- it's a small -- even

2  though it's -- you know, it sounds like a lot, 600 -- almost

3  600 million accounts, it still is just a small subset of Google

4  users, which is in the 2 billion range.

5  So it's not all -- you know, just -- it's not the --

6  because you have a cell phone, we will find you.  You have to

7  have a cell phone.  You have to have a Google account.  You

8  have to have location history.  And then, to be returned, you

9  have to be estimated within that area.

10 **Q.**  Yeah.  It's certainly beneficial to see who may have been

11 in the box, but just because your name or your device doesn't

12 pop up doesn't mean you weren't there; correct?

13 **A.**  That can be true, yes.

14 **Q.**  Because, for example, it only hits, what -- it only

15 checks for information every five, six, ten minutes.  How

16 often?

17 **A.**  It can be multiple times a minute most of the time.  I've

18 seen it, you know, six times a minute, two times a minute.  It

19 stores quite a bit of data.

20 **Q.**  Okay.  Well, and I thought I'd seen that sometimes that

21 it could be longer.  It could be more like five minutes.  I may

22 have that wrong.  But could it be more than a five-minute

23 interval?

24 **A.**  The way it's described in the data I've seen, it's

25 generally not that long, no.

1  **Q.**   Okay.  Fair enough.  But if you're somebody like the

2  driver of the white SUV who comes through briefly and then

3  comes back through and drops somebody off and leaves, your

4  device might not talk to Google in the few moments you drive

5  past; right?

6  **A.**   It's possible.

7  **Q.**   So you might not -- so your device may not hit

8  so-to-speak because you're only there briefly?

9  **A.**   It's possible.

10  **Q.**   Okay.  Or you could just have location services off;

11  correct?

12  **A.**   Yes.  Again, if it doesn't show up, it very well could be

13  because location history is not an -- not an enabled option.

14  **Q.**   So there are a little over 20 people in this room.  If we

15  did a geofence for this room for right now, we're not

16  necessarily going to get 20 devices that hit, are we?

17  **A.**   No.  I would only expect about three or four.

18  **Q.**   Okay.  Now, one other thing to be clear, this search

19  warrant -- I've done search warrants for phones.  You probably

20  did too when you were a police officer.

21  **A.**   I have, yes.

22  **Q.**   When you're looking for text messages setting up a drug

23  deal or pictures that may be important or you're searching for

24  e-mails or things like that, that's not what a geofence warrant

25  is about, is it?

 1  **A.**   No.  It's just about location.

 2  **Q.**   That's right.  Just about location.  You're not searching

 3  for communications on a phone.  That's something separate?

 4  **A.**   Correct.

 5  **Q.**   Let me ask you, Mr. McInvaille, what is an IP address?

 6  **A.**   It's Internet Protocol address.  It allows essentially

 7  the tracking of what occurs across the Internet.  So, when

 8  requests are made for particular websites, essentially, you're

 9  going to be making that request for a particular IP address out

10  to another IP address that's a, you know, Google or whoever,

11  that way it facilitates the transaction of the information.

12  **Q.**   Okay.  So, normally -- I've got an iPad, and most

13  evenings I get on it at some point for a little while and surf

14  the web on my iPad.  My iPad would have a specific IP address,

15  wouldn't it?

16  **A.**   So your home Wi-Fi would.

17  **Q.**   My home Wi-Fi?

18  **A.**   Correct.

19  **Q.**   Got you.  So, in other words, my wife's computer, my

20  daughter's phone, my iPad would all work off the same IP

21  address at my home?

22  **A.**   Yes.  Generally off of different ports but, yes.

23  **Q.**   Okay.  Now, would you agree that Google keeps millions

24  and millions of IP addresses?

25  **A.**   Yes, they do.  Within those accounts, they will also

1   store IP addresses as well.

2   **Q.**   Okay. Would you agree it would be far more than 592

3   million?

4   **A.**   More IP addresses?

5   **Q.**   Yes.

6   **A.**   Yes.

7   **Q.**   Would you agree with me that Google would have to search

8   every customer to see who is using an IP address at a specific

9   date and time? In other words -- let me back up because I

10   should have asked a different question at first. Have you seen

11   search warrants to determine whose IP address this is?

12   **A.**   Yes. If you have the IP address and you're trying to

13   determine its -- its owner?

14   **Q.**   Yes.

15   **A.**   Yes.

16   **Q.**   Okay. So if I send -- if I want to know -- if I've got

17   the IP address and I want to know who does that belong to, I

18   can ask Google about it, and they would have to search every

19   customer to see who's using that IP address at a specific date

20   and time?

21   **A.**   So, for that example, what you would do is -- IP

22   addresses are like phone numbers. They're owned by the

23   individual companies. So, you know, let's say Comcast or

24   someone like that, they own a block of IP addresses.

25       So then when you determine that that one falls within

1    their block, you go to them with a search warrant or whatever

2    legal process.  You make that request to them and say, "At this

3    date and time, this IP address was used, and I need the

4    subscriber information from it because of X probable cause."

5    They will then query for that specific IP address to tell you

6    the subscriber.

7    **Q.**    Law enforcement can actually request Google identify the

8    user of the IP address with just a grand jury subpoena; right?

9    **A.**    That's like -- yes, probably.

10   **Q.**    Okay.  And isn't it true that an IP address can show a

11   person using a Google address in a specific location such as a

12   house?

13   **A.**    Yes.  You can resolve them back to specific addresses,

14   because, again, like the Wi-Fi in your home, it's in a fixed

15   location.

16   **Q.**    And even though there's millions and millions and

17   millions of IP addresses out there, you can get all of that

18   with just a grand jury subpoena, can't you?

19   **A.**    You can, but you're making a very specific request.

20   **Q.**    All right.  Now, I want to show you something.  With

21   assistance from somebody in my office who knows far more about

22   technology than me, we created this document last night.  And I

23   use the term "we" very loosely.

24          Do you recognize -- well, first of all, before I ask you

25   about that, let me go back for a second.  In your report -- you

1   were shown this a minute ago.  I believe you were asked a
2   question about this box right here (indicating).  I don't have
3   a color copy.  I have -- I think when I copied I didn't use
4   color, but this is the same box you were shown a few minutes
5   ago; right?

