1       UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF MISSISSIPPI
2         OXFORD DIVISION

3
  UNITED STATES OF AMERICA     PLAINTIFF
4

5
  VS.           NO. 3:21CR107
6

7
  JAMARR SMITH, THOMAS IROKO AYODELE,
8  AND GILBERT McTHUNEL, II    DEFENDANTS

9

10
      TESTIMONY OF CHRISTOPHER MOODY
11       EXCERPT FROM JURY TRIAL

12
     BEFORE HONORABLE SHARION AYCOCK
13     UNITED STATES DISTRICT JUDGE

14
       Oxford, Mississippi
15       February 23, 2023

16

17
      APPEARANCES NOTED HEREIN
18

19

20

21

22

23  Court Reporter:  PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
         Federal Official Court Reporter
24         911 Jackson Avenue East
         Oxford, MS 38655
25

1   <u>APPEARANCES:</u>

2   For the Government:   ROBERT J. MIMS, Esquire
                         CLYDE McGEE IV, Esquire
3                        U.S. Attorney's Office
                         900 Jefferson Avenue
4                        Oxford, MS  38655

5   For the Defendant
     Smith:              GOODLOE T. LEWIS, Esquire
6                        Hickman, Goza & Spragins, PLLC
                         P.O. Drawer 668
7                        Oxford, MS  38655-0668

8   For the Defendant
     Ayodele:            WILLIAM F. TRAVIS, Esquire
9                        8619 Highway 51 North
                         Southaven, MS  38671
10

