1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF MISSISSIPPI
2              OXFORD DIVISION

3

4    UNITED STATES OF AMERICA                    PLAINTIFF

5
     VS.                                          NO. 3:21CR107
6

7    JAMARR SMITH, THOMAS IROKO AYODELE,
8    AND GILBERT McTHUNEL, II                     DEFENDANTS

9

10
               TRANSCRIPT OF JURY TRIAL
11                  VOLUME 2 OF 5

12
           BEFORE HONORABLE SHARION AYCOCK
13           UNITED STATES DISTRICT JUDGE

14
                 Oxford, Mississippi
15               February 21, 2023

16

17
              (APPEARANCES NOTED HEREIN)
18

19

20

21   Court Reporter:    PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
22                      Federal Official Court Reporter
                        911 Jackson Avenue East
23                      Oxford, MS  38655

24

25

APPEARANCES:

For the Government:    ROBERT J. MIMS, Esquire
                       CLYDE McGEE, IV, Esquire
                       U.S. Attorney's Office
                       900 Jefferson Avenue
                       Oxford, MS   38655

For the Defendant
 Smith:                GOODLOE T. LEWIS, Esquire
                       Hickman, Goza & Spragins, PLLC
                       P.O. Drawer 668
                       Oxford, MS   38655-0668

For the Defendant
 Ayodele:              WILLIAM F. TRAVIS, Esquire
                       8619 Highway 51 North
                       Southaven, MS   38671

For the Defendant
 McThunel:             PAUL A. CHINICHE, Esquire
                       Chiniche Law Firm, PLLC
                       P.O. Box 1202
                       Oxford, MS   38655-1202

1

## TABLE OF CONTENTS

PAGE

Voir Dire                                                                3

Selection of a Jury                                                    109

Motions                                                                121

Preliminary Instructions                                               143

Opening Statement by Mr. McGee                                         147

Opening Statement by Mr. Lewis                                         154

Opening Statement by Mr. Travis                                        159

Opening Statement by Mr. Chiniche                                      160

Motions                                                                165

GOVERNMENT'S WITNESSES

    SYLVESTER COBBS

        Direct Examination by Mr. Mims             178
        Cross-Examination by Mr. Lewis             200
        Cross-Examination by Chiniche              203

    TRECE HIGGS

        Direct Examination by Mr. Mims             206
        Cross-Examination by Mr. Lewis             231
        Cross-Examination by Mr. Travis            235
        Redirect Examination by Mr. Mims           236
        Recross-Examination by Mr. Lewis           240

    TIAJUANNA WILLIAMS

        Direct Examination by Mr. McGee            241
        Cross-Examination by Mr. Lewis             252
        Cross-Examination by Mr. Chiniche          254

    PATRICK WILSON

        Direct Examination by Mr. McGee            258
        Cross-Examination by Mr. Lewis             272
        Cross-Examination by Mr. Chiniche          273

                                                          PAGE
STEPHEN MATHEWS

        Direct Examination by Mr. Mims              277
        Cross-Examination by Mr. Lewis             355
        Cross-Examination by Mr. Chiniche          373
        Cross-Examination by Mr. Travis            392
        Redirect Examination by Mr. Mims           403

HERBERT DWAYNE MARTIN

        Direct Examination by Mr. Mims             422
        Cross-Examination by Mr. Lewis             427
        Cross-Examination by Mr. Chiniche          434
        Cross-Examination by Mr. Travis            435
        Redirect Examination by Mr. Mims           435

FOREST COFFMAN

        Direct Examination by Mr. McGee            436
        Cross-Examination by Mr. Lewis             451
        Cross-Examination by Mr. Chiniche          466
        Redirect Examination by Mr. McGee          472

PATRA MALONE

        Direct Examination by Mr. McGee            472

LARSHARONDRA JORDAN

        Direct Examination by Mr. Mims             478
        Cross-Examination by Mr. Travis            483
        Redirect Examination by Mr. Mims           485

CHRISTOPHER MOODY (VIA ZOOM)

        Direct Examination by Mr. McGee        492/503
        Cross-Examination by Mr. Lewis             542
        Cross-Examination by Mr. Chiniche          577
        Redirect Examination by Mr. McGee          579

Government Rests  -  586

Defendants' Motion  -  586

Defendants Rest  -  616

Jury Instruction Conference  -  600

1  Jury Charge  -  617

2  Closing Argument by Mr. Mims  -  633

3  Closing Argument by Mr. Chiniche  -  654

4  Closing Argument by Mr. Travis -  663

5  Closing Argument by Mr. Lewis  -  672

6  Closing Argument Rebuttal by Mr. McGee  -  682

7  Verdict  -  701

8  Certificate of Court Reporter  -  708

9

| GOVERNMENT'S EXHIBITS | I.D. | ADMITTED |
|---|---|---|
| G-1 | | 192 |
| G-2A | | 183 |
| G-2B | | 183 |
| G-3 | | 302 |
| G-3A | | 303 |
| G-3B | | 303 |
| G-3C | | 302 |
| G-4 | | 310 |
| G-4A | | 311 |
| G-5 | | 244 |
| G-5A | | 244 |
| G-5B | | 244 |
| G-5C | | 244 |
| G-6 | | 260 |
| G-6A | | 260 |
| G-6B | | 260 |
| G-7 | | 208 |
| G-7B | | 227 |
| G-7C | | 210 |
| G-7D | | 210 |
| G-7E | | 227 |
| G-8 | | 190 |
| G-9 | | 260 |
| G-9A | | 260 |
| G-9B | | 260 |
| G-9C | | 260 |
| G-9D | | 260 |
| G-10 | | 208 |
| G-10A | | 229 |

GOVERNMENT'S EXHIBITS
(CONT'D.)                              I.D.              ADMITTED

| | | |
|---|---|---|
| G-11 | | 323 |
| G-12 | | 331 |
| G-13A | | 282 |
| G-13B | | 282 |
| G-14 | | 290 |
| G-15 | | 317 |
| G-16 | | 316 |
| G-17 | | 316 |
| G-18 | | 318 |
| G-19 | | 326 |
| G-20 | | 329 |
| G-21 | | 424 |
| G-23 | | 352 |
| G-24 | | 352 |
| G-25 | | 492 |
| G-25A | | 585 |
| G-26 | | 331 |

1        **THE COURT:** Okay. Ladies and gentlemen, if you would

2  stand and raise your right hand to be sworn.

3     (JURY SWORN.)

4        **THE COURT:** Thank you.

5        I'm not going to starve you to death anymore. Okay?

6        Okay. So let me tell you two or three things. First

7  of all, going forward, you cannot discuss this case, not with

8  anybody. Not among each other, not anywhere you have lunch,

9  not with your spouses or your significant others tonight until

10  we have a verdict. Okay?

11        I know you're probably scattered, parked all over

12  Oxford. Now, at this lunch break I'm about to give you, I am

13  suggesting that you go get your vehicle and bring it to the

14  west side of the courthouse. There's a place over there

15  particularly for jury parking, and it will be very convenient

16  for you coming in and out for the rest of the week. Okay?

17        So I have some -- this is a strange day, and I

18  apologize on the front end. I've got some matters that I have

19  got to take up that are totally unrelated to this case, people

20  that are already in the courtroom. I've got to take up this

21  matter, and then I've got some issues about this case that I

22  have got to take up with the lawyers.

23        So I'm going to send you to lunch and let you stay at

24  lunch until 2:30. When you come back, you'll come back to the

25  jury room that the security officer will show you. You won't

1    come back here right now.  You'll come back to the courtroom
2    when we're ready for you.  I'm warning you now that at 2:30 I
3    have a Zoom meeting that's going to take 15 or 20 minutes.  So
4    I may be a little late starting, but it's not anybody else's
5    fault.  It's my fault.  I've just got to take this for about 15
6    or 20 minutes.