6   **A.**   It is.

7   **Q.**   And this is basically where you've got the geofence box
8   as a square; correct?

9   **A.**   Correct.

10  **Q.**   And that is basically around -- the post office is right
11  here (indicating); right?

12  **A.**   Correct.

13  **Q.**   And then you were asked some questions about -- about one
14  of the hits that came back in Step 1, and you've drawn this
15  basically circle that's a -- it's a 347-meter radius from the
16  latitude and longitude given for that hit; correct?

17  **A.**   Correct.

18  **Q.**   Okay.  Because you were asked some questions about, well,
19  the device could have been inside or outside the box; right?

20  **A.**   That's right.

21  **Q.**   So why didn't you plot more than just one point with the
22  largest radius?

23  **A.**   I don't recall if this is the largest, but I was asked
24  to -- to show an example of where the device -- essentially
25  where the device could be in relation to -- to a data point.

1   **Q**.    Okay.  Well, we had nine other points.  I'm going to

2   throw out the one at 5:58 that we don't believe was --

3   **A**.    Okay.

4   **Q**.    -- was related to it.  I'm talking about the -- I'm

5   talking about the seven points related to device 859 and the

6   three points related to device 768.  Why didn't you plot the

7   other nine points?

8   **A**.    Again, this is just an example for that one question

9   about how it looks where -- where the data point falls because

10   I have all of them plotted.

11   **Q**.    Okay.  You would agree that GPS is more accurate than

12   Wi-Fi; is that correct?

13   **A**.    It can be.

14   **Q**.    It can be?  You don't think it usually is?

15   **A**.    Yes, it can be more accurate.  Yes.

16   **Q**.    Okay.  That's why, in fact, on three of these the source

17   is GPS.  The three associated with 768; right?

18   **A**.    Correct.

19   **Q**.    And the seven associated with device 859, the source is

20   WiFi; right?

21   **A**.    That's correct.

22   **Q**.    And we see the GPS has a much smaller radius around the

23   latitude and longitude; right?

24   **A**.    That's right, but that's not always true.

25   **Q**.    Okay.  So I want to go back now to the chart that I had

1   help creating.  Let's look at the green -- at the green ones

2   first because those are three points.  You said you went

3   ahead -- that maybe when you were working on this you plotted

4   all ten points?

5   **A.**   Yes, I plotted all the data.  Yes.

6   **Q.**   Okay.  So would you agree with me that the ones in green

7   are the three points associated with device 768?

8   **A.**   If they're plotted correctly, yes.  I'll just assume that

9   you have done this properly.

10   **Q.**   Okay.  Well, if we need to, I've got the person who put

11   this together.  We can bring her in here in a minute and talk

12   about it but --

13   **A.**   Unless you don't think it's correct, again, I said I'd

14   trust you.

15   **Q.**   Okay.  Fair enough.  And the circles around each point --

16   I've got a -- I've got one that zooms in a little bit better

17   we'll look at in a second, but the circles around each point

18   would just be the radius in meters around the latitude and

19   longitude; correct?

20   **A.**   That's what it should be, yes.

21   **Q.**   Okay.  And then for the blue ones, what we've got here,

22   the outer circle would be the same one that you had shown in

23   your report, the 347 meters; right?

24   **A.**   It appears to be, yes.

25   **Q.**   Okay.  Well, let me go back for a second.  You would

1  agree with me, for the seven points associated with device 859,

2  it's all the exact same latitude and longitude?

3  **A.**   It is.

4  **Q.**   Okay.  And that's where we have the blue dot right here

5  (indicating), the blue pinpoint?

6  **A.**   Correct.

7  **Q.**   And then we have radiuses around them.  And I will just

8  tell you, for purposes of keeping this simple, rather than

9  trying to clutter up this chart with seven different blue

10  lines, I had my assistant plot the largest one, which is 347

11  meters, and the smallest one, which is the inner one, which is

12  92 meters, and then one that was 146 meters.  Does that appear

13  to be accurate to you?

14  **A.**   Again, trusting that you did it properly, yes.

15  **Q.**   You won't dispute that it's accurate?

16  **A.**   I'm not, no.

17  **Q.**   All right.  And I'm going to put this one up here.  This

18  one kind of cuts off part of the -- part of the outer one, but

19  it helps us zoom in on the picture a little bit better.  It's

20  the same chart, just zoomed in a little bit.

21        The square box here (indicating), that is the geofence.

22  That's the parameters of the geofence; right?

23  **A.**   Correct.

24  **Q.**   Okay.  So, on device 768, the green ones, the entire

25  circle -- and, again, you said earlier the device is somewhere

1   in the circle; right?

2   **A.**   It should be, yes.

3   **Q.**   Yeah.  The pinpoint doesn't really mean anything.  It's

4   somewhere in that circle?

5   **A.**   Right.

6   **Q.**   And the entire circle on the three green hits are all

7   within the geofence box; correct?

8   **A.**   That's correct.

9   **Q.**   Okay.  Now, I want to look at the smallest blue line.

10  That's the smallest, shortest diameter, the 92-meter diameter.

11  You can see here (indicating).  This is the back of the post

12  office; right?

13  **A.**   It appears to be, yes.

14  **Q.**   Okay.  And the edge of that line runs right along right

15  there -- where we were watching the video earlier, it would

16  just cover where the assailant was hiding behind the post

17  office, wouldn't it?

18  **A.**   Yes.

19  **Q.**   All right.  And that's the tightest radius on the blue.

20  The 146, which is the second biggest radius, would certainly

21  encompass the post office, and the 347 would as well, wouldn't

22  it?

23  **A.**   That's correct.

24  **Q.**   So while, admittedly, on the 347-meter radius, a good bit

25  of it's inside the box, a good bit of it is outside the box,

1 but for the other eight -- oh, I'm sorry -- the other six

2 related to device 859, that would be located mostly inside the

3 box, wouldn't it?

4 **A.** Better than the other, yes.

5 **Q.** Okay.  In fact, with the smallest one, it's

6 overwhelmingly inside the box, isn't it?

7 **A.** Yes.  Much better than 347.

8 **Q.** Okay.  There was some discussion a minute ago about

9 further legal process.  Is it fair to say that you are not a

10 judge?

11 **A.** I am not.