    For the Defendant
11   McThunel:           PAUL A. CHINICHE, Esquire
                         Chiniche Law Firm, PLLC
12                       P.O. Box 1202
                         Oxford, MS  38655-1202
13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              *  *  *  *  *
 1
 2        (JURY IN.)
 3            THE COURT:  Okay.  You may have a seat.
 4            Let the record reflect that the jury is back in the
 5   courtroom.
 6            Ladies and gentlemen, the screen is being positioned
 7   to where hopefully all of you can see the screen.  I'm going to
 8   rely on the screen here to my left for those that will be
 9   examining the witness and then allow you to view that one.
10            From time to time, documents may be shown to you as
11   well as this witness.  The marvel of technology.  And so, just
12   know that if documents are shown, then you're going to see them
13   on your individual screens there.  Okay?
14            Let's test audio and just make sure we're okay.
15            MR. McGEE:  Mr. Moody, can you hear me?
16            THE WITNESS:  Yes, sir.
17            MR. McGEE:  Thank you.
18            Your Honor, at this time, the government would move --
19   again, we spoke about this previously, but the government would
20   move to admit G-25, which contains three videos and one
21   PowerPoint slideshow, into evidence.
22            THE COURT:  No objection -- I heard no objection
23   during the break.  That will be received.  G-25 is received.
24        (EXHIBIT NO. G-25 ADMITTED INTO EVIDENCE.)
25            MR. McGEE:  Could you state your name for the record?
```

1      **THE WITNESS:** Yes. My name is Christopher Moody.

2      **COURTROOM DEPUTY:** He hasn't been sworn.

3      **MR. McGEE:** They're going to swear you in first.

4      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

5      **CHRISTOPHER MOODY, GOVERNMENT'S WITNESS, AFTER BEING**

6      **DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS VIA ZOOM:**

7                          **DIRECT EXAMINATION**

8      BY MR. McGEE:

9      **Q.** Could you state your name again for the record?

10     **A.** Yes. My name is Christopher Moody.

11     **Q.** And, Mr. Moody, by whom are you employed?

12     **A.** I'm employed by the United States Postal Inspection

13     Service.

14     **Q.** And what's your position there?

15     **A.** I'm currently the technical surveillance coordinator for

16     the inspection service.

17     **Q.** Okay. And what kind of things -- what kind of duties

18     does that involve?

19     **A.** So that involves doing investigation analysis of new

20     technologies for investigation. I manage two senior technical

21     surveillance specialists. I act as a subject matter expert on

22     GIS mapping and also on communications intercept.

23     **Q.** Okay. And do you work on -- just to kind of put it in

24     layman's terms, do you work on phone records and geolocation

25     records from Google and other social media platforms?

1   **A.**   Yes, I do.

2   **Q.**   And how long have you been doing that?

3   **A.**   I've been doing that for approximately 13 years total,

4   the last three years as a technical surveillance coordinator.

5   **Q.**   Okay.  And let me -- let me stop you there.  So you're

6   obviously on Zoom today, and I don't want to get into any

7   details or anything.  I don't want to get into any personal

8   medical issues, but you were not authorized to travel down

9   here; is that correct?

10   **A.**   That is correct.

11   **Q.**   And -- but you're the guy -- you're the analyst that's

12   been working on this case; correct?

13   **A.**   That is correct.

14   **Q.**   Okay.  So have you been certified or recertified?

15   **A.**   Yes.  I have taken training courses from the FBI task

16   team, from NATIA, from PenLink, CellHawk, and other providers

17   in phone analytics.

18   **Q.**   Okay.  And how often is that training -- how often do you

19   get that training?

20   **A.**   So I take some form of that training every year from

21   different providers, different training classes.

22   **Q.**   And is that because technology is ever changing; is that

23   right?

24   **A.**   Yes.  The technology is always changing.  The way that

25   the different providers handle phone records is always

1    changing, and the way that their towers work is always
2    changing.

3    **Q.**   Okay.  And what's your educational background?
4    **A.**   So I'm a certified electronics technician.  I have an
5    associate's degree in computer sciences with a major in
6    criminal justice and a bachelor's in computer forensics and
7    digital investigations.

8    **Q.**   And prior to today's testimony, have you been qualified
9    as an expert with specialized knowledge in regards to cell
10   phone location data?

11   **A.**   Yes, I have.

12   **Q.**   And where was that?

13   **A.**   That was in the Western District of Tennessee in Memphis
14   courthouse.

15   **Q.**   Okay.  And how many times was that?

16   **A.**   That was twice.

17   **Q.**   And have you ever been rejected as an expert?

18   **A.**   No.

19            **MR. McGEE:**  Your Honor, at this time, the government
20   would move to admit Mr. Christopher Moody as an expert in the
21   field of cell site and geolocation/historical location records.

22            **THE COURT:**  Do you wish to voir dire?

23            **MR. LEWIS:**  I do, Your Honor.

24            **THE COURT:**  Mr. Lewis, you may come forward to
25   voir dire this expert on his qualifications.

1    **VOIR DIRE EXAMINATION**

2    **BY MR. LEWIS:**

3    **Q.**    Hi, Mr. Moody.  My name is Goodloe Lewis.  So I believe

4    you're going to offer testimony today in two areas, and the

5    first is -- this is what the government called it -- cell phone

6    technology, cell towers, and analysis of historical cellular

7    phone records for determining location.  Does that sound right?

8    **A.**    That sounds correct.

9    **Q.**    Okay.  And then the second topic is device location

10   analysis, location data analysis, and Google location data

11   history analysis for the purpose of determining approximate

12   location.  Does that sound right?

13   **A.**    Yes.

14   **Q.**    So, for shorthand, I'm going to call these two separate

15   topics historical cell phone records and Google location data.

16   Does that sound fair?

17   **A.**    Sounds fair.

18   **Q.**    Okay.  So we're going to start on historical phone

19   records.  To be clear, the technology that you're about to

20   testify today, even in 2023, has only been validated in the law

21   enforcement community; right?

22   **A.**    As far as cell phone technology?

23   **Q.**    Historical cell --

24   **A.**    No.  Cell phone --

25   **Q.**    Go ahead.

**A.**     So even the providers use some form of historical cell phone analysis for doing site survey and use of their data towers on how well they're working.  So that's not a totally correct statement that only law enforcement uses the location technology.

**Q.**     That's not exactly what I'm asking.  I'm asking, has the greater scientific community validated this historical cell phone data that you're going to testify about, or has it mainly just been validated by law enforcement?

**A.**     I know that it has been validated by law enforcement.  I can't say outside of that what other scientific investigations have been done.

**Q.**     Fair enough.  And, obviously, law enforcement has a vested interest in this being reliable and admissible; right?

**A.**     Law enforcement does have an interest in the testimony of the data.  I don't know that it (audio interference) because we also use it to exclude suspects or targets.

**Q.**     Well, okay.  I think you answered my question, which is that law enforcement is testifying about this stuff in trials, that is, people like you, and, therefore, law enforcement has an interest in it being reliable, else you wouldn't be here; right?

**A.**     Okay.

**Q.**     All right.  So do you -- do you know of any authoritative journals or publications in the area of cell tower historical

1   data that I can access that are not government documents?

2   **A.**   Not that I'm aware of.

3   **Q.**   Okay.

4   **A.**   But I do know that you have contracted individuals from

5   your firm to provide evidence.  So, evidently, they have access

6   to these reports.

7   **Q.**   But you don't know one way or the other whether that

8   comes from law enforcement or the greater scientific community.

9   You just don't know?

10  **A.**   No.

11  **Q.**   All right.  So I'm going to turn now to the Google

12  location data history.  And you have never testified about that

13  to a jury before?

14  **A.**   No.

15  **Q.**   To be even clearer, nobody has ever testified about that

16  to a jury before?

17  **A.**   I do not know that that is accurate.

18  **Q.**   You don't know one way or the other?

19  **A.**   I don't know that your statement is accurate.  So I

20  cannot --

21          **MR. McGEE:**   Your Honor --

22  **A.**   -- answer one way or the other.

23  **BY MR. LEWIS:**

24  **Q.**   Okay.

25          **MR. McGEE:**   May we approach?  I have an objection.

1        **THE COURT:**  Okay.

2        (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

3        **MR. McGEE:**  Your Honor, first of all, I think it's

4   outside the scope of voir diring the expert, but, secondly, I

5   think he's -- Mr. Lewis has been making generalizations about

6   how many trials this has been in.  And, I mean, they cited a

7   case where it had been extensively litigated, and he is making

8   it sound like this is the first case that has ever used Google

9   location, which is kind of not true.

10       **MR. LEWIS:**  I'm being very careful to say before a

11  jury in a jury trial.  And he didn't know.  He has answered the

12  question.  I don't think I'm going to ask him anything else

13  about trials.

14       **THE COURT:**  Okay.  Stay within the voir dire.  Okay?

15  Thank you.

16       (END OF BENCH CONFERENCE.)

17  **BY MR. LEWIS:**

18  **Q.**   This is, assuredly, a novel theory about this Google

19  location data; right?  It hasn't been around very long?

20  **A.**   Well, Google hasn't been around very long either.

21  Technology continues to grow, and we keep getting new tools.

22  **Q.**   Okay.  So it -- you've given us your CV in this case;

23  correct?

24  **A.**   Correct.

25  **Q.**   That's like your résumé, your qualifications; correct?

1 **A.**   Correct.

2 **Q.**   And your CV contains no mention of having Google geofence

3 training; correct?

4 **A.**   Correct.

5 **Q.**   There have been no studies or analysis by somebody other

6 than Google or the government to state that this theory about

7 geofence location is reliable or unreliable; right?

8 **A.**   Not to my knowledge.

9 **Q.**   You're not aware of any scientific studies that have

10 tested this theory to determine if it's reliable?

11 **A.**   Not to my knowledge.

12 **Q.**   You're not aware of any peer review publications

13 discussing this technology and validating its reliability?

14 **A.**   Not to my knowledge.

15 **Q.**   You do not know the error rate?

16 **A.**   Don't know that there is a current error rate available,

17 no, if that's what you're asking.

18 **Q.**   That was going to be my next question.  The error rate

19 has never been determined; correct?

20 **A.**   Neither has the positivity rate, for that matter.

21 **Q.**   Okay.  And this theory has not attained widespread

22 acceptance in the greater scientific community?  I'm not

23 talking about just the law enforcement community.

24 **A.**   Well, proximity analysis in targeted marketing does have

25 widespread acceptance.  So there are other communities out

1    there, not necessarily scientific communities, that are using

2    location history from these for targeted marketing.

3    **Q.**   Okay.  I'm asking you about the greater scientific

4    community, though.  You're not aware of anything?

5    **A.**   Yeah.

6    **Q.**   You're not aware that it's obtained widespread acceptance

7    in the greater scientific community?

8    **A.**   No.  And I don't know what relevant -- or what reason the

9    scientific community would be investigating either.

10            **MR. LEWIS:**  Your Honor, that's all of my voir dire,

11   and I do have an objection.

12            **THE COURT:**  Okay.  Let me allow the others to voir

13   dire.

14            Mr. Chiniche?

15            **MR. CHINICHE:**  No, Your Honor.

16            **THE COURT:**  Mr. Travis?

17            **MR. TRAVIS:**  No.  Thank you, Your Honor.

18            **THE COURT:**  Do I hear your objection?

19            **MR. LEWIS:**  I'll state it in front of the jury or

20   wherever you want me to state it.

21            **THE COURT:**  Okay.  State your objection.  I may call

22   you to the bench.

23            **MR. LEWIS:**  So, Your Honor, we're talking about two

24   separate topics that he's going to talk about.  One is the

25   historical cell phone data records.  My objection to that is

1  simply and only that it has not been validated by the greater

2  scientific community.  That is my objection to that.

3  **THE COURT:**  Does the government wish to respond?

4  **MR. McGEE:**  Can we approach the bench for my response,

5  Your Honor?

6  **THE COURT:**  Pardon?

7  **MR. McGEE:**  I think we need to approach the bench with

8  my response.

9  **THE COURT:**  You may.

10  (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

11  **MR. McGEE:**  Obviously, the government believes that

12  Mr. Moody is more than qualified to be an expert and frankly

13  hasn't -- this is the first time I have heard any objection to

14  any qualifications or whatnot.

15  But, secondly, I find it peculiar that they actually

16  called an expert for the same exact purpose in the motion to

17  suppress hearing -- so they offered an expert in this same

18  realm, this Google location records, and we didn't have an

19  objection.  The Court admitted.  And he has the similar

20  qualifications as this man.  Probably Mr. Moody has more.  And

21  so we would -- we would submit --

22  **THE COURT:**  Any response?

23  **MR. LEWIS:**  I don't have any additional argument.

24  **THE COURT:**  I am going to allow the witness to

25  testify.  So the objection is overruled, and you are free to

1  handle these things on cross.

2  **MR. LEWIS:** Do you want to hear me on the Google --
3  may I be heard on the Google objection as well?

4  **THE COURT:** Yes, you may.

5  **MR. LEWIS:** My objection is novel theory. I don't
6  think anybody has testified about this before in front of a
7  jury. He has not stated any of the basic fundamental factors
8  that *Daubert* requires an expert to testify as to a theory.

9  He doesn't know the error rate. There has been no
10 peer review. There has been no validation in the scientific
11 community. He has not testified this theory is generally
12 accepted. None of those factors. It is just absolutely none.
13 He is the least qualified witness he can be on this subject.

14 **THE COURT:** Again, I'm going to allow him to testify
15 as the government's expert. I overrule the motion. These
16 matters could better be served on a motion -- *Daubert* motion,
17 but, you know, you're going to have a lot of latitude in
18 cross-examination to make this jury understand that this is
19 novel technology. So proceed.

20 **MR. LEWIS:** Okay. Thank you.

21 (END OF BENCH CONFERENCE.)

22 **MR. McGEE:** Your Honor, so, at this time, the
23 government would move to admit Christopher Moody as an expert
24 in the field of cell site and geolocation/historical location
25 services.

1    **THE COURT:**  Thank you.

2        The Court has had the opportunity to hear objections

3    at the bench.  Having heard those objections, the Court

4    overrules the objection, allows this person to testify as an

5    expert in those fields for the government.

6        **MR. McGEE:**  Thank you, Your Honor.

7                    **DIRECT EXAMINATION**

8    **BY MR. McGEE:   (CONTINUED)**

9    **Q.**   Mr. Moody, what is a communications intercept?

10   **A.**   So a couple of terms.  Communications intercept is when

11   law enforcement collects data on individuals using

12   communication devices or applications.

13   **Q.**   Okay.  And who else collects information on -- from

14   communications?

15   **A.**   So communications data is collected by phone carriers

16   that provide service.  It's collected by applications that are

17   being used by individuals, and it's being collected by

18   organizations such as Google, Bing, and other agencies that

19   process data.

20   **Q.**   Okay.  And what is a cell site?

21   **A.**   So a cell site, in simple terms, is one half of a

22   communication between a cell phone and another party.  So your

23   individual would have a cell phone.  It talks to a cell site,