7         And so that's just the nature of today, but we're
8    going to piece it together just as best as we can.  So remember
9    not to discuss the case.  I will tell you this many times.
10   Don't undertake to google anything.  Everything you hear has
11   got to come from the evidence box.  So don't -- don't start
12   researching this.  Okay?

13        You're dismissed.  I'll see you about 2:30.
14        (JURY OUT.)

15        **THE COURT**:  Okay.  Counselors, I'm going to dismiss
16   you.  I'm going to do this sentencing that will take me
17   20 minutes maybe, thereabout.  What I would like for us to do
18   is for you not to go to lunch, but take the 20 minutes, come
19   back, and let's knock these motions out.  And then I'll
20   probably have to take this conference call.  We're trying to
21   get sewer installed at Aberdeen.

22        **MR. CHINICHE**:  That's important.

23        **THE COURT**:  We might likely need it.  So that being
24   the case, I -- that will give you a few minutes before you make
25   your opening statements.  Okay?

1       Okay.  We're in recess.  Thank you for your patience.

2   (RECESS TAKEN.)

3       **THE COURT**:  We'll be back on the record.  Let's go

4   through as much of this as we can.  And I'll just be honest

5   with you, you may have a preference as to how we do them in a

6   certain order.  Any preference?

7       **MR. LEWIS**:  I don't think so, Your Honor.

8       If I could add, we've got one other *ore tenus* motion

9   that has to do with one of their exhibits.  Mr. McGee is on

10  notice of it, and we're prepared to discuss that too.

11      **THE COURT**:  Okay.  So I'm just going to take them as

12  they appear.  I've got the Government's Request for Notice of

13  the Alibi Defense, and then I have the amended notice.  Is

14  there any question about -- have you been provided what you

15  need to have provided to you, Government?

16      **MR. MIMS**:  I believe so, Your Honor.  I've had one

17  defendant who has put me on notice of alibi defense and

18  provided witnesses.

19      **THE COURT**:  Uh-huh.

20      **MR. MIMS**:  I've had another that's given me notice of

21  a potential alibi defense but has stated he has no witnesses to

22  support that.  And I have a third that has not provided any

23  alibi; so I'm assuming his client has no alibi.  But as far as

24  I -- as far as I know, I --

25      **THE COURT**:  You're on notice?

1    **MR. MIMS**:  Yes, ma'am.

2    **THE COURT**:  Okay.  Again, I'm asking this just kind of

3    out of an abundance of caution, but I don't think there's

4    anything further to be addressed in the motion in order to

5    suppress.  Is there anything that needs to be clarified before

6    we start the trial?

7    **MR. LEWIS**:  No, Your Honor.

8    **THE COURT**:  Wasn't that fun?

9    So I have a Motion in Limine as to the Expert

10   Testimony by Non-Designated Experts.  This is filed by

11   Mr. Lewis on behalf of Mr. Smith.  I've read the motion.  Is

12   there any further discussion, any further argument with respect

13   to that?

14   **MR. LEWIS**:  No, Your Honor.  I stand by our filing.  I

15   may have rebuttal if he has argument.

16   **THE COURT**:  I'm sorry?

17   **MR. LEWIS**:  I may have rebuttal if the Government has

18   argument.

19   **THE COURT**:  Let me hear from you, Mr. Mims.

20   **MR. MIMS**:  Your Honor, of course, I have filed a

21   written response.  Just to add to that, I've been doing this 15

22   years as a prosecutor.  I can't say I know everything as a

23   prosecutor, but I have never once -- I have asked many, many,

24   many times of a law enforcement agent witness, you know,

25   questions about, based on your training and experience, what

1  did you perceive or what did you think.  I've never even so

2  much as had an objection to it that I can recall.  I have sure

3  never had any of that testimony precluded.

4          I've read the *Haines* case cited by the defendants in

5  their motion, and I have also addressed it in my response.  I

6  think it's very applicable to some extent.  The *Haines* case, in

7  part, dealt with drug slang from wires in a drug case.  And I

8  understand from reading that case, and also consulting with

9  Mr. McGee, that usually in a drug case when you have somebody

10  testifying about the wire you designate them as an expert to

11  talk about what drug slang means.

12          It's not exactly what we have here, but I do

13  understand from *Haines* that they had three categories of

14  evidence that they reviewed.  And part of it they said this

15  would require expert testimony and part of it they said would

16  not.  And I think that, in our case, the questions I might have

17  of my case agent would fall into the category two testimony or

18  evidence from *Haines,* the meaning of specific words and terms

19  used by the particular defendants in that case, not in general.

20  The difference in the category one evidence was it was in the

21  drug trade in general.  Category two was this case specific.

22          So I think, at a bare minimum, I ought to be able to

23  ask, for example, Mr. Mathews, who's the investigator in this

24  case, you know, based on your training and experience, did you

25  have a theory as to how this case occurred.  And he could

1    testify that, yes, based on these reasons that I saw here, I

2    believe in this case we had somebody on the inside providing

3    information to the defendants or somebody on the inside that

4    was involved in this.  And we're going to put on proof there

5    was actually an inside connection.

6           I certainly think that is admissible, and that should

7    not be precluded when he's testifying based on his training and

8    experience.

9           **THE COURT:**  And will Mathews be able to state that

10   based upon his perception of the investigation?

11          **MR. MIMS:**  Yes, Your Honor.  Of course, I don't know

12   until we get into the witness examination exactly what it is

13   that they're objecting to him testifying to or if it's just a

14   blanket can't ask any questions about -- based on your training

15   and experience.  But I think certainly he can testify based on

16   his training and experience as to this case and what he thought

17   about this case even if -- if he can't do it as cases in

18   general; although, again, I've never even seen that come up

19   before.

20          **THE COURT:**  So let's -- I'll hear from you if you've

21   got any rebuttal.

22          **MR. LEWIS:**  Your Honor, I've just got a real

23   straightforward interpretation or reading of the expert witness

24   rules.  If you are going to provide testimony to the jury based

25   on your experience, training, you know, expertise, that's

1    expert testimony. You've got to be designated as an expert. I

2    think it's just that clear.

3          **THE COURT:** And I disagree a bit, and here's why. I

4    think the 701 -- it's not necessarily experience and training

5    because he can give opinions based upon his perception, but

6    it's when it gets too scientific, too technical, too

7    specialized. That's where he becomes the expert. I may not be

8    able to answer this question for you until I really hear the

9    solicitation of the question and what it is.

10          But I will just say, generally speaking, Mr. Mims,

11    you're right. You can ask that officer what kind of training

12    and experience he has and his perceptions of this case and his

13    investigation, and, therefore, he can give me an opinion. But

14    he can't get into scientific, technical, or other specialized

15    knowledge.

16          **MR. MIMS:** Your Honor, if I may just add to it, if

17    you -- if you were to accept the defendant's position, then

18    basically going forward, in every single case I ever bring, I

19    would then have to designate my law enforcement agent as an

20    expert witness, which I'm sure would then draw objections from

21    the defendants if I did that every time and asked him to

22    testify as an expert.

23          **THE COURT:** But I didn't accept it.

24          **MR. MIMS:** I understand. That's just part of my

25    argument for the record, Your Honor.

1    **THE COURT:**  Okay.  You filed a motion in limine,

2  Defense Counsel.  Your second one was as to the interpretation

3  of videos.

4    **MR. LEWIS:**  Your Honor, I'll boil that down.

5    **THE COURT:**  Okay.

6    **MR. LEWIS:**  What I think is going to happen is the

7  Government is going to play the video in this case and ask the

8  agent to narrate to the jury what is happening.  What do you

9  see this dot on the thing doing?  Oh, that person is robbing

10  the post office.  What do you see?  What is going on here?