12 **Q.** Okay.  And you are not -- you've not been proposed as an

13 expert on the law; correct?

14 **A.** No, I'm not.

15 **Q.** Okay.  So I'm going to use myself as an example.  Okay?

16 I'm just going to give you an absolute hypothetical.  I am a

17 very happily married man.  I will tell you this is just a wild

18 hypothetical.

19    But if my location history was turned on on February 5th

20 of 2018 at 5:30 p.m., in theory, my information would be stored

21 in this Sensorvault, and Google would review what's in their

22 Sensorvault to respond to the search warrant; right?

23 **A.** Correct.

24 **Q.** Okay.  If I was somewhere I didn't want somebody to be --

25 if I was at my girlfriend's house, for example, and I didn't

1  want my wife to know about it, Google's not going to find this

2  by searching their Sensorvault, are they?

3  **A.**  Say that again.  I'm sorry.

4  **Q.**  If I'm somewhere I don't want to be on February 5th of

5  2018 at 5:30 p.m., this search warrant is not going to show it

6  unless I was at the Lake Cormorant post office; right?

7  **A.**  Right.  They're not going to call your wife.

8  **Q.**  Yeah.  If I was at my girlfriend's house at 5:30 p.m.

9  that evening, the postal inspection service isn't going to

10  know, are they?

11  **A.**  No.  Unless your girlfriend stays at the post office.

12  **Q.**  That's right.  Google's not going to even know because

13  they're not looking to see where I am.  They're just looking to

14  see was my device in the box or not; right?

15  **A.**  Yeah.

16  **Q.**  Okay.  And while Google might search their Sensorvault,

17  they may know where I am, they're going to know anyway because

18  I've already given them that information, haven't I?

19  **A.**  Yeah.  But, again, this isn't something that they just

20  are willingly going through.  This is a -- again, a legal

21  demand they're going to search this data for.  So, no, they're

22  not just looking to see where you are.

23  **Q.**  I agree.  But unless I'm at the Lake Cormorant post

24  office that evening, the only people that's going to know that

25  is Google, and they already know it because I've already shared

1 that information with them; right?

2 **A.** But, again, you make it out as though they're keeping

3 tabs on you being there. Again, they're only looking in this

4 instance. So they would only know if you were there, yes,

5 because they're looking.

6 **Q.** Just a couple more questions for you. Google sends this

7 information back in response to the geofence warrant, and,

8 basically, it showed two devices were there. And you don't

9 disagree -- and the devices I'm talking about are device 859

10 and 768. Okay? You don't disagree that in Step 3 they

11 disclose that those devices belong to Jamarr Smith and Gilbert

12 McThunel?

13 **A.** No.

14 **Q.** Okay.

15 **A.** In the beginning, you said -- you said two or three?

16 **Q.** I'm sorry. They sent back three.

17 **A.** Okay.

18 **Q.** But I'm ignoring the third one about whatever record --

19 waves records because --

20 **A.** Okay.

21 **Q.** -- that -- I don't believe that's relevant to this.

22 **A.** Got you.

23 **Q.** It's at that point they say device 859 and 768 were

24 present in the vicinity of Lake Cormorant post office; right?

25 **A.** Correct. Those devices.

1   **Q.**   All right.  And you would agree me that we've been able
2   to identify those devices in Step 3 as Smith and McThunel?
3   **A.**   For those accounts, yes.
4   **Q.**   For those accounts.  Okay.  So you don't disagree that
5   Smith and McThunel were present at the Lake Cormorant post
6   office at 5:30 p.m. that evening, do you?
7   **A.**   I can't say them physically, but an account that you have
8   associated with them, yes.
9   **Q.**   Okay.  Their devices were present, weren't they?
10  **A.**   The devices with those accounts, yes.
11  **Q.**   And, in fact, you've watched the video here.  I assume
12  you've watched it before.
13  **A.**   Yes.
14  **Q.**   You do see on the video where the assailant has his elbow
15  up to his ear for three minutes standing behind the post
16  office, don't you?
17  **A.**   So I watched today, but I -- honestly, from that TV, I
18  couldn't see it, but, again, I wasn't close enough to be able
19  to see it.  I can't -- I can't rule on that either way.
20  **Q.**   Okay.  And you were here a while ago when we put the
21  phone records up.  You don't dispute that the phone records
22  confirm that McThunel and Smith were on the phone with each
23  other for a five -- roughly five-minute phone call around 5:15
24  p.m. that evening, do you?
25  **A.**   I haven't reviewed those records.

1  **Q.**    Let's take a look at them real quick.  Here's the phone

2  records from C Spire.  Did you ever review phone records when

3  you were a police officer?

4  **A.**    Yeah, I've reviewed one or two sets.

5  **Q.**    Okay.  So here's the start time, 1716 and 10 seconds.

6  You understand it's military time; correct?

7  **A.**    I do.

8  **Q.**    And that's on February 5th; right?

9  **A.**    Correct.

10 **Q.**    And in civilian time, that would be 5:16 p.m., wouldn't

11 it?

12 **A.**    Correct.

13 **Q.**    And we have a phone call.  The calling number would be

14 6029.  The called number would be 7511.  I'll represent to you

15 that's Jamarr Smith's number and Gilbert McThunel's number.

16 And the duration of the call lasted 350 seconds; right?

17 **A.**    Okay.

18 **Q.**    And if my math is correct, I guess that's about five

19 minutes and 50 seconds; right?

20 **A.**    It's close.

21 **Q.**    Okay.  So you don't dispute, do you, that, in fact,

22 Gilbert McThunel was on the phone with Jamarr Smith, assuming

23 that I have not lied to you about the -- whose numbers those

24 are?

25 **A.**    No.  Can -- can I see those records?

1    **Q.**   Absolutely.

2         **MR. MIMS:**  May I approach the witness, Your Honor?

3         **THE COURT:**  You may.

4    **A.**   Does it have a definition sheet with it or not?

5    **BY MR. MIMS:**

6    **Q.**   It does.  Feel free to dig through it.  Just please don't

7    get it out of order because I'll never get it back.

8    **A.**   Got you.  I know you guys like printing records.  It's

9    not a good idea.

10   **Q.**   I'm sorry?