24   which is a tower or a set of antennas on a building somewhere

25   that received that signal, and then transferred either to

1   another cell tower or to a landline phone.

2   **Q.**   Okay.  And then -- so, as far as cell sites on the tower,

3   explain to the jury a little more about that.  We've heard a

4   little bit already about sectors.  If you could explain to the

5   jury what that means.

6   **A.**   So a cell site generally can have either a single sector

7   or multiple sectors.  The sectors are basically the direction

8   that the antennas are facing.  So, if a tower has three

9   sectors, they would have three sets of antennas.  One facing at

10  30 degrees, one facing at 120 degrees, and another facing at

11  240 degrees that would give you the whole coverage of the

12  tower.

13  **Q.**   And do certain towers have different sectors?

14  **A.**   Yes.  Towers can have what they call omni pole towers,

15  which are single sector 360-degree coverage.  They can have

16  three sectors, six sectors, nine sectors, depending on the

17  volume and location of the tower.

18  **Q.**   Okay.  What is the best way to describe what a cell phone

19  does?

20  **A.**   So the simplest way to -- a cell phone is like an old

21  school walkie-talkie.  It's a radio transceiver --

22  transmitter/receiver that sends a signal to the tower, and the

23  tower sees that, forwards it through a switch to the phone

24  company, and then sends that which is received on the cell

25  phone itself.

 1  **Q.**    And who -- who collects or stores that data after that
 2  phone call is made?

 3  **A.**    So that data is collected and stored by the service
 4  provider, whether it be T-Mobile, AT&T, Verizon, or any other
 5  service provider.

 6  **Q.**    Does each provider have its own tower?

 7  **A.**    Yes.  Most providers have towers, but there are providers
 8  that are called MVNOs or mobile virtual network operators that
 9  lease towers from the major providers.

10  **Q.**    You said lease towers?

11  **A.**    Yes.  So they use someone else's -- like, an AT&T
12  tower -- Cricket, which is an MVNO, uses AT&T towers.  Consumer
13  Cellular, which is another MVNO, uses Verizon towers.

14  **Q.**    How does the phone know which tower to communicate with?

15  **A.**    So the phones are programmed to their provider, to talk
16  to their towers first, and then if their tower is not
17  available, they would do what's called roaming, where they
18  would talk to an available tower on another provider that they
19  have contracts with.

20  **Q.**    And why would a tower not be available?

21  **A.**    So towers could not be available for many reasons, one of
22  which could be service.  If a tower got hit by lightning or a
23  phone company disruption on the landline handling it, then that
24  tower may not work.  So it may go to the next nearest tower.
25  Or --

1   **Q.**    What about tall buildings?

2   **A.**    -- it could be overcrowded.

3   **Q.**    Okay. So you said overcrowding. What about tall

4   buildings, could that -- or elevations such as mountains?

5   **A.**    A mountain could block a signal, or you could be too

6   close to a tower to get a signal from a given tower.

7   **Q.**    What about a rural flat area? Would it be easier to

8   get --

9   **A.**    Rural flat area?

10   **Q.**    Would it be easier to get a cell signal --

11   **A.**    They're going to give you --

12   **Q.**    I'm sorry.

13   **A.**    They're going to give you an -- easier to get a signal in

14   a straight area in a straight line, but you could be too close

15   to the tower. So that's why another tower may pick you up.

16   **Q.**    Okay. What does azimuth mean?

17   **A.**    Azimuth is the direction that the tower is pointing. As

18   I mentioned earlier, my example of 30 degrees, 120 degrees,

19   240. So it's the direction that the antennas are facing center

20   line. And then the antennas generally go out 60 degrees on

21   each side, for a total of 120 degrees.

22   **Q.**    So could you hit on all -- could you technically hit on

23   all cell sectors in one tower?

24   **A.**    Only at different points in time. Not simultaneously,

25   unless it's an omni pole sector, which is 360-degree coverage.

1          **THE COURT:**   Is that loud enough for you?

2          **JURORS:**   (Nod heads up and down.)

3   **BY MR. McGEE:**

4   **Q.**   Explain to the jury how -- how phone companies keep cell

5   site location information.

6   **A.**   So the phone companies have a master database that they

7   keep of their individual towers and locations that they update

8   regularly, and they provide that not only internally to their

9   customers but also to law enforcement and government agencies

10  through the NDCAC or the National Domestic Communications

11  Assistance Center in Washington, D.C., for use for analysis for

12  cases.

13  **Q.**   Okay.  So service of process has to be sent to the phone

14  company in order to get phone records or especially phone

15  geolocation records; correct?

16  **A.**   Geolocation records have to be done with a search

17  warrant.

18  **Q.**   Okay.  Let's talk about Google.  Does Google store

19  location data?

20  **A.**   Yes, Google does store location data.

21  **Q.**   Is Google -- are they storing that data for law

22  enforcement?

23  **A.**   No, not particularly.

24  **Q.**   Okay.  Why would they store that data?

25  **A.**   They store that data because they use it to analyze for

1    their customers their travel patterns, their history patterns,

2    to make recommendations and sell advertising.

3    **Q.**    Okay.  And so let's be clear about what we're talking

4    about.  Earlier we talked about phone cell site location

5    records; right?

6    **A.**    Correct.

7    **Q.**    And that was with phone companies?

8    **A.**    Correct.

9    **Q.**    And now we're talking about Google location records.

10   Could those also be through the use of a phone?

11   **A.**    Yes.  If they're using a Google application on a phone,

12   then the data would correlate with the phone.

13   **Q.**    And they would also have to have their location services

14   on; correct?

15   **A.**    That is correct.

16   **Q.**    Do you have to be making a call or sending a text message

17   when Google stores location data on you?

18   **A.**    No, you do not.

19   **Q.**    What type of location data is Google storing?

20   **A.**    So Google is storing a location on the phone based on one

21   of three types of location input.  They will either have a GPS

22   location, a Wi-Fi location, or a cell tower location.  GPS

23   being the most accurate and then moving backward through Wi-Fi

24   or cell site location.

25   **Q.**    Okay.  So let's talk first about GPS location data.  So

1   if I am riding down the road and I've got my location services
2   turned on and I pull up Google Maps or e-mail or have e-mail
3   running in the background, then how is -- how could Google get
4   GPS on us -- on my phone?

5   **A**.     So your phone has -- your phone has GPS antennas in the
6   phone, and the phone is looking to sky -- and it needs to see
7   clear sky.  So you can't be in a parking deck or an obstructed
8   view.  And it has to see one of three -- or three of sixteen
9   geostational (sic) satellites that are in orbit.  And with
10  three satellites, it can pinpoint your location anywhere in the
11  world.

12  **Q**.     So, just to be clear, that's coming from a satellite, not
13  from a cell tower?

14  **A**.     That is correct.

15  **Q**.     So two totally different things?

16  **A**.     Yes.

17  **Q**.     Tell me about sci-fi because -- I mean -- not sci-fi --
18  Wi-Fi, because this was -- this was fascinating to me.  I learn
19  something every day.  Please tell me how Google -- for example,
20  in these records I'll show you later, it shows Wi-Fi is a way
21  that Google collected location information on a customer.  How
22  does that -- how does that work?

23  **A**.     So the way the Wi-Fi works, initially when Google set out
24  to google street maps and street view, they sent cars around
25  the country with cameras and radio receivers on the cars, and

1  those radio receivers captured the Wi-Fi access points as they

2  were driving along.  So they had the location of the access

3  point relative to anyplace that they drove.  They then used

4  that to create their maps.  Nowadays, it's used via Android

5  devices.  The Android phones collect the data and report it

6  back.

7  **Q**.   Okay.  So let me make sure I understand that.  If I have

8  my phone and I'm looking at the -- and I turn it on Wi-Fi, what

9  can I see?

10  **A**.   You're going to see the access points that are available

11  to you to connect to.  They're being broadcast at all times out

12  in the open.

13  **Q**.   Okay.  So, if, for example, you live next door to me and

14  I open up my phone, I may see the name of your Wi-Fi; is that

15  correct?

16  **A**.   That is correct.

17  **Q**.   Okay.  And so I -- again, I may have to explain just to

18  make sure I understand.  So you're saying that -- you're saying

19  that Google rode around and collected these Wi-Fi points or

20  open -- open Wi-Fi?

21  **A**.   Correct.

22  **Q**.   Is that right?

23  **A**.   Correct.  So the actual SSID or ID is broadcast openly.

24  It could be a closed or a restricted Wi-Fi where you need a

25  password to access it, but you could see that it was there

1  unless it was hidden.

2  **Q.**    So Google knows the location of that SSID number.  Is

3  that what you're saying?

4  **A.**    Yes.  They know the location of where they picked it up.

5  Their vehicle captured GPS location information when they saw

6  those IDs and where they were.

7  **Q.**    Okay.  So, if Google sends us records through a search

8  warrant that says the data was collected via Wi-Fi, that's how

9  they did it?

10  **A.**    That's how they knew that the Wi-Fi was there, and their

11  report showed that that Wi-Fi was available to be connected to

12  when they sort the location data.

13  **Q.**    And then you mentioned a third way.  I think you said

14  cell or cell towers?

15  **A.**    Cell sites.  Cell sites.

16  **Q.**    Cell sites?

17  **A.**    Yeah.  Cell sites.

18  **Q.**    Okay.  So third completely separate way.  Explain that to

19  the jury, please.

20  **A.**    So, at that point, their software could see the cell site

21  that they were connected to, and that would correlate to a cell

22  site that was belonging to a provider, and they know where

23  those cell sites are located.

24  **Q.**    And that's all through the cell phone?

25  **A.**    It's all through the cell phone.

1  **Q.**   And their database?

2  **A.**   Yes.

3  **Q.**   So, just to be clear, if I pull -- if I pull out my phone

4  right now and I pull up Google Maps -- or why don't we say

5  this.  If I'm in my car and I'm riding down the road and I pull

6  up Google Maps and it drops a blue dot on top of me, is that

7  going to be accurate?

8  **A.**   Google has the idea in their company -- they want that to

9  be accurate 68 percent of the time.

10 **Q.**   Okay.  And -- okay.  What tools -- what tools did you use

11 in this case, in other words, software tools, to interpret and

12 analyze -- let's start with the phone location data?

13 **A.**   So, with the phone location data, we used primarily PLX,

14 which is an analytical software provided by PenLink.

15 **Q.**   And in layman's terms, explain to the jury what that

16 does.  Like, how does it work?

17 **A.**   So the records that we receive from phone providers come

18 in many different formats.  Some of them come as Excel CSV

19 files.  Some of them are PDF documents.  And what PLX does is

20 basically takes those different forms and puts them into a

21 database and standardizes the columns so that they can be

22 analyzed --

23 **Q.**   And what -- what --

24 **A.**   -- so that everything is the same --

25 **Q.**   Everything is what?  Could you repeat that last part?

1  **A.**    Everything is in the same -- in order.

2  **Q.**    Okay.  So what you're saying is you could put multiple

3  records into this PLX program, and then what would you do with

4  those records?

5  **A.**    So the analysis would then be depending on the case

6  specific, whether you're looking to see maybe a time-fixed

7  analysis, what phones were active during any given point or who

8  was talking to who at some point in the investigation, or

9  mapping the devices, where were the phones during an existing

10 time frame.

11 **Q.**    Okay.  So, just to be clear, making sure I understand

12 what you said, you said you could take -- you could take cell

13 phone records, put it in PLX, and it would spit out a map that

14 would show where the phones were?

15 **A.**    You can create a map from PLX, yes.

16 **Q.**    Okay.  What is CellHawk?

17 **A.**    CellHawk is another tool that we use, sometimes with

18 phone records and with Google records for mapping location

19 information.

20 **Q.**    And does it -- is it similar to PLX?

21 **A.**    It's more to the mapping side than the analytical side of

22 investigations.

23 **Q.**    Okay.  And can it create animated maps?

24 **A.**    Yes.

25 **Q.**    Were you asked to do some analysis on T-Mobile, AT&T,

1    C Spire, and Google records in this case?

2    **A.**   Yes, I was.

3         **MR. McGEE:**   I'm showing the witness what's been

4    previously marked G-5A.

5    **BY MR. McGEE:**

6    **Q.**   And this is Government's Exhibit G-5A.  Do you recall

7    doing some analysis on these T-Mobile records?

8    **A.**   Yes, I do.

9    **Q.**   Okay.  And what is the number there on these T-Mobile

10   records?  Can you see that well?  Okay.

11   **A.**   No.  It needs to be zoomed in on this side.  Yes.

12   662-360-6029.

13   **Q.**   Okay.  And we've -- we've talked about this a bunch, but

14   I just want you to briefly touch on UTC time.  What exactly is

15   that?

16   **A.**   Okay.  UTC time is what you call Universal Time

17   Coordinated.  It basically aligns with Greenwich Mean Time, and

18   it's an international standard for time.  And that time is then

19   added or subtracted to based on where you are with reference to

20   Greenwich, England.  So, if you are in Central Time, you are

21   minus six hours from UTC --

22   **Q.**   Okay.

23   **A.**   -- for local time.

24   **Q.**   So, again, in February, you're going to be -- you're

25   going to be minus six; correct?

1  **A.**    I'd have to look and see how you handle daylight savings
2  time to give an accurate answer.
3  **Q.**    Okay.  So let's look at this.  This is Government's
4  Exhibit 7E.  And did you -- well, did you receive these AT&T
5  records also and use them in your analysis?
6  **A.**    I'm waiting for it to come up.  Can you move it up to
7  the -- oh, there it is.  Yep.
8  **Q.**    Okay.  So you did --
9  **A.**    Those are mobility records.
10 **Q.**    You did analysis on 228-596-4000; is that correct?
11 **A.**    That's correct.
12 **Q.**    This is Government's Exhibit G-6A.  This is -- we'll just
13 speed this up.  This is 662-710-7511, a C Spire phone.  Do you
14 recall that one?
15 **A.**    Yes, I do.
16 **Q.**    And did you use these records in your analysis?
17 **A.**    Yes, I did.
18 **Q.**    C Spire phone 662-209-0205 -- did you use these in your
19 analysis?
20 **A.**    Yes.
21 **Q.**    And you received those from -- you received those from
22 another postal inspector in this case; is that correct?
23 **A.**    That is correct.
24 **Q.**    And did you manipulate them or do anything to change them
25 before you put it into those programs you previously spoke of?

1  **A.**    No.

2  **Q.**    And so are those the accurate records from the phone

3  companies?

4  **A.**    Yes.

5  **Q.**    Okay.  Switching gears to Google, what was asked for in

6  the Google geofence historical location warrant?

7  **A.**    So, in the first part of the warrant, we asked for

8  obfuscated or hidden IDs for any users that were within a box

9  that was drawn around the post office in Lake Cormorant,

10  Mississippi.

11  **Q.**    Okay.  And did they respond?

12  **A.**    They did respond.

13  **Q.**    Okay.  And have you also put -- that data that Google

14  held, have you also put it into your program -- or I guess

15  which program did you put it in?

16  **A.**    So we put that into CellHawk and mapped the data that

17  they responded with.

18  **Q.**    And is this what we're talking about?  This is

19  Government's Exhibit --

20  **A.**    Yes.  That's their initial obfuscated response.

21  **Q.**    When you say "obfuscated," you just mean they've been

22  anonymized by Google; is that right?

23  **A.**    Yes.

24  **Q.**    Okay.  And then later they gave the subscriber to those

25  people; is that correct?

1  **A.**    That is correct.  Under a search warrant returned to