11  Explain to the jury what's going on in this video.  I object to

12  that.  The jury can watch the video and reach their own

13  conclusions.  Okay?

14    Now, if it's --

15    **THE COURT:**  The --

16    **MR. LEWIS:**  If I may, Your Honor, the -- if they want

17  to say we saw a white SUV in the video, and, therefore, we

18  began investigating whether, you know, one of the perpetrators

19  had a white SUV, they can do that, but narrating to the jury,

20  hey, jurors, here's what the video is showing you, I think is

21  improper.  And, of course, that's what happened at our

22  suppression hearing, and I objected then too.

23    **THE COURT:**  Okay.  Mr. Mims.

24    **MR. MIMS:**  Your Honor, again, it's one of those things

25  it's hard to know until you really get into it, but, certainly,

1   I think it's very relevant for the case agent to talk about
2   what he sees on the video because it goes into his
3   investigation.

4           He's going to say, I would anticipate, we saw a white
5   SUV drive past, and then it comes back, and it drops off
6   somebody who turned out to be the assailant who went behind the
7   post office and waited on Mr. Cobbs to arrive.  We found that
8   white SUV to be a person of interest.

9           Here's a red Hyundai that comes into the scene and
10  makes a U-turn and pulls up in front of the post office and
11  lingers in front of an old closed down store.  That appears to
12  be a lookout.  That's a vehicle or a person of interest to us.
13  Based on reviewing what we see going on -- and, oh, by the way,
14  here's the assailant hanging out behind the post office who
15  attacks Mr. Cobbs, the postal carrier.

16          We believe there were three people involved in this
17  crime, at least involved from a physical presence standpoint.
18  There was a lookout, an assailant, and a drop-off vehicle.  And
19  so we investigated, based upon that, looking for three people;
20  looking for who owned the white SUV; looking for who owned the
21  red Hyundai.  And here's how we went about our investigation.
22  I think it's certainly relevant to talk about it from that
23  standpoint.

24          **THE COURT:**  So, Mr. Lewis, y'all cite the *Slack v.*
25  *City* case -- *City of San Antonio*.

1              **MR. LEWIS:**  Yes.

2              **THE COURT:**  That was an expert witness.  You contend

3    that this will likely come through Mathews looking at the video

4    like we did in the suppression hearing?

5              **MR. LEWIS:**  Right.

6              **THE COURT:**  Okay.  So, Mr. Mims, Mr. Mathews cannot

7    give -- he cannot give a final conclusion.  He cannot say this.

8    Okay?

9              **MR. MIMS:**  Yes, ma'am.

10             **THE COURT:**  So he can lay the foundation of his

11   investigation and -- that the video was one of the sources and

12   he looked at the video, and based upon his review of the video

13   as a law enforcement officer, this is what he took from that

14   and how he ran with it, but he can't tell this jury he had a

15   phone, he robbed the post office.

16             **MR. MIMS:**  Yes, ma'am.

17             **THE COURT:**  Okay?  And then third is photographs.

18             **MR. LEWIS:**  I think this one is resolved.

19             **THE COURT:**  Okay.  Is it?

20             **MR. MIMS:**  It's resolved kind of, sort of.

21             **THE COURT:**  Then it's not resolved.

22             **MR. MIMS:**  We have numerous photos here.  I believe

23   there's approximately eight of them that came off of -- most of

24   them came off of Jamarr Smith's Facebook page.  Some of them

25   are just firearms by themselves.  There's a couple of pictures

1  with Jamarr Smith holding a firearm.  The Government has no
2  intentions of asking any questions of that on direct
3  examination.

4       We do think it would be appropriate on
5  cross-examination of any defense witnesses that may take the
6  stand to be able to ask the witness to agree that Jamarr Smith
7  would have access to firearms because a firearm was involved in
8  this case.  So ask, "Would one of these individuals, for
9  instance, Jamarr Smith, have access to firearms?"  And if they
10 deny that or if they say they're not -- they don't know when
11 they would know, I think we should be able to put on the
12 pictures from Facebook to show that that person is mistaken or
13 not telling the truth.

14      I also think that if they -- it's possible they could
15 open the door in examining, for example, Mr. Mathews by saying
16 something to the effect of, you know, you don't have any proof
17 that my client had a firearm or has access to firearms.  Then
18 it might become relevant.

19      And the last thing is -- I don't really think they
20 would do this, but just to be certain we address it, if we
21 don't put on proof that any of these individuals had access to
22 firearms, which I don't think is an actual element for us to
23 prove that in the case, I certainly wouldn't want them -- in
24 trial for them to stand up here in front of the jury and say
25 the Government has put on no proof that anybody had access to

1  firearms when they've asked us not to put on that proof through
2  these Facebook photos.
3       So those are just my concerns.  But, no, the
4  Government has no intentions during the direct examination of
5  its witnesses to put any evidence of that on.
6       **THE COURT:**  And I guess it sounds like the door is
7  going to have to be opened for that to even be something we
8  consider at a later time.  Okay?
9       **MR. LEWIS:**  I agree, Your Honor.
10      **THE COURT:**  Okay.  So are there -- that other
11 matter -- ore tenus matter.
12      **MR. LEWIS:**  And I'm going to have to use the ELMO,
13 Your Honor.  And I'm going to try to not make this more
14 complicated than it needs to be.
15      May I proceed?
16      **THE COURT:**  You may.
17      **MR. LEWIS:**  So the Government is going to call an
18 expert witness named Chris Moody.  The Government has provided
19 us some videos of -- that he's going to testify to, and the
20 Government has provided us a PowerPoint that I think just takes
21 still shots out of the video.  Okay?
22      He is going to testify to two separate areas of phone
23 technology, one of which has to do with Google.  Our motion
24 does not have to do with Google, you'll be pleased to hear.
25 Our motion has to do with what is called a tower dump.  Okay?

1        And so I'm going to put on the thing here -- on the

2   ELMO -- this is page 8 of the PowerPoint.  And basically what I

3   believe the testimony is going to be is that a cell phone

4   antenna has three quadrants that have these pie-shaped coverage

5   of -- you know, that go out on three sides.  So you can see

6   here that on some of these they have, you know, just one

7   quadrant.  Some of these, they have all three quadrants.

8   That's a full circle.

9        **THE COURT:**  Uh-huh.

10       **MR. LEWIS:**  What is misleading about this, Your Honor,

11  is I believe the testimony is going to be that the coverage is

12  not this uniform, regular, straight pie shape that says that

13  the phone was somewhere in that shaded area there.  Okay?  The

14  testimony I believe is going to be -- is that the coverage goes

15  out long distances beyond that.  And so what this suggests to

16  the jury is that the phone was somewhere in that pie-shaped

17  area.

18       And I'm going to hand you a case where a court in

19  D.C. -- and, Your Honor, I don't think you need to rule on this

20  before opening if this is something you want to chew on for a

21  minute.

22       **THE COURT:**  Okay.

23       **MR. LEWIS:**  But -- you know, unless they plan to play

24  it to the jury, and I don't think they do.  But, you know, the

25  Court found that -- and this is the thing, Your Honor.  This

1  isn't -- this is common, okay, that this kind of evidence is
2  put on.

3      But it says, "The Court" -- and I'm in the highlighted
4  portion there down a little lower -- "The Court agrees that the
5  use of the wedges could confuse members of the jury and mislead
6  them into believing that defendant's phone must have been
7  within that space," in other words, the shaded space.  "Thus,
8  in order to avoid any unfair prejudice to the defendant, the
9  arcs used to depict the outer limit of the pie-shaped wedges
10  should be removed from Agent Eicher, E-i-c-h-e-r apostrophe -s,
11  Eicher's reports.  The wedges will then appear as open-sided
12  V shapes opening out in the direction of the sector used by the
13  phone."