11   **A.**   I know you guys like printing these things.  It's

12   terrible.

13   **Q.**   Yeah, it is.

14   **A.**   You said the definition sheet is here?

15   **Q.**   It should be.  I believe I attached it.  It may be at the

16   very back.

17   **A.**   Okay.  (Reviews record.)  Okay.  I just wanted to be able

18   to review them since you asked me about them.

19   **Q.**   I'm sorry?

20   **A.**   I just wanted to be able to review them since you asked.

21   I just had not seen them.

22   **Q.**   All right.  Thank you.

23        **MR. MIMS:**  Your Honor, I have no further questions.  I

24   would offer into evidence the plotting of some of these points

25   that I referred to with the expert.  I'd offer them as G-4A and

1  G-4B.

2         **THE COURT:**  Any objection?

3         **MR. CHINICHE:**  May I just take a look at them?

4         **THE COURT:**  Certainly.

5         **MR. MIMS:**  Oh, I'm sorry.

6      (CONFERRING OFF THE RECORD.)

7         **MR. CHINICHE:**  No objection.

8         **MR. LEWIS:**  No objection.

9         **THE COURT:**  Thank you.  They'll be received.

10     (EXHIBIT NOS. G-4A AND G-4B ADMITTED INTO EVIDENCE.)

11        **MR. MIMS:**  Your Honor, with that, I have no further

12  questions.

13        **THE COURT:**  Redirect.

14                     **REDIRECT EXAMINATION**

15  BY MR. LEWIS:

16  **Q.**   You were asked about practices inside Google, you know,

17  what their specific interior practices are.  And I'm not sure

18  if this is an issue or not, but if the Court desired to hear

19  what goes on at Google, the Court has the power to subpoena

20  Google employees, which may be painful for us to listen to, to

21  come and testify about that; correct?

22  **A.**   It's happened before.

23  **Q.**   Right.  I was about to say, in the *Chatrie* case, a number

24  of Google employees testified; correct?

25  **A.**   That's correct.

1    **Q.**    And then in the *Dawes* case in California, which is maybe

2    a little more convenient, there were Google -- did Google

3    employees testify or did they just do affidavits?

4    **A.**    No.  They completed declarations to avoid having to come

5    for testimony.

6    **Q.**    And so you have relied on these declarations in your

7    testimony today as to about what Google practices are; correct?

8    **A.**    Right.  And those applied to those matters that I was

9    working, yes.

10   **Q.**    And, in fact, those declarations were attached to a

11   report that we've provided the Court; correct?

12   **A.**    That's correct.

13   **Q.**    Okay.  You were asked a series of questions about turning

14   on and off location history.  Is it your testimony that someone

15   turning on location history and, therefore, providing that

16   information to Google no longer has an expectation of privacy

17   in that information?

18   **A.**    No, I don't.  And from reviewing the documents that have

19   been provided, the *amicus* brief in *Chatrie*, those things,

20   Google also doesn't akin it to the release of it.  They -- they

21   view it as protected.  They require themselves that you provide

22   a search warrant.  There have been other agencies in the field

23   that can get that data without a search warrant, but Google

24   requires it.  So they do not feel that it's non-protected

25   material.  They describe it as a journal.

1  **Q.**  Okay.  And Mr. Mims gave a long -- perhaps overlong

2  example of him not -- him being at his girlfriend's house.  You

3  understood him to be saying that he would have an expectation

4  of privacy in that information?

5  **A.**  You would think that everybody would, yes.

6  **Q.**  In the warrant that was sent to Google in this case in

7  November of 2018 -- now, let's not get confused about these

8  warrants that were sent in 2019.  Those warrants had specific

9  what?

10  **A.**  Account names.  So, as a result of the geofence request

11  where the three accounts were subsequently retrieved back from

12  the three different steps, then there were -- the narrowing

13  occurred in a separate piece.  That occurred afterwards, after

14  the accounts were identified.

15  **Q.**  Okay.  This warrant in November of 2018, did it request

16  information for a specific IP address?

17  **A.**  The geofence warrant?

18  **Q.**  Right.

19  **A.**  No, it did not.

20  **Q.**  Did it request information about a specific phone number?

21  **A.**  No, it did not.

22  **Q.**  Did it request information about a specific e-mail?

23  **A.**  No.  It actually asked for anonymized information.

24  **Q.**  Did it ask for information about a specific Google

25  account?

1  **A.**    No.

2          **MR. LEWIS:**  I have nothing further, Your Honor.

3          **THE COURT:**  Okay.  I have two or three things I want

4  to ask.

5          **MR. LEWIS:**  I'm sorry.  He --

6          **MR. CHINICHE:**  Your Honor --

7          **THE COURT:**  Oh, I'm very sorry.  Come ahead,

8  Mr. Chiniche.

9                          **REDIRECT EXAMINATION**

10  **BY MR. CHINICHE:**

11  **Q.**    Mr. McInvaille, why don't you testify for prosecutors?

12  **A.**    They don't need private companies to assist them.  They

13  have law enforcement agencies that they can request services

14  from.

15  **Q.**    And presumably free to them; right?

16  **A.**    Yeah.  I've never seen a prosecutor pay the FBI for their

17  work.

18  **Q.**    And does Google offer any training that you could go to?

19  **A.**    No.

20  **Q.**    So that's why you haven't had any training?

21  **A.**    Right.  There are a few law enforcement only classes that

22  are available out there that go directly towards the process of

23  the request, not so much the technology.

24  **Q.**    Okay.

25  **A.**    So essentially teaching people that this is an option.

1  **Q.**    All right.  And Mr. Mims showed you a diagram from last

2  night, Government G-4A and G-4B.  You see those?

3  **A.**    Yes.

4  **Q.**    And the radius -- that's similar to the one in your

5  report; is that correct?

6  **A.**    It is.

7  **Q.**    And then I believe this is the zoomed in -- zoom-in

8  version?

9  **A.**    It appears to be, yes.

10  **Q.**    And in this diagram, you're familiar with the landmarks

11  here.  The intersection of the road; right?

12  **A.**    Yes, the railroad tracks.

13  **Q.**    Railroad tracks that we saw the train on the video.  And

14  this is the post office right here (indicating); right?

15  **A.**    Correct.