2  them, they did provide the subscriber information.

3  **Q.**    Okay.  And this -- the source here is -- looks like about

4  seven hits or eight hits.  The source is Wi-Fi, and then the

5  other one is GPS.  Is that what you were talking about earlier?

6  **A.**    That's what I was talking about earlier.

7  **Q.**    What is that display radius?  What does that mean?

8  **A.**    So the display radius is what they're considering -- how

9  accurate they believe that location to be.  So we're not saying

10  that the person or individual was exactly at 34.90403 degrees

11  or -- and negative 90.  We're saying they were within 11 meters

12  of that point.

13  **Q.**    Okay.  What's the best way to display those in your maps?

14  **A.**    So the way that those are generally displayed is a center

15  point with a shaded circle around the outside of that center

16  point, the shaded circle being the radius or area of accuracy.

17  **Q.**    So would that mean that Google is saying you're somewhere

18  in that dot -- I mean, in that circle?  Excuse me.  Not dot.

19  Circle.

20  **A.**    In that shaded -- somewhere in that shaded circle.

21  **Q.**    And, again, this is for the Google records?

22  **A.**    This is for the Google records.

23         **THE COURT:**  Would you identify that exhibit?

24         **MR. McGEE:**  Yes.  Thank you, Your Honor.  G-3A.  I

25  almost forgot.

1  **BY MR. McGEE:**

2  **Q.**   And then these are the two subscribers in question.

3  These have already been entered into evidence as G-4A.  Is this

4  what you were talking about earlier when you learned the

5  subscriber information?

6  **A.**   Yes.  This is the secondary return with subscriber

7  information.

8  **Q.**   That's G-4A.  Now, that's not all of the Google location

9  information that you received, was it?

10  **A.**   No, it's not.

11  **Q.**   What other Google historical location information did you

12  receive?

13  **A.**   So, after the subscribers were identified as persons of

14  interest, the inspector went back and got historical location

15  information prior to the robbery as well as some further post

16  information which we analyzed.

17  **Q.**   So, just to put it in layman's term, this was only for an

18  hour time period; is that correct?

19  **A.**   That is correct.

20  **Q.**   And what you're saying is you received more records with

21  a greater scope after a search warrant, a greater scope of

22  Google records on these two accounts; is that right?

23  **A.**   That is correct.

24         **MR. McGEE:**  Ms. Bailey, can you pull up Government's

25  Exhibit 4, the bleek.location.history.csv, please?  This has

1  already been entered into evidence under Government's

2  Exhibit 4.

3  **BY MR. McGEE:**

4  **Q.**   Is this the records we were just talking about?  Can you

5  see that?

6  **A.**   One second.  Yes.  That's one set of the records we were

7  just talking about.

8  **Q.**   Okay.  And it's got -- it lists the device tag there that

9  we just talked about, the anonymous -- the anonymized number;

10  correct?

11  **A.**   If you'd zoom in on the device tag.

12  **Q.**   Yeah.  Is that better?

13  **A.**   That's better.  Device tag -- I'd have to look to see if

14  that was -- have to cross-anonymize, but, yeah, that is --

15  appears to be the same.

16  **Q.**   And I can show you that in a moment.

17        **MR. McGEE:**  All right.  So if you don't mind pulling

18  up the --

19  **BY MR. McGEE:**

20  **Q.**   And up here -- if we look at the top here, it says

21  bleek.location.history.csv.

22        **THE COURT:**  Not so fast.

23        **MR. McGEE:**  Sorry, Your Honor.

24  **BY MR. McGEE:**

25  **Q.**   Bleek.location.history.csv.  And this is the data that

1   was received from Google; correct?

2   **A.**   That is correct.

3   **Q.**   So I'm about to pull up Government's Exhibit 4.   Okay.

4   Mr. Moody, can you see that device tag?

5   **A.**   Yes.

6   **Q.**   And since I can't show you the ELMO at the same time, I'm

7   just going to read it out from the Government's Exhibit 3A.

8   1577088768.   Is that what that says there on the Excel

9   spreadsheet?

10  **A.**   Yes, that is.

11  **Q.**   Okay.   And up top, it says

12  jamarrsmith33@gmail.locationhistory.csv?

13  **A.**   Correct.

14  **Q.**   And that's what was received from Google?

15  **A.**   Correct.

16  **Q.**   And, again, that's Government's Exhibit 4.   So did you

17  rely on the records produced by the phone companies and Google

18  in your -- in your analysis?

19  **A.**   Yes, I did.

20  **Q.**   And when you received those records, how did you go about

21  your analysis?

22  **A.**   So, when I received the records, I put the records into

23  CellHawk for the Google location information and PLX for the

24  phone record information and then, based on information about

25  the case, filtered to dates and time relevant to the case to

1    see what, if any, actions the phones were taking, whether they

2    corresponded with the information we have about the case or

3    whether it ruled them out from being involved.

4    **Q.**   And can Google location data be even more accurate than a

5    cell site or tower data?

6    **A.**   Yes, most definitely.

7    **Q.**   So, again, you mentioned this earlier, but we're talking

8    about February 5th of 2018; is that correct?

9    **A.**   That is correct.

10   **Q.**   And were you provided data from the towers near the Lake

11   Cormorant area?  Are you familiar with that area now?

12   **A.**   I am now familiar with that area, yes.  And I was

13   provided with data from cell phones that hit on towers in and

14   around the Lake Cormorant area.

15   **Q.**   Okay.  And I'm not going to -- I'm not going to pull

16   these up one by one because I think it would be too hard, but

17   you have made a -- you have made a -- three videos and a

18   PowerPoint, and that encompasses all of your data that you've

19   analyzed in this case; is that correct?

20   **A.**   That is correct.

21   **Q.**   Mr. Moody, I'm now going to pull up the slideshow first.

22   This is Government's Exhibit 25 that's been admitted into

23   evidence.

24        **MR. McGEE:**  Go ahead to Slide 2, please.

25   **BY MR. McGEE:**

1 **Q.** I think I already asked you this, but this slideshow is

2 based on the data that was provided to you from the phone

3 companies and Google; correct?

4 **A.** That is correct.

5 **Q.** Okay. Can you see that okay?

6 **A.** Yes, sir.

7 **MR. McGEE:** Just to be sure, can the jury see that?

8 **JURORS:** Yes, sir.

9 **MR. McGEE:** Okay. Thank you.

10 BY MR. McGEE:

11 **Q.** What are we looking at here, Mr. Moody? What are we

12 looking at here?

13 **A.** So these are the phase one returns for Jamarr Smith's

14 phone at the post office in Lake Cormorant. If you look at the

15 big white building that is center and north in the map, that is

16 a farm right behind the post office. Just below that, you see

17 a little black roof. That is the actual post office.

18 **Q.** Okay. So would it be fair to state it's right above that

19 big yellow circle?

20 **A.** Yes, that would be fair to say.

21 **Q.** And this is in Lake Cormorant, Mississippi?

22 **A.** It's in Lake Cormorant, Mississippi.

23 **Q.** And whose Google locations are these?

24 **A.** These are Jamarr Smith's Google locations.

25 **Q.** Okay. And what are the dates and time of these hits?

1   **A.** So this was the one-hour period on the date of the

2   robbery. This was the initial return from Google.

3   **Q.** Okay. And what are the -- what are the --

4   **A.** 17:22, 17:24, 17:25.

5   **Q.** And so it looks like that the six UTC has already been

6   taken off. So these are Central times; is that correct?

7   **A.** That is correct.

8   **Q.** So that would be 5:22 through 5:25; is that right?

9   **A.** That is correct.

10  **Q.** And what were the types of hits -- how did Google collect

11  this information? What did they use?

12  **A.** So these were hits on GPS. So these are the most

13  accurate. And they range anywhere from 11 meters to 37 meters

14  in accuracy.

15  **Q.** And that leads to my next question. Why are the circles

16  identified different sizes here?

17  **A.** Because that, as we talked about earlier, shows the area

18  of accuracy for each hit. The smaller circles are the 11 and

19  18 meters. The larger is the 37 meters.

20          **MR. McGEE:** Okay. Next slide, please.

21  **BY MR. McGEE:**

22  **Q.** Mr. Moody, I'm on now Slide 3. The previous one was

23  Slide 2. On Slide 3 of Government's Exhibit 25, what am I

24  looking at here?

25  **A.** So these are that same one-hour time period return on

1   Gilbert McThunel's phone.

2   **Q.**   Okay.  I see there's -- this is from the geofence just to

3   be clear; is that correct?

4   **A.**   This is from the stage one geofence warrant.

5   **Q.**   Okay.  And, again, do these circles accurately represent

6   the map's display radius in meters on the map?

7   **A.**   Yes.  Yes.

8   **Q.**   On the day in question?

9   **A.**   On the day in question.

10  **Q.**   And, just to be clear, these times are in military time,

11  and UTC -- has UTC already been taken out as it appears?

12  **A.**   UTC has already been taken out.

13  **Q.**   Okay.

14          MR. McGEE:  Okay.  Next slide.

15  BY MR. McGEE:

16  **Q.**   And this -- what slide is this?

17  **A.**   This is a combined with both of them being mapped at the

18  same time.

19  **Q.**   All right.  So it kind of covers up the yellow circles;

20  is that right?

21  **A.**   That is correct.

22          MR. McGEE:  Okay.  Next slide, please.

23  BY MR. McGEE:

24  **Q.**   Mr. Moody, what are we looking at here?

25  **A.**   So now we're looking at an overview of Gilbert McThunel's

1   Google history from -- I believe it was 3:30 through 6:30 on
2   the date of the robbery.
3   **Q.**   On the left hand in that -- in that box, is that where
4   you're reading the times from?
5   **A.**   Yes.
6   **Q.**   Okay.  And what's down here -- is that Batesville,
7   Mississippi?
8   **A.**   Yes.
9   **Q.**   And where did you get those -- the residence, did you get
10  that from Mr. Moody (sic) also?
11  **A.**   So those were provided by the inspector that was working
12  the case.
13  **Q.**   Okay.  And, again, where did you get these records?
14  **A.**   So these are Google records.
15  **Q.**   So this is not from the geofence; is that right?
16  **A.**   This is from the historical that was provided at stage
17  three or the third go-back to Google.
18  **Q.**   I think earlier Mr. Moody (sic) testified he followed up
19  with another search warrant sometime later.  Does that sound
20  right?
21  **A.**   The inspector went back to Google.  So they were -- they
22  approached Google three times during this process.  The first
23  time was for the anonymized data to see who touched the box;
24  the second time was to identify the subscribers; and the third
25  time was for historical of the suspects.

1 **Q.** Okay. I see what you're saying. We just get confused
2 because we've talked a lot about three steps, but that's with
3 the geofence. This is for more expansive records with a
4 separate search warrant; correct?

5 **A.** So this would be the third step of the geofence, is the
6 more expansive warrant or the more expansive time frame.

7 **Q.** Okay. So let me ask you this. And, again, you weren't
8 involved in that warrant process, were you?

9 **A.** No, I was not.

10 **Q.** Okay. So -- but you got more expansive records from
11 Google that we just looked at in Government's Exhibit 4, which
12 is a more expansive time frame; is that correct?

13 **A.** That is correct.

14 **Q.** Okay. And so you plotted or essentially used this
15 program; is that right?

16 **A.** Yes.

17 **Q.** And what program was that?

18 **A.** So this was CellHawk.

19 **Q.** Okay. And so is this an accurate representation of what
20 was in those Google records that we looked at earlier,
21 Government's Exhibit 4?

22 **A.** Yes.

23 **MR. McGEE:** And that was Slide 5, Your Honor.

24 **BY MR. McGEE:**

25 **Q.** Oh, and let me ask one more question about Slide 5. What

1  is that red pin up there by Lake Cormorant?

2  **A.**   So that is the location of the Lake Cormorant Post

3  Office.

4  **Q.**   Okay.

5       MR. McGEE:  Okay.  Next slide.

6  BY MR. McGEE:

7  **Q.**   Okay.  What am I looking at here?

8  **A.**   So this is Jamarr Smith's phone -- or excuse me -- Google

9  history location for that same 3:30 to 6:30 time frame on the

10  date in question.

11  **Q.**   And what date is that?

12  **A.**   That was March 5th, 2018, I believe.

13  **Q.**   February 5th?

14  **A.**   February 5th.  Yes, I'm sorry.  February 5th, 2018.

15  **Q.**   And, again, what do the circles represent?

16  **A.**   So the circles are the point and area of accuracy for

17  each response from Google for location.

18  **Q.**   Okay.

19       MR. McGEE:  Next slide, please.

20  BY MR. McGEE:

21  **Q.**   This is Slide 7.  What am I looking at here?

22  **A.**   So this is an overlay of both Smith and McThunel's

23  geolocation information shown in the same map.

24  **Q.**   Okay.  And, again, this is accurate data; is that right?

25  **A.**   That is correct.

1   **Q.**   And it's received from Google?

2   **A.**   Yes.

3       **MR. McGEE:**  Okay.  Slide 8, please.

4   **BY MR. McGEE:**

5   **Q.**   Okay.  Little different map here.  What are we looking

6   at?

7   **A.**   So this is Jamarr Smith's cell phone record from T-Mobile

8   for that February 5th, 2018, time frame from 3:00 to 6:30.

9   **Q.**   And -- okay.  Yeah.  So what -- tell me the color

10  coordinations that you've used here.

11  **A.**   So, on all of the phone records, Jamarr Smith's are

12  green; Gilbert McThunel's are yellow; and then Ayodele's are

13  purple for the cell site sectors.  That way when they're

14  showing you can identify which individual was using the tower.

15  **Q.**   And what is that red pin there?

16  **A.**   That red pin is the Lake Cormorant Post Office.

17      **MR. McGEE:**  Okay.  Slide down, please.

18  **BY MR. McGEE:**

19  **Q.**   Okay.  And what am I looking at here?

20  **A.**   So this is the cell towers used by Thomas Ayodele on

21  February 5th, 2018, from 3:00 to 6:30 p.m.

22  **Q.**   And the red pin is also the Lake Cormorant Post Office;

23  is that correct?

24  **A.**   That is also the Lake Cormorant Post Office.

25  **Q.**   Now, we're going to talk about the shaded areas --

1 because it may be a little confusing to the jury now, but we're

2 going to talk about it in about two slides in detail.

3       **MR. McGEE:** If you could go to the next slide, please.

4 **BY MR. McGEE:**

5 **Q.** Okay. And what is this?

6 **A.** So this is Gilbert McThunel's cell phone tower activity

7 from the same February 5th, 2018, from 3:00 to 6:30 p.m.

8 **Q.** Okay. That's in orange there. And the pin is also the

9 Lake Cormorant Post Office?

10 **A.** That is correct.

11       **MR. McGEE:** Okay. Next slide, please.

12 **BY MR. McGEE:**

13 **Q.** Okay. And what are we --

14 **A.** This is an overlay of --

15 **Q.** -- looking at?

16 **A.** This is an overlay of all three of the phones together in

17 one map. So Jamarr Smith, Ayodele, and McThunel's phones.

18 And, if you look, there's a definite pattern where they all

19 tend to follow the same areas of usage.

20 **Q.** And that's Slide 11.

21       **MR. McGEE:** Okay. Let's go to the last slide, 12.

22 **BY MR. McGEE:**

23 **Q.** Okay. What's the time frame on this one? Is this also

24 3:00 to 6:30?

25 **A.** Actually, this slide is more condensed. This is more

1   around the 5:00 time frame.  We zoomed in, and we actually

2   highlighted some times on the towers that were being used.

3   **Q.**   Okay.  We'll get to those in a second, but let's talk

4   about -- let's talk about these wedges, or I think you call

5   them sectors; is that right?

6   **A.**   Yes.  Those would be representation of sectors.  So those

7   are the direction that the tower is pointing, and they're

8   showing who is using the tower.

9   **Q.**   Okay.  Are you saying -- are you telling the jury that

10  one of the defendants was in the shaded area, in other words,

11  in the wedge or cone?

12  **A.**   I am not saying that they are within the cone, but they

13  are in that direction.  So the cone includes an area where they

14  could be, but it also extends straight out.  If you take the

15  lines on each side of the cone or wedge and draw a line

16  straight out, that area that would be arced between out further

17  is still within the coverage area of the tower.

18  **Q.**   Okay.  And it looks like the wedges are different sizes;

19  is that correct?

20  **A.**   Yes.  The wedges are different sizes based on the antenna

21  width or beamwidth of the particular tower.

22  **Q.**   Okay.

23  **A.**   So maybe a 90-degree beamwidth.  So it will be a little

24  bit narrower, or if it's a 120, a little bit wider.