14      So, you know, going back, page 8 shows what I just
15  showed you.  Page 9, you know, this shows more of the
16  pie-shaped sectors.  And really the last page, which is page
17  12, I mean, this is -- this is what really is the -- is the big
18  thing here because I do not believe the agent is -- I'm
19  sorry -- the expert is going to say that the phones were
20  somewhere within that shaded area.  Okay?  I think the phones
21  is just going -- the expert is just going to say that was where
22  the sector went out, that the phone was somewhere out there,
23  okay, but not within the shaded area.

24      And the judge in the D.C. Circuit or District said you
25  should not have these closed-ended -- these close-ended pie

1   shapes.  You should just show where the sector is, not that
2   there's some end point to the sector where the phone must have
3   been, because I don't think the witness is going to testify
4   that the phone was in that sector.
5            And that's our argument, Your Honor.
6            **THE COURT:**  Can I ask --
7            **MR. LEWIS:**  I'll leave this up for you.
8            **THE COURT:**  Let me ask you a couple of questions
9   based --
10           **MR. LEWIS:**  Yes.
11           **THE COURT:**  -- on this graph, be sure I understand.
12  So I'm looking now at the one that's on the screen that's kind
13  of purple toward the right upper hand, and it's not a full
14  circle.
15           **MR. LEWIS:**  Right.
16           **THE COURT:**  Okay.  So what do you say about that?  Is
17  there no reception in those areas that's not shaded?
18           **MR. LEWIS:**  What I'm saying is the witness is
19  suggesting to the jury that the phone was located somewhere in
20  that purple area by this -- this drawing.
21           **THE COURT:**  Even though it's a partial area?
22           **MR. LEWIS:**  Well, even though the witness is not going
23  to state that as testimony.  Even though the phone could be,
24  you know, out from there, it's not -- the phone does not have
25  to be in that colored shades area there.

1    And the point is, you know, they've got all of these
2  sectors here down around Lake Cormorant.  I mean, that doesn't
3  mean that the phone was in one of those shaded sectors.  It was
4  just somewhere in the "V" shape.  You know, maybe outside the
5  sector.  You know, it could have been anywhere.

6    **THE COURT:**  I follow you.  So let me ask you this.
7  Just -- not arguing the facts right now.  Just trying to
8  understand what you're telling me about this graph.

9    Does the Government agree that the phone does not
10  necessarily have to be in the shaded area?

11    **MR. McGEE:**  That's correct, Your Honor.  It's simply
12  pointing -- and the easiest way to -- I can -- I can give you
13  my full argument, if you want me to, now.

14    **THE COURT:**  Okay.

15    **MR. McGEE:**  Okay.  So if you'll look back at this map,
16  what this expert does is he's using this program to take --
17  he's taken these phone records, and he's put them in -- putting
18  them in a program that plots the cell sites.

19    And when I say "cell sites," I'm talking about which
20  way the phone hit, in other words, which way the antenna was
21  pointing.  There's three different antennas on a cell phone
22  tower.  And so, for example, it may be like that
23  (demonstrating).  One, two, three.

24    **THE COURT:**  Uh-huh.

25    **MR. McGEE:**  So if I'm driving right here (indicating),

1  I'm going to hit on this cell site or sector.

2          THE COURT:  Okay.

3          MR. McGEE:  Now, I may be right here (indicating).  I

4  may be right here (indicating), and I may be right here

5  (indicating).  I may be right here (indicating) until it hits

6  the next tower, you know, where another tower may be going like

7  this (indicating).  Okay?

8          So I do agree that nobody's saying and nobody is going

9  to say on direct that they are in this shaded area.  But if you

10  look at this -- and by the way, the ones that are circled, my

11  understanding, are -- they've hit -- they hit on all sides of

12  that tower at some point, the ones that are full circle.

13          THE COURT:  Uh-huh.

14          MR. LEWIS:  I agree with that.

15          THE COURT:  Okay.

16          MR. McGEE:  Okay.  So, for example, here, if we try to

17  just use lines, lines here (indicating), lines there

18  (indicating), you know, a different color line going this way

19  (indicating), it would just get too confusing for the jury.

20  We're trying to make it easier for the jury.  And I felt like

21  this is the -- this is the way it's done, in my opinion.

22          THE COURT:  So what you're telling me -- both of you

23  are telling me, that the -- that the shaded area is merely

24  showing me the direction of the cell reception?

25          MR. McGEE:  That's correct, Your Honor.

1           **MR. LEWIS:**  Right.

2           **THE COURT:**  Okay.

3           **MR. McGEE:**  And this will be -- this will be cleared

4    up on direct, and obviously cross if it's not clear enough on

5    direct, that nobody is saying that, for example, McThunel here

6    (indicating) is within this.  Now, what we are saying is he's

7    somewhere here (indicating).  He's hitting on that tower, and I

8    think it will be clear.

9           **THE COURT:**  He's in the ray?

10          **MR. McGEE:**  He's in the ray.  That's right.

11          **THE COURT:**  Okay.

12          **MR. McGEE:**  And I think it will be clearly explained.

13   If we try to do it some other way, it's going to get confusing.

14   This is the easiest way to show color-coded shades of each

15   different phone.

16          **THE COURT:**  So does that satisfy you, Mr. Lewis?

17          **MR. LEWIS:**  No, Your Honor.

18          **THE COURT:**  Okay.

19          **MR. LEWIS:**  Because the jury is going to see that, and

20   the Government -- you know, they're going to think that

21   somebody is in that shaded area, when I think we all agree

22   that's not true.  It doesn't have to be shaded.  I appreciate

23   Mr. McGee thinks it's more confusing to do it the other way.

24   We think it's less prejudicial to do it the other way.

25          **THE COURT:**  The other way being those first --

1      **MR. LEWIS:**  Take out the shading.  Just show the "V."
2   Just show the black lines that are a "V."

3      **THE COURT:**  Okay.

4      **MR. McGEE:**  Then there will be no way to differentiate
5   between the three phones.  There will be no --

6      **MR. LEWIS:**  The witness can do that on the stand if he
7   wants to point.  I mean, it makes it maybe harder on the
8   witness but, again, less prejudicial to the defendant.

9      **THE COURT:**  Because there's three defendants,
10  Mr. Lewis, I'm actually leaning toward allowing the color-coded
11  photo, but it may need to be accompanied with a limiting
12  instruction from the outset to where the jury is told its
13  limitations and what it means.  Otherwise --

14      Well, let me ask you this, Mr. McGee.  Does it become
15  important as part of any of the proof what direction the
16  defendants were traveling in for their cell direction?

17      **MR. McGEE:**  Yes, Your Honor.

18      **THE COURT:**  Okay.

19      **MR. McGEE:**  So, for example, you know, it will
20  obviously be beneficial for the proof because what happened --
21  that McThunel hits at 5:28 on a tower pointing straight to the
22  post office as opposed to, you know, if it was pointing north.

23      **THE COURT:**  I understand.  Okay.  That's my
24  inclination.  We can take it up.

25      Mr. Lewis, are there any of these graphs that are --

1 that you're acceptable with?  Because I didn't see all of them.

2 **MR. LEWIS:**  I don't believe so.  The video is very

3 difficult to watch and understand, which I think is why the

4 Government has done what they've done here with this PowerPoint

5 to try to pull the stuff out and make it a little more -- I

6 guess you'd say clear.  But, again, the videos have the same

7 stuff in it, if that answers your question.

8 **THE COURT:**  Okay.  Okay.