16  **Q.**    None of these devices are in that parking lot of the post

17  office, are they?

18  **A.**    The circles intersect with the parking lot, but, you

19  know, they -- I wouldn't say that they're -- they're not

20  confined to the parking lot, no.

21  **Q.**    Right.  The GPS coordinates where those green pegs are?

22  **A.**    No.  They're -- again, they're not confined to the -- to

23  the parking lot.

24  **Q.**    Which is right here (indicating)?

25  **A.**    Correct.

1  **Q.**     Thank you, Mr. McInvaille.

2          **THE COURT:**  Mr. Travis?

3          **MR. TRAVIS:**  No thank you, Your Honor.

4          **THE COURT:**  So I understand that you've testified

5  about 42 times.  I'm really looking for some information, kind

6  of historical, that might help me here.

7          In those cases where you've testified, have you seen

8  in some instances the language that is used -- that is attached

9  to the affidavit in this case?

10          **THE WITNESS:**  Similar language, yes.

11          **THE COURT:**  So this language in Paragraph 2 says "Law

12  enforcement will seek additional information regarding those

13  devices through further legal process."  Have you ever

14  testified regarding what that further legal process entails?

15          **THE WITNESS:**  So the other cases that I've had

16  where -- so each of these warrants kind of -- they facilitate

17  their own steps.  So the over -- the overall process from start

18  to finish is generally about the same.  Sometimes Step 2 gets

19  removed, and then sometimes Step 2 is in there.  The other

20  piece that gets added or removed is the "further legal

21  process."

22          So, for example, in *Chatrie*, that warrant is very

23  similar to this warrant.  The one piece that this warrant has

24  that *Chatrie* does not is the "further legal process."  So, for

25  example, switching over to other cases that I've worked where

1  they say "further legal process," it's because more warrants
2  are required to go through the steps.

3       In the *Dawes* case, we actually learned that from the
4  time that that initial search warrant was done to subsequent
5  search warrants that that team was initiating later, that the
6  judge had actually asked them to begin adding in a step to get
7  further legal process for each and every request throughout the
8  steps.

9       So they would go from Step 1 with the original
10 warrant, get that data.  They would then analyze and take a
11 look at it.  If they decided we want, you know, one or three of
12 these people to move on to the subsequent steps, they would go
13 get a new warrant, make that request to Google, and then,
14 again, analyze and, if needed, make another subsequent request
15 with legal process -- new legal process.  A brand new search
16 warrant.

17      So, essentially, for a three-step process, they would
18 go get three warrants.  In the initial warrant, they would
19 describe that I'm going to do each of these things with a
20 separate warrant in between each one.  And that's generally the
21 way it's described, is with further legal process.

22      **THE COURT:**  So, to clarify, I had questioned myself as
23 to whether the intent might be that there be a separate warrant
24 for Step 2 and a separate warrant for Step 3.

25      **THE WITNESS:**  I've seen that several times, yes.

1    **THE COURT:**  Now, you've seen that, but have you seen
2  it in all your cases?

3    **THE WITNESS:**  No.  Again, these warrants have been
4  tailored in -- in different ways.  There's times that I see all
5  three steps.  There's some times that I see two steps.  There's
6  times that I see three steps with warrants in between or just
7  two steps with warrants in between.  It's really on how it's
8  been tailored and presented to the judge.

9    **THE COURT:**  So, to be clear, looking at this
10  particular one, when you see in Paragraph 2 -- do you need to
11  look at this language?

12    **THE WITNESS:**  I -- I recall it.

13    **THE COURT:**  Okay.  When you see in Paragraph 2 "and
14  will seek any additional information regarding those devices
15  through further legal process," in all of your other cases,
16  your testimony has been consistent that that requires
17  additional warrants at each stage?

18    **THE WITNESS:**  Right.  Because if you actually read
19  that paragraph, what it states is it outlines we are going to
20  ask for and receive the anonymized data, which is that G-3 page
21  that they've shown us several times.

22    Once we have that information, we will analyze, and
23  then if we want to seek more information.  So, if we want the
24  contextual information and if we want to determine who the
25  subscriber is, that we will get further legal process.

1          In my other cases that I have had where that is

2     spelled out, there are multiple warrants for this one process.

3          **THE COURT**:  So is it fair to say that in the cases

4     you've testified that what you deem as an expert to be required

5     is dependent upon the language in the search warrant?

6          **THE WITNESS**:  Exactly, yes.

7          **THE COURT**:  Okay.  So tell me -- this 68 percent

8     accuracy that I see referred to, can you tell me what that

9     means?

10          **THE WITNESS**:  Yes.  So if you recall the two pictures

11     that we've been going through with the circles around the

12     geofence, those circles on that map's display radius has been

13     provided.  So, as Mr. Mims said, you can take that latitude and

14     longitude, drop it on the map.  You then draw the circle around

15     that reference location.

16          **THE COURT**:  Uh-huh.

17          **THE WITNESS**:  Then you can kind of forget that that

18     center point exists at that point.  You can take the little pin

19     drop and pull it out, get rid of it, because now what we know

20     is that the device should be within this circle.

21          Now, Google has testified that it is their goal that

22     68 percent of the time the device should be located somewhere

23     within that circle.  So for -- let's just take the 92-meter

24     circle that's in the center here, that center blue circle, the

25     smallest one.  Google is saying that the device should be

1   located within the boundaries of that circle 68 percent of the

2   time, meaning there is a chance that the device could be

3   outside of the circle somewhere as well.

4   **THE COURT:**  And back to Mr. Chiniche's question, like

5   this diagram here does not represent that the green -- where

6   the green dot is positioned on the map means that the person

7   with the device was standing at that exact location?

8   **THE WITNESS:**  Exactly.  So it's somewhere within

9   the -- it should be somewhere within each of those circles.

10   Each one of those is a separate measurement.

11   **THE COURT:**  So you started doing this in 2017?

12   **THE WITNESS:**  I began working at Envista in 2017, yes.

13   **THE COURT:**  So help me with the history.  At that

14   time, I don't think there was a case -- our search warrant was

15   signed in November of 2018.  To your knowledge, what -- what

16   law -- what were you using prior to the decision -- the first

17   decisions that came?