25  **Q.**   And what are the -- what are the color coding of each of

1   these -- on each of these maps -- or on this map?  Excuse me.

2   **A**.  So color coding is the same.  Purple is Thomas Ayodele;

3   Jamarr Smith is in green; and Gilbert McThunel is in yellow.

4   **Q**.  Okay.  And what is the red pin there?

5   **A**.  The red pin is the Lake Cormorant Post Office.

6   **Q**.  So what are the specific times here?

7   **A**.  So those specific times are times that each of those

8   individuals connected with calls on the highlight or pointed to

9   sector of the tower.  So, starting at the left-hand side at

10   5:26 p.m., there is a green shaded sector just south of the

11   Lake Cormorant Post Office pointing roughly southwest that

12   Jamarr Smith connected a phone call on.

13         **MR. LEWIS**:  Excuse me, Your Honor.  Can I state an

14   objection?  He keeps saying these people or these individuals

15   are connecting.  More accurately, a device is connecting.

16         **THE COURT**:  Yes, sir.

17         **MR. LEWIS**:  These people are here, that's not

18   accurate, Your Honor.

19         **THE COURT**:  That's -- it is a device.  Thank you.

20   It's sustained.

21   **BY MR. McGEE**:

22   **Q**.  So, Mr. Moody, if you could -- from here forward, if you

23   could just state Smith's device or McThunel's device, I think

24   it would help.  That would help the jury.

25   **A**.  Okay.

1   **Q.**   Thank you.  Okay.  So let's talk about -- you mentioned

2   at 5:26 p.m. Jamarr Smith's device.  That's the -- where the

3   tower is pointing southwest; is that right?

4   **A.**   That is correct.

5   **Q.**   And, again --

6   **A.**   And then --

7   **Q.**   Well, let me just --

8   **A.**   -- moving up -- yeah.

9   **Q.**   Well, I was just going to say, we didn't -- obviously, as

10  you can see from the slideshow, we're not going over every

11  single time that was hit on these towers; correct?

12  **A.**   No.  We just took a representative sample.

13  **Q.**   Okay.  And we're going to look at the -- we're going to

14  look at the base records next, but keep going.  So what about

15  Mr. Ayodele's device?

16  **A.**   So Mr. Ayodele's device, which is the next one up, at

17  5:18 and 5:27 p.m., that device connected on a tower that was

18  pointing roughly west/northwest right there at the post office.

19  **Q.**   Okay.

20  **A.**   I'm not saying that the device was at the post office,

21  but the tower is just south of the post office pointing

22  west/northwest.

23  **Q.**   What about -- all right.  What are the next ones?

24  **A.**   So the next one is 5:16 p.m., and McThunel's phone is

25  hitting the yellow shaded -- or device -- McThunel's device is

1    in the yellow shaded tower that is pointed in just about the
2    same direction as the previous tower we discussed.

3    **Q.**   Okay.

4    **A.**   And then coming over to the right, at 5:28 p.m., we have
5    McThunel's device pointing at a tower that is north of the post
6    office and pointing south.

7    **Q.**   Okay.  So, now, I'm going to show you Government's
8    Exhibit 5A.  Just to be clear, the program does this -- what
9    I'm about to do -- for you; is that correct?

10   **A.**   Correct.  It basically will filter out records for a date
11   and time frame.

12   **Q.**   Mr. Moody, I know you have a copy of some excerpts that I
13   e-mailed you.  It may be easier for you to refer to those than
14   to read the screen, but I will zoom as best I can.

15       I'm first looking at the T-Mobile records, Mr. Moody, and
16   I'm looking at the time 2326 or 5:26 p.m.  Are you with me?

17   **A.**   I'm with you.  I'm looking at the records here.

18   **Q.**   Okay.  So there's a call at 2326, an outgoing call;
19   correct?

20   **A.**   Correct.

21   **Q.**   And it's from 662-360-6029 to 662-710-7511; correct?

22   **A.**   Correct.

23   **Q.**   And if I scroll over, you can double-check you, can't
24   you?  You can double-check your slideshow, can't you?

25   **A.**   Yep.

1   **Q.**   And what -- what tower is that?

2   **A.**   One second. I'm sorry. I looked up at the other screen

3   and lost my place on my --

4   **Q.**   Sorry.

5   **A.**   -- hard copy. 34.889013 degrees and a negative 90.206 --

6   **Q.**   And that's pointing to --

7   **A.**   -- Nesbit Road, Lake Cormorant -- Lake Cormorant -- or

8   Nesbit Road; Lake Cormorant, Mississippi.

9   **Q.**   And that's pointing 230 degrees; is that right?

10   **A.**   Yes, that is correct.

11   **Q.**   All right. I'm just going to do it for two more. We're

12   not going to do it for every one of them. Everybody is getting

13   hungry. I am.

14       I'm going to next show the witness AT&T G-7E. That's the

15   AT&T records, and I'm going to 5:13 and 5:27, which is 2313 and

16   2327.

17   **A.**   Okay. I've got those.

18   **Q.**   Okay. So, again, we're double-checking your slideshow;

19   right?

20   **A.**   Yes.

21   **Q.**   We've got calls right here from 662-360-6029 to

22   228-859-85 -- excuse me -- 596-4000?

23   **A.**   Correct.

24   **Q.**   And if I put in these GPS coordinates, it's going to put

25   me on the tower in your slideshow; right?

1  **A.**     Yes.

2  **Q.**     AT&T doesn't have addresses on their records, do they?

3  **A.**     No, they do not.  They give the lat and longitude, and

4  then they give the azimuth.

5  **Q.**     Okay.  Lastly, these are the C Spire records, G-6A, 5:16

6  and 5:28.  There's 5:16.  Are you with me?

7  **A.**     I'm with you.

8  **Q.**     And what tower is that at 5:16?

9  **A.**     Lake Cormorant.

10  **Q.**     Okay.  Now, the direction is 350, and the azimuth is

11  300 degrees; is that right?

12  **A.**     That's correct.

13  **Q.**     Okay.  So, again, your -- your program does this where we

14  don't have to go through every single one; is that right?

15  **A.**     That is correct.

16          **MR. McGEE:**  Your Honor, may we approach?

17          **THE COURT:**  You may.

18      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

19          **MR. McGEE:**  I know it gets dicey around lunch.  I

20  think I probably have 20 minutes left.  If you want to keep

21  going through it or --

22          **THE COURT:**  I think you finish, if we can, and then

23  I'll give them a break, and we'll come back with

24  cross-examination.

25          **MR. McGEE:**  Sounds good.  Thank you, Your Honor.

1   (END OF BENCH CONFERENCE.)

2   **BY MR. McGEE:**

3   **Q.**   So you've analyzed the Google, the T-Mobile, the C Spire,

4   and the AT&T records; correct?

5   **A.**   Correct.

6   **Q.**   And for Smith and McThunel, the Google and the -- and

7   their phone records appear to be consistent with being in the

8   same place; correct?

9   **A.**   Yes.   They tend to follow the same pattern.  If you were

10  to overlay the two maps, they're very similar in pattern.

11  **Q.**   And that's Smith and McThunel.  And then -- and you also

12  looked at Mr. Ayodele's phone location records too; correct?

13  **A.**   Correct.

14  **Q.**   And does it follow a similar pattern?

15  **A.**   Yes, it does.

16          **MR. McGEE:**   Okay.  Your Honor, I'm showing the witness

17  Government's Exhibit 25, and it's going to -- we're going to

18  play a video titled "Lake Cormorant 2.MP4."  And let me --

19  before you play it, Robin --

20  **BY MR. McGEE:**

21  **Q.**   Did you create animations/videos of this evidence?

22  **A.**   Yes, I did.

23  **Q.**   And do those involve screen recordings?  Is that what

24  we're going to be looking at?

25  **A.**   Yes, they are.

1  **Q.**    Okay.

2         **MR. McGEE:**  Go ahead and pull it up.  Okay.  Pause it

3  real quick.

4  **BY MR. McGEE:**

5  **Q.**    Okay.  This is a screenshot from what program?

6  **A.**    This is a screenshot from CellHawk.

7  **Q.**    And we're looking at 2:30 to 11:59 p.m.; is that right?

8  **A.**    I'd have to get in closer on the right-hand side, but I

9  believe that sounds about right.

10  **Q.**    Okay.  I'm just going to read this side just to speed it

11  up, if that's okay.  So I'm going to read your legend you've

12  got here just to make it easier on you.  You tell me if

13  something doesn't sound right.  It says AT&T.  It's got --

14  228-596-4000 is in green.  Does that sound right?

15  **A.**    That sounds right.

16  **Q.**    Okay.

17  **A.**    That's the top one.

18  **Q.**    Then provider 662-209-0205, that's going to be Chevella

19  Hines's phone in blue.  Do you recognize that?

20  **A.**    Yes.

21  **Q.**    Okay.  And then we've got the two Google device tags

22  representing Jamarr Smith and Gilbert McThunel; correct?

23  **A.**    Correct.

24  **Q.**    Okay.

25         **MR. McGEE:**  Ms. Bailey, if you don't mind playing the

1  video.

2       (PLAYING VIDEO, EXHIBIT G-25.)

3            MR. McGEE:  Okay.  Stop it there.

4       (STOPPED VIDEO.)

5  BY MR. McGEE:

6  Q.    So that's -- that's a video that you created from these

7  phone records that we previously went over.  I forgot -- I may

8  have forgotten to show you Chevella Hines, but I think I did.

9  This includes her records too; is that correct?

10 A.    That is correct.

11 Q.    Okay.

12 A.    Phone and Google records.

13 Q.    Phone and Google.  Thank you.

14       Okay.  I believe, if I'm looking at it correctly, this

15 is -- this is called animated map, 1530 to 1830.MP4, and this

16 also contains the same color codings that I previously went

17 over, being the 4000 number in green, 0205 in blue, and the two

18 device tags from Google; correct?

19 A.    Correct.

20 Q.    And this is a smaller time frame of 3:30 p.m. to 6:30

21 p.m.?

22 A.    That is correct.

23 Q.    And you created this map --

24 A.    Yes.

25 Q.    -- from the information received from Google and the

1  phone companies?

2  **A.**  Correct.

3       **MR. McGEE:**  Hit play, please.

4     (PLAYING VIDEO, EXHIBIT G-25.)

5  **BY MR. McGEE:**

6  **Q.**  So we're at 4:25.  Okay.  We're at 5:10.

7       **MR. McGEE:**  Pause it, please.  Go back just a hair.

8  Go back just a hair.  Okay.  A little bit more.  All right.  Go

9  forward a little bit.  A little more.  A little more.

10 **BY MR. McGEE:**

11 **Q.**  All right.  So there's a blue -- and it's happened a few

12 times that I haven't pointed out, but there's a blue tower, and

13 that's going to be Ms. Chevella Hines's phone; is that right,

14 Mr. Moody?

15 **A.**  That is correct.

16      **MR. McGEE:**  Okay.  So let's hit play.

17 **BY MR. McGEE:**

18 **Q.**  That's going to be right around Robinsonville Post

19 Office; correct?

20 **A.**  Correct.

21 **Q.**  Right there.  5:41.

22      **MR. McGEE:**  You can keep it playing, Robin.  Thank

23 you.

24 **BY MR. McGEE:**

25 **Q.**  Okay.  And that's around 6:02 p.m.

1        (STOPPED VIDEO.)

2              **MR. McGEE:**  Okay.  And then let's play the last video.

3    **BY MR. McGEE:**

4    **Q.**    So all of that -- just to be clear, all of that is

5    information that you received from the phone companies and

6    Google; correct?

7    **A.**    That is correct.

8    **Q.**    Okay.  And this is from 2:30 to 12:00.  It's the whole

9    time frame.  And it looks like we have the same table of

10   contents on this one as the last two videos?

11   **A.**    That is correct.

12             **MR. McGEE:**  All right.  Go ahead.

13        (PLAYING VIDEO, EXHIBIT G-25.)

14   **BY MR. McGEE:**

15   **Q.**    And, just to be clear, is that you moving the screen --

16   like, not right now, but when you recorded the screen, is that

17   what you're doing there?

18   **A.**    That's the software itself adjusting to -- as the hits

19   come, it moves to center the screen.

20   **Q.**    Got you.  This is 5:15.

21             **MR. McGEE:**  Okay.  Pause it.

22        (STOPPED VIDEO.)

23             **MR. McGEE:**  Court's indulgence.

24             **THE COURT:**  Yes.

25        (CONFERRING OFF THE RECORD.)

1         **MR. McGEE:** Tender the witness, Your Honor. Thank

2  y'all. I'm sorry.

3         **THE COURT:** Okay. This would be a good time to take a

4  break. Do not discuss this testimony with anyone, and do not

5  attempt to google anything.

6         So we're going to come back -- going to come back at

7  2:00. So I'm going to excuse you to the jury room. I will see

8  you at 2:00 for us to continue with this witness.

9         Mr. Moody, I need to make -- can you make yourself

10  available at 2:00 for the Court?

11         **THE WITNESS:** Yes, Your Honor.

12         **THE COURT:** Thank you. Do not speak with anyone about

13  your testimony until you resume your testimony later this

14  evening -- afternoon. Thank you.

15         You may take them out. Be careful with those wires,

16  ladies and gentlemen.

17   (JURY OUT.)

18         **THE COURT:** Okay. We'll be in recess until 2:00.

19   (LUNCH RECESS TAKEN.)

20         **THE COURT:** You may bring back in the jury.

21   (JURY IN.)

22         **THE COURT:** Let the record reflect that the jury has

23  returned to the courtroom. We'll pick up with

24  cross-examination, Mr. Lewis.

25         **MR. LEWIS:** Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. LEWIS:**

**Q.**   Mr. Moody, can you hear me okay?

**A.**   Yes, sir.

**Q.**   So, to be clear, in explaining to the jury what you did in this case is you took information from others, Google, T-Mobile, C Spire, AT&T, and you plugged that information into a program which produced these animations you showed?

**A.**   For the animations, yes, but also in the software that analyzes records for content and communications.

**Q.**   Okay.  You did not design this program that created this animation?

**A.**   No.

**Q.**   You just plugged the data in and the animations came out?

**A.**   Correct.

**Q.**   You cannot vouch for the accuracy or reliability of the Google records?

**A.**   I can say that they are the records that were provided by Google.

**Q.**   Okay.  I'll accept that, but you didn't compile them yourself?

**A.**   Google compiled them from their records.

**Q.**   Right.  And you did not verify they were correct?

**A.**   That would be Google's responsibility to verify that they are correct.

1    **Q**.    So same question as to the telephone records. You did
2    not compile them?

3    **A**.    They were compiled and certified by the phone company.

4    **Q**.    Okay. And you did not verify they were correct?

5    **A**.    They were certified by the phone company as being
6    accurate.

7    **Q**.    Okay. Mr. Moody, my question was -- I'm asking you what
8    you did or didn't do to verify whether they were correct. You
9    did not --

10    **A**.    I don't maintain -- as I don't maintain their standard of
11    records or their file keeping, that would be on the phone
12    company to verify their correctness. I can only take what they
13    give me as being accurate.

14    **Q**.    Okay. So the answer to my question is, yes, I did not
15    verify they were correct; right?

16    **A**.    I verified they were certified by a statement of record
17    from the provider.

18    **Q**.    Okay. So, under the trash in/trash out theory, if the
19    underlying information provided you by Google and the phone
20    companies is incorrect, then your opinions here are incorrect?
21    **A**.    I don't see any evidence of that in fact, that the
22    evidence -- that the evidence given to me from the provider is
23    incorrect.

24    **Q**.    Well, I know you don't agree with that, but I'm asking,
25    hypothetically, if it was incorrect, that would cause problems

1    with your -- with your conclusions; correct?

2    **A.**    If it wasn't certified data, then I would say yes, but

3    they certified their data is correct based on their record

4    keeping.

5    **Q.**    For example, the phone companies could have given

6    incorrect location data for the cell towers?

7    **A.**    No.

8    **Q.**    You don't agree with that?

9    **A.**    I don't agree that they give incorrect location because

10   they keep that as a fairly tight course of records on where

11   their cell towers are, where they're located, what is active at

12   any given time.

13   **Q.**    Okay.  So, if the jury thinks that there are problems

14   with the data or the government has not shown it's reliable,

15   then they are free to reject your opinions?

16   **A.**    The jury is free to reject opinions of anyone.

17   **Q.**    Yeah.  They don't have to agree with you?

18   **A.**    They don't have to agree with you either, sir.

19   **Q.**    Okay.  You want to argue with me about this?

20                **THE COURT:**  No.

21             **MR. McGEE:**  Objection, Your Honor.

22             **THE COURT:**  Neither one of you are going to argue

23   about this.

24             **MR. LEWIS:**  Okay.

25   **BY MR. LEWIS:**

1  **Q.**  The jury does not have to agree with you, do they?

2  **A.**  They don't have to agree with us.