9 Let me address another -- completely different matter

10 before we go further because I need to do this on the record

11 regarding Chris Moody, who I think we just referred to as the

12 expert for the Government, him testifying.

13 You will recall that last Monday, February the 13th,

14 that we held a conference call regarding Mr. Moody's

15 unavailability, and we discussed several things.  One was

16 continuing the trial for a short period of time.  Another was

17 continuing the trial, which could have been a much longer time

18 in order for Mr. Moody to heal and be able to come travel.  And

19 then what we ended up agreeing to was to allow him to appear by

20 video.

21 And we discussed this briefly, but, you know, that, of

22 course, raises a confrontation issue kind of.  Even though

23 you're going to be able to cross-examine him on video, he will

24 not be literally sitting here in the courtroom.  So the record

25 needs to be clear that each of these defendants have agreed to

1   allow Mr. Moody to proceed in this way.  And what I would

2   propose to do is ask about three or four short questions of

3   each of the defendants with their counsel and just let you tell

4   me that you're in agreement, if indeed you are, to proceeding

5   in this way.

6         So I'll start with Mr. Smith.  Mr. Smith, have you had

7   a conversation with Mr. Lewis where he explained to you that

8   the defendant's expert would be proceeding in this trial by

9   appearing on a Zoom versus appearing in person?

10         **DEFENDANT SMITH:**  Yes, Your Honor.

11         **THE COURT:**  Are you satisfied with that?

12         **DEFENDANT SMITH:**  Yes, ma'am, I am.

13         **THE COURT:**  And has he explained to you that -- the

14   difference is that he will be cross-examining that witness over

15   Zoom.  He won't be cross-examining that witness here presently

16   in the courtroom.  You understand that?

17         **DEFENDANT SMITH:**  Yes, ma'am.

18         **THE COURT:**  And you heard that that might have -- if

19   we hadn't done it that way, it might have resulted in a

20   continuation, and we were all trying to avoid that.  But are

21   you satisfied and comfortable that that expert is going to

22   appear in this case in that fashion?

23         **DEFENDANT SMITH:**  Yes, ma'am.

24         **THE COURT:**  Has anyone tried to coerce you, threaten

25   you, promise you anything in exchange for this agreement?

1        **DEFENDANT SMITH:**  No, ma'am.

2        **THE COURT:**  Okay.  I'm satisfied as to you.  Now, I'll

3    speak with Mr. Ayodele.  I'll never get it pronounced

4    correctly.  My apologies.

5        Same questions I would pose to you.  Have you had a

6    conversation with your attorney about Chris Moody appearing by

7    Zoom?

8        **DEFENDANT AYODELE:**  Yes, ma'am.  He said it.  Yes,

9    Your Honor.

10       **THE COURT:**  Okay.  Are you comfortable doing that?

11       **DEFENDANT AYODELE:**  Yes, ma'am, that's fine.

12       **THE COURT:**  You understand he will not be in the

13   courtroom to testify personally?

14       **DEFENDANT AYODELE:**  Right.

15       **THE COURT:**  Okay.  And has anybody made any threats or

16   promises to you?

17       **DEFENDANT AYODELE:**  Not at all.

18       **THE COURT:**  And you're satisfied to proceed in this

19   matter versus having a continuance in this case?

20       **DEFENDANT AYODELE:**  Yes, ma'am.

21       **THE COURT:**  And then last, Mr. McThunel --

22       **DEFENDANT McTHUNEL:**  Yes, ma'am.

23       **THE COURT:**  -- you've heard my questions.  Just trying

24   to satisfy that everybody knows so it's not a surprise to

25   anyone when this projector comes on --

1    **DEFENDANT McTHUNEL:** Yes, ma'am.

2    **THE COURT:** -- and this expert witness is not here in

3  the courtroom. You're satisfied?

4    **DEFENDANT McTHUNEL:** Yes, ma'am.

5    **THE COURT:** And understand it might have evolved into

6  a continuance had we not done it this way; right?

7    **DEFENDANT McTHUNEL:** Yes, ma'am.

8    **THE COURT:** And so you're satisfied that your attorney

9  can adequately cross-examine by Zoom for the --

10    **DEFENDANT McTHUNEL:** Yes, ma'am.

11    **THE COURT:** -- for the jury?

12    **DEFENDANT McTHUNEL:** Yes, ma'am.

13    **THE COURT:** Okay. Anybody threaten you --

14    **DEFENDANT McTHUNEL:** No, ma'am.

15    **THE COURT:** -- promise you anything, coerce you to

16  answer it in this fashion?

17    **DEFENDANT McTHUNEL:** No, ma'am.

18    **THE COURT:** Okay. Counselors, are you satisfied?

19    **MR. LEWIS:** Yes, Your Honor.

20    **THE COURT:** Okay. You have told me -- when I bring

21  them back in, I've got to read them this preliminary

22  instruction. And then, Mr. McGee, you're going to take

23  30 minutes in opening?

24    **MR. McGEE:** Probably won't take that long but, yes,

25  ma'am.

1         **THE COURT:** Mr. Goodloe, Mr. Travis -- Mr. Goodloe,

2 you're going to take 15; Mr. Chiniche and Mr. Travis going to

3 take 10 each.

4         Okay. I'm going to take a quick break and go see what

5 the status of this Zoom meeting is, and I'll be back just as

6 soon as possible, and then we'll start with these opening

7 statements.

8    (RECESS TAKEN.)

9         **THE COURT:** Okay. Are we ready to bring in the jury?

10        **MR. MIMS:** Yes, Your Honor.

11        **MR. TRAVIS:** Yes, Your Honor.

12        **THE COURT:** Okay. You may bring them in.

13    (JURY IN.)

14         **THE COURT:** You may have a seat. Let the record

15 reflect that the jury is back in the courtroom. Thank you for

16 your patience.

17         Ladies and gentlemen, the first thing I'm going to do

18 is read a jury instruction to you. I think this will help you

19 in kind of seeing an outline of how the case will be tried in

20 your presence.

21         Before I do so and before I forget, is the rule

22 invoked?

23        **MR. LEWIS:** Yes, Your Honor.

24        **MR. CHINICHE:** Yes, Your Honor.

25        **MR. MIMS:** Yes, Your Honor.

1    **THE COURT:**  Yes, the rule is invoked.

2         And, ladies and gentlemen, that simply means that

3    witnesses who plan to testify will not be allowed to sit in the

4    gallery until after they have testified.

5         **MR. MIMS:**  Your Honor, for the record, we have Stephen

6    Mathews here who is a witness but he is our Government case

7    agent in this case.

8         **THE COURT:**  And he's exempt from the rule.

9         Members of the jury, you have now been sworn as the

10   jury to try this case.  At this time, I will give you some

11   preliminary instructions to guide you in your participation in

12   the trial.

13        As the jury, you will decide the disputed questions of

14   fact.  As the judge I will decide all questions of law and

15   procedure.  From time to time during the trial and at the end

16   of the trial, I will instruct you on the rules of law and

17   advise you that you must follow those rules in making your

18   decision.

19        Soon the parties will make what is called an opening

20   statement.  Opening statements are intended to assist you in

21   understanding the evidence.  What the parties say is not

22   evidence -- what the lawyers say is not evidence.  Excuse me.

23        After the opening statements, the Government will call

24   witnesses and present evidence.  Then the defendant will have

25   an opportunity to call witnesses and present evidence.  After

1   the parties' main case is completed, the Government may be
2   permitted to present rebuttal evidence.  After all of the
3   evidence is completed, the lawyers will again address you in
4   what we refer to as final arguments or closing arguments.

5           Keep in mind that there are things that you should do
6   throughout this trial.  The first is keep an open mind, keep an
7   open mind during the trial.  Do not decide any fact until you
8   have heard all of the evidence, the closing arguments, and the
9   jury instructions.