18   **THE WITNESS:**  So this process of asking for this data

19   is relatively new.  The underlying data, the location history

20   specific to a person's account, we've been -- I've been

21   reviewing that since -- since I was in law enforcement 2013.

22   That's -- that's a function that we've been able to get and

23   review.

24   So that technology, as far as how that process and how

25   that data is collected and used and how that works, has been

1    reviewed by law enforcement for, you know, ten years now.

2    **THE COURT:** Primarily from cell tower dumps?

3    **THE WITNESS:** So, no, from Google itself. But, again,

4 that request at that time was and still is, in some instances,

5 the specific account. I'm asking for your specific account

6 because I want to know where you are versus this is a new

7 request that has been tailored so that if I don't know who you

8 are and I want to try to find you, then I can find you.

9    **THE COURT:** Okay. Have you testified before regarding

10 whether or not a search was overbroad?

11    **THE WITNESS:** Yes. So I often get asked that in these

12 specific requests.

13    **THE COURT:** So, in *Google V*, that was 875 square

14 meters. This one is, like, 98,000 square meters. I don't

15 recall anybody has mentioned that today. Is that overbroad or

16 not?

17    **THE WITNESS:** So, in terms of the box that you see

18 drawn, one of the important things to understand here is that

19 the -- the only thing that the time in the box restricts is how

20 much data they receive back. It has no impact on the search

21 that's conducted.

22       So I often tell you that if you -- if you took one of

23 the tiles on the floor and said, "Hey, Google, I want to know

24 who's in that -- on that -- standing on that tile for one

25 minute," the search of all of the users still has to occur.

1  Now, because we made that box so very small, they might only
2  return one person, but they had to still search everyone.

3       So the box really does nothing to restrict the search.
4  It only restricts what they get back in return.

5       **THE COURT:**  The result?

6       **THE WITNESS:**  Right.

7       **THE COURT:**  So the fact that this search is three or
8  four acres doesn't matter?

9       **THE WITNESS:**  Honestly, no.  If they would have drawn
10  it bigger, they may have returned more users, but the search
11  was still the same.  If you draw it smaller to just the
12  confines of the -- of the parking lot or the building there or
13  the back of the building, you may have returned less users,
14  but, again, it's not going to change the search that was made.

15       **THE COURT:**  I think I understand.  So, in this
16  affidavit, it mentions all location data, including cell tower,
17  GPS, and other Wi-Fi means.

18       **THE WITNESS:**  Right.

19       **THE COURT:**  Is -- is there anything about this case
20  that is significant to you about the source?  Do you even know
21  the source?

22       **THE WITNESS:**  So it tells you in the -- in the records
23  what source was used to derive each of the locations.  So if
24  you look at that G-3 -- it should be about four columns over, I
25  believe, four or five columns over -- you'll see the source

1  that was used.

2  **THE COURT**:  And several of those -- that first number,
3  whatever it was, it shows Wi-Fi.  Then the last three, I think
4  it is, shows GPS.  Does that matter?

5  **THE WITNESS**:  No, it does not.  What you're looking at
6  is that is, at that time, what Google used to determine those
7  locations is really all it is.  It doesn't -- it doesn't change
8  what the scope of the search was or any of that.  So, no, I
9  would say it's insignificant.

10  **THE COURT**:  And it doesn't speak to the accuracy?

11  **THE WITNESS**:  No.  Wi-Fi is -- all of them are
12  estimations.  Wi-Fi is even more of a broader estimation than
13  GPS, but, no, it should not have any significant problem with
14  the -- with the accuracy.  What you see there is relatively
15  what you get.

16  **THE COURT**:  In the cases that you've testified in, is
17  it always alleged in the affidavit that a phone was used or
18  possibly used?

19  **THE WITNESS**:  I can't speak to that and say that every
20  one, but I know I have seen it where it's mentioned.  But, of
21  course -- so, for example, in *Chatrie*, in that matter, the
22  person was standing directly underneath a camera.  You could
23  see the physical phone in their hand.  You could see the color
24  of the phone.  That's how close it was.

25  So I can't speak to all of them but -- actually, no, I

1   can -- I can say for sure that not all of them reference having

2   a phone. *Dawes* in California does not reference having a phone

3   because they didn't have any pictures, video, any inclination.

4   It was just looking because they thought they may just because

5   people have phones.

6           **THE COURT:** Did you testify in *Google IV*?

7           **THE WITNESS:** I'm sorry?

8           **THE COURT:** Did you testify in the case that's denoted

9   as *Google IV*?

10          **THE WITNESS:** Which one is that?

11          **MR. LEWIS:** Your Honor, *Google I, II, III, IV,* and *V*

12   were all *ex parte* matters --

13          **THE COURT:** Got you.

14          **MR. LEWIS:** -- where the magistrate judge just ruled

15   on them. And this is maybe kind of new to me, but had a

16   written opinion based on a warrant application. The only

17   developed records -- you could ask him, but *Chatrie*, *Dawes*,

18   maybe a case in Florida where there was an evidentiary hearing

19   like this, Your Honor.

20          **THE COURT:** Okay. So, Counselors, put this in the

21   back of your mind. Later, after you make your argument, I do

22   have some questions for you, but it's my understanding that the

23   *Google IV* case, the affidavit did not allege that the suspect

24   had a phone?

25          **MR. MIMS:** That may be. I have got it here. I can

1  look at it.  But, in fact, there are many, many cases in which
2  there's no allegation in the affidavit that the subject had a
3  phone.  I've gotten geofence warrants before on cases I've
4  worked on where we had no video, had no idea whether there were
5  phones there or not.  The affidavit is based on a statement
6  that, hey, criminals, like everybody else, they all have a
7  phone.  And if they have a phone, Google could have location
8  information.

9       **THE COURT:**  Okay.  Is it significant to you in this
10 case that of the three device numbers that came back to turn
11 out to be two of the defendants in this case, the other, the
12 permanentwaves dot whatever, was not further searched?  Does
13 that in any way make the identity of the two positive hits less
14 reliable?

15      **THE WITNESS:**  No.  My only concern with the -- I'm
16 sorry -- the waves account -- I can't recall the first part --
17 is that, you know, the portion that had been described earlier
18 about realizing that that account was insignificant to the
19 investigation based on time comes from the very first step of
20 the warrant.  So you see that time that was being used, that
21 1758 time there on the screen, that comes from the very first
22 data set.