3  **Q.**  Okay.  And you're not saying that the -- your

4  testimony -- excuse me.  I'm not saying that your testimony had

5  anything to do with it, but you testified about historical cell

6  data in a case where the defendant was acquitted, which was in

7  *U.S. versus Standard*?

8  **A.**  That is correct.

9  **Q.**  You don't get to decide what the jury believes.  The jury

10  gets to decide what they believe?

11  **A.**  Is that a question, sir?

12  **Q.**  Yes.  Am I right?

13  **A.**  The jury decides what they believe.

14  **Q.**  Okay.  So I'm going to break down the subjects that I'm

15  going to ask you about into two separate categories, and I'm

16  first going to talk about what we talked about earlier when we

17  were talking, which is historical cell site data.  You with me?

18  **A.**  I'm with you so far.

19  **Q.**  And then the second topic I'm going to talk about is the

20  Google data.  You with me?

21  **A.**  With you so far.

22  **Q.**  Okay.  So historical cell tower data is not an exact

23  science?

24  **A.**  The historical cell site data is data maintained by the

25  phone carrier on the cell sites that were used and the sectors

1 that were used.  That is data that is fact.

2 **Q**.  Okay.  It has not been tested by the greater scientific

3 community?

4 **A**.  It is data that is fact.  There's nothing to test.  It's

5 what was actually used by the phone to make a call.  So I don't

6 know what you're wanting the scientific community to test.

7 **Q**.  Well, has the -- I think you testified earlier that

8 you're not aware that the greater general scientific community

9 has studied this.  You have no knowledge of that?

10 **A**.  Well, studying the fact that providers maintain a record

11 of calls and the cell towers that they're used with the sectors

12 is not something that would be studied.  That is a record --

13 system of records for the phone company that they maintain and

14 they're saying were used.

15 **Q**.  Okay.  But this -- this data has only been studied and

16 tested by law enforcement to your knowledge?

17 **A**.  The data -- so now that you bring this up, the data --

18 for instance, if that's what you're qualifying for, because

19 you're very ambiguous in what you're talking about, the

20 propagation of towers and radio propagation is a scientific and

21 studied thing.  So, if we want to get into propagation of

22 towers, that is scientifically studied.  It's a general

23 subsidiary of science, and there are specialty people out there

24 that do that.

25 **Q**.  To your knowledge --

1  **A.**   If we're talking about --

2  **Q.**   Excuse me.  Go ahead.

3  **A.**   If we're talking about just the records themselves, they

4  are historical records of actions that took place and do not

5  have any exact location information that would be studied.

6  **Q.**   Okay.  The only entity that's --

7  **A.**   It is a --

8  **Q.**   Sorry.  Go ahead.

9  **A.**   That it's a -- it is a sector that was used and the

10  direction it's pointing.

11  **Q.**   Okay.  The only entity that's using this technology at

12  trials, to your -- to your knowledge, is the government?

13  **A.**   No.  I believe defenses have also used cell phone

14  technology to prove innocence of suspects in cases.

15  **Q.**   Okay.  Well, those are -- those are criminal cases;

16  right?

17  **A.**   They were defense attorneys that were using the data.  So

18  it's not just the government using the data.

19  **Q.**   Okay.  There is controversy about cell tower analysis?

20  There's controversy about cell tower analysis; right?

21  **A.**   That wasn't a question.  Is there controversy?  I'm sure

22  defenses have controversy, yes.

23  **Q.**   Okay.  In fact, some people call it junk science.  You

24  heard of that?

25  **A.**   I have not heard it called junk science personally.

1  **Q.**  Okay.  But you're testifying about something that at
2  least some people out in the community think is unreliable?
3  **A.**  You may be saying some people.  I have not heard people
4  say it personally.
5  **Q.**  Okay.  Because -- and you're in law enforcement, and you
6  talk to law enforcement people; right?
7  **A.**  I am -- I work for a law enforcement agency.
8  **Q.**  And you talk to people --
9  **A.**  I do talk to -- I talk to people with phone providers.  I
10  talk to people with other companies.  So I do know that -- the
11  information regarding the location of calls that's used by the
12  phone companies themselves.  I wouldn't think they call it junk
13  science.
14  **Q.**  Now, not even law enforcement considers this to be the
15  best way to find somebody; right?
16  **A.**  It is a way.  It's not the most accurate way, but it is a
17  way.
18  **Q.**  So what I said was correct.  Law enforcement does not
19  consider this the best way to find somebody?
20  **A.**  I'm not saying they don't consider it the best way
21  because it may be the only way you have at some point.
22  **Q.**  Okay.  Well, let's say -- use this example.  Let's say
23  somebody is in trouble and dials 911 but does not know where
24  they are.  Okay?  You're with me so far; right?
25  **A.**  Yeah.  So you're talking --

1  **Q.**  Okay.  Excuse me.

2  **A.**  -- about --

3  **Q.**  Excuse me.  Sir -- Mr. Moody, my question is do you

4  follow me?  I haven't asked the next question yet.

5  **A.**  Okay.  Well, I'm telling you where I'm following you and

6  where I believe you're at.  You're at a real world event on a

7  live phone call.

8  **Q.**  Yes.  Somebody is -- if you'll let me ask my question.

9  So somebody is in trouble, and they dial 911, but they don't

10  know where they are.  Do you understand what I've asked you to

11  this point?

12  **A.**  Okay.

13  **Q.**  Okay.  Law enforcement does not use historical cell site

14  data to find this person; correct?

15  **A.**  Correct, because they're on a live call.

16  **Q.**  It's too inaccurate?

17  **A.**  No, because they're on a live call.

18  **Q.**  It might get them to only within miles of the person they

19  need to find; right?

20  **A.**  We're talking about an apple and an orange here, sir.

21  You're talking about a live call versus something that happened

22  in the past.  The live call can get triangulation from existing

23  towers.  You cannot go back and triangulate a historical call.

24  **Q.**  Okay.  So at least my concept is correct that law

25  enforcement does not use this kind of information to find

1    somebody who's dialed 911 but don't know where they are;

2    correct?

3  **A.**    Correct.

4  **Q.**    They use GPS to locate that person?

5  **A.**    Not necessarily.

6  **Q.**    Well, they can use GPS to locate that person?

7  **A.**    If the system on the phone that they're on will allow

8    them to access GPS, yes.

9  **Q.**    Okay.  But that's not what you're talking about here.

10   You're not -- you're not using GPS data?

11 **A.**    We are using GPS on the Google data.

12 **Q.**    Okay.  I haven't gotten there yet.  You're not using that

13   on the cell site data; correct?

14 **A.**    Correct.

15 **Q.**    Okay.  GPS data is more accurate?

16 **A.**    Correct.

17 **Q.**    Okay.  Another way to find people -- I think you've

18   already mentioned it -- is to triangulate amongst towers?

19 **A.**    Correct.

20 **Q.**    You've not done that here?

21 **A.**    Cannot do it here because we're not doing a live

22   intercept on these individuals on the date in question.

23 **Q.**    And let me make sure the jury understands what we're

24   talking about when I say triangulate.  I'll just draw it on the

25   ELMO.  So, if you've got, you know, three cell towers and they

1  have all got a radius, this area right here is the
2  triangulation of location; correct?
3  **A.**   That is incorrect, sir.  That is incorrect.
4  **Q.**   Okay.  That's not triangulation?
5  **A.**   That is not triangulation.
6  **Q.**   Okay.
7  **A.**   Triangulation is all three towers must send out a signal
8  in the time that the tower return is measured, and the three
9  points are then aligned based on that for triangulation.
10  **Q.**   Okay.  But at any rate, you did not do triangulation in
11  this particular case?
12  **A.**   No, because that can only be done on a live collection or
13  a ping order, and it has to be done at the time that the
14  incident is going on.
15  **Q.**   Okay.  What you're doing here, these towers have about a
16  20-mile range?
17  **A.**   The range -- I'd have to refer to the phone companies on
18  the exact range.
19  **Q.**   Okay.  Well --
20  **A.**   You have to know where the next nearest tower is.
21  **Q.**   You wouldn't dispute that a 20-mile range of these towers
22  is reasonable?
23  **A.**   Not knowing where the next nearest tower is, I would not
24  say either way.
25  **Q.**   Okay.  The data that you're using is actually for billing

1  purposes, right, by these phone companies?

2  **A.** Tower data itself is not necessary for billing. The call

3  record history is for billing.

4  **Q.** Okay. But you use the call record history to get this

5  information that you're giving us here today; right?

6  **A.** Yes.

7  **Q.** It's not for -- this -- this information that these phone

8  companies keep is not for the purpose of tracking people;

9  correct?

10  **A.** Right. It's for their internal system use for network

11  availability, network uptime, calls on network.

12  **Q.** Okay. You talked a little bit about tower sectors

13  earlier, and you talked about four-sector towers and

14  three-sector towers; correct?

15  **A.** I talked about one-sector, three-sector, and

16  multiple-sector.

17  **Q.** Right. But there's such thing as a four-sector tower?

18  **A.** Yes. They can be any combination of sectors based on how

19  the phone company chooses to build them.

20  **Q.** Okay. So, if somebody from AT&T testified yesterday that

21  AT&T had four-sector towers in this area, would you dispute

22  that?

23  **A.** No, because they're their towers.

24  **Q.** Okay. And so, if you depicted on your map AT&T having a

25  three-sector tower, that would be an inaccurate depiction;

1  correct?

2  **A**.  My maps don't depict the number of sectors that are on

3  the tower, only the sectors that were used.

4  **Q**.  Well, but you can look at your map, and you can decide --

5  I mean, you can make a determination of whether you're calling

6  this a three-sector tower or a two-sector tower -- or a

7  four-sector tower; right?

8  **A**.  No, you can't, because you're only seeing the sectors

9  that were used for phone calls.  You're not seeing every sector

10  on a tower.

11  **Q**.  Okay.  Now, one of your opinions about the location of

12  these phones is based on the assumption that the cell phone is

13  connecting with the nearest tower?

14  **A**.  No, that's not an assumption on my part.  I'm only using

15  the data provided by the carrier to show the towers that the

16  phone connected to.

17  **Q**.  Okay.  So -- so let's --

18  **A**.  I'm making no assumption about whether it's the nearest

19  tower or not.

20  **Q**.  So let's make sure that's crystal clear because this was

21  something I was concerned about off the record, but -- because

22  when you show these shaded pie slices on the -- on your map

23  here -- I'll use the blowup.

24  　　　　**THE COURT**:  Can you identify the exhibit?

25  　　　　**MR. LEWIS**:  G-25.

1  **BY MR. LEWIS:**

2  **Q.**   I'll use the blowup.  You're not saying that -- that the

3  person is necessarily close to any one of these towers;

4  correct?

5  **A.**   I'm only saying that they -- and like I brought up in my

6  testimony, that the individual -- if you take that sector line

7  and draw it out -- like, I'm going to use the yellow one that's

8  right there in the middle.  If you take your highlighter and

9  draw a line straight out north -- yeah, you can do that one.

10  That's fine -- and draw the other side straight out, they are

11  out in that cone at some point within 80 percent of the

12  distance to the next nearest tower.

13  **Q.**   Okay.  And so you're not pinpointing where a person is

14  within that area; correct?

15  **A.**   No, we're not.

16  **Q.**   What I said -- what I said was correct.  Okay.  Thank

17  you.

18       Okay.  And so, to be clear, so the jury is not confused,

19  this shading doesn't mean that's just the limit of the range of

20  the tower; correct?

21  **A.**   That is correct.  That shading is just there to show you

22  the identity of who was using that sector of tower.

23  **Q.**   Okay.  And there's something like 20 different factors

24  that decide which tower picks up a device; right?

25  **A.**   Now, I know there are multiple factors.  I won't say

1  there are 20 factors, but there are multiple factors.

2  **Q.**  Well, let me give you some.  Where the antenna is pointed

3  is a factor; correct?

4  **A.**  Correct.

5  **Q.**  You did not research any of the -- where the antennas

6  were pointed in this case; correct?

7  **A.**  Correct.

8  **Q.**  You really can't even do that because the phone company

9  doesn't tell you that?  I have a bad habit when I ask

10  questions.  Sometimes I don't say correct or right at the end.

11  When I stop talking, that's the end of a question.  Okay?

12  **A.**  Okay.  So the -- okay.  So the phone company does not in

13  their records say the direction that the antenna is facing.

14  **Q.**  Okay.  Sometimes when the closest tower is too busy due

15  to call volume or traffic the device will connect with another

16  tower somewhere else; right?

17  **A.**  Correct.

18  **Q.**  Or the tower is down because of weather or storm or

19  lightning strike?

20  **A.**  Correct.

21  **Q.**  And you did not research weather conditions to see if any

22  towers were down because of weather during the time in

23  question?

24  **A.**  I do know that the weather conditions that day were not

25  stormy and not raining.

**Q.** Okay. But you didn't research it. That's just what one of the prosecutors told you.

**A.** No. That's because I have seen personally video of the day in question.

**Q.** Okay. Well, the question is you did not research anything that happened with the weather before or after the video?

**A.** Not before or after the video.

**Q.** Okay. Another reason that a device would not connect with a nearby tower is because the tower is down for repairs, maintenance, or updates?

**A.** Yes.

**Q.** You didn't research that either?

**A.** Because the data that I was analyzing was the records of towers used during the event in question. That's what the --

**Q.** Mr. Moody --

**A.** -- analysis was based on.

**Q.** I'm sorry. Can you say the last part of your answer again?

**A.** The data that I analyzed was based on the towers that were used provided by the phone company, and that's what the analysis was based on.

**Q.** Okay. Another reason that a phone might not connect with a nearby tower is that the closer tower is shorter than the tower -- than a taller tower that was nearby? Let me ask a

1   better question.  The height of the tower could affect whether

2   a phone connects with that tower or some tower at a more

3   distant location; correct?

4   **A.**   Correct.  When put into effect with terrain or

5   geographical things that would block a signal.

6   **Q.**   Okay.  I'm getting there.  All right.  So, other than

7   that, cars or buildings could be blocking a closer tower;

8   correct?

9   **A.**   Potentially.

10   **Q.**   And then that would be true even in a flat area, as we

11   heard; right?

12   **A.**   Depending on -- yes, the cars would be a little bit less.

13   Buildings could be more.

14   **Q.**   Okay.  And you could have done a topographic analysis to

15   determine whether anything might be blocking devices in the

16   northwest part of Mississippi, but you did not do that?

17   **A.**   I'm sorry.  It sounds like a statement.  I didn't hear a

18   question.  Sorry.

19   **Q.**   Okay.

20   **A.**   So --

21   **Q.**   Mr. Moody, once again, I'm not going to say correct or

22   right every time I ask you a question.  So just, if I stop

23   talking, you can go ahead and answer.

24         **MR. McGEE:**  Your Honor, can he just -- can he just ask

25   a question?

1    **THE COURT:**  Don't talk over him either.  Give him an
2    opportunity to finish that answer.

3    **MR. LEWIS:**  Okay.

4    **THE COURT:**  Mr. McGee.

5    **MR. McGEE:**  I would ask that -- I would ask that he
6    would ask the witness a question.  I have a hard time, too,
7    understanding when he's asking questions because I -- he
8    doesn't want to interrupt him in the middle of a question.

9    **THE COURT:**  I understand.

10   **MR. McGEE:**  So if he would just please try.

11   **THE COURT:**  He can ask the question the way he wants
12   to, but it is sometimes sounding more like a statement than a
13   question.  So clarify it with the witness and then give him an
14   opportunity to respond.