10          Pay close attention to the testimony and the evidence.
11  You will need to rely upon your own memories.  Even though
12  there is a court reporter here making notes, you will not get a
13  copy of the transcript.  On the other hand, any exhibits that
14  are introduced will be available to you, and you'll have them
15  in the jury room.

16          Until this trial is over, do not discuss this case
17  with anyone and do not permit anyone to discuss it with you.
18  Do not discuss the case even with the other jurors until all
19  jurors are in the jury room and the case has completed and
20  you're ready for deliberations at the end of the case.  If
21  anyone should attempt to discuss the case with you, you must
22  report it to the court security officer.

23          You, as jurors, must decide this case based solely
24  upon the evidence presented here within these four walls.  This
25  means that during the trial you must not conduct any

1   independent research about the case.  I want to -- I want to

2   say that again to you.  You're going to hear some things about

3   this case -- it's an interesting case.  You're going to hear

4   some things that may prompt you to want to go do your

5   independent research.  You're prohibited from doing that.  In

6   other words, you should not consult dictionaries or reference

7   materials.  You should not search the Internet, websites,

8   blogs, or any other electronic tools to obtain information

9   about the case.

10          Until you retire to deliberate, you may not discuss

11  the case with anyone, even your fellow jurors.  Now, after you

12  retire to deliberate, you will begin discussing the case with

13  your fellow jurors, but you cannot discuss the case with anyone

14  else.  For instance, you may be discussing the case at the end

15  of the case, not reach a decision that day.  You can't go home

16  and discuss it with your spouse or significant other.  Have to

17  bring you back next morning to the courtroom in the same

18  fashion that you left.  I know that many of you use cell

19  phones, the Internet, and other tools of technology, but you

20  cannot resort to that in this case.

21          During the trial, it may be necessary from time to

22  time that I confer with the attorneys and the parties, perhaps,

23  or conduct a part of the hearing of the trial outside of your

24  presence.  I will handle these matters as briefly and as

25  conveniently for you as I can, but please understand that it's

1   a necessary and important part of the trial.

2        Should it become necessary that I talk to the
3   attorneys, I will typically bring them to the bench over here
4   to the side.  You'll hear some noise.  It's what we call white
5   noise.  It's intended to be such that you can't hear what our
6   discussions are over here.  There are times that I have to
7   develop the record or see an exhibit or something to where I'll
8   actually have to ask you to return to the jury room until I
9   take it up with the attorneys.

10       As you know, this is a criminal trial, and there's
11   three basic rules that I want you to keep in mind at all times
12   during this trial.  The first is the defendant in this case --
13   each of these three defendants are presumed innocent until
14   proven guilty.  The indictment brought against the defendants
15   by the Government is only an accusation, nothing more.  It is
16   not proof of guilt or anything else.  The defendant starts here
17   with a clean slate.

18       Second, the burden of proof is on the Government until
19   the very end of the case.  The defendant has no burden to prove
20   his innocence.  The defendant has no obligation to present
21   evidence, and the defendant has no obligation to testify.
22   Since the defendant has a right to remain silent, the law
23   prohibits you from arriving at your verdict by considering that
24   the defendant may or may not have testified.

25       Third, the Government must prove the defendant's guilt

1    beyond a reasonable doubt.  You heard me speak of that this

2    morning.  This is the burden.  I will give you further

3    instructions on this point later about how you determine what

4    is proof beyond a reasonable doubt, but, in any event, you bear

5    in mind throughout the duration of this trial that the

6    Government has the burden.

7         I'm going to allow Mr. McGee to come forward and make

8    closing -- make closing -- make opening arguments.

9         So what we're going to do today is hear from the

10   defendants in their opening statements.  Then we are going to

11   recess and not call any witnesses today.  We'll start in the

12   morning.  I'll give you further instructions about that to

13   where we can start calling witnesses one after the other.

14        Mr. McGee.

15        **MR. McGEE:**  Thank you, Your Honor.

16        Sylvester Cobbs was a contract postal driver.  On

17   February 5th, 2018, he had just picked up registered mailbags,

18   which included the cash generated from the mail that day from

19   the post office, and mailbags.  He picks it up at Dundee,

20   Tunica, Robinsonville -- I want you to remember that one -- and

21   then he pulled up to the Lake Cormorant post office.

22        He backed his big truck to the back of the post

23   office.  He backed up.  He got out of the truck, walked up to

24   the front, then walked back to the back, opened up the back of

25   the truck, goes in to get the mail.  What he did not know --

1    what he did not know was that three -- these three guys right
2    here had been planning to assault him and rob him that day.

3          They traveled from Batesville, Mississippi, where they
4    resided, to Lake Cormorant post office, which, by the way --
5    it's the first time I heard this -- it's only -- it's only open
6    till noon, or it's a half-day post office.  Okay?  And,
7    thankfully -- you know, this day and age almost everything is
8    on camera; right?  Thankfully, a nearby business, a farm
9    implement, had a camera pointed straight at the back of the
10   post office.

11         Now, do you think -- do you think that --
12   Mr. McThunel, do you think that he walked up with nothing
13   covering his face?  They're smarter than that, aren't they?
14   They're smarter.  He had a mask.  He had gloves.  And you're
15   going to see on camera -- you're going to see Mr. Ayodele's
16   white Yukon pull up.  You can't hide the description of your
17   car, can you?  You can hide your face, but you can't hide that
18   car.

19         You're going to see him pull up, passes the back of
20   the post office, comes back around, and you're going to see
21   Mr. McThunel get out of the vehicle.  And you're going to see
22   him laying in wait behind the post office.  He's sitting there
23   going like this (indicating), looking around.  He goes back
24   around to the other side.  He only waited two and a half
25   minutes before Cobbs showed up.  Two and a half minutes.

1    That's how good of a plan this was.  I'm going to tell you how
2    they knew that in a little while.

3         So back to Mr. Cobbs.  You'll see on the video
4    Mr. Cobbs begins getting attacked by Mr. McThunel.  You can see
5    him striking him on video.  He sprays him with pepper spray.
6    He sits there and threatens him.  And then what does he get?  I
7    want you to remember this.  Okay?  I want you to remember this.
8    What does Mr. McThunel get?  He grabs the registered mailbags.
9    That's the cash.

10        Now, does it have a big sign on it that says cash?
11   No.  There's regular mail, and there's the registered mailbags
12   with cash.  Over $60,000 in there.  That's a good heist.
13   60,000.  And, remember, he'd just been to Robinsonville.
14   Mr. Cobbs had.  Had just been to Robinsonville.

15        Then you'll see Mr. Cobbs.  He essentially hobbles
16   off, and then -- probably smart thing, honestly, when you think
17   about it -- he jumps in his truck and takes off to the front of
18   the post office and calls the police.

19        Now, you'll see Mr. McThunel.  He's got a box.  He's
20   got that box with those registered mail -- rail bags --
21   mailbags.  Excuse me.  And you'll see him pacing back and
22   forth.  He gets down on a knee.  He's pacing back and forth
23   waiting on his ride to come back.

24        Well, thankfully, that's on camera too.  You see
25   Mr. Ayodele's white SUV Yukon.  His Yukon -- white Yukon

1　comes -- comes around.  Mr. McThunel goes off camera.  Yukon

2　goes off camera.  Then the Yukon comes speeding by.

3　　　　During that time, you will also see a red sedan, a red

4　sedan that the Government will prove was owned by Mr. McThunel

5　and being driven by Mr. Smith.  Y'all think he kept that red

6　Hyundai for long after that robbery?  No.  He got rid of it.

7　He sold it to Kirk Auto.

8　　　　Now, that's all fine and good, Mr. Prosecutor, but

9　you've got to prove things.  And it's our burden, and we will

10　prove those to you.