23      And as a result of even realizing that that was
24 insignificant due to the time, it's -- that account still
25 progressed through Step 2 and Step 3.  And then, instead of

1 getting the further information to get more locations for that

2 account that would have shown you where this person possibly

3 lives, where they go to work every day, things like that that

4 would allow you to identify them was not sought.

5 So it's weird that this device makes it through all

6 three steps and then is determined to not be relevant based on

7 a piece of information that came from the very first step.

8 **THE COURT:** Okay. Mr. Mims, any questions in light of

9 mine?

10 **MR. MIMS:** I do, Your Honor.

11 **RECROSS-EXAMINATION**

12 BY MR. MIMS:

13 **Q.** Mr. McInvaille, in relation to that last set of

14 questions, you did -- you were here when Mr. Mathews testified;

15 right?

16 **A.** Yes.

17 **Q.** You did hear him say they tried to figure out who

18 permanentwavesrecords was and could not locate that; correct?

19 **A.** Yes.

20 **Q.** Okay. So they didn't just completely ignore it. They

21 tried to follow up and couldn't find it?

22 **A.** Yes.

23 **Q.** Because it could have been a person who was in the

24 vicinity at the time and may possibly have been a witness;

25 right?

1  **A**.    It's possible.

2  **Q**.    Okay.  But from the video, it clearly wasn't somebody who

3  was involved in the robbery, was it?

4  **A**.    I don't -- I don't know that I can make that

5  determination.

6  **Q**.    Okay.  So you were asked a question about this further

7  legal process.  You would agree with me that in this language

8  here that's in the second page to Attachment A to the warrant,

9  the language that kind of lays out Step 1, Step 2, and Step 3,

10  right --

11  **A**.    Correct.

12  **Q**.    -- it doesn't say anything about -- it doesn't say

13  specifically going back for another search warrant, does it?

14  **A**.    It says "further legal process."

15  **Q**.    I understand it says that.  It doesn't say go back for a

16  search warrant, does it?  It doesn't use the word "search

17  warrant," does it?

18  **A**.    What would be legal process then?

19  **Q**.    Sir, I'm asking you, does it say go get another search

20  warrant?

21  **A**.    I'm just trying to understand what legal process would be

22  if it's not a search warrant.

23  **Q**.    Mr. McInvaille, I appreciate -- I appreciate that.  I'm

24  asking you a very specific question.

25  **A**.    Okay.

1 **Q.** When it comes to Step 2 and Step 3 --

2     **THE COURT:** Answer his question.

3 **BY MR. MIMS:**

4 **Q.** -- it does not use the words "go get another search

5 warrant," does it?

6 **A.** No. It says "further legal process."

7 **Q.** Okay. And my understanding is when -- when I've talked

8 with case agents -- and I've dealt with multiple geofence

9 warrants. I've talked to them about how do you do this, what

10 do you submit to Google -- they always talk about the Google

11 legal portal. Do you call -- have you heard it called the

12 legal portal?

13 **A.** Yeah. LERS, L-E-R-S, the portal.

14 **Q.** Okay.

15 **A.** It can be named a few things.

16 **Q.** What does LERS stand for?

17 **A.** Law Enforcement Resource something, I believe.

18 **Q.** Okay. If you're wanting to have legal communications on

19 search warrants with Google, you go through this legal portal,

20 don't you?

21 **A.** Yes.

22 **Q.** All right. And, in fact, this Attachment A says -- in

23 regards to Step 2 and Step 3, it says that once these accounts

24 have been identified in Step 1, the devices that were present,

25 law enforcement may review those, and upon demand, the provider

1  shall provide more information; correct?

2  **A.**  Yes.

3  **Q.**  And, again, it says the same thing in Step 3.  Upon

4  demand, the provider shall provide; right?

5  **A.**  Yes.

6  **Q.**  Now, would you agree with me that Google is not

7  necessarily the most law enforcement friendly company out

8  there?

9  **A.**  They seem to respond, what, 10,000 times a year it

10  sounded like.

11  **Q.**  Really.  Have you ever -- have you ever as a case agent

12  submitted geofence warrants to Google?  You haven't, have you?

13  **A.**  No.  I've submitted other requests.

14  **Q.**  Would you disagree with me if I told you that Google

15  would be very hesitant to refuse (sic) to comply if they didn't

16  think you had dotted all of your I's and crossed all of your

17  T's legally?

18  **A.**  Say that again.

19  **Q.**  Would you disagree with me if I told you that Google

20  would not hesitate to reject your warrant if you didn't take

21  all of the appropriate steps in their mind?

22  **A.**  That's right.  They will.

23  **Q.**  I'm sorry?

24  **A.**  They will reject your warrant, yes.

25  **Q.**  Yes.  Now, you talked about the 68 percent probability.

1    I've never really fully understood that.  What you're telling

2    me is, when you draw this circle -- or when Google provides

3    information that leads to these circles, that there's a

4    68 percent probability that the device is inside the circle;

5    right?

6    **A**.    Correct.  Yeah.  Forget the geofences here.  Just look at

7    the circle.  One individual circle at a time.  68 percent of

8    the time it's in the circle.

9    **Q**.    Which means 32 percent of the time it might not be or

10   wouldn't be?

11   **A**.    It's possible, yes.

12   **Q**.    Okay.  But wouldn't -- even for the 32 percent, we're not

13   saying there's a 32 percent chance that that device is back

14   home in Batesville an hour away.  It just might be over here,

15   not inside the circle; right?

16   **A**.    It could be.

17   **Q**.    Well, let's talk about -- I'm not talking about could be.

18   What I'm saying is, you're telling this Court that, well -- if

19   I understand it correctly.  If I'm wrong, tell me.  What I

20   understand you saying is, just because Google says here's your

21   latitude and longitude, here's your radius, draw a circle, it's

22   still only a 68 percent chance you're inside that circle.

23        What I'm saying is, that doesn't mean there's only a

24   68 percent chance they are really there at all, period.

25   There's still 100 percent chance they're near this post office.

1    They might just be outside the circle, not inside?

2    **A.**   Again, that's possible. That's correct.