15   **MR. LEWIS:**  Okay.

16   **BY MR. LEWIS:**

17   **Q.**    I think my --

18   **A.**    Topographic --

19   **Q.**    Thank you.  My question was that you could have done a
20   topographical analysis to determine if things were blocking
21   towers, et cetera, but you did not; correct?

22   **A.**    Because I was not trying to determine what the phone
23   company would determine based on that information.

24   **Q.**    Okay.  So, therefore, the tower that was activated on
25   your map here may not be the closest tower to the device that

1   activated it; correct?

2   **A.**   May not.

3   **Q.**   Okay.  So here's a universal experience for

4   Mississippians.  I will be driving on I-55, and I will not have

5   a good signal for some reason.  Okay?  That means there's

6   probably an issue with a cell tower; right?

7   **A.**   I can't say that for certain just on those few facts that

8   you just gave me.

9   **Q.**   Well, I mean, I-55 is the main artery in the state of

10  Mississippi that runs from Memphis to Jackson and beyond.

11  Sometimes people drive on I-55, and, for whatever reason, they

12  have trouble getting a cell signal.  One explanation for that

13  would be they're having trouble getting connected to a tower;

14  right?  One possible explanation?

15  **A.**   That is a possible explanation.

16  **Q.**   Okay.  Sometimes you dial your phone and nothing happens

17  or it takes a while to start ringing.  That could mean there's

18  a cell tower issue.  That's a possible explanation for that?

19  **A.**   That is also congestion on the phone network is a

20  possible answer.

21  **Q.**   Okay.  And that's what we talked about earlier, that

22  sometimes traffic or congestion would cause a phone not to

23  connect with a nearby tower; right?

24  **A.**   But it's not just the tower that can cause that lag.

25  It's also the landline network that can cause the lag based on

1 the example.

2 **Q.** Okay. Another thing -- let's go back to our pie slices.

3 Again, this is G-25. This coverage area in the pie slice is

4 not a perfect -- does not have perfect lines; correct?

5 **A.** So, in general, the radio signals can bleed, if that's

6 what you're asking.

7 **Q.** Well, I don't know what that means --

8 **A.** So it doesn't --

9 **Q.** -- so I'm not sure I'm asking that.

10 **A.** -- it doesn't --

11         **THE COURT:** Stop. Re-ask the question.

12         Mr. Moody, give him a chance to finish it.

13 **BY MR. LEWIS:**

14 **Q.** Okay. Let me just ask this again, and maybe you --

15 again, I'm sorry. You're showing these pie slices as very

16 regular, are you not, I mean, with straight lines on each side?

17 That's fair to say; correct?

18 **A.** That's fair to say we're showing them out at a number of

19 degrees provided by the provider. So they give us an azimuth,

20 and they give us a beamwidth that they're saying that their

21 coverage is.

22 **Q.** Okay. But you know that the coverage is not that regular

23 and exact; correct?

24 **A.** It can vary to the left or right a little -- a few

25 degrees, yes.

1   **Q**.   Right. And I don't mean to make this too crazy, but, I

2   mean, it could look like -- something like that; correct? It

3   could be very irregular. Can we --

4   **A**.   Not the sector --

5   **Q**.   -- zoom in?

6   **A**.   It's not going to be that irregular. Now, if you were

7   looking at an overall propagation chart for the radio waves,

8   it's going to have an ill-defined look, but it's going to be

9   generally within the number of degrees.

10       So, if they say the azimuth is 90 degrees and their

11   beamwidth is 60, it may go 63 degrees out, it may go 62 degrees

12   on the other side of each, but the outer bands would definitely

13   have an irregular opinion for propagation. And that's

14   generally going to be about 80 percent of the next nearest

15   tower.

16   **Q**.   And so -- I think you've already said this, but there's

17   no way that you could accurately depict the coverage of the

18   sector because it's based upon a lot of factors that you don't

19   know; right?

20   **A**.   Now, all we said was that the tower itself was being used

21   and that sector in that direction was being used.

22   **Q**.   Okay. So what I'm saying is, the -- how the actual

23   sector coverage looks relies on a lot of factors. Orientation

24   of the tower, power settings, tilt angles, things of that

25   nature; correct?

1  **A.**  Right, which -- none of which I testified to.

2  **Q.**  Because you don't know; right?

3  **A.**  Okay.

4  **Q.**  All right.  The sector coverage could be much smaller

5  than that due to the lay of the land, buildings, topography,

6  other factors; correct?

7  **A.**  Could be.

8  **Q.**  You could attempt to establish what the sector coverage

9  looked like by doing something called a drive test; correct?

10  **A.**  That is something that is used in time.

11  **Q.**  And a drive test -- and I'll let you tell me, but it's

12  basically where somebody drives around and does very specific

13  calculations on what the sector coverage looks like; correct?

14  **A.**  Correct.

15  **Q.**  You've done those before?

16  **A.**  No.

17  **Q.**  Okay.  And you didn't do it here; correct?

18  **A.**  No.

19  **Q.**  Okay.  These data calculations that the cell companies

20  did, you could not repeat them.  You could not make these

21  calculations yourself; right?

22  **A.**  The cell companies didn't do a calculation.  They stored

23  a historical record of the tower that was used, the sector that

24  was used.

25  **Q.**  Okay.  That determination was done in-house with them.

1  You didn't do that; correct?

2  **A.**  Right.  That was done at the time of the call.  They

3  recorded that information.

4  **Q.**  Okay.  Two people can be standing beside each other with

5  a cell phone, and they do not always connect to the same tower?

6  **A.**  Yes, that is possible.

7  **Q.**  So this technology cannot pinpoint exact location;

8  correct?

9  **A.**  That is correct.

10  **Q.**  And you cannot say where these phones were within the

11  radius of the tower when it picked them up; correct?

12  **A.**  Correct.

13  **Q.**  And you cannot say that these devices were at the post

14  office when it picked them up?

15  **A.**  Correct.

16  **Q.**  And you cannot say that any of these defendants

17  individually were at the post office at anytime using this

18  information?

19  **A.**  Correct.

20  **Q.**  Okay.  All right.  I'm finished talking about historical

21  cell site data.  I'm going to move to Google now.  You with me?

22  **A.**  I'm with you.

23  **Q.**  Okay.  The purpose of Google location data is not to

24  solve crimes; correct?

25  **A.**  Correct.

1  **Q**.    It's allowing Google to run its apps like Google Maps;
2  right?
3  **A**.    Well, it's collected by its -- the app.  It's allowing
4  Google to sell location data for ad purposes to make money for
5  their business.
6  **Q**.    Okay.  But, I mean, they -- like, on Google Maps, it will
7  tell you if there's a lot of traffic in a certain place;
8  correct?
9  **A**.    Correct.
10 **Q**.    And so they use location data to, for example, chart
11 traffic; right?
12 **A**.    Yes.
13 **Q**.    And you said earlier they use it to sell ads; correct?
14 **A**.    Correct.
15 **Q**.    So here's an example.  I like tacos.  If I've got
16 location services on my phone and am in Memphis, Google might
17 send me an ad for a taco place that is near where I am;
18 correct?
19 **A**.    Correct.
20 **Q**.    Okay.  And by the way, I would like to talk to you about
21 whether science has been -- has validated this or done any kind
22 of testing about Google data, but your answer to those
23 questions would be you are unaware of any of that; correct?
24 **A**.    Correct.
25 **Q**.    Okay.  Because this is very cutting-edge stuff; correct?

1    **A.**    It's very new, yes.

2    **Q.**    Okay.  I'll accept that.  Back to talking about Google

3    wanting to sell me a taco.  So it's not designed to be

4    perfectly accurate by Google; right?

5    **A.**    Just to clarify, is that a question?

6    **Q.**    It is.  I'm sorry.

7    **A.**    Okay.

8    **Q.**    You're training me now.  Right?  It's not designed to

9    be --

10   **A.**    They want --

11   **Q.**    -- perfectly --

12   **A.**    They want their location accuracy to be at least

13   68 percent of the time.

14   **Q.**    Okay.  And in this particular case, you're familiar with

15   the -- the fence -- the geofence that was used to obtain this

16   data; correct?

17   **A.**    Correct.

18   **Q.**    Somebody outside of that fence could actually have been

19   caught in it; correct?

20   **A.**    Correct.

21   **Q.**    Okay.  Somebody just merely driving by on the highway,

22   maybe just outside the fence, they could be -- their phone

23   could be captured in that; correct?

24   **A.**    If their accuracy overlapped the fence, then, yes.

25   **Q.**    Okay.  So, in other words, there can be false positives

1 where somebody is reported inside the fence but they're not

2 actually there; correct?

3 **A**. Correct.

4 **Q**. And then there can be false negatives where -- and this

5 is maybe more common -- where somebody is not in the fence --

6 sorry -- that somebody is in the fence but Google doesn't pick

7 it up; right?

8 **A**. That is usually more extremely rare that they don't pick

9 up somebody within the fence.

10 **Q**. Okay. All right.

11 **A**. Usually, there would be more false positives than false

12 negatives.

13 **Q**. Okay. So, in order for Google to capture this location

14 history, somebody has to have either an Android phone; right?

15 **A**. iPhone or Android.

16 **Q**. Okay. Well, on an iPhone, you have to have a Google app

17 that's running; right?

18 **A**. Correct.

19 **Q**. Okay. And in any given area, everybody with a phone is

20 not going to have location services activated; right?

21 **A**. It's possible.

22 **Q**. Well, Google says that only about one-third of their

23 users have location services activated at any given time;

24 correct?

25 **A**. Okay.

1   **Q.**   Well, okay.  Do you want me to show it to you, or will

2   you -- do you accept that as true?

3   **A.**   If you have a statement from Google saying that, I will

4   accept it as true.

5   **Q.**   Okay.  All right.  I'll leave it.  So not everybody

6   inside that geofence -- not every -- let me be more accurate.

7   Not every device inside that geofence that the government drew

8   and sent to Google is going to show up in what Google sends

9   back; right?  You want me to ask that again?

10   **A.**   If you could clarify it.  It was a little confusing.

11   **Q.**   It was.  I'm going to ask another one.  Because Google

12   only tracks people with location services activated inside the

13   fence, right, that not everybody who's inside the fence is

14   going to be returned from Google as having an account in there;

15   right?

16   **A.**   Correct.

17   **Q.**   Okay.  Because not everybody has location services

18   activated on their phone; correct?

19   **A.**   Correct.

20   **Q.**   Okay.  Now, the records sent to you by Google that you

21   plugged into your program, you did not do anything to validate

22   them; correct?

23   **A.**   I accepted the records that were provided by Google that

24   they say came from their customer and certified to and loaded

25   them.

1   **Q.**   Okay.  Google itself only validates that data; correct?

2   **A.**   That's correct.

3   **Q.**   Google does not validate that data for the purpose of

4   trying criminal defendants, does it?

5   **A.**   They do to the effect that they certify the data

6   collected by warrant or court order as being accurate.

7   **Q.**   Accurate to their own standards; correct?

8   **A.**   Correct.

9   **Q.**   Okay.  And you -- well, keep going.  In your experience,

10  how accurate is the data provided by Google?

11  **A.**   In general, in the cases that we provided data for, the

12  data has been relevant and shown that the people were at or

13  near the vicinities most of the time.

14  **Q.**   You testified that it showed that people were at or near

15  the vicinity, and that's a little misleading, isn't it?

16  **A.**   No, because a device cannot walk itself.  A person

17  carries a device.

18  **Q.**   Right.  But -- I totally agree with that, but you can't

19  say that a specific person is carrying a device.  You're just

20  saying that there's a device somewhere?

21  **A.**   In the other cases, there were other evidence, to include

22  video and other things, that put that person on the scene.

23  **Q.**   Okay.  But you haven't testified in any of those cases?

24  **A.**   No.  In several of those cases, my testimony was

25  stipulated to prior to trial or the defendants pled guilty.

1 **Q.** Okay. Well, what we do know about Google is that they

2 searched a lot of accounts to get this information; correct?

3 **A.** Correct.

4 **Q.** Google, in fact, says that they searched 592 million

5 accounts to get the information that they produced in this very

6 case; right?

7 **A.** Okay.

8 **Q.** They could have even searched some of the jurors'

9 accounts to get the information that they provided in this

10 case; correct? It's possible?

11 **A.** Correct.

12 **Q.** Okay. And we know that Google -- the Google warrant did

13 not return all of the devices that were known to be inside the

14 fence at relevant times; correct?

15 **A.** That I am not correct on because I know that it returned

16 three devices --

17 **Q.** Okay. But --

18 **A.** -- during the --

19 **Q.** Well, you said earlier that you watched the video. So

20 you know that the driver of the mail truck, Mr. Cobbs, was

21 there; right?

22 **A.** So the driver of the mail truck was there on the scene.

23 **Q.** Okay. And you know he made a 911 call; correct?

24 **A.** I do believe he made a 911 call at some point.

25 **Q.** Okay. We finally got there. So his phone was not

1  returned by Google; right?

2  **A.**    That I do not know because I do not know the number or

3  the subscriber information of the third party that was returned

4  by Google.

5  **Q.**    Okay.  Well, that makes --

6  **A.**    It was deemed not to be --

7  **Q.**    I'm sorry.  My fault.  Continue.

8  **A.**    It was deemed not to be relevant by the inspectors

9  involved in investigating the case.

10  **Q.**    Right.  I was going to say that that makes two of us who

11  don't know what this third account -- who owned this third

12  account; right?  Nobody knows who owned that account; correct?

13  **A.**    The inspector does.

14  **Q.**    He does?  He knows the name of the -- of the subscriber

15  to that account?

16  **A.**    Well, he identified that that account was not valid for

17  investigative purposes.

18  **Q.**    I thought you said the inspector --

19  **A.**    So --

20  **Q.**    I thought you said the inspector knew the owner of that

21  account.

22  **A.**    Well, if he doesn't know whose it was, how did he

23  identify it wasn't valid for the investigation?

24  **Q.**    Good point.  All right.  So you watched the video.  There

25  was an individual that was walking around the scene of the --

1   of the post office.  Do you recall seeing that?

2   **A**.    The video in particular I watched started as the truck

3   pulled in and then through the armed robbery and the pistol

4   whipping.

5   **Q**.    Okay.  So assume for me that that man's name was

6   Mr. Coffman, and he testified here earlier this morning that he

7   had an Android phone.  Okay.  Assume that for me.  Okay?  You

8   with me?

9   **A**.    I'm assuming with you.

10  **Q**.    Okay.  That phone -- or that account was not returned by

11  the Google geofence warrant; correct?

12  **A**.    You said he was there that morning or --

13  **Q**.    If I said that morning, I didn't mean to.  That

14  afternoon.

15  **A**.    Without knowing who that third device was, then I cannot

16  say either way.

17  **Q**.    All right.  Mr. Coffman testified earlier that he had a

18  girlfriend who was in the house right there at the scene.  I

19  believe he testified that she had an Android phone as well.

20  That phone was not returned by the Google geofence; right?

21  **A**.    Only three phones were returned by the Google geofence.

22  **Q**.    We also saw a train go by.  Did you see that?

23  **A**.    No, I did not see a train.

24  **Q**.    Okay.  Well, if you'll take my word for it, that train

25  probably had a conductor -- conductors and engineers in it

1  who -- no phones came back for those people, did it?

2  **A.**  No.  Only three devices were returned.

3  **Q.**  Okay.  There were cars that drove through the scene that

4  I think the government has clearly excluded as having anything

5  to do with the robbery.  You agree with that?  Let me ask it

6  again.

7  **A.**  I'm not knowing which -- not knowing which cars you're