11　　　　So let me go back to the 911 call.  911 call,

12　Mr. Cobbs calls.  He says, "Black male between 25 and 35.  He

13　beat me and robbed me.  And there's a red Hyundai involved.

14　And he dropped his gun, and I almost grabbed it."  That's what

15　he says on the 911 call.  Okay?

16　　　　So, again, let's go back.  Two and a half minutes they

17　waited, and they know exactly what to grab.  What does that

18　sound like to y'all?

19　　　　So the inspectors who arrive on scene, they have a

20　surveillance video with the two vehicles.  We've got to prove

21　those two vehicles; right?  We've got to prove an assailant

22　too; right?

23　　　　All right.  We also have an eyewitness who said he saw

24　the red sedan acting suspicious.  And so he came up and said,

25　"Hey, what's going on?"  He lives across from the post office.

1    "What are you doing?"  "I was looking for 61.  I was looking

2    for 61."  He goes, "Man, 61's right there.  You can see it."

3    "Okay.  Okay."  Takes off.  So that's all they've got at this

4    point.  That's all they've got.

5        So the inspectors in this case, they begin trying to

6    figure out, what are we going to do?  We've got to find these

7    suspects.  We've got to find who did this.  Inspector from out

8    of town contacts one of them and says, "There's a new thing --

9    there's a new thing that Google is keeping and that we can get

10   a search warrant for.  It's called a geofence."  I love

11   technology.  I love it.

12        So what they did -- can y'all see that?

13        **JURORS:**  Not yet.

14        **MR. McGEE:**  Okay.

15        **JURORS:**  Yes.

16        **MR. McGEE:**  What they did -- here's the post office

17   (indicating).  They drew a box around the post office, and they

18   got a search warrant from a judge, and they sent it to Google.

19   And they said, "Google, I want you to tell me which of your

20   subscribers -- whether through Google Maps, Google e-mail,

21   whatever -- which of your subscribers were in that box between

22   5:00 p.m. and 6:00 p.m."  By the way, the robbery occurred

23   sometime between 5:15 and 5:30.

24        I bet you can already -- I bet you already know what

25   I'm about to say.  They sent back some subscribers.  Okay?  Two

1   out of the three subscribers are siting right over there.

2   Jamarr Smith hit in the box multiple times.  Gilbert McThunel

3   hit in the box multiple times.  Now, you'll hear some technical

4   details from experts, but that's a rough way of saying it.

5         During the time of the robbery, during that time

6   period, there was another one that hit at 5:58 that they don't

7   believe had anything to do with it.  There was one hit at 5:58.

8   They don't believe that one had anything to do with it.

9         So what you'll hear is Mr. Smith and Mr. McThunel had

10   their location services turned on.  Y'all ever get that from

11   Google, where it says you want your location service on?  Yes.

12   You know, it improves your ads, improves your -- whatever.

13   You turn your phone on.  It knows where you are, et cetera,

14   et cetera, et cetera.  Okay?

15         Now, is that it?  No, that's not it.  The agent then

16   got more detailed records from Google on these two accounts.

17   What do you think it showed?  It showed their trip from

18   Batesville to Lake Cormorant and then right back to Batesville

19   together.

20         Now, who else keeps -- who else keeps track of us

21   besides Google and Facebook and everybody?  Phone companies;

22   right?  Phone companies.  When I make a call, it hits on a

23   tower; right?  It's got to.  It's the only way it works.

24         I'm going to show you what the phone record said

25   between -- I'm just going to start with 4:00 p.m. that

1   afternoon to 6:45 p.m. that afternoon.  Okay?  Smith talked to
2   McThunel 19 times during that time period.  So Smith talked to
3   McThunel 19 times.  Smith talked to Ayodele 18 times during
4   that time period.  Smith, Mr. Ayodele.  Smith -- we'll talk
5   about who this is in a second -- talked to a Ms. Hines --
6   excuse me -- 16 times during that time period.  And then
7   Mr. McThunel, who we will prove rode together, talked four
8   times during that time.

9         These records tell a story, don't they?  They tell a
10  story.  But that's not it.  That's not all.  So what did I
11  mention earlier?  It's got to hit a tower, doesn't it?  It's
12  got to hit a tower.

13        So, again, keep in mind, we're talking about Google
14  over here.  All right?  Now we're going to talk about phone
15  tower locations, towers and sectors.  Mr. McThunel, Lake
16  Cormorant area during that time period (indicating).
17  Mr. Smith, Lake Cormorant area during that time period
18  (indicating).  Mr. Ayodele, Lake Cormorant area during that
19  time period (indicating).  All three phones.

20        So we talked a little about Robinsonville.  You will
21  hear evidence that Mr. Smith was in a relationship with
22  Ms. Hines, who we just talked about.  You remember
23  Robinsonville -- what I said?  Mr. Cobbs had just been to
24  Robinsonville.  They pull up at the post office -- the robbers
25  pull up two minutes before he arrives.  Guess who is the post

1  office -- postmaster in Robinsonville?  Ms. Hines, Mr. Smith's
2  significant other.

3        In summary, the evidence will show a conspiracy.
4  Phone call records, Google records, phone location records,
5  vehicles, and an inside job.  And when I finish, we will ask
6  you to find them guilty of both counts.

7        Oh, one -- one more thing.  One more thing.  Excuse
8  me.  There was mention of an eyewitness in voir dire.  I told
9  you a little bit about him earlier.  He lives across from the
10  post office.

11        A year and a half after the robbery, once they figure
12  this out, they go to the eyewitness with 18 photos.  There's a
13  defendant in each stack.  Six, six, six.  The eyewitness only
14  talked to the person in the car of the red Hyundai.  You know
15  who he circled?  Jamarr Smith.

16        Now, do you have to rely on that alone?  No.  Because
17  his Google location records put him there and so do his phone
18  location records.

19        Thank you.

20        **THE COURT:**  Mr. Lewis.

21        **MR. LEWIS:**  Let me state our position right out of the
22  gate.  Jamarr is innocent of these accusations.  They got the
23  wrong guys.  They are not guilty.  Okay?

24        Now, you're going to find that the Government -- U.S.
25  Government, with all of its resources, with all of its

1  investigative techniques, with all of its money, okay, cannot
2  bring you any real evidence that these people committed this
3  crime.

4      And to be clear, what the prosecutor is telling you in
5  opening statement is not proof; right?  The judge said the
6  proof comes from the witness stand.  What they are telling you
7  is not proof.  Okay?  The prosecutor was not a witness to these
8  things.  They are going to have to call witnesses to testify to
9  things.  I'm not a -- I was not a witness to it either.  Okay?
10 What I'm saying is not proof.  But the proof is going to show
11 in this case that in some cases the -- what the Government is
12 telling you is not the whole story or that the whole story is a
13 lot more confusing and contradictory than they say it is.

14     Now, let me talk briefly about Google and cell phone
15 records.  Okay?  I'm going to start with Google.  I believe --
16 I could be wrong -- that this is the first case in the United
17 States to be tried using this Google technology.  That's a big
18 thing.  This -- this is cutting-edge, new wave stuff where the
19 Government is going to Google and getting location information
20 from them and using it to prosecute people.

21     You're going to hear that there is problems with that
22 technology.  Okay?  The same is true of the cell phone
23 information.  You are going to hear it is not precise.  It does
24 not always -- it's not as clean, it's not as simple, it's not
25 as easy as what they tell you it is.  Okay?