3    **Q.**   What's not possible is it doesn't mean there's a

4    32 percent chance they were nowhere near here?

5    **A.**   I don't think they would be -- you said Batesville. No,

6    I don't think so.

7    **Q.**   Yeah. They're not an hour away or they're not 30 minutes

8    away?

9    **A.**   Correct.

10    **Q.**   They're here?

11    **A.**   Somewhere, yes.

12    **Q.**   Okay. And the last thing, you were asked some questions

13    about the size of the box. You can draw a geofence box all

14    sorts of different sizes, can't you?

15    **A.**   You can.

16    **Q.**   In fact, sometimes you don't draw a box. Sometimes you

17    just put one latitude and longitude and say -- and you do a

18    radius around that and say give me everything within a hundred

19    meters of this latitude and longitude; right? You've seen

20    those?

21    **A.**   Yes. You can even see people where they'll draw polygons

22    that cover just the parking lot and a strip of the road, or,

23    you know, it can be shaped like a "T." It can be anything.

24    **Q.**   And you typically base that on the different crime scenes

25    you're dealing with; right?

1  **A**.    They probably do, yes.

2  **Q**.    So, in this case, we had evidence from the video that

3  you've got -- you've got the assailant -- let me get the other

4  one that zooms in.

5      You've got an assailant that's here behind the post

6  office (indicating).  You've got a white SUV that comes across

7  the road and down here and back twice (indicating).  You've got

8  a red car that comes in here -- I can't remember the direction

9  it comes from, but it comes in here -- I think it comes this

10  way (indicating), and then it goes across the tracks and turns

11  around and comes back and then comes up here in the roadway in

12  front of this building right here (indicating).

13      So, in other words, here it makes sense.  Don't just draw

14  a little box right around the post office, but let's encompass

15  these roads where the cars are traveling.  That makes sense,

16  doesn't it?

17  **A**.    Again, yeah, you could draw the polygon to cover, you

18  know, the areas that you're describing in the video.  You could

19  tailor it to those -- you know, to that strip of road, that

20  section.  You could tailor how you -- how you need it.

21  **Q**.    Have you ever been to Lake Cormorant, Mississippi?

22  **A**.    I'm sorry?

23  **Q**.    Have you ever been to Lake Cormorant, Mississippi?

24  **A**.    No, sir.

25  **Q**.    I will tell you there is nothing there, as you can

1  probably see from this map.  There's literally nothing there.

2  At 5:30 on a Monday afternoon --

3         **MR. LEWIS**:  Excuse me, Your Honor.  I think people

4  from Lake Cormorant would object to that.

5         **MR. MIMS**:  I'm not sure there's anybody from Lake

6  Cormorant to object to it.

7  **BY MR. MIMS**:

8  **Q**.    But let me ask you this question.  You would agree with

9  me there would be a difference in the number of people you

10 might expect in Lake Cormorant, Mississippi, at 5:30 p.m. on a

11 Monday afternoon compared to the Oxford Square at noon on a

12 football Friday weekend?

13 **A**.    Right.  You're going to return a different set of users,

14 yes.

15 **Q**.    Right.  And so, in a case like this where you're looking

16 at a crime in Lake Cormorant, you might draw a bigger box

17 partly because you've got roads you're trying to cover, but

18 partly because you know you're only going to get a few devices

19 anyway; right?

20 **A**.    It's possible.

21 **Q**.    Whereas, if -- you've probably never been to Oxford on a

22 football Friday, but let me tell you, it gets crazy around

23 here.  If you had a crime on the Square at noon on a Friday

24 before a football game, you're going to have to probably draw a

25 small box or you're going to get way more information?

1   **A**.   Right.  They're going to respond with more users, yes.

2   **Q**.   Yeah.  So the size of the box can sometimes be related to

3   your location and the number of people that may be there;

4   right?

5   **A**.   It could.  It restricts the return, yes.

6   **Q**.   All right.  Thank you.

7         **MR. MIMS**:  No further questions, Your Honor.

8         **THE COURT**:  Let me ask you a question, and so you will

9   know it when you get there.  On the 32 percent, does that mean

10   that someone could be inside the radius and not be detected?

11   Is that some of the 32 percent?

12         **THE WITNESS**:  Yeah.  I mean, you could have -- so it

13   kind of goes both ways.  In cases that I've had, you'll either

14   have people who never entered the geofence -- if they have a

15   bad estimation or an estimated inside, well, now their data

16   gets returned versus -- you can also have bad estimations the

17   other way.  Let's say you know that device is squarely within

18   the geofence but a bad estimation is made by Google and puts

19   them outside of the fence, now their data is not returned.  So

20   that actually cuts both ways.

21         I've seen plenty of data where in Step 2 you see

22   people travel.  Let's just say -- you know, this covers a lot

23   of the street, but there are some that will meet up close to

24   the street but not encompass it.  You'll see people travel and

25   then jump in and jump back out.  You can tell they never

1    stopped.  There's no way they stopped based on their path of

2    travel and speed.

3          **THE COURT:**  Okay.

4          **MR. MIMS:**  May I follow up on that?

5          **THE COURT:**  Yes, sir.

6    **BY MR. MIMS:**

7    **Q.**    Mr. McInvaille, just one question on that.  Fair to say

8    that as far as this whole 68 percent deal, Google is exercising

9    its own good faith to try to comply with the warrant to say who

10   they reasonably believe to be within the parameters?

11   **A.**    Again, they're returning the estimates that they have,

12   yes.

13         **THE COURT:**  Counselors?

14         **MR. LEWIS:**  We have no questions.

15         **MR. CHINICHE:**  No, Your Honor.

16         **MR. TRAVIS:**  No thank you.

17         **THE COURT:**  Let's take a break and then -- you're

18   finally released.  You can sit in the courtroom.

19                              * * * * *

20

21

22

23

24

25

1    CERTIFICATE

2

3        I, Phyllis K. McLarty, Federal Official Realtime Court

4    Reporter, in and for the United States District Court for the

5    Northern District of Mississippi, do hereby certify that

6    pursuant to Section 753, Title 28, United States Code, that the

7    foregoing 73 pages are a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12       Witness my hand, this 16th day of February, 2023.

13

                         /s/ Phyllis K. McLarty
14                       PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
                         Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25