8  referring to in the video because there was at least one

9  vehicle in there that I know has not been excluded.

10  **Q.**  I understand.  There was some cars -- some cars that the

11  government has certainly excluded as being relevant to the

12  incident; correct?

13  **A.**  Okay.

14  **Q.**  The -- there were no Google accounts returned for those

15  people either, were there?

16  **A.**  No.  Only three devices.

17  **Q.**  Okay.  But Google did return an account, as you said

18  earlier, that the government decided was not relevant; correct?

19  **A.**  Correct.

20  **Q.**  And, in fact, we heard yesterday that Mr. Mathews

21  testified that he didn't think the government had probable

22  cause to get information on that person; right?  Or, no -- do

23  you -- you don't know that; correct?

24  **A.**  I don't know that because I did not hear the testimony

25  yesterday.

1 **Q.** Okay. Fair enough. But the government went and got that

2 person's account data anyway, didn't it?

3 **A.** That would be on Mr. Mathews if he served that part of

4 the warrant.

5 **Q.** Okay. Because, just to be clear, when Google returned

6 the anonymous data, right, we didn't know that person's

7 account? I'm looking at Exhibit G-3A. It's just anonymous;

8 right?

9 **A.** That's correct.

10 **Q.** I'm showing you Exhibit G-3A. This is the anonymous data

11 that Google returned; right?

12 **A.** The itemized data; correct.

13 **Q.** Okay. And Mr. Mathews testified that he didn't think

14 they had probable cause to get any information about that

15 person because the call was so late. Does that sound familiar?

16 Does that sound like something you heard before? Not the call

17 but --

18 **A.** No, it does not.

19 **Q.** Sorry? Let me ask it again. He testified, because of

20 the timing that the return came back, he didn't think they had

21 probable cause to get that information. Does that sound

22 familiar?

23 **A.** That personally is not familiar to me because I was not

24 involved in that step of getting the data.

25 **Q.** Okay. But at any rate, the government went and got that

1   person's account data anyway.  They got the name of the account

2   anyway; right?

3   **A.**    I did not get the name of the account.  So I don't know.

4   **Q.**    Well, you know the name of it, which is permanentwaves;

5   right?

6   **A.**    No.  I did not know the name until you just brought it to

7   my attention.

8   **Q.**    I'm looking at Exhibit G-36.  Is it your testimony that

9   you've never seen this before?

10  **A.**    I've seen the information on the top two.  I have not

11  seen the information on the bottom one.

12  **Q.**    Okay.  So -- but you do know that there was a third

13  account returned, which is now you know named

14  permanentwavesrecords; correct?

15  **A.**    Correct.

16  **Q.**    And as we sit here today, we know no more information

17  about that account -- or you know no more information about

18  that account; correct?

19  **A.**    That is correct.

20  **Q.**    You are not testifying that these devices were involved

21  in the robbery in any way; correct?

22  **A.**    Correct.

23  **Q.**    You're only saying that they were somewhere within the

24  fence between 5:00 and 6:00 p.m. on February 5, 2018; correct?

25  **A.**    Correct.

1  **Q.**    Or maybe somewhere outside the fence during that

2  particular time if we're using the 68 percent factor; correct?

3  **A.**    Somewhere within the area of accuracy provided by the

4  provider.

5  **Q.**    Okay.  Let me show you one more thing -- or a couple more

6  things.  In your PowerPoint, which is G-25, you've got headings

7  on these documents; right?  Google Locations - Geofence -

8  Jamarr Smith?

9  **A.**    Yes.

10  **Q.**    Okay.  Did you type that in?

11  **A.**    It was prepared and typed for me.

12  **Q.**    Okay.  At any rate -- well, was it done at your office?

13  Was it done under your direction?

14  **A.**    Yes.  Because that was after we had identified all of the

15  providers that the slide was made, all of the anonymized data

16  brought over to an actual user.

17  **Q.**    Right.  So that's where I'm headed.  It is misleading for

18  you to tell the jury that Google Locations - Geofence -- that

19  this is representing where Jamarr Smith is.  That's not what

20  you're saying?

21  **A.**    That is represented Jamarr Smith's geofence identified.

22  If you take that anonymized number as brought up in the -- my

23  original testimony earlier today and look at the spreadsheet

24  for Jamarr Smith, they are the identical number that is the

25  device that was Jamarr Smith's.

1   **Q.**   I understand. I'm talking about a human being named

2   Jamarr Smith. It is misleading for you to tell the jury that

3   Jamarr Smith is located in these places right here. Jamarr

4   Smith, the human being.

5   **A.**   Okay. So the device owned by Jamarr Smith --

6   **Q.**   Did you finish your answer?

7   **A.**   That would be the device -- that would be the device

8   owned by Jamarr Smith.

9   **Q.**   Okay. Thank you. So if we go to page -- I believe this

10   is page 8 or 9 of your thing. You've got Cell Site Data From

11   T-Mobile - Jamarr Smith. It is misleading for you to say that

12   Jamarr Smith, the human being, is located anywhere around these

13   cell sites; right?

14   **A.**   Those are Jamarr Smith's T-Mobile records and the device

15   belonging to Jamarr Smith.

16   **Q.**   You are not saying that Jamarr Smith, the human being,

17   was located in any of those places; correct?

18   **A.**   I'm saying the device used those cell towers belonging to

19   Jamarr Smith.

20   **Q.**   Okay.

21         **MR. LEWIS:** Excuse me, Your Honor.

22      (CONFERRING OFF THE RECORD.)

23         **MR. LEWIS:** I don't have any further questions, Your

24   Honor.

25         **THE COURT:** Thank you.

1          Mr. Chiniche.

2          **MR. CHINICHE:**  Yes, Your Honor.

3      (CONFERRING OFF THE RECORD.)

4          **MR. CHINICHE:**  Your Honor, Mr. Lewis asked many of the

5  questions I was going to address.  I'm just looking for one

6  exhibit.

7          **THE COURT:**  Okay.  That's fine.

8      (CONFERRING OFF THE RECORD.)

9          **MR. CHINICHE:**  Thank you, Your Honor.  We're straight.

10          **THE COURT:**  Okay.

11                        **CROSS-EXAMINATION**

12  **BY MR. CHINICHE:**

13  **Q.**    Mr. Moody, can you hear me?

14  **A.**    I can hear you, sir.

15  **Q.**    Okay.  My name is Paul Chiniche.  I represent

16  Mr. McThunel.  In your PowerPoint presentation, you listed a

17  cell phone number 662-710-7511; right?  That cell number --

18  **A.**    Okay.

19  **Q.**    And that is used in your -- in your PowerPoint

20  presentation; is that right?

21  **A.**    Correct.

22  **Q.**    Okay.  And in your PowerPoint presentation, you indicate

23  that that phone number belongs to Gilbert McThunel; right?  You

24  have McThunel on your PowerPoint; is that right?

25  **A.**    That's correct.

1   **Q.**   Okay.  If you could see Government Exhibit 6 -- G-6, this

2   is -- I'm representing to you -- have you ever seen this

3   document?  This is the C Spire accountholder information.  Have

4   you ever seen this document?

5   **A.**   I have not personally.

6   **Q.**   Okay.  And it indicates, does it not, that the subscriber

7   is Travonya Nash.  Can you see that?

8   **A.**   Can you zoom in -- can you zoom in a little bit on the

9   document so I can --

10  **Q.**   That the user account subscriber is Travonya Nash.  Do

11  you understand that?  Do you see that, sir?

12  **A.**   I see that, uh-huh.

13  **Q.**   All right.  Thank you, Mr. Moody.

14          **MR. CHINICHE:**  No further questions.

15          **THE COURT:**  Mr. Travis?

16          **MR. TRAVIS:**  No cross-examination.  Thank you, Judge.

17          **THE COURT:**  And redirect?

18          **MR. McGEE:**  Court's indulgence one moment.

19          **THE COURT:**  Yes.

20      (PAUSE IN PROCEEDINGS.)

21          **MR. McGEE:**  May I proceed, Your Honor?

22          **THE COURT:**  You may.

23                      **REDIRECT EXAMINATION**

24  BY MR. McGEE:

25  **Q.**   Mr. Moody, if someone was in the geofence or near the

1  post office and they did not have their location services

2  turned on, would Google be collecting producible records on

3  them that they would produce?

4  **A.**  No.

5  **Q.**  Thank you.  So I'm not going to ask you any more about

6  other co-conspirators.  I'm not going to ask about victims, and

7  I'm not going to ask about eyewitnesses.  I'm going to ask you

8  about the three defendants sitting over here.  Is that fair?

9  **A.**  Yes.

10  **Q.**  Google sent certifications with all of these records; is

11  that correct?

12  **A.**  That is correct.

13  **Q.**  And certifying that they are accurate from their business

14  records that they collect?

15  **A.**  Correct.

16  **Q.**  Is that -- do they collect that without our interference?

17  **A.**  Yes.

18  **Q.**  So we have nothing to do with collecting their records;

19  is that correct?

20  **A.**  That is correct.

21  **Q.**  Now, you touched on this briefly, but I want to make sure

22  I understand it before we move forward.  I don't want to

23  belabor this, but Mr. Lewis asked you about the -- how close it

24  could be to the tower, and you mentioned 80 percent.  Can you

25  see that document in front of you, which is your slideshow?

1 **A.** Yes, I can.

2 **Q.** Explain to the jury what you mean by 80 percent, and

3 obviously in as much layman's terms as possible so we can all

4 understand it.

5 **A.** All right.  So the easiest way to represent this is if we

6 look at the two yellow-coded sectors and the towers that

7 they're connected to.  So McThunel's phone call at 5:26 and the

8 one below that, those two points are towers that have the white

9 dot and the red circle.

10 **Q.** Just to -- just to clarify, that is 5:28; correct?

11 **A.** Yes, 5:28.

12 **Q.** Okay.

13 **A.** 5:28 and 5:26.

14 **Q.** Okay.  Continue.

15 **A.** So the 80 percent would be -- if we look at the top tower

16 to the right and we measure the distance to the bottom tower on

17 the left, that top tower's general best signal is going to be

18 within 80 percent of the distance.

19 **Q.** Okay.  So to make sure I understand --

20 **A.** So if --

21 **Q.** Go ahead.

22 **A.** So, if you were to look at, say, the bottom 20 percent or

23 the area from -- or just rough eyeballing it where it says

24 U.S. 51 down to the next tower, that would probably be about

25 20 percent, maybe a little bit more, and that would connect to

1  the lower tower.

2  **Q.**   I see.  That makes sense.  And, again, that doesn't

3  change the way the tower is pointing, which is the middle of

4  this arc; is that correct?

5  **A.**   Does not -- does not change the way the towers point.

6  **Q.**   Right.

7          **THE COURT:**   That was G-25?

8          **MR. McGEE:**   That is G-25.  Thank you, Your Honor.  And

9  that's the last slide, which I believe is 12.

10  **BY MR. McGEE:**

11  **Q.**   So, again, let me make sure I understand.  So what you're

12  saying is he wouldn't jump over this tower and be down here.

13  Is that what you're saying?

14  **A.**   Correct.

15  **Q.**   Okay.

16  **A.**   That next tower would then pick up the call in most

17  situations, unless that tower was not in service.  Which based

18  on the records, it was in service.

19  **Q.**   Okay.  Thank you.  Were any of these towers used in this

20  diagram -- were any of these disabled?

21  **A.**   None of the towers that were in the diagram were disabled

22  because they were all handling phone calls.

23  **Q.**   Thank you.  Pulling up Government's -- pulling up

24  Government's Exhibit 4.  Now, I appreciate what Mr. Lewis said

25  about GPS is more accurate.  That is a true statement; correct?

1  **A.**    That is correct.

2  **Q.**    There was a lot of talk about geofence, geofence,

3  geofence during your cross-examination.  Do you recall that?

4  **A.**    Yes, I do.

5  **Q.**    Did they ever talk to you about the rest of the records?

6  **A.**    No.

7          **MR. McGEE:**  I'm going to switch back.  I'm sorry.

8  BY MR. McGEE:

9  **Q.**    This is Government's Exhibit 25.  This is Slide 7 of

10 Government's Exhibit 25.  Did we talk about all of these other

11 GPS hits?

12         **MR. LEWIS:**  Well, Your Honor, my objection would be --

13 **A.**    No, we did not.

14         **MR. LEWIS:**  -- if I didn't --

15         **THE COURT:**  Excuse me.

16         **MR. LEWIS:**  -- talk about it on cross, then it would

17 be improper redirect to ask him about it now.

18         **MR. McGEE:**  Well, Your Honor, he talked about geofence

19 records, and there's more expansive records than just the ones

20 he talked about in the box of the defendant.

21         **THE COURT:**  I think that's right.  It will be -- it

22 will be overruled.

23 BY MR. McGEE:

24 **Q.**    Again, Mr. Lewis said GPS is more accurate in his

25 cross-examination.

1   **A.**    That is correct.

2        **MR. McGEE:**  Can you zoom in to where it has -- just

3   shows the date, GPS coordinates, and that "Type" where it says

4   GPS, cell, et cetera?

5   **BY MR. McGEE:**

6   **Q.**    So, obviously, I'm not going to go through these

7   thousands of hits here.  We're just looking at a short time

8   frame, just to be clear, which is not a thousand hits, and this

9   is essentially the time frame of the robbery.  And what type of

10   hits did Google produce during this time frame?

11   **A.**    GPS hits.

12   **Q.**    What else did it produce?  Can you read that?

13   **A.**    I see -- it needs to be zoomed in a little bit more on

14   this end.

15   **Q.**    Okay.

16   **A.**    So GPS, GPS, GPS, cell, and Wi-Fi right above it.

17   **Q.**    So all three?

18   **A.**    Correct.

19   **Q.**    And for Mr. McThunel's Google account, did they produce

20   the same thing?  Let's pull it up.

21   **A.**    I believe they had all -- they had all three also.

22   **Q.**    I'm just showing on here -- looks like cell and Wi-Fi

23   during that time; is that correct?

24   **A.**    Cell and Wi-Fi, yes.

25   **Q.**    And Wi-Fi are the ones we talked about earlier; right?

1  **A.**   Correct.

2  **Q.**   So we don't just have the, what, nine hits in the

3  geofence; correct?  The jury also has Government's Exhibit 4,

4  which is an extensive -- extensive amount of hits from Google;

5  is that correct?

6  **A.**   That is correct.

7  **Q.**   Now, there was some talk of maybe you misleading the jury

8  with -- saying that it was Jamarr Smith or Gilbert McThunel's

9  phone.

10           **MR. McGEE:**   I'm showing the witness what's been marked

11  G-11.

12  **BY MR. McGEE:**

13  **Q.**   What phone number does that say under Gilbert McThunel?

14           **MR. McGEE:**   You may have to --

15  **A.**   I'm waiting for it to --

16           **MR. McGEE:**   Actually, I can do that.  I'm sorry.

17  **A.**   It's not up on my screen.

18           **MR. CHINICHE:**   Your Honor, I'm going to voice an

19  objection.  This document was not shown to this witness on

20  cross-examination.

21           **MR. McGEE:**   I agree that it wasn't, Your Honor.

22           **THE COURT:**   No, it wasn't.

23           **MR. McGEE:**   And he showed him the subscriber

24  information, but that's not the whole story.

25           **THE COURT:**   This -- no, it's sustained.

1    **MR. McGEE:**  Okay.  No further questions, Your Honor.

2    **MR. MIMS:**  Your Honor, can I have one second?

3    **MR. McGEE:**  One second.  I'm sorry.

4    (CONFERRING OFF THE RECORD.)

5    **MR. McGEE:**  Your Honor, at this time, we would move to

6    admit 25A, which is just a print-off of the slideshow for the

7    jury.

8    **THE COURT:**  Any objection?

9    **MR. LEWIS:**  I thought it was already in.

10   **THE COURT:**  Okay.  25A will be admitted.

11   (EXHIBIT NO. G-25A ADMITTED INTO EVIDENCE.)

12   **MR. McGEE:**  That's all I have, Your Honor.  Thank you.

13   **THE COURT:**  So have we finished with Mr. Moody?

14   **MR. McGEE:**  Yes, Your Honor.

15   **THE COURT:**  Okay.  Mr. Moody, thank you for your

16   testimony.  We're going to conclude your testimony at this

17   time.  Thank you.

18   **THE WITNESS:**  Yes, Your Honor.  Thank you.

19                              *  *  *  *  *

20

21

22

23

24

25

CERTIFICATE


I, Phyllis K. McLarty, Federal Official Realtime Court
Reporter, in and for the United States District Court for the
Northern District of Mississippi, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that the
foregoing 97 pages are a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is in
conformance with the regulations of the Judicial Conference of
the United States.

Witness my hand, this 20th day of March, 2023.


/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Federal Official Court Reporter