1    Let me tell you a little bit about Jamarr.  He's 38
2  years old.  He lives in Batesville.  His mother is Jackie
3  Smith.  She is a former Batesville police officer.  She is an
4  investigator for the district attorney's office over there that
5  has Panola County in its -- in its district.  Jamarr has a
6  transmission business over there in Panola County.  He rebuilds
7  transmissions.  He works with his hands.  He works.  He has a
8  young daughter you will hear -- you may hear that's very
9  important to him.

10    Now, let's talk about how I believe the Court has
11  instructed you to look at the evidence in this case.  Okay?
12  Some people look at the world through colored glasses.  All
13  right?  You've got rose-colored glasses.  That's an optimistic
14  person.  You've heard of that.  And in Mississippi, you hear
15  people -- some people look at the world through maroon-colored
16  glasses -- they're Mississippi State fans -- or Oxford, they
17  look at the world through red and blue-colored glasses.  Okay?

18    What I'm asking you to do in this trial is look at the
19  evidence that the Government puts on through
20  constitutional-colored glasses.  Okay?  I want you to filter
21  everything coming off the witness stand or every document they
22  show you through constitutional-colored glasses.

23    What do I mean by that?  Okay.  Two things -- and,
24  again, the Court has already told you this.  The presumption of
25  innocence, number one, and, number two, that the Government has

1   the duty to prove every single element of their case beyond a
2   reasonable doubt.  Okay?  Those -- that's what I want you to be
3   constantly filtering this evidence through, applying that to
4   the evidence.  Okay?  And, you know, that is evidence.  The
5   presumption of innocence is evidence.

6       They're going to introduce Government's Exhibit 1.
7   Well, let me tell you, the Exhibit 0 in this case, the first
8   evidence that's come in in this case, Exhibit 0, is the
9   presumption of innocence.  Okay?  And I'm going to ask you to
10  hold on to that throughout this entire trial.  That presumption
11  exists at all times.

12      Now, if you are constantly holding the Government to
13  that burden, okay, you're going to see that Jamarr did not have
14  anything to do with this robbery.  He's not on film.  His
15  picture is not on film.  There's no fingerprints.  There's no
16  physical evidence.

17      Now, let's talk about this witness -- this eyewitness
18  who says that he's going to identify Jamarr.  And like I said
19  earlier, there are problems.  It's a bigger story than the
20  Government is giving you.  He identified the person in the red
21  Hyundai as a man at or under 6 feet tall, 170, 180 pounds --
22  and here's the important part.  Let me get out of the way --
23  with a reddish goatee.  That's what he identified at the time.
24  The man in that car had a reddish goatee.  Jamarr does not have
25  a reddish goatee.

1            So what happens?  A year and a half later, the

2 Government comes to him, and they give him a lineup, okay, a

3 year and a half later.  And you're going to hear about that.

4 You're going to hear about what happened during that lineup.

5 You're going to hear about what the Government is supposed to

6 do during a lineup to make sure it's fair, to make sure it's

7 accurate.  And you can reach your own conclusions about what

8 happened, but I'm going to submit to you that that

9 identification is not going to be credible.  It's not going to

10 make sense to you, and you're not going to believe it.

11            So Jamarr may not testify in this case, and you're

12 sitting there saying to yourself, well, if it was me and I was

13 falsely accused of a crime, I would be shouting from the

14 rooftops.  I would be fighting to get up on the witness stand

15 and testify.

16            Here's why that is going to be a problem for me,

17 because if he testifies, two things are going to happen.

18 Number one, you are going to think that he -- well, two things

19 are going to happen.  He's going to get cross-examined by a

20 prosecutor that's trained, trained to point out problems in

21 people's testimony.  Jamarr is not trained to be

22 cross-examined.  He's -- he's a transmission guy.  He rebuilds

23 engines.  Okay?

24            Testifying -- the agents that testify, that's their

25 job.  They are trained to be cross-examined.  Jamarr is not

1    trained to be cross-examined.  The prosecutors are trained to
2    cross-examine people and point out problems in their testimony.
3    So if he makes a mistake, he forgets a fact under pressure,
4    you're going to say to yourself, he's lying.  He's trying to
5    save his skin.  But if he does not testify, you're going to say
6    what I said earlier.  Why would an innocent man not testify?

7         Well, fortunately, for me and us, the founding fathers
8    of this country solved that problem for me.  They say that a
9    person like Jamarr does not have to testify.  They don't.  And
10   you cannot read anything into that.  You cannot take an
11   inference from that that's adverse to him; right?  Does
12   everybody agree with that?  And that goes all the way back to
13   the founding of our country.

14        So if you do what I asked you, if you're constantly
15   holding the Government to their burden and you are constantly
16   remembering the presumption of innocence in this case, you're
17   going to wonder what these guys are doing here, and you're
18   going to return a verdict of not guilty.  Thank you.

19             **THE COURT:**  Thank you.

20             Mr. Travis.

21             **MR. TRAVIS:**  Thank you, Your Honor.

22             May it please the Court, Your Honor.

23             **THE COURT:**  Yes.

24             **MR. TRAVIS:**  Good afternoon, ladies and gentlemen.

25             Just briefly.  Keep it simple on behalf of

1  Mr. Ayodele.  I introduced him to you earlier during voir dire
2  this morning.

3       On behalf of Mr. Ayodele, I'm submitting that at the
4  close of this case we will be asking you in earnest for a
5  verdict of not guilty, stating an argument that the prosecution
6  will not prove beyond a reasonable doubt that Mr. Ayodele
7  committed any crime or was involved in any criminal activity on
8  February the 5th of 2018.  We'll be asking for that verdict of
9  not guilty.

10      Thank you, Your Honor.

11      **THE COURT:**  Thank you.

12      Mr. Chiniche.

13      **MR. CHINICHE:**  Yes, Your Honor.

14      Good afternoon.  Paul Chiniche.  I represent
15  Mr. McThunel.  I too am going to be asking you for a guilty of
16  not -- a verdict of not guilty at the conclusion of this trial.

17      You will see a video.  You will see a crime being
18  committed.  You will see someone behind a mail truck, and
19  you'll see the truck back up.  And you will see what looks like
20  bags being picked up.  You will see something happening, but
21  you won't see the faces -- or the face of my client or the
22  faces of our clients.

23      And what concerns me on behalf of Mr. McThunel is that
24  you will think somebody's got to pay, and if the prosecutors
25  think that these three did it or Mr. McThunel did it, then

1 that's who I'm going with. And I'm concerned that if their

2 cell phones go through this imaginary fence that the Government

3 has drawn, that because of that, you will convict my client.

4 I'm concerned about that.

5 So I'm asking you to reserve your judgment, to listen

6 to the facts, to see exactly what the Government did and the

7 investigators did. Because my co-counsel, Mr. Lewis, is

8 right -- and the judge indicated -- what we say is not

9 evidence. We weren't there. Mr. Mims and Mr. McGee, the

10 prosecutors, they weren't there either, nor was Inspector

11 Mathews, sitting next to their table. He wasn't there.

12 It's your job to determine whether or not Mr. McThunel

13 was involved. I'm asking you to reserve judgment, to listen to

14 the witnesses's testimony, and to consider this case

15 independent.

16 Thank you.

17 **THE COURT:** Thank you.

18 I'm going to recess court and allow you to go home

19 today early. Might be the last day this week that it happens

20 this way, so kind of preparing you. But remind you that you

21 are not to speak with anyone about the case. You're not to

22 discuss the case at all. Don't do any independent research.

23 In the morning, park out here west of the courthouse

24 if you'd like. It's convenient. Go to the jury room, wait,

25 and we should be able to promptly start at 9:30 calling

162

1  witnesses.  You're excused.  Thank you.
2      (JURY OUT.)
3          **THE COURT:**  Okay.  Gentlemen, I'll see you in the
4  morning.  We'll start promptly at 9:30.  Thank you.
5      (RECESSED AT 3:40 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25