1                 UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF MISSISSIPPI
2                    OXFORD DIVISION

3

UNITED STATES OF AMERICA            PLAINTIFF

4

5

VS.                       NO. 3:21CR107

6

7

JAMARR SMITH, THOMAS IROKO AYODELE,
8  AND GILBERT McTHUNEL, II          DEFENDANTS

9

10
               TRANSCRIPT OF JURY TRIAL
11                VOLUME 4 OF 5

12
        BEFORE HONORABLE SHARION AYCOCK
13         UNITED STATES DISTRICT JUDGE

14
                Oxford, Mississippi
15               February 23, 2023

16

17
           (APPEARANCES NOTED HEREIN)
18

19

20

21

22
  Court Reporter:     PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
23                Federal Official Court Reporter
                 911 Jackson Avenue East
24                Oxford, MS  38655

25

1    APPEARANCES:

2    For the Government:    ROBERT J. MIMS, Esquire
                            CLYDE McGEE, IV, Esquire
3                          U.S. Attorney's Office
                            900 Jefferson Avenue
4                          Oxford, MS   38655

5    For the Defendant
     Smith:                 GOODLOE T. LEWIS, Esquire
6                          Hickman, Goza & Spragins, PLLC
                            P.O. Drawer 668
7                          Oxford, MS   38655-0668

8    For the Defendant
     Ayodele:               WILLIAM F. TRAVIS, Esquire
9                          8619 Highway 51 North
                            Southaven, MS   38671

10
     For the Defendant
11   McThunel:              PAUL A. CHINICHE, Esquire
                            Chiniche Law Firm, PLLC
12                         P.O. Box 1202
                            Oxford, MS   38655-1202

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (CALL TO ORDER OF THE COURT AT 9:30 A.M.)

2         **THE COURT:**  Okay.  If there's nothing at this time,

3    we'll bring the jury in.

4         (JURY IN.)

5         **THE COURT:**  You may have a seat.

6         Let the record reflect that the jury has returned to

7    the courtroom.  Good morning, ladies and gentlemen.

8         **JURORS:**  Good morning.

9         **THE COURT:**  Hope you had a good evening.  So we will

10   get started this morning.  The Government will call its first

11   witness of the morning.

12        **MR. MIMS:**  Your Honor, call Dwayne Martin.

13   (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

14        **COURTROOM DEPUTY:**  You may take the stand.

15        **HERBERT DWAYNE MARTIN, GOVERNMENT'S WITNESS,**

16   **AFTER BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

17                       **DIRECT EXAMINATION**

18   BY MR. MIMS:

19   **Q.**   Sir, would you state and spell your name for the record,

20   please.

21   **A.**   My name is Herbert Dwayne Martin.

22   **Q.**   Could you spell that for the court reporter?

23   **A.**   H-e-r-b-e-r-t.  Middle name Dwayne, D-w-a-y-n-e.  Martin,

24   M-a-r-t-i-n.

25   **Q.**   Mr. Martin, where do you reside?

Martin - Direct

1   **A.**   I currently live outside of Jackson, Mississippi.

2   **Q.**   Okay.  What do you do for a living?

3   **A.**   I'm a United States Postal Inspector.

4   **Q.**   How long have you been an inspector with the U.S. Postal

5   Inspection Service?

6   **A.**   A little over 20 years.

7   **Q.**   Did you participate in the investigation of the robbery

8   of Lake Cormorant post office that occurred on February 5,

9   2018?

10  **A.**   I did.

11  **Q.**   During that investigation, did you have an opportunity to

12  interview Forest Coffman?

13  **A.**   I did.

14  **Q.**   Who is Forest Coffman?

15  **A.**   He is an individual who is a witness who lived across the

16  road from the post office.

17  **Q.**   Okay.  What was the purpose of that interview of

18  Mr. Coffman?

19  **A.**   When I interviewed Mr. Coffman on -- I believe it was

20  July the 1st, 2019, my intent or my purpose was to show him

21  three photo lineups to see if he could identify anybody in the

22  photo lineups.

23  **Q.**   Okay.  Where did this interview occur?

24  **A.**   It occurred in Memphis, Tennessee.

25  **Q.**   What information did you present to Mr. Coffman?

1  **A.**    I presented Mr. Coffman with three photo lineups,

2  consisting of six photographs in each lineup and, like I said,

3  asked him if he could identify anybody in those lineups as

4  somebody that he saw or had contact with on the day of the

5  robbery at Lake Cormorant, Mississippi.

6  **Q.**    Okay.

7            **MR. MIMS:**  May I approach the witness, Your Honor?

8            **THE COURT:**  You may.

9  **BY MR. MIMS:**

10 **Q.**    Sir, I'm handing you a three-page exhibit marked G-21.

11 Do you recognize that document?

12 **A.**    I do.

13 **Q.**    What is that?

14 **A.**    These are the photo lineups I presented to Mr. Coffman in

15 Memphis.

16           **MR. MIMS:**  Your Honor, I'd offer these into evidence

17 as Exhibit G-21.

18           **MR. LEWIS:**  No objection.

19           **MR. TRAVIS:**  No objection, Your Honor.

20           **THE COURT:**  They will be received.  G what?  I'm

21 sorry.

22           **MR. MIMS:**  21.

23    (EXHIBIT NO. G-21 ADMITTED INTO EVIDENCE.)

24 **BY MR. MIMS:**

25 **Q.**    Tell me again if you would.  What did you tell -- if

1 anything, did you tell Mr. Coffman before showing him the

2 lineups?

3 **A.** I instructed him that our -- I told him that I had some

4 photo lineups that I wanted him to look at and see if he

5 recognized anybody in the photo lineups as somebody he had

6 contact with that day of the robbery in Lake Cormorant,

7 Mississippi.

8 **Q.** Did you know any of the defendants in this case? Did you

9 know who they were?

10 **A.** I did -- I've seen their names before, but, no, sir, I

11 did not know them.

12 **Q.** Did you know which of these people in the lineups were

13 any of the suspects, I should say?

14 **A.** No, sir, I did not know.

15 **Q.** Okay. Did Mr. Coffman view all three lineups at once or

16 each lineup separately?

17 **A.** I believe he looked at each of them individually, one at

18 a time.

19 **Q.** And tell me again exactly where this occurred.

20 **A.** We were in a lobby area of a high-rise apartment complex.

21 **Q.** Was anybody there with you?

22 **A.** No, sir. It was just me and him in the lobby.

23 **Q.** Where did you stand during this -- or sit or wherever

24 during the --

25 **A.** We were sitting at a little, like, sitting area, like,

1    in -- like a hotel lobby might have.  You had a couple of

2    chairs and a small table in between, and so we were sitting

3    around that table.  I was opposite of him, I believe.

4    **Q.**   Did you do anything to suggest to Mr. Coffman which photo

5    to select?

6    **A.**   No, sir.

7    **Q.**   Let's look at the photos.  I'm going to start with the

8    back one here.  Is this one of the photo lineups you presented

9    to him?

10   **A.**   I believe so, yes, sir.

11   **Q.**   Is this another one of the photo lineups you presented to

12   him?

13   **A.**   That is.

14   **Q.**   And this third one is also one of the photo lineups?

15   **A.**   That's correct.

16   **Q.**   Did Mr. Coffman select a photo in any of the lineups?

17   **A.**   The one you currently have right now, he selected that

18   photo.  He circled it, initialed it, and dated it as that was

19   the guy that he talked to in the red vehicle right before the

20   robbery occurred in Lake Cormorant, Mississippi.

21   **Q.**   And so the circle that we see here, who drew that circle?

22   **A.**   Mr. Coffman did.

23   **Q.**   And the initials here, who wrote that?

24   **A.**   Mr. Coffman.

25   **Q.**   And who wrote that date?

1   **A.**   Mr. Coffman.

2          **MR. MIMS:**  Your Honor, I have no further questions.

3          **THE COURT:**  Cross-examination, Mr. Lewis.

4                         **CROSS-EXAMINATION**

5   **BY MR. LEWIS:**

6   **Q.**   Hi, Mr. Martin.  My name is Goodloe Lewis.

7   **A.**   Good morning.

8   **Q.**   So in January of 2017, the Department of Justice created

9   guidelines and procedures for eyewitness identification.  Are

10  you aware of that?

11  **A.**   No, sir.

12  **Q.**   Okay.

13         **MR. LEWIS:**  May I approach the witness, Your Honor?

14  **BY MR. LEWIS:**

15  **Q.**   I'm going to hand you a document.

16         **MR. MIMS:**  Your Honor, may I raise an objection real

17  quickly?  Mr. -- or Inspector Martin does not work for the

18  Department of Justice, and so I believe this line of

19  questioning --

20         **THE COURT:**  He can cross-examine him to see what he

21  knows.  It's overruled.

22  **BY MR. LEWIS:**

23  **Q.**   So what I've handed you, Mr. Martin, is a memorandum for

24  heads of department law enforcement components, all department

25  prosecutors from the U.S. Department of Justice, dated

1  January 6, 2017.  You with me?

2  **A.**  Yes, sir.

3  **Q.**  Are you familiar with this document?

4  **A.**  I am not.

5  **Q.**  Okay.  Does -- does the memos from the Department of

6  Justice apply to a law enforcement agency like the Postal

7  Inspection Service?

8  **A.**  I do not know that answer, sir.

9  **Q.**  Okay.  Well, let me come at it from this direction.

10 Would you agree that there has been a good bit of publicity in

11 the last few years about people being improperly convicted of

12 crimes based on eyewitness identification that were later

13 exonerated because of DNA evidence?

14        **MR. MIMS:**  Your Honor, I object.

15        **THE COURT:**  Sustained.  Counselors, approach.

16     (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

17        **THE COURT:**  You want to state your objection for the

18 record?

19        **MR. MIMS:**  I object as improper cross-examination.

20        **THE COURT:**  I'd think it's bordering on expert is my

21 concern.

22        **MR. LEWIS:**  Well, my position is eyewitness

23 identification is awfully important, and he has got to work

24 hard to get it right.  And I think he should -- you know, I

25 think I'm entitled to ask him what he did to work hard to get

1    it right.

2    **THE COURT:** Well, you can certainly ask him about his

3    investigation and what he did, but I think you bordered on

4    asking him an expert question. He has got to have some

5    expertise to be able to answer what you have just asked him.

6    **MR. LEWIS:** Well, I think that the Government would

7    consider him to be an expert in eyewitness identification.

8    **THE COURT:** He was not tendered as one, though. So

9    pursue what he did in the lineup, but that particular question

10   is sustained.

11   **MR. MIMS:** Your Honor, may I ask a question before we

12   leave? I'm not sure if Mr. Lewis even intends to try to read

13   from this memorandum, but I would object to him reading from

14   the memorandum as well if that's his intentions.

15   **MR. LEWIS:** Are there any policies and procedures he

16   uses for eyewitness lineups?

17   **MR. MIMS:** You'll have to ask him.

18   **MR. LEWIS:** I can do that.

19   **MR. MIMS:** But he can't read from this Department of

20   Justice memorandum. He doesn't work for them, and reading from

21   the memorandum is inappropriate.

22   **THE COURT:** He doesn't know. So you are not going to

23   be able to cross him on what's in that memo. You just need to

24   ask him what he did and challenge that, I think.

25   (END OF BENCH CONFERENCE.)

1  **BY MR. LEWIS:**

2  **Q.**   Is it important to get eyewitness identification right?

3  **A.**   Yes, sir.

4  **Q.**   And because of that, it is important to follow a standard

5  policy and procedure when doing so?

6  **A.**   I do.  I follow our policy.

7  **Q.**   Okay.  And the postal service has a policy and procedure

8  for doing lineups; correct?

9  **A.**   Somewhat of one, yes, sir.  Not as detailed as this DOJ

10  memo.

11  **Q.**   What do you mean by "somewhat of one"?

12  **A.**   I mean, we have a standard policy that we go by, but it's

13  not as in depth as this one that you just presented to me.

14  **Q.**   Okay.  So one of the things I'm going to assume that is

15  important in the postal service inspector's policy is that the

16  person showing the lineup should not be involved in the case?

17  **A.**   I don't know that that can happen, but I was involved in

18  the case.

19  **Q.**   Okay.  Right.  You had investigated the case really from

20  day one; correct?

21  **A.**   I was part of the investigation.  I was -- yes.

22  **Q.**   Okay.  The idea there being that, if the person showing

23  the lineup is not involved in the case, they're not going to

24  know who the suspects are; correct?

25  **A.**   That's correct.

1   **Q.**    That wasn't true in this case.  You did know who the

2   suspects were?

3   **A.**    No, sir.  I -- I was on the initial response to the

4   investigation in the first few days of the investigation, but

5   then that was it.  I actually was the first inspector on scene

6   because I was in the area investigating another robbery.

7       (PAUSE IN PROCEEDINGS.)

8   **BY MR. LEWIS**:

9   **Q.**    You told Mr. Mims that you knew who the suspects were

10  before you conducted this lineup?

11  **A.**    No, sir.

12  **Q.**    Okay.  You knew there were suspects?

13  **A.**    I knew there were suspects, yes, sir.

14  **Q.**    Okay.  Now, you're supposed to give the witness -- I'm

15  sorry -- the person some instructions before they look at the

16  lineups?

17  **A.**    We do.

18  **Q.**    Okay.  One of those is they don't have to identify

19  anybody?

20  **A.**    Absolutely.

21  **Q.**    Okay.  You are to record it if you can?

22  **A.**    I did not record it, no, sir.

23  **Q.**    My question was you are to record it if you can?

24  **A.**    That is not our policy, no, sir.

25  **Q.**    Okay.  You didn't record it?

1   **A.**   I did not.

2   **Q.**   You could have?

3   **A.**   Could.

4   **Q.**   Would have been a good idea if you had?

5   **A.**   I don't know the answer to that.

6   **Q.**   Well, because I would be able to hear what he said rather

7   than rely on what you said.

8   **A.**   Okay.

9   **Q.**   You agree with that?

10  **A.**   That is true.

11  **Q.**   Okay.  And then you have to do a report; correct?

12  **A.**   That's correct.

13  **Q.**   And your report should document what happened at the

14  lineup?

15  **A.**   Yes, sir.

16  **Q.**   Did I give you a copy of your report?

17  **A.**   No, sir.  This is just the -- I don't think so.  Hang on.

18  No, sir.  This is just the memorandum from the Department of

19  Justice.

20          **MR. LEWIS:**  May I approach, Your Honor?

21          **THE COURT:**  You may.

22  BY MR. LEWIS:

23  **Q.**   Does that look like your report from July of 2019?

24  **A.**   It does.

25  **Q.**   Okay.  And by the way, this was a year and five months or

1   so -- excuse me -- yeah, about a year and five months after the

2   incident; correct?

3   **A.**   It was February the 5th of 2018.

4   **Q.**   What --

5   **A.**   I'm sorry.  July the 1st.

6         **THE COURT:**  Don't speak at the same time.

7         **MR. LEWIS:**  Excuse me.

8   **BY MR. LEWIS:**

9   **Q.**   What I said was correct.  It's about 15 months after the

10  incident?

11  **A.**   Okay.  I'm not good at calculating that in my head.

12  Sorry.

13  **Q.**   Not good at math?

14  **A.**   No, sir.

15  **Q.**   Okay.  So the entirety of your reporting about what

16  happened at the lineup is there in the last paragraph; correct?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  And so you did not document in that report the

19  time that it took him to make the identification?

20  **A.**   I did not.

21  **Q.**   You did not document the names of all persons present, or

22  did you?

23  **A.**   Well, it was just me and Mr. Coffman; so I did.

24  **Q.**   You did not document his confidence in the

25  identification?

1   **A.**   I did not.

2   **Q.**   You did not write down his statement as close to verbatim

3   as possible about what he said when he made the identification?

4   **A.**   I did not.

5   **Q.**   You did not write down any gestures or nonverbal

6   reactions he made when he looked at the report -- I'm sorry --

7   looked at the lineup?

8   **A.**   I did not.

9   **Q.**   You did note in your report that Mr. Coffman reported

10  that the person had a reddish goatee; correct?

11  **A.**   That's correct.

12  **Q.**   Okay.

13          **MR. LEWIS:**   No further questions, Your Honor.

14          **THE COURT:**   Thank you.

15          Mr. Chiniche.

16          **MR. CHINICHE:**   Yes, Your Honor.

17                          **CROSS-EXAMINATION**

18  **BY MR. CHINICHE:**

19  **Q.**   Mr. Martin, the witness you interviewed, Mr. Coffman, he

20  did not identify Gilbert McThunel, did he?

21  **A.**   No, sir.

22          **MR. CHINICHE:**   Thank you, Your Honor.

23          **THE COURT:**   Thank you.

24          Mr. Travis.

25          **MR. TRAVIS:**   Thank you, Your Honor.

Martin - Cross by Mr. Travis/Redirect

**CROSS-EXAMINATION**

**BY MR. TRAVIS:**

**Q.** Morning, sir.

**A.** Good morning.

**Q.** He also did not identify Thomas Iroko Ayodele, did he, sir?

**A.** He did not.

**Q.** Thank you.

      **MR. TRAVIS:** Thank you, Your Honor.

      **THE COURT:** Redirect?

      **MR. MIMS:** Very briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. MIMS:**

**Q.** Inspector Martin, just to make sure we're clear on this, you did not know what any of the suspects looked like in this case, did you?

**A.** I did not.

**Q.** You didn't know, out of this lineup, which ones were potential suspects?

**A.** I did not.

**Q.** And so when Forest Coffman circled what turns out to be Jamarr Smith, you didn't know at that time whether he picked one of the suspects or not, did you?

**A.** I did not.

**Q.** Thank you.

1    **MR. MIMS:**  No further questions, Your Honor.

2    **THE COURT:**  Thank you.  May he be finally excused?

3    **MR. MIMS:**  Yes, ma'am.

4    **THE COURT:**  You're excused, sir.  Thank you.

5    **THE WITNESS:**  Thank you.

6    **THE COURT:**  Who would you call next?

7    **MR. McGEE:**  Forest Coffman, Your Honor.

8    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

9    **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

10   **MR. McGEE:**  May I proceed, Your Honor?

11   **THE COURT:**  You may.

12   **FOREST COFFMAN, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

13   **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

14   **DIRECT EXAMINATION**

15   **BY MR. McGEE:**

16   **Q.**   Mr. Coffman, if you could state your name for the record,

17   please.

18   **A.**   Forest Coffman.

19   **Q.**   And, Mr. Coffman, where do you live right now?

20   **A.**   Lake Cormorant, Mississippi.

21   **Q.**   Where on Lake Cormorant?  What's your address?

22   **A.**   1245 Lakeside Road.

23   **Q.**   Okay.  And in February of 2018, where did you live?

24   **A.**   12777 Star Landing Road West.

25   **Q.**   And where is that exactly?  Just tell us about exactly

1  where that is.

2  **A.** Pretty much it's a three-way intersection of Old 61 and

3  Star Landing Road.

4  **Q.** Okay. What's across the street from where you lived?

5  **A.** A farm building and a post office.

6  **Q.** Okay. Is that the Lake Cormorant post office?

7  **A.** Yes, sir.

8  **Q.** Are there any stores around there?

9  **A.** There's an old store. Used to be a store back in the

10  day. It's nothing now. It's just an abandoned building.

11  **Q.** So it's no longer in business?

12  **A.** Correct.

13  **Q.** Are there any other stores in the immediate vicinity of

14  that area?

15  **A.** Maybe a mile away there is on side of Highway 61.

16  **Q.** That's on 61?

17  **A.** 61 and Star Landing. About a mile away there's a gas

18  station.

19  **Q.** Okay. So I'm going to show you a map here. This is

20  G-13A. This is an aerial drone photo. Is this an accurate

21  depiction of the area where you lived?

22  **A.** Yes, sir.

23  **Q.** And if you could indicate on there exactly where you were

24  living.

25  **A.** Right where that car is parked.

1    **THE COURT:**  You can touch the screen.

2    BY MR. McGEE:

3    **Q.**    Yeah, you can touch the screen.

4    **A.**    Oh, okay.  Right here (marking).  There's a -- you can't

5    really see it that good because the buildings are hiding it.

6    Well, I guess you can.  That roof right there (marking), that

7    silver, that's a trailer house.  I lived right there.

8    **Q.**    That's where you lived?

9    **A.**    Correct.

10   **Q.**    Okay.  Now, just to be clear, that's where you lived on

11   February 5th, 2018?

12   **A.**    Yes.

13        **MR. McGEE:**  Tracy, if you wouldn't mind doing a

14   screenshot of that.

15        **COURTROOM DEPUTY:**  Oh, I'm so sorry.

16   BY MR. McGEE:

17   **Q.**    Can you mark it again one more time?  Sorry.

18   **A.**    (Marking.)

19   **Q.**    Thank you.  And is the post office right here across the

20   street?  It's G-13A.

21   **A.**    Correct.

22   **Q.**    And would this be the front of the post office?

23   **A.**    Yes, sir, it's the front door.

24   **Q.**    This is the back back here?

25   **A.**    Correct.

Coffman - Direct

1   **Q.**   Okay.  And this is the farm --

2   **A.**   Yes, sir.  Blythe Bayou.

3   **Q.**   -- area; is that right?

4   **A.**   Yes, sir.

5          **THE COURT:**  Speak up just a little bit.

6   **A.**   That's the farm, yeah.  It's called Blythe Bayou Farm.

7   **BY MR. McGEE:**

8   **Q.**   Okay.  And describe the -- describe the old store you

9   were just talking about that's abandoned.  What does it look

10  like in this picture?

11  **A.**   What does it look like?

12  **Q.**   What color is the store?

13  **A.**   Oh, it's red brick.

14  **Q.**   Okay.  And that's --

15  **A.**   The front of it's white with four windows and a door --

16  **Q.**   Okay.  So that --

17  **A.**   -- with a bar on them.

18  **Q.**   -- that's the store you are talking about?

19  **A.**   Correct.  Yes, sir.

20  **Q.**   Okay.  Got you.

21  **A.**   Used to be a general store back in the day.  It's nothing

22  now.

23  **Q.**   Got you.  And so you obviously know why we're here

24  today --

25  **A.**   Correct.

Coffman - Direct

1   **Q.**   -- right?  What -- what happened on February 5th, 2018?

2   **A.**   I was outside piddling around outside, and I kept

3   noticing a vehicle circling the area back and forth, just

4   traveling back and forth, you know, just for a fair amount of

5   time.  And I noticed that I wasn't familiar with the vehicle.

6   Right around that area -- I know everyone that lives on that

7   street.  I've lived there my whole life.

8   So I walked outside, stopped the gentleman, and said,

9   "Hey, can I help you?  Are you lost or something, you know?"

10  **Q.**   All right.  Let me stop you there.  I'm going to ask you

11  to come up to the mike just a hair to make sure she can hear

12  everything you say.  Sorry.

13  Okay.  You said you saw a suspicious vehicle riding

14  around that you hadn't seen before?

15  **A.**   Correct.

16  **Q.**   And you stopped the gentleman, and what did you say to

17  him?

18  **A.**   I asked him, "Hey, can I help you with anything?  You

19  lost?  You need some help or something?  You know, you've been

20  hanging out here for a while.  You need some help looking for

21  something?"  And he said he was looking for the highway.  And I

22  gave him directions to the highway, which is 61, and that was

23  it.  Turned around and went about my business, and he turned

24  around and went about his business.

25  **Q.**   And could you see 61 from where you were?

Coffman - Direct

1   **A.**   I wouldn't necessarily say you could see it but almost.

2   **Q.**   Okay.  And how close were you to this car?

3   **A.**   Very close.  From here to this glass maybe.

4   **Q.**   Okay.  And can you describe --

5   **A.**   Within feet.

6   **Q.**   -- the car?

7   **A.**   It was a red, maroon four-door sedan.  Like a -- I want

8   to say it was like a Hyundai -- Honda, Hyundai, or something.

9   **Q.**   Okay.  And so you said you were from here to there.  Were

10  you on the passenger side or the driver's side?

11  **A.**   Probably the driver's side.

12  **Q.**   Okay.

13  **A.**   Because it -- yeah, I want to say the driver's side.

14  **Q.**   So how close were you to his face?

15  **A.**   From here to this glass maybe.

16  **Q.**   Okay.  So two feet?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  And if you could describe what he looked like.

19  **A.**   Middle-aged guy, maybe 30.

20         **THE COURT:**  Do I need to interrupt him and tell him

21  that's not middle age?

22         I'm just playing with you.  Go ahead.

23  **A.**   30 years old.  Maybe -- you know, maybe 30 -- early 30s,

24  small goatee.

25  **BY MR. McGEE:**

1  **Q.**   Okay.

2  **A.**   That's right off.  You know, he had a hood on -- hoodie

3  on; so --

4  **Q.**   Hoodie on.  Was he wearing a hat also?

5  **A.**   I think he had the hood on.

6  **Q.**   Okay.  What race was he?

7  **A.**   Black.

8  **Q.**   Okay.  And then I think you had mentioned previously to

9  the officers he had a reddish goatee?

10  **A.**   Yeah.  It was kind of -- it had, like, a reddish tint to

11  it.

12  **Q.**   Okay.  I'm going to show you part of this video that is

13  Government's Exhibit -- I believe it's 1, and we're going to

14  start at the 10:33 mark -- the 10:33 mark.

15       Let me -- while that's coming up, let me ask you, had you

16  ever seen this individual before?

17  **A.**   No, sir.

18  **Q.**   So you didn't recognize him?

19  **A.**   Not at all.

20  **Q.**   Okay.  Have you seen him since then?

21  **A.**   No, sir.

22  **Q.**   Okay.  Before we get to the video, tell me what happened

23  after -- after you spoke to him and he drove off.  What

24  happened next?

25  **A.**   I went back inside my house.  I went back inside.  A few

1  moments later, I heard a bunch of commotion.  I walked outside,

2  and the sheriff's department and all of that good stuff was at

3  the post office.

4  **Q.**  Okay.

5  **A.**  And I went over and spoke with them.

6  **Q.**  And tell me about what -- when you spoke with them, what

7  happened -- what was that conversation like?

8  **A.**  I went over to one of the deputies and said, "Hey, what's

9  going on?"  He said -- he asked me who I was.  I told him --

10       **MR. LEWIS:**  Excuse me, Your Honor.  I would object to

11  what he was told by the deputies.

12       **MR. McGEE:**  No problem -- no problem, Your Honor.

13  That's fine.

14       **THE COURT:**  It's sustained.

15       **MR. McGEE:**  We're just trying to tell a story.

16  BY MR. McGEE:

17  **Q.**  So you speak with the deputy.  Did you end up going back

18  over to your trailer; is that right?

19  **A.**  I did, yes, sir.

20  **Q.**  Okay.  And what did -- don't tell me what they said.

21  Okay?  But tell me what you said.  Okay.  What did you say to

22  the deputy?

23  **A.**  I told them -- they -- they informed me of what had

24  happened.  You know, I said, "What's going on?"  They kind of

25  gave me a brief of it.  And I said, well, I -- I spoke to --

1 told them I spoke to a man that was unfamiliar with the area,

2 you know, being suspicious.

3 And I told them I also had cameras on the outside of my

4 house. They came in my house and got the video and all of that

5 good stuff.

6 **Q.** So this was the sheriff's deputies?

7 **A.** Correct. DeSoto County Sheriff's Department.

8 **Q.** Okay. And so you had cameras, and they came and looked

9 at the cameras; is that right?

10 **A.** Yes, sir.

11 **Q.** Did they take any camera footage that you know of?

12 **A.** They did.

13 **Q.** Okay.

14 **A.** I think he just took a -- I want to say they just took a

15 recording of my TV with his phone.

16 **Q.** With his phone?

17 **A.** Yes, sir.

18 **Q.** The deputy?

19 **A.** Yes, sir.

20 **Q.** Okay. Got you.

21 **MR. McGEE:** And let's play the video at 10:33.

22 (PLAYING VIDEO, EXHIBIT NO. G-1.)

23 **BY MR. McGEE:**

24 **Q.** So I'm going to ask you, is this the car -- you can see

25 it better when it comes by. But is this -- does this look like

1   the same car, make and model, et cetera, from when you talked

2   to the person?

3   **A.**   Yes, sir.

4   **Q.**   Okay.  All right.  We're going to keep watching for a

5   moment.  About 30 more seconds.

6          **MR. McGEE:**  Robin, can I get you to pause real quick?

7          (PAUSED VIDEO.)

8   **BY MR. McGEE:**

9   **Q.**   So I just want to -- I want to bring your attention to

10  the corner of that store where that white awning or overhang

11  is.  Okay?  So I want you -- I want everybody to watch right

12  there.  Okay?

13         **MR. McGEE:**  All right.  Go ahead, Robin.  Thank you.

14         (PLAYING VIDEO.)

15         **MR. McGEE:**  Okay.  Pause it, please.

16         (STOPPED VIDEO.)

17  **BY MR. McGEE:**

18  **Q.**   Okay.  Now, we watched this video yesterday; correct?

19  **A.**   Yes, sir.

20  **Q.**   What do you believe just happened right before this?

21  **A.**   That's where I spoke to the gentleman out in the road.

22  **Q.**   Okay.  So do you believe -- again, I think we talked

23  about this, but do you believe you had just talked to him just

24  off camera right there?

25  **A.**   Yes, sir.

1   **Q.**   Okay.  And was that the car -- was that the way the car
2   was facing?
3   **A.**   Yes.
4   **Q.**   And was that the same car you're talking about?
5   **A.**   Correct.
6   **Q.**   And who is that person in the video right there?
7   **A.**   That's me.
8   **Q.**   Okay.  So I'm going to show --
9          **MR. McGEE:**  I'm going to go back to this ELMO, Tracy.
10  Thank you.  Thank you, Ms. Bailey.
11  **BY MR. McGEE:**
12  **Q.**   And, again, just so -- now that we've seen the video, if
13  you could indicate approximately where you -- where you talked
14  to him.
15  **A.**   I'd say somewhere right along in here (marking).
16  **Q.**   Okay.
17         **MR. McGEE:**  Tracy, if you don't mind screenshotting
18  that.
19  **A.**   This white building back here (indicating), this one
20  right there that I just touched, that's my -- at the time, it
21  was my uncle's shop.  He owned it.  And so I was just piddling
22  around in the shop and stuff, and I was walking back and forth
23  from my house to the shop.
24  **BY MR. McGEE:**
25  **Q.**   Okay.

1    **A.**    And I had noticed him coming back and forth numerous

2    times.  So when I come back out of the shop, he passed me

3    and -- you know, was going to pass me.  I stopped and said,

4    "Hey, can I help you?"  Been piddling around here for a minute.

5    **Q.**    I understand.  Okay.  So some time goes by; right?

6    **A.**    Correct.

7    **Q.**    And then did you hear anything else about it?

8    **A.**    Not for a long time.

9    **Q.**    Okay.  And then fast-forward to July of 2019.  Around

10   June, July, were you contacted by someone with the Postal

11   Inspection Service?

12   **A.**    I was.

13   **Q.**    And without telling me what they said, did y'all set up a

14   meeting?

15   **A.**    We did.

16   **Q.**    Okay.  And where was the meeting?

17   **A.**    He came to my apartment building.  I had moved at the

18   time, and he came to my apartment building when I got off work.

19   **Q.**    And you were in Memphis; is that right?

20   **A.**    Yes, sir.

21   **Q.**    Okay.  And so it wasn't this guy, was it, that came to

22   your apartment?

23   **A.**    I honestly can't remember.

24   **Q.**    Okay.

25   **A.**    It's been years ago.

1  **Q.**    I understand.  So they come to your apartment, and what

2  did y'all talk about?

3  **A.**    He just -- pretty much he asked me the story that I just

4  explained, and then he gave me a bunch of pictures, random

5  people, told me to pick out which one I thought I talked to

6  that day.

7  **Q.**    Okay.  And were you shown them all at once, or were you

8  shown them one at a time?

9  **A.**    No.  It was a big -- it was, like, three or four sheets

10  of paper --

11  **Q.**    Okay.  Are these --

12  **A.**    -- with a whole bunch of random people.

13  **Q.**    Are these the three sheets of paper, Government's

14  Exhibit 21, page 1, page 2, page 3?

15  **A.**    Yeah.

16  **Q.**    Do those look like the lineups they showed you?

17  **A.**    Yes, sir.

18  **Q.**    Okay.  Did anybody suggest anything to you, like pointing

19  at anybody or giving you a hint?

20  **A.**    No, sir.

21  **Q.**    And have those -- have any alterations or anything been

22  made as to these documents?  Whose initials are those?

23  **A.**    That's mine.

24  **Q.**    Okay.  And did you circle that individual?

25  **A.**    Yes, sir.

1  **Q.** And did you put the date on there?

2  **A.** Yes, sir.

3  **Q.** And these look like the lineups that he showed you; is

4  that correct?

5  **A.** Correct.

6  **Q.** Was anybody else there?

7  **A.** Just me and the investigator, officer, whatever he was.

8  **Q.** And is this the person from the red car outside of

9  your -- of your trailer?

10  **A.** Yes, sir.

11  **Q.** Were any other photos shown to you that day?

12  **A.** Just the three sheets with random people on it.

13  **Q.** Just these three sheets. And you only chose one person

14  out of the three sheets; is that right?

15  **A.** Yes, sir.

16  **Q.** And, again, I can't ask you what they said -- what the

17  agent said, inspector said, but nobody suggested anything to

18  you; correct?

19  **A.** Correct.

20  **Q.** Have you been shown anything since then?

21  **A.** That's -- that's the last time I spoke to him besides a

22  couple of weeks ago.

23  **Q.** Okay. What was that conversation a couple of weeks ago?

24  **A.** Told me I was subpoenaed to court.

25  **Q.** Okay.

1  **A.**   That was about it.

2  **Q.**   Okay.

3  **A.**   That they'd be contacting me with information of when and

4  where.

5  **Q.**   Okay.  Was your selection based on anything else other

6  than your observation of him at the time of the commission of

7  the crime?

8  **A.**   No, sir.

9  **Q.**   Okay.  And I know it's been five years.  This occurred in

10  2018, but I want you to look around the courtroom and see if

11  you see this individual who you spoke with.  Take your time.

12  **A.**   Yes, sir.

13  **Q.**   And what is that person wearing, and where is he?

14  **A.**   A maroon button-up.

15  **Q.**   Okay.  And where's he sitting?  If you could point to

16  him, please.

17  **A.**   The far back right of the courtroom (pointing).

18  **Q.**   Okay.  So is it this individual right here (indicating)?

19  **A.**   I believe so.

20       **MR. McGEE:**  Your Honor, for the record purposes -- I

21  would ask to note for record purposes that the witness has

22  pointed to the defendant Jamarr Smith.

23       **THE COURT:**  The record will so note.

24  BY MR. McGEE:

25  **Q.**   Now, I'm not talking about possibilities.  Okay?  Is that

Coffman - Cross by Mr. Lewis

1 the guy you talked to?

2 **A.** Yes.

3 **Q.** Okay.

4     **MR. McGEE:** Court's indulgence.

5     **THE COURT:** Thank you.  Yes.

6     (CONFERRING OFF THE RECORD.)

7     **MR. McGEE:** Tender the witness, Your Honor.

8     **THE COURT:** Mr. Lewis.

9                **CROSS-EXAMINATION**

10 **BY MR. LEWIS:**

11 **Q.** Hi, Mr. Coffman.  My name is Goodloe Lewis.

12 **A.** Yes, sir.

13 **Q.** We've never met before, have we?

14 **A.** No, sir.

15 **Q.** Why did you smile before you pointed to my client over

16 there?

17 **A.** I just grinned a little bit because it's kind of

18 blatantly obvious who I'm going -- you know, who I was going to

19 point out.

20 **Q.** Was it embarrassing?

21 **A.** Was what embarrassing?

22 **Q.** To have to point at him.

23 **A.** A little bit.

24 **Q.** You gestured to the screen.  It was obvious who you

25 wanted to point to because you had seen on the lineup who you

Coffman - Cross by Mr. Lewis

1  had circled and initialed before you pointed over there; right?

2  **A.**  Yeah.  And I also seen him in 2018.

3  **Q.**  Okay.  But what I said was correct.  You saw him on the

4  lineup sheet that you had circled in 2019 before you pointed

5  over there; right?

6  **A.**  Say that again.

7  **Q.**  Sure.  You saw the screen.  You gestured to the screen.

8  You saw the picture of him that you circled in 2019 before you

9  pointed over there; right?

10 **A.**  Well, yeah.  It was displayed before that question was

11 asked.

12 **Q.**  Okay.  All right.  So let's go back to February of 2018.

13 And you talked about -- I like this word -- you were piddling

14 around in the shop?

15 **A.**  Correct.

16 **Q.**  Did you have your cell phone with you?

17 **A.**  I'm not sure.

18 **Q.**  Well, if it wasn't on your person, was it probably in

19 your house?

20 **A.**  Yes, sir.

21 **Q.**  Which was right there?

22 **A.**  Correct.

23 **Q.**  Yeah.  Did you have an Android phone?

24 **A.**  I believe so at the time.

25 **Q.**  And I probably don't need to ask any more, but I'll go

1  ahead and ask this.  Did you have a Gmail account, e-mail

2  account that was Gmail?

3  **A.**   Maybe.  Possibly.  I don't --

4  **Q.**   It would be -- like, my wife is angelaannavery@gmail.com.

5  **A.**   Probably so.

6  **Q.**   Okay.  That sounds --

7  **A.**   Used a bunch of different e-mails over time.  I can't

8  remember.

9  **Q.**   But that sounds like an e-mail account you might have?

10  **A.**   Possibly.

11  **Q.**   Okay.  Do you remember what day of the week this was?

12  **A.**   I do not.

13  **Q.**   If I suggested to you it was a Monday, does that sound

14  close, about right?

15  **A.**   I can't remember which day of the week it was.

16  **Q.**   I'm going to do a little better.  It was the day after

17  the Super Bowl.

18  **A.**   So that would be a Monday.

19  **Q.**   Okay.  Well -- and that was a dumb question, but I was

20  going to say it was the Super Bowl.  Eagles beat the Patriots

21  41 to 33.  Does that sound -- does that jog your memory?

22  **A.**   I'm not a big NFL fan.

23  **Q.**   Okay.  Me either.  We have something to talk about.  All

24  right.  Did you go to a Super Bowl party?

25  **A.**   I did not.

1   **Q.**   Did you have any alcohol to drink the day before?

2   **A.**   Not that I believe.

3   **Q.**   The day after?

4   **A.**   No, sir.

5   **Q.**   You do drink?

6   **A.**   Yes, sir.

7   **Q.**   Okay.  And I'm not bringing this up to embarrass you, but

8   you'll understand why I'm asking this in a minute.  You had a

9   DUI in Hernando a little while back?

10  **A.**   Correct.

11  **Q.**   Have you talked to the Government about that?

12  **A.**   Talked to the Government about it?

13  **Q.**   Yes, sir.

14  **A.**   No.

15  **Q.**   Okay.  The weather that day?  Cloudy?  Sunny?

16  **A.**   It was fair weather.

17  **Q.**   Okay.  Does that mean sunny?

18  **A.**   Yes, sir.

19  **Q.**   Okay.  Was it cold?

20  **A.**   I would say it was average temperature.  Maybe

21  65 degrees.

22  **Q.**   Windy?

23  **A.**   It's always windy in the Delta.

24  **Q.**   Okay.  And this was fairly late in the day in February;

25  right?

Coffman - Cross by Mr. Lewis

1  **A.**   Correct.

2  **Q.**   Sun was going down?

3  **A.**   Yes, sir.

4  **Q.**   Sun already down?

5  **A.**   No, it wasn't already down, but it was getting there.

6  **Q.**   But if I suggested to you this was sometime between 5:00

7  and 6:00 in February, the sun is pretty much down by then;

8  right?

9  **A.**   Yes, sir.

10 **Q.**   Okay.  There are no streetlights in the area?

11 **A.**   No, sir.

12 **Q.**   City of Lake Cormorant doesn't have a lot of

13 streetlights?

14 **A.**   It doesn't.

15 **Q.**   Doesn't have a stoplight either, does it?

16 **A.**   Only one.

17 **Q.**   Oh, it has one.  Okay.  Let me ask you about your video.

18 **A.**   Yes, sir.

19 **Q.**   Did it show anything?

20 **A.**   Just showed cars going by.

21 **Q.**   Did it -- did it show the red car you said you looked at?

22 **A.**   I -- I can't remember.  I think I watched the video one

23 time, and DeSoto County Sheriff's Department kept it after

24 that.  I never fooled with it after that.  I can't remember.

25 **Q.**   Do you still have it?

1  **A.**   No, sir, I do not.

2  **Q.**   Okay.  Did it show the mail truck or anything like that?

3  **A.**   I think you may have been able to see it when it first

4  swung into the drive there, but you couldn't see it when it was

5  pulled in.

6  **Q.**   Could you see the back of the post office at all?

7  **A.**   No, sir, you couldn't.  That block store -- that red

8  brick building was blocking it.

9  **Q.**   All right.  And so you said earlier that you gave a

10  statement to the DeSoto County deputies on that day; correct?

11  **A.**   Correct.

12  **Q.**   And so everything was real fresh in your mind at that

13  point?

14  **A.**   That's right.

15  **Q.**   I think you noted here we are five years later.  Things

16  are not quite so fresh in your mind today; correct?

17  **A.**   That's right.

18  **Q.**   Okay.  So when things were real fresh in your mind, here

19  is what you told the DeSoto County sheriffs.  That the person

20  in the car was a male, black; correct?

21  **A.**   Correct.

22  **Q.**   Light skin?

23  **A.**   Correct.

24  **Q.**   Reddish color goatee?

25  **A.**   Correct.

Coffman - Cross by Mr. Lewis

1    **Q.**   About six feet tall?

2    **A.**   Yes.

3    **Q.**   170 to 180 pounds?

4    **A.**   Correct.

5    **Q.**   And then the judge got you on the middle-aged thing.

6    About 30 years of age?

7    **A.**   That's right.

8    **Q.**   Okay.  That's what you told law enforcement that day when

9    everything was very fresh in your mind?

10   **A.**   Yes.

11   **Q.**   Okay.  And it was important to you at that time to

12   provide as much detail as you could?

13   **A.**   That's right.

14   **Q.**   I mean, you needed to give them every single detail you

15   possibly could; correct?

16   **A.**   Correct.

17   **Q.**   Because you might be in court five years later and not

18   have to remember all of this?

19   **A.**   That's right.

20   **Q.**   I mean, have to remember all of this; right?  Okay.  Now,

21   as to the red car -- and I can show you the report from DeSoto

22   County, but you did not tell them make, model, year, anything

23   like that.  You just said red car?  You want me to show it to

24   you?

25   **A.**   That's fine.

1 **Q.** Okay.

2 **MR. LEWIS:** May I approach, Your Honor?

3 **THE COURT:** You may.

4 **BY MR. LEWIS:**

5 **Q.** Now, there's some stuff in here that I'm not going to ask

6 you about because it doesn't have to do with you, but this last

7 paragraph here is what I'm going to ask you about. Okay?

8 **MR. McGEE:** Your Honor, just to be clear, Mr. Lewis

9 cannot read from a report that's not his. It hasn't been

10 adopted by him. So I just want to make it clear. He can

11 certainly ask him about what he told the officers.

12 **THE COURT:** Yes, sir.

13 **MR. LEWIS:** Yeah. I mean, I -- I think we're going to

14 be all right, Your Honor.

15 **BY MR. LEWIS:**

16 **Q.** So the -- the part there -- you did not provide any other

17 details other than red car; correct? That's all you said.

18 Does that refresh your recollection?

19 **A.** Yes.

20 **Q.** Okay. And then you said earlier -- and this isn't in the

21 report so I'm going to rely on you -- you weren't real sure

22 whether you came to the passenger side or the driver's side.

23 Fair?

24 **A.** Pretty sure it was the driver, I want to say.

25 **Q.** Okay. Not certain?

1  **A.**    I'm pretty certain it was, on account of where I was

2  coming from and which way the car was -- which direction the

3  vehicle was traveling.

4  **Q.**    All right.

5  **A.**    It wouldn't have made much sense to go to the passenger

6  side.

7  **Q.**    Okay.  And so the person obviously was sitting inside the

8  car?

9  **A.**    Correct.

10  **Q.**    And you testified today, I think, that he was wearing a

11  gray hoodie; right?

12  **A.**    Correct.

13  **Q.**    No hat?

14  **A.**    Correct.

15  **Q.**    If the report says he was wearing a gray, straight bill

16  hat, would you disagree with that?

17  **A.**    That's what the report says.  So if I said that five

18  years ago, that's probably what he was wearing.

19  **Q.**    Okay.  Your testimony is that you could tell somebody

20  sitting inside a car wearing a straight bill hat and a gray

21  hoodie, that they're about six feet tall?

22  **A.**    Just based off assumption.  I was asked to give what I

23  assumed by the sheriff's office.

24  **Q.**    It was a guess?

25  **A.**    It was an educated guess.

1   **Q.**   Okay.  Well, you don't judge people's height as a job or

2   a hobby, do you?

3   **A.**   Not typically.

4   **Q.**   Okay.  And then you said -- same question, that this

5   person in the gray hoodie with the straight bill hat sitting in

6   the car was about 170 to 180 pounds.  You could tell that?

7   **A.**   Say it again now.

8   **Q.**   Sure.  You could tell that this person sitting in the car

9   wearing a grade hoodie with a straight bill hat was, in your

10  opinion, 170 to 180 pounds?

11  **A.**   Give or take.

12  **Q.**   And as to their appearance, as to their face, you stated

13  they had two distinguishing characteristics.  Light skin?

14  **A.**   Correct.

15  **Q.**   And reddish hair?  Excuse me.  Reddish goatee?

16  **A.**   Correct.

17  **Q.**   Those were clearly present?

18  **A.**   Yes.

19  **Q.**   In your experience, you have seen African Americans with

20  reddish hair?

21  **A.**   Like a reddish tint on facial hair.  Not -- I wouldn't

22  say red-headed hair.

23  **Q.**   Okay.  My question was you have seen African Americans

24  with reddish hair.  They exist?

25  **A.**   Yeah.

Coffman - Cross by Mr. Lewis

1 **Q.** Okay.  Did you go to Lake Cormorant High School?

2 **A.** I did.

3 **Q.** Okay.  So public school.  You've been around African

4 Americans all of your life?

5 **A.** Correct.

6 **Q.** It is unique, though, to find an African American that

7 has reddish hair because they tend to be very light skinned.

8 You agree?

9 **A.** Correct.

10 **Q.** Okay.  And it's your testimony that this person was light

11 skinned with a reddish goatee?  Yes?

12 **A.** Yes.

13 **Q.** How long did you talk to this person?

14 **A.** Maybe a total of 30 seconds.

15 **Q.** Okay.  You did not see this as a dangerous situation?

16 **A.** I seen it as a suspicious situation.  That's why I

17 stopped and spoke.  As far as dangerous goes, it could have

18 been.  You never know.  Any situation can be dangerous.

19 **Q.** Well, I'm asking you what you remember.  Did you think

20 this was a dangerous situation to see this person out there?

21 **A.** I'm not going to say I thought it was dangerous, but I

22 definitely thought it was suspicious.

23 **Q.** Stressful for you?

24 **A.** No.  I was just curious.

25 **Q.** Okay.  You were not stressed?

1  **A.**    (Shakes head from side to side.)  No.

2  **Q.**    Okay.  You've got to answer out.  She's got to type it

3  down.  You are not trained in observation like a police officer

4  or somebody like that?

5  **A.**    No.

6  **Q.**    When you talked to the DeSoto County sheriffs that day,

7  you did not -- they didn't do a drawing or anything like that?

8  **A.**    No, sir.

9  **Q.**    They didn't provide you with a lineup that day?

10 **A.**    They did not.

11 **Q.**    So what did you do the rest of the year of 2018?

12 **A.**    Worked and carried on life.

13 **Q.**    That's what I thought.  So, basically, law enforcement

14 did not come back to you anytime during the remainder of the

15 year of 2018?

16 **A.**    Not at all.

17 **Q.**    Okay.  Had you pretty much forgotten about the incident

18 and moved on with your life?

19 **A.**    Pretty much.

20 **Q.**    All right.  So we're going to eventually get to July of

21 2019, but the first half of 2019, I assume it's the same deal.

22 Working, carrying on with your life?

23 **A.**    That's right.

24 **Q.**    This is more curiosity than anything else.  You were

25 living at Lake Cormorant at the time, but by July of 2019 you

1  were living in Memphis?

2  **A.**  Correct.

3  **Q.**  Okay.  So what were you doing for a living?

4  **A.**  Construction.

5  **Q.**  Okay.  You were living in an apartment in Memphis?

6  **A.**  Yes, sir.

7  **Q.**  Okay.  At the time, were you still doing -- backing up to

8  February 2018, were you still doing construction?

9  **A.**  Yes.  I had the same job.

10  **Q.**  Okay.  So first half of 2019, living life, carrying on

11  like usual; right?

12  **A.**  Yes.

13  **Q.**  Not thinking about this incident?

14  **A.**  That's right.

15  **Q.**  The officer comes back to you?

16  **A.**  Correct.

17  **Q.**  Your memory was not as fresh a year and a half or a year

18  and -- let's say 15 months after the incident; correct?

19  **A.**  Yep.

20  **Q.**  Haven't even thought about it a lot?

21  **A.**  That's right.

22  **Q.**  The officer told you, "We've got some suspects"?

23  **A.**  Yeah.  He said they had -- I remember him saying that it

24  was possible suspects.

25  **Q.**  Okay.  He indicated to you he knew who they were?

Coffman - Cross by Mr. Lewis

1   **A.**   Sir?

2   **Q.**   He indicated he knew who they were?

3          **MR. McGEE:**   Your Honor, I'm going to object.  He's

4   asking for hearsay.

5          **THE COURT:**   It's sustained.

6   **BY MR. LEWIS:**

7   **Q.**   He presented you -- well, start over.  When the officer

8   came to see you, you wanted to be cooperative?

9   **A.**   That's right.

10  **Q.**   You wanted to help?

11  **A.**   Yes.

12  **Q.**   You wanted to help the investigation?

13  **A.**   That's right.

14  **Q.**   You wanted to help the Government solve the crime?

15  **A.**   Correct.

16  **Q.**   You wanted to get it right?

17  **A.**   That's right.

18  **Q.**   Now, was it an intimidating situation?

19  **A.**   By no means.

20  **Q.**   Who all was present?

21  **A.**   Just an investigator and I.  Just me and an investigator.

22  **Q.**   You were told you didn't have to pick -- you were not

23  told you didn't have to pick anybody?

24  **A.**   He said, "If it don't look like anyone on this page, you

25  don't have to pick someone."

Coffman - Cross by Mr. Lewis

1  **Q.**  Okay.

2  **A.**  He said, "Whatever, you know, stands out -- to the best

3  of your ability, pick who you believe you spoke with."

4  **Q.**  Okay.  Did he tell you not to guess?

5  **A.**  He did.  He said, "Don't just choose a random person just

6  to be picking somebody."

7  **Q.**  Did he give you all three sheets at one time?

8  **A.**  Yeah.  He took them and spread them out on the table.

9  **Q.**  Okay.  So you didn't do them one at a time?

10 **A.**  I looked over one, looked over the other, looked over the

11 other one.

12 **Q.**  I understand that, but it wasn't he handed you a sheet,

13 held the other sheets without you being able to look at them.

14 You say he laid them out, all three?

15 **A.**  Yeah.  I believe -- I believe they were spread out across

16 the table when looked over them -- I looked over them.

17 **Q.**  You knew you had to be sure because somebody's liberty

18 might be riding on it?

19 **A.**  That's right.

20 **Q.**  You were not completely sure this was the right person?

21 **A.**  I wouldn't say I was 100 percent sure, no, but I was

22 very -- I'm trying to think -- confident in my choice.

23 **Q.**  You were confident but not 100 percent sure?

24 **A.**  That's right.

25 **Q.**  How long did you meet with the Government to prepare for

Coffman - Cross by Mr. Chiniche

1  your testimony today?

2  **A.**   Maybe five minutes.

3  **Q.**   Okay.  There's a salvage yard up in Walls?

4  **A.**   Tri-State Auto.

5  **Q.**   Okay.  They sell transmissions?

6  **A.**   They sell all kind of stuff, yeah.

7          **MR. LEWIS:**  No further questions, Your Honor.

8          **THE COURT:**  Mr. Chiniche.

9          **MR. LEWIS:**  Oh.  Excuse me, Your Honor.

10        (CONFERRING OFF THE RECORD.)

11         **MR. LEWIS:**  Excuse me.  One more question, Your Honor.

12         **THE COURT:**  Yes, sir.

13  **BY MR. LEWIS:**

14  **Q.**   Mr. Smith does not have a reddish goatee, does he?

15  **A.**   Not from what I can see.

16         **MR. LEWIS:**  No further questions.

17         **MR. CHINICHE:**  May I have just a moment, Your Honor?

18         **THE COURT:**  Yes, sir.

19                    **CROSS-EXAMINATION**

20  **BY MR. CHINICHE:**

21  **Q.**   Morning, Mr. Coffman.

22  **A.**   Morning.

23  **Q.**   I'm Paul Chiniche.  I represent Gilbert McThunel.

24  **A.**   All right.

25  **Q.**   Do you have any paperwork up with you at the witness

1   stand?

2   **A.**   Just the -- my statement.

3   **Q.**   Okay.

4       **MR. CHINICHE:**  Your Honor, may I approach the witness?

5       **THE COURT:**  You may.

6   **BY MR. CHINICHE:**

7   **Q.**   Mr. Coffman, you did not identify Mr. McThunel as

8   involved in this case, did you?

9   **A.**   No, sir.  I only spoke to one person that afternoon.

10   **Q.**   Okay.  You were interviewed by Brian Falatko; is that

11   right?

12   **A.**   I honestly can't remember his name.  I just know it was

13   an investigator from the postal service.

14   **Q.**   Okay.  When were you interviewed?  When were you first

15   interviewed by law enforcement?

16   **A.**   I spoke with the DeSoto County sheriff's deputies that

17   afternoon --

18   **Q.**   Okay.

19   **A.**   -- of the incident.  And then it wasn't again until July

20   of 2019.

21   **Q.**   Okay.  So two interviews we've got?

22   **A.**   Correct.

23   **Q.**   The first was with the DeSoto Sheriff's Department?

24   **A.**   Yeah.  That was just kind of an on scene.  They just kind

25   of asked me a few questions, and that was it.

Coffman - Cross by Mr. Chiniche

1  **Q.**  Right.

2  **A.**  Never heard from them again.

3  **Q.**  And then later July 1, 2019, in Memphis?

4  **A.**  Yes.

5  **Q.**  In the lobby of your apartment --

6  **A.**  Yes.

7  **Q.**  Okay.  All right.  So on the day of the incident, when

8  you spoke to sheriff deputies, you identified the driver's skin

9  color; right?

10  **A.**  Yes.

11  **Q.**  His height; is that right?

12  **A.**  Yes.

13  **Q.**  You identified his weight, approximate?

14  **A.**  Yes.

15  **Q.**  You identified his approximate age; right?

16  **A.**  Approximately.

17  **Q.**  You identified the head gear he was wearing?

18  **A.**  Yes.

19  **Q.**  You identified his clothing?

20  **A.**  Yes.

21  **Q.**  And you identified the car as red?

22  **A.**  Yes, sir.  I believe I said maroon or red.

23  **Q.**  According to the report, you said red.

24  **A.**  Okay.

25  **Q.**  You agree with that?

1  **A.**  Yeah, that's fine.

2  **Q.**  You did not say that it was maroon.

3  **A.**  Okay.

4  **Q.**  And you did not give a make or model, did you?

5  **A.**  I can't remember what I told them.

6  **Q.**  You didn't give him a tag number?

7  **A.**  No.

8  **Q.**  You didn't give him the state that the tag was issued out

9  of; right?

10  **A.**  I don't believe I give him anything about any information

11  regarding the tag.

12  **Q.**  You didn't notice if it was a Mississippi tag or a

13  Tennessee tag, did you?

14  **A.**  I did not.

15  **Q.**  You didn't notice if it was an Arkansas tag or a

16  Louisiana tag, did you?

17  **A.**  I didn't.

18  **Q.**  You only indicated that it was a red car; right?

19  **A.**  That's right.

20  **Q.**  The sheriff deputy came in your house and looked at a

21  video that you all had; right?

22  **A.**  Yes.

23  **Q.**  And you lived at that house with who?

24  **A.**  My girlfriend.

25  **Q.**  Anybody else in that house?

1  **A.**  That was it.

2  **Q.**  Do you have any other family members on the property?

3  **A.**  No.

4  **Q.**  Did your girlfriend have a cell phone at the time?

5  **A.**  I'm sure.

6  **Q.**  Did she have an iPhone or an Android phone?

7  **A.**  Probably an Android.

8  **Q.**  Are you still with that girl?

9  **A.**  I'm not.

10  **Q.**  Okay.  How old are you?

11  **A.**  Twenty-seven.

12  **Q.**  Okay.  How long have you lived in this area?

13  **A.**  Lake Cormorant area?

14  **Q.**  Uh-huh.

15  **A.**  My whole life.

16  **Q.**  Okay.  And you've got family that owns property there?

17  **A.**  Correct.

18  **Q.**  So you still go back there?

19  **A.**  Correct.

20  **Q.**  And you went to high school down the road; right?

21  **A.**  Yes.

22  **Q.**  And there are a number of businesses in that area, aren't

23  there?

24  **A.**  Yeah.  Not too many, but there's businesses around.

25  **Q.**  All right.  Sigma Supply Company of North America on Star

1   Landing Road -- are you familiar with that business?

2   **A.**   Yeah, I know where that's at.

3   **Q.**   And 18-wheelers come in and pull into those docks, load

4   and unload, don't they?

5   **A.**   Yes.

6   **Q.**   Do you know what Sigma Supply does?

7   **A.**   They distribute stuff. It's a distributor.

8   **Q.**   Okay. And there's a new gas station -- Shell gas station

9   on 61, isn't there?

10   **A.**   It's not new. It's been there as long as I can remember.

11   **Q.**   Okay. There's a lot of -- there's activity at these two

12   locations that I'm mentioning; right?

13   **A.**   There is.

14   **Q.**   There's a number of African American churches in the

15   area, aren't there?

16   **A.**   Yeah.

17   **Q.**   Lake Cormorant Mountain Baptist Church, Lake Cormorant

18   Union -- these are on the east and west of Star Landing Road;

19   right?

20   **A.**   Yes.

21       **MR. CHINICHE:** I have no further questions. Thank

22   you, Your Honor.

23       **THE COURT:** Thank you.

24       Mr. Travis.

25       **MR. TRAVIS:** Thank you, Your Honor. I have no

Coffman - Redirect

1    questions of this witness.

2         **THE COURT:**  Thank you.  Redirect.

3                        **REDIRECT EXAMINATION**

4    **BY MR. McGEE:**

5    **Q.**  Just one question.  I show you G-13A.  Are there any

6    businesses that are active in this picture?

7    **A.**  None besides Blythe Bayou Farm.  And I don't know if you

8    consider -- people don't go in there to shop or anything.  It's

9    not a business.

10   **Q.**  That's what I'm asking.  Thank you.

11        **MR. McGEE:**  No further questions, Your Honor.

12        **THE COURT:**  May he be finally excused?

13        **MR. McGEE:**  Yes, Your Honor.

14        **THE COURT:**  Thank you.  You're excused.

15        **THE WITNESS:**  Yes, ma'am.  Thank you.

16        **THE COURT:**  Who would you call next?

17        **MR. McGEE:**  Your Honor, the Government would call

18   Patra Malone.

19      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

20        **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

21        **MR. McGEE:**  May I proceed, Your Honor?

22        **THE COURT:**  You may.

23    **PATRA MALONE, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

24              **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

25                     **DIRECT EXAMINATION**

Malone - Direct

1    **BY MR. McGEE:**

2    **Q.**   Ms. Malone, if you could state your full name for the

3    record, please.

4    **A.**   Patra Marie Malone.

5    **Q.**   And, Ms. Malone, where do you reside right now?

6    **A.**   Gulfport, Mississippi.

7    **Q.**   How long have you lived there?

8    **A.**   All of my life.

9    **Q.**   Okay.

10   **A.**   Thirty years.

11   **Q.**   And so I'm going to ask you to speak -- try to speak a

12   little bit into the microphone.  You're kind of soft-spoken.

13   **A.**   All of my life.

14   **Q.**   Thank you.  And so, just to be clear, in February of

15   2018, you were also living in Gulfport; is that correct?

16   **A.**   Correct.

17   **Q.**   Okay.  And do you know Roko or Thomas Ayodele?

18   **A.**   I do.

19   **Q.**   How long have you known him?

20   **A.**   Since high school.

21   **Q.**   Okay.  And how do y'all know each other?

22   **A.**   Just friends.  We had some classes in high school.

23   **Q.**   Okay.  And do you -- do you talk -- did you talk to him

24   in 2018?

25   **A.**   Yes.  We talked periodically.

Malone - Direct

 1 | **Q.**   Okay.  And y'all -- did you talk on the phone and

 2 | Facebook?

 3 | **A.**   Yeah.  We usually text.

 4 | **Q.**   Usually text?

 5 | **A.**   Yeah.

 6 | **Q.**   Okay.  Okay.  I'm going to show the witness what's been

 7 | previously marked G-7B.

 8 |         **MR. TRAVIS:**  May I see that first, please?

 9 |         **MR. McGEE:**  Sure.

10 |         **MR. TRAVIS:**  Thank you, Your Honor.

11 | **BY MR. McGEE:**

12 | **Q.**   And what is -- well, let me -- first, let me ask you,

13 | what is your phone number?

14 | **A.**   228-669-1566.

15 | **Q.**   Okay.  So I'm going to show you these phone records

16 | between -- and these are -- these are the text records, G-7B.

17 | It says SMS here.  So this is February 5th, 2018, 2324.  That's

18 | the time.  We won't even get into that today.

19 |         Okay.  But my point of showing you this is, in February

20 | of 2018, did you -- did you text with Ayodele?

21 | **A.**   Yes.  That's right.

22 | **Q.**   Okay.  And is that his number?

23 | **A.**   I didn't know his number by heart.  I had it in my phone.

24 | **Q.**   And is it the one that ends in 4000?

25 | **A.**   I -- I don't know it by heart, but, I mean, I have his

Malone - Direct

1  name -- I had his name and number in my phone.

2  **Q.**  Okay.  So let me ask you this.  Do you know a Little Bo?

3  **A.**  No.

4  **Q.**  He lives in -- he lived in Batesville until he passed

5  away.  You don't know that person?

6  **A.**  No.  I don't know anybody in Batesville.

7  **Q.**  You didn't know anybody in Batesville?

8  **A.**  No.

9  **Q.**  Okay.  So you don't know a James -- this is the same

10  person, just his real name -- James McArthur Scott?

11  **A.**  I don't.

12  **Q.**  Don't recognize him?  So would it be fair to say that a

13  Little Bo was not texting you on this day?  Is that a correct

14  statement?

15  **MR. TRAVIS:**  I object to that, Your Honor.  That could

16  be total speculation.

17  **THE COURT:**  It's sustained.

18  **MR. TRAVIS:**  Thank you, Judge.

19  **BY MR. McGEE:**

20  **Q.**  Have you ever been texted by a person named Little Bo?

21  **A.**  Not that I know of, no.

22  **Q.**  Okay.  Thank you.  And do you see the person you call

23  Roko or Thomas Ayodele in the courtroom today?  You can stand

24  up if you need to.

25  **A.**  Yes.

1  **Q.**   Okay.  And, again, I know this is awkward, and I'm sorry.

2  But can you please point out where he's sitting and what he's

3  wearing?

4  **A.**   Over there.  A green shirt, gray.

5  **Q.**   Green shirt with a jacket?

6  **A.**   Uh-huh.

7  **Q.**   And a gray beard?

8  **A.**   Yeah.  Right over there (pointing).

9          **MR. McGEE:**  All right.  Your Honor, I would ask the

10  record reflect that she has -- this witness has pointed to the

11  defendant Thomas Ayodele.

12          **THE COURT:**  The record may reflect.

13          **MR. McGEE:**  The Court's indulgence.

14          **THE COURT:**  Yes.

15      (CONFERRING OFF THE RECORD.)

16  **BY MR. McGEE:**

17  **Q.**   Your Honor, I'm going to hand the witness what's been --

18  actually, that's not it.

19          **MR. McGEE:**  One moment, Your Honor.

20          **THE COURT:**  Okay.

21  **BY MR. McGEE:**

22  **Q.**   I'm going to hand the witness what's been previously

23  entered into evidence as G-12 and --

24          **MR. TRAVIS:**  May I see that one before -- I'm trying

25  to keep up with all of these exhibits.

1    **MR. McGEE:** Yeah. I'm sorry, Bill. I should have
2    shown you.

3        **MR. TRAVIS:** Thank you, sir. Thank you.

4    **BY MR. McGEE:**

5    **Q.** Ms. Malone, I'm going to ask you to write your number and
6    your name on this piece of paper, please. This is G-12.

7    **A.** (Marking.)

8    **Q.** Thank you. And just to be clear, so you -- you have
9    Mr. Ayodele's number saved in your phone; is that correct?

10   **A.** I had it saved in my phone.

11   **Q.** You had it, yeah. And, again, I'm going back to 2018.
12   But you had it saved in your phone, and when you're texting
13   this phone number --

14       **MR. TRAVIS:** Object to the leading, Your Honor. He's
15   testifying, and he's been testifying.

16       **THE COURT:** It's sustained.

17   **BY MR. McGEE:**

18   **Q.** When you were texting this number, was it someone else?

19   **A.** Not that I know -- knew of --

20   **Q.** Okay.

21   **A.** -- I mean, you know.

22       **MR. McGEE:** Thank you, Your Honor.

23       **THE COURT:** Mr. Lewis?

24       **MR. LEWIS:** I have no questions, Your Honor.

25       **THE COURT:** Mr. Chiniche?

1    **MR. CHINICHE:**  No, Your Honor.

2    **THE COURT:**  Mr. Travis?

3    **MR. TRAVIS:**  No questions.  No questions.

4    **THE COURT:**  May she be finally excused?

5    **MR. McGEE:**  Yes, Your Honor.

6    **THE COURT:**  You're excused.  Thank you, ma'am.

7         Who would the Government call next?

8    **MR. MIMS:**  Your Honor, we call Larsharondra Jordan.

9    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

10        **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

11   **LARSHARONDRA JORDAN, GOVERNMENT'S WITNESS, AFTER BEING DULY**

12              **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

13                        **DIRECT EXAMINATION**

14   BY MR. MIMS:

15   **Q.**   Ma'am, would you state your name for the record, please.

16   **A.**   My name is Larsharondra Jordan.

17   **Q.**   And would you spell your name as well, please.

18   **A.**   L-a-r-s-h-a-r-o-n-d-r-a.

19   **Q.**   Ms. Jordan, where are you from?

20   **A.**   I'm from Clarksdale, Mississippi.

21   **Q.**   How long have you lived there?

22   **A.**   I'll say about -- been, like, six years now.

23   **Q.**   Okay.  What do you do for a living?

24   **A.**   I am a sales associate at Auto Zone, and I'm a manager at

25   Firestone Complete Auto Care.  And I have my own cleaning

1  business.

2  **Q.**   All right.  Hard-working woman.

3  **A.**   Of course.

4  **Q.**   Do you know Roko Ayodele?

5  **A.**   Yes, I do.

6  **Q.**   How long have you known him?

7  **A.**   Off and on, I'll say about a good least -- probably about

8  six -- probably about six years or so.

9  **Q.**   All right.  Do you see him in this courtroom?  And you

10  may have to stand up and look around.  We've got high tables

11  and stuff, but do you see him --

12  **A.**   Yes.

13  **Q.**   -- in this courtroom?

14  **A.**   Yes.

15  **Q.**   Can you identify him?  Can you point him out and identify

16  him?

17  **A.**   The gentleman in the gray suit.

18  **Q.**   All right.  At this table back here?

19  **A.**   The -- uh-huh.

20  **Q.**   At which end of the table?

21  **A.**   Right here (indicating).

22          **MR. MIMS:**  Your Honor, I'd ask the record reflect that

23  the witness has identified the defendant Roko Ayodele.

24          **THE COURT:**  The record can reflect.

25  **BY MR. MIMS:**

Jordan - Direct

1   **Q.**   Ms. Jordan, what is your phone number?

2   **A.**   Now?  901-871-3238.

3   **Q.**   What was your phone number back in February 2018?

4   **A.**   I can't recall.  I don't -- I had multiple numbers then.

5   I had 444-4562, 313-96 -- I can't recall.  I don't know.

6   **Q.**   How many numbers have you had?

7   **A.**   I think I had about three since -- since then.  302-7560

8   I think is one of them.  I don't know.  I can't recall.

9   **Q.**   Let me ask you this question.

10  **A.**   Uh-huh.

11  **Q.**   Do you recall Roko Ayodele's phone number?

12  **A.**   No, I don't remember his number at all.

13  **Q.**   Did you have his phone number in your phone?

14  **A.**   Back then I did.

15  **Q.**   Okay.  Did you ever call or receive phone calls from

16  Mr. Ayodele?

17  **A.**   Well, we communicated.

18  **Q.**   All right.  When you talked to someone at the number that

19  was in your phone for Ayodele, did you ever talk to anybody

20  else besides him?

21  **A.**   No.  I had no reason to.

22          **MR. MIMS:**  Your Honor, may I have one moment?

23          **THE COURT:**  You may.

24       (CONFERRING OFF THE RECORD.)

25          **MR. MIMS:**  Your Honor, I'm getting close.  If I could

1   just have one more second.

2          **THE COURT:**  Certainly.

3       (CONFERRING OFF THE RECORD.)

4          **MR. MIMS:**  Your Honor, may I approach the witness?

5          **THE COURT:**  You may.

6   **BY MR. MIMS:**

7   **Q.**   Ms. Jordan, let me ask you, with your phone service, do

8   you pay in advance or do you get prepaid phones or do you do

9   both?  What do you do normally?

10  **A.**   Say that again.  Repeat that question.

11  **Q.**   With your phone service, do you -- do you ever get

12  prepaid phones or do you have phones that you pay off every

13  month, or how does that work?

14  **A.**   I pay my phone bill monthly.

15  **Q.**   Okay.  Have you ever had prepaid phones?

16  **A.**   Never.  Had no reason to.

17  **Q.**   Who's your -- who has your carrier been with?

18  **A.**   I done had Cricket.  I done been with Straight Talk.

19  **Q.**   Have there been others?

20  **A.**   Not that I recall.

21  **Q.**   Let me ask you this question.  Would you look at the

22  subscriber information that's -- I think it's the third box

23  down on there.  Do you see a phone number on there?

24  **A.**   4131?

25  **Q.**   I'm sorry?

Jordan - Direct

1 **A.**  313-4131?

2 **Q.**  Yes.

3 **A.**  Uh-huh.

4 **Q.**  Do you recognize that number?

5 **A.**  If it was mine, I don't remember.  It might -- I don't

6 know.  I can't recall.

7 **Q.**  It could be.  You cannot recall?

8 **A.**  Huh-uh.

9 **Q.**  All right.  Ms. Jordan, let me ask you one other

10 question.  Do you know what kind of car Mr. Ayodele drives?

11       **MR. TRAVIS:**  Could you repeat that, please.

12       **MR. MIMS:**  Yes.

13 **BY MR. MIMS:**

14 **Q.**  Do you know what kind of vehicle Mr. Ayodele drives or

15 what kind of vehicle he drove back in 2018?

16 **A.**  In 2018?

17 **Q.**  Yeah.

18 **A.**  No.

19 **Q.**  Do you remember any of the vehicles he drove?

20 **A.**  The only thing I know, it was white, but I don't know

21 what kind.

22 **Q.**  When you say white, would you describe that vehicle?

23 **A.**  It was, like, a white pickup truck or something like

24 that.  I don't know.

25 **Q.**  Was it large or small?  That's okay.  If I can have the

Jordan - Cross by Mr. Travis

1  paper back.  Thank you.

2  **A.**    I mean, there are different -- all different kind of --

3  size of trucks.  I don't know whether it was small or big.  I

4  just know he had a white vehicle.  I didn't pay attention to

5  the size of it.

6          **MR. MIMS:**  Your Honor, I have no further questions.

7          **THE COURT:**  Thank you.  Mr. Lewis?

8          **MR. LEWIS:**  No questions.

9          **THE COURT:**  Mr. Chiniche?

10          **MR. CHINICHE:**  No, Your Honor.

11          **THE COURT:**  Mr. Travis?

12          **MR. TRAVIS:**  Briefly.  Thank you, Judge.

13                      **CROSS-EXAMINATION**

14  BY MR. TRAVIS:

15  **Q.**    Good morning, Ms. Jordan.

16  **A.**    Good morning.  How are you?

17  **Q.**    I'm well.  You all right?

18  **A.**    I'm fabulous.

19  **Q.**    I represent Mr. Ayodele.

20  **A.**    Uh-huh.

21  **Q.**    And you know him?

22  **A.**    Uh-huh.

23  **Q.**    And let me just -- just a very few questions.  You,

24  yourself, have or have owned more than one phone at one time.

25  Is that fair?

1   **A.**   I've changed phone numbers multiple times, but, you know,

2   I done had, like, at least three, four phones.

3   **Q.**   Okay.

4   **A.**   I don't -- I don't keep up with that.  I don't keep up

5   with no numbers.

6   **Q.**   All right.  But have you ever owned more than one phone

7   at a time?  Just curiosity.

8   **A.**   No.  I always have one phone.

9   **Q.**   Okay.  Now, you know Mr. Ayodele.  The prosecutor was

10   asking you about a white vehicle.  Did you know during your

11   relationship with him that he at times owned more than one

12   vehicle?

13   **A.**   No.

14   **Q.**   Okay.  All right.

15   **A.**   I've only seen one vehicle.

16   **Q.**   Would you be --

17   **A.**   It was white.

18   **Q.**   Would you be familiar with whether he did or did not?

19   **A.**   He did -- I only saw one vehicle.

20   **Q.**   Okay.

21   **A.**   It was the white vehicle.

22   **Q.**   Okay.  But you wouldn't know if he owned other vehicles?

23   **A.**   No.

24         **MR. TRAVIS:**  Okay.  Thank you, Your Honor.

25         **THE COURT:**  Redirect?

1    **MR. MIMS:**  Very briefly.

2                        **REDIRECT EXAMINATION**

3    **BY MR. MIMS:**

4    **Q.**   Ms. Jordan, do you remember being interviewed by case

5    agents in this case?  Were you ever interviewed by a federal

6    postal inspector?

7    **A.**   Somebody called years ago over the phone.  We talked over

8    the phone.  I never met nobody.

9         **MR. TRAVIS:**  May I review the document?

10        **MR. MIMS:**  There's no document right now.

11        **MR. TRAVIS:**  Okay.

12   **BY MR. MIMS:**

13   **Q.**   So you talked to somebody who did a phone -- telephone

14   interview?

15        **MR. TRAVIS:**  Your Honor, I'm going to object to this

16   redirect.  I didn't go into that on cross.  It's improper

17   redirect.

18        **THE COURT:**  Possibly.  I just don't know what the

19   question is.  So let's approach.

20      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

21        **MR. MIMS:**  Your Honor, the question just simply goes

22   to her memory and credibility.  She had a -- she was

23   interviewed by a case agent.  She explained what her phone

24   number was.  Now she doesn't remember this phone number.

25             I just want to establish that she did talk to

1  Mr. Stephen Mathews or talked to a case agent on the telephone.
2  I'm not going to get into what she told him.  I just want to
3  establish that she talked to him.
4           **MR. TRAVIS:**  May I reply?
5           **THE COURT:**  Yes.
6           **MR. TRAVIS:**  All I asked on cross was whether or not
7  she owned more than one phone, whether or not Mr. Ayodele --
8  whether she knew if he owned more than one vehicle.  I didn't
9  get into anything else.  It would be improper redirect.
10          **THE COURT:**  It's sustained.
11      (END OF BENCH CONFERENCE.)
12          **MR. MIMS:**  Your Honor, I have no further questions.
13          **THE COURT:**  Thank you.  May she be finally excused?
14          **MR. MIMS:**  Yes, Your Honor.
15          **THE COURT:**  Okay.  You may step down.  You're excused,
16  ma'am.
17          Is this a good time to take a break?
18          **MR. MIMS:**  Yes, Your Honor.
19          **THE COURT:**  Okay.  So, ladies and gentlemen, we're
20  going to take a break at this time for 15 minutes.
21          Your next witness is going to be by Zoom.  Am I
22  correct, Government?
23          **MR. MIMS:**  Yes.
24          **THE COURT:**  Okay.  Your next witness is going to be by
25  Zoom.  So we've got to kind of get equipment set up and that

1   kind of thing. But this witness might take a little while.

2   I'll have to kind of judge that as we get closer to the noon

3   hour, a good quitting time, but I would suggest you take a

4   break right now before we get into that witness. You're

5   excused.

6       (JURY OUT.)

7       **THE COURT:** Okay. So, Counselors, we'll take a recess

8   for about 15 minutes. Clay Vaughn is coming to set up IT. I'm

9   just saying you might have to move around a bit to get to a

10   good screen. So we'll have to see how we can set that up.

11       **MR. LEWIS:** This doesn't have to be on the record.

12       (CONFERRING OFF THE RECORD.)

13       **MR. CHINICHE:** If we wanted to use exhibits that are

14   already admitted --

15       **THE COURT:** Yeah.

16       **MR. CHINICHE:** -- with this witness, cell phone

17   records, will we be able to do that?

18       **MR. McGEE:** Yes.

19       **THE COURT:** Yes. Now, you need a little practice. So

20   when Clay gets here, let him talk to you about the camera and

21   the location and the best place to actually lay those exhibits

22   for the witness to see them.

23       **MR. CHINICHE:** Thank you.

24       **THE COURT:** Okay. Thank you.

25       (RECESS TAKEN.)

1  **MR. LEWIS:**  If you'll recall, Your Honor, you had --
2  I'm sorry -- we had presented this ore tenus motion about the
3  pie shapes.

4  **THE COURT:**  Yes.

5  **MR. LEWIS:**  I was not sure the Court had ruled on
6  that.  The Government thinks the Court has, but I just wanted
7  to get clarification as to whether my motion was granted or
8  denied.

9  **THE COURT:**  Okay.  I actually thought of that
10  yesterday because I don't think I made myself very clear.  My
11  intent was to overrule the objection, but I think what I had
12  mentioned is that there might need to be -- from the Court,
13  there might need to be a limiting instruction at the time
14  before the graphs are done just so there's not a
15  misunderstanding.

16  You know, I don't want the jury to listen to all of
17  that and have a misconception that I might could clear up from
18  the beginning so they view all of the testimony in a different
19  light.  So I'm receptive to y'all conferring and deciding
20  whether or not I should attempt to explain that through an
21  instruction from the beginning.

22  If not, it certainly -- it seemed like to me y'all
23  kind of agreed but you just had a different way to approach it.
24  That's got to be clear to the jury.  I mean, they're going to
25  be a bit overwhelmed with this technology and information, and

 1  we don't need to make it any more difficult than it has to be.

 2          **MR. McGEE:**  Yes, Your Honor.  And I intend to ask him

 3  a couple of times, to make sure they hear it, that nobody is

 4  saying that they are in the shaded area.

 5          **THE COURT:**  Okay.  Make it clear.

 6          **MR. McGEE:**  And then they can clear it up on cross as

 7  well.

 8          **MR. LEWIS:**  So in light of that, Your Honor, I think

 9  what we're going to do to try to expedite is pre-admit some

10  exhibits that he wanted to introduce through this witness --

11          **THE COURT:**  Okay.

12          **MR. LEWIS:**  -- to make things run smooth.

13          **MR. McGEE:**  Your Honor, there's three videos and a

14  slide show on this.

15          **THE COURT:**  Give me the numbers.

16          **MR. McGEE:**  This is Government's Exhibit 25.

17          **THE COURT:**  G-25.

18          **MR. McGEE:**  It will contain those four files.  Of

19  course, they've already seen them.

20          **THE COURT:**  Okay.

21          **MR. McGEE:**  And it will just make it, I think, go more

22  smoothly considering he is remote and not here.

23          **THE COURT:**  Okay.

24          **MR. McGEE:**  So would you like me to just state it -- I

25  mean, before I even get into the witness, just state this is in

1  evidence?

2          **THE COURT:**  Yes.

3          **MR. McGEE:**  Or offer it and then --

4          **THE COURT:**  So they hear it, and I'll admit it.

5          **MR. McGEE:**  Your Honor, one last question just to make

6  sure I understand.  When I showed this -- we went through this

7  last week, but I want to make sure when I show this document --

8  if it will -- if it will focus here.  Do I need to hit manual

9  focus or -- there we go.

10          All right.  So what I want to make sure is, number

11  one, Mr. Moody can see that.  And, Mr. Moody, you can see that?

12          **THE COURT:**  Can he talk to us?

13          **COURTROOM DEPUTY:**  Hang on just a second.

14          **MR. McGEE:**  So, again, it's not focusing, but I think

15  he can -- Mr. Moody, can you see that document?

16          **THE WITNESS:**  Yeah.

17          **MR. McGEE:**  Okay.  And it is on the jury, so just

18  letting y'all know.  I think when you put it on here he can see

19  it and the jury can see it.

20          **THE COURT:**  The jury can see the document?

21          **MR. McGEE:**  Can see the document on their screens in

22  front of them, and then they can see the witness right here.

23          **THE COURT:**  Okay.  I got you.

24          **MR. McGEE:**  That's all I have, Your Honor.  Thank you.

25          **THE COURT:**  Okay.  Bring them in.

1          **MR. LEWIS:**  Those documents are already admitted?

2          **THE COURT:**  I think he's going to admit them actually

3     in the presence of the jury, but I know they're going to be

4     received.

5          **MR. LEWIS:**  Sure.

6          (JURY IN.)

7          **THE COURT:**  Okay.  You may have a seat.

8          Let the record reflect that the jury is back in the

9     courtroom.

10         Ladies and gentlemen, the screen is being positioned

11    to where hopefully all of you can see the screen.  I'm going to

12    rely on the screen here to my left for those that will be

13    examining the witness and then allow you to view that one.

14         From time to time, documents may be shown to you as

15    well as this witness.  The marvel of technology.  And so just

16    know that if documents are shown, then you're going to see them

17    on your individual screens there.  Okay?

18         Let's test audio and just make sure we're okay.

19         **MR. McGEE:**  Mr. Moody, can you hear me?

20         **THE WITNESS:**  Yes, sir.

21         **MR. McGEE:**  Thank you.

22         Your Honor, at this time, the Government would move --

23    again, we spoke about this previously, but the Government would

24    move to admit G-25, which contains three videos and one

25    PowerPoint slideshow, into evidence.

Moody - Direct

1      **THE COURT:**  No objection -- I heard no objection

2    during the break.  That will be received.  G-25 is received.

3      (EXHIBIT NO. G-25 ADMITTED INTO EVIDENCE.)

4      **MR. McGEE:**  Could you state your name for the record?

5      **THE WITNESS:**  Yes.  My name is Christopher Moody.

6      **COURTROOM DEPUTY:**  He hasn't been sworn.

7      **MR. McGEE:**  They're going to swear you in first.

8    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

9      **CHRISTOPHER MOODY, GOVERNMENT'S WITNESS, AFTER BEING**

10   **DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS VIA ZOOM:**

11                    **DIRECT EXAMINATION**

12   BY MR. McGEE:

13   **Q.**   Could you state your name again for the record?

14   **A.**   Yes.  My name is Christopher Moody.

15   **Q.**   And, Mr. Moody, by whom are you employed?

16   **A.**   I'm employed by the United States Postal Inspection

17   Service.

18   **Q.**   And what's your position there?

19   **A.**   I'm currently the technical surveillance coordinator for

20   the inspection service.

21   **Q.**   Okay.  And what kind of things -- what kind of duties

22   does that involve?

23   **A.**   So that involves doing investigation analysis of new

24   technologies for investigation.  I manage two senior technical

25   surveillance specialists.  I act as a subject matter expert on

1  GIS mapping and also on communications intercept.

2  **Q.**   Okay.  And do you work on -- just to kind of put it in

3  layman's terms, do you work on phone records and geolocation

4  records from Google and other social media platforms?

5  **A.**   Yes, I do.

6  **Q.**   And how long have you been doing that?

7  **A.**   I've been doing that for approximately 13 years total,

8  the last three years as a technical surveillance coordinator.

9  **Q.**   Okay.  And let me -- let me stop you there.  So you're

10  obviously on Zoom today, and I don't want to get into any

11  details or anything.  I don't want to get into any personal

12  medical issues, but you were not authorized to travel down

13  here; is that correct?

14  **A.**   That is correct.

15  **Q.**   And -- but you're the guy -- you're the analyst that's

16  been working on this case; correct?

17  **A.**   That is correct.

18  **Q.**   Okay.  So have you been certified or recertified?

19  **A.**   Yes.  I have taken training courses from the FBI task

20  team, from NATIA, from PenLink, CellHawk, and other providers

21  in phone analytics.

22  **Q.**   Okay.  And how often is that training -- how often do you

23  get that training?

24  **A.**   So I take some form of that training every year from

25  different providers, different training classes.

1 **Q.** And is that because technology is ever changing; is that
2 right?

3 **A.** Yes. The technology is always changing. The way that
4 the different providers handle phone records is always
5 changing, and the way that their towers work is always
6 changing.

7 **Q.** Okay. And what's your educational background?

8 **A.** So I'm a certified electronics technician. I have an
9 associate's degree in computer sciences with a major in
10 criminal justice and a bachelor's in computer forensics and
11 digital investigations.

12 **Q.** And prior to today's testimony, have you been qualified
13 as an expert with specialized knowledge in regards to cell
14 phone location data?

15 **A.** Yes, I have.

16 **Q.** And where was that?

17 **A.** That was in the Western District of Tennessee in Memphis
18 courthouse.

19 **Q.** Okay. And how many times was that?

20 **A.** That was twice.

21 **Q.** And have you ever been rejected as an expert?

22 **A.** No.

23 **MR. McGEE:** Your Honor, at this time, the Government
24 would move to admit Mr. Christopher Moody as an expert in the
25 field of cell site and geolocation/historical location records.

1    **THE COURT:** Do you wish to voir dire?

2    **MR. LEWIS:** I do, Your Honor.

3    **THE COURT:** Mr. Lewis, you may come forward to

4    voir dire this expert on his qualifications.

5                        **VOIR DIRE EXAMINATION**

6    **BY MR. LEWIS:**

7    **Q.** Hi, Mr. Moody. My name is Goodloe Lewis. So I believe

8    you're going to offer testimony today in two areas, and the

9    first is -- this is what the Government called it -- cell phone

10   technology, cell towers, and analysis of historical cellular

11   phone records for determining location. Does that sound right?

12   **A.** That sounds correct.

13   **Q.** Okay. And then the second topic is device location

14   analysis, location data analysis, and Google location data

15   history analysis for the purpose of determining approximate

16   location. Does that sound right?

17   **A.** Yes.

18   **Q.** So, for shorthand, I'm going to call these two separate

19   topics historical cell phone records and Google location data.

20   Does that sound fair?

21   **A.** Sounds fair.

22   **Q.** Okay. So we're going to start on historical phone

23   records. To be clear, the technology that you're about to

24   testify today, even in 2023, has only been validated in the law

25   enforcement community; right?

1  **A.**    As far as cell phone technology?

2  **Q.**    Historical cell --

3  **A.**    No.  Cell phone --

4  **Q.**    Go ahead.

5  **A.**    So even the providers use some form of historical cell

6  phone analysis for doing site survey and use of their data

7  towers on how well they're working.  So that's not a totally

8  correct statement that only law enforcement uses the location

9  technology.

10 **Q.**    That's not exactly what I'm asking.  I'm asking, has the

11 greater scientific community validated this historical cell

12 phone data that you're going to testify about, or has it mainly

13 just been validated by law enforcement?

14 **A.**    I know that it has been validated by law enforcement.  I

15 can't say outside of that what other scientific investigations

16 have been done.

17 **Q.**    Fair enough.  And, obviously, law enforcement has a

18 vested interest in this being reliable and admissible; right?

19 **A.**    Law enforcement does have an interest in the testimony of

20 the data.  I don't know that it (audio interference) because we

21 also use it to exclude suspects or targets.

22 **Q.**    Well, okay.  I think you answered my question, which is

23 that law enforcement is testifying about this stuff in trials,

24 that is, people like you, and, therefore, law enforcement has

25 an interest in it being reliable, else you wouldn't be here;

1  right?

2  **A.**  Okay.

3  **Q.**  All right.  So do you -- do you know of any authoritative
4  journals or publications in the area of cell tower historical
5  data that I can access that are not Government documents?

6  **A.**  Not that I'm aware of.

7  **Q.**  Okay.

8  **A.**  But I do know that you have contracted individuals from
9  your firm to provide evidence.  So, evidently, they have access
10  to these reports.

11  **Q.**  But you don't know one way or the other whether that
12  comes from law enforcement or the greater scientific community.
13  You just don't know?

14  **A.**  No.

15  **Q.**  All right.  So I'm going to turn now to the Google
16  location data history.  And you have never testified about that
17  to a jury before?

18  **A.**  No.

19  **Q.**  To be even clearer, nobody has ever testified about that
20  to a jury before?

21  **A.**  I do not know that that is accurate.

22  **Q.**  You don't know one way or the other?

23  **A.**  I don't know that your statement is accurate.  So I
24  cannot --

25          **MR. McGEE:**  Your Honor --

Moody - Voir Dire Examination

1  **A.**    -- answer one way or the other.

2  **BY MR. LEWIS:**

3  **Q.**    Okay.

4          **MR. McGEE:**  May we approach?  I have an objection.

5          **THE COURT:**  Okay.

6      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

7          **MR. McGEE:**  Your Honor, first of all, I think it's

8  outside the scope of voir diring the expert, but, secondly, I

9  think he's -- Mr. Lewis has been making generalizations about

10 how many trials this has been in.  And, I mean, they cited a

11 case where it had been extensively litigated, and he is making

12 it sound like this is the first case that has ever used Google

13 location, which is kind of not true.

14         **MR. LEWIS:**  I'm being very careful to say before a

15 jury in a jury trial.  And he didn't know.  He has answered the

16 question.  I don't think I'm going to ask him anything else

17 about trials.

18         **THE COURT:**  Okay.  Stay within the voir dire.  Okay?

19 Thank you.

20     (END OF BENCH CONFERENCE.)

21 **BY MR. LEWIS:**

22 **Q.**    This is, assuredly, a novel theory about this Google

23 location data; right?  It hasn't been around very long?

24 **A.**    Well, Google hasn't been around very long either.

25 Technology continues to grow, and we keep getting new tools.

1 **Q.** Okay. So it -- you've given us your CV in this case;
2 correct?

3 **A.** Correct.

4 **Q.** That's like your résumé, your qualifications; correct?

5 **A.** Correct.

6 **Q.** And your CV contains no mention of having Google geofence
7 training; correct?

8 **A.** Correct.

9 **Q.** There have been no studies or analysis by somebody other
10 than Google or the Government to state that this theory about
11 geofence location is reliable or unreliable; right?

12 **A.** Not to my knowledge.

13 **Q.** You're not aware of any scientific studies that have
14 tested this theory to determine if it's reliable?

15 **A.** Not to my knowledge.

16 **Q.** You're not aware of any peer review publications
17 discussing this technology and validating its reliability?

18 **A.** Not to my knowledge.

19 **Q.** You do not know the error rate?

20 **A.** Don't know that there is a current error rate available,
21 no, if that's what you're asking.

22 **Q.** That was going to be my next question. The error rate
23 has never been determined; correct?

24 **A.** Neither has the positivity rate, for that matter.

25 **Q.** Okay. And this theory has not attained widespread

Moody - Voir Dire Examination

1    acceptance in the greater scientific community?  I'm not

2    talking about just the law enforcement community.

3    **A.**    Well, proximity analysis in targeted marketing does have

4    widespread acceptance.  So there are other communities out

5    there, not necessarily scientific communities, that are using

6    location history from these for targeted marketing.

7    **Q.**    Okay.  I'm asking you about the greater scientific

8    community, though.  You're not aware of anything?

9    **A.**    Yeah.

10    **Q.**    You're not aware that it's obtained widespread acceptance

11    in the greater scientific community?

12    **A.**    No.  And I don't know what relevant -- or what reason the

13    scientific community would be investigating either.

14              **MR. LEWIS:**  Your Honor, that's all of my voir dire,

15    and I do have an objection.

16              **THE COURT:**  Okay.  Let me allow the others to voir

17    dire.

18              Mr. Chiniche?

19              **MR. CHINICHE:**  No, Your Honor.

20              **THE COURT:**  Mr. Travis?

21              **MR. TRAVIS:**  No.  Thank you, Your Honor.

22              **THE COURT:**  Do I hear your objection?

23              **MR. LEWIS:**  I'll state it in front of the jury or

24    wherever you want me to state it.

25              **THE COURT:**  Okay.  State your objection.  I may call

Moody - Voir Dire Examination

1  you to the bench.

2          **MR. LEWIS:**  So, Your Honor, we're talking about two

3  separate topics that he's going to talk about.  One is the

4  historical cell phone data records.  My objection to that is

5  simply and only that it has not been validated by the greater

6  scientific community.  That is my objection to that.

7          **THE COURT:**  Does the Government wish to respond?

8          **MR. McGEE:**  Can we approach the bench for my response,

9  Your Honor?

10          **THE COURT:**  Pardon?

11          **MR. McGEE:**  I think we need to approach the bench with

12  my response.

13          **THE COURT:**  You may.

14      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

15          **MR. McGEE:**  Obviously, the Government believes that

16  Mr. Moody is more than qualified to be an expert and frankly

17  hasn't -- this is the first time I have heard any objection to

18  any qualifications or whatnot.

19          But, secondly, I find it peculiar that they actually

20  called an expert for the same exact purpose in the motion to

21  suppress hearing -- so they offered an expert in this same

22  realm, this Google location records, and we didn't have an

23  objection.  The Court admitted.  And he has the similar

24  qualifications as this man.  Probably Mr. Moody has more.  And

25  so we would -- we would submit --

Moody - Voir Dire Examination

1    **THE COURT:** Any response?

2    **MR. LEWIS:** I don't have any additional argument.

3    **THE COURT:** I am going to allow the witness to

4    testify. So the objection is overruled, and you are free to

5    handle these things on cross.

6    **MR. LEWIS:** Do you want to hear me on the Google --

7    may I be heard on the Google objection as well?

8    **THE COURT:** Yes, you may.

9    **MR. LEWIS:** My objection is novel theory. I don't

10   think anybody has testified about this before in front of a

11   jury. He has not stated any of the basic fundamental factors

12   that *Daubert* requires an expert to testify as to a theory.

13   He doesn't know the error rate. There has been no

14   peer review. There has been no validation in the scientific

15   community. He has not testified this theory is generally

16   accepted. None of those factors. It is just absolutely none.

17   He is the least qualified witness he can be on this subject.

18   **THE COURT:** Again, I'm going to allow him to testify

19   as the Government's expert. I overrule the motion. These

20   matters could better be served on a motion -- *Daubert* motion,

21   but, you know, you're going to have a lot of latitude in

22   cross-examination to make this jury understand that this is

23   novel technology. So proceed.

24   **MR. LEWIS:** Okay. Thank you.

25   (END OF BENCH CONFERENCE.)

1    **MR. McGEE:** Your Honor, so, at this time, the

2    Government would move to admit Christopher Moody as an expert

3    in the field of cell site and geolocation/historical location

4    services.

5         **THE COURT:** Thank you.

6         The Court has had the opportunity to hear objections

7    at the bench.  Having heard those objections, the Court

8    overrules the objection, allows this person to testify as an

9    expert in those fields for the Government.

10        **MR. McGEE:** Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12   **BY MR. McGEE:  (CONTINUING)**

13   **Q.**   Mr. Moody, what is a communications intercept?

14   **A.**   So a couple of terms.  Communications intercept is when

15   law enforcement collects data on individuals using

16   communication devices or applications.

17   **Q.**   Okay.  And who else collects information on -- from

18   communications?

19   **A.**   So communications data is collected by phone carriers

20   that provide service.  It's collected by applications that are

21   being used by individuals, and it's being collected by

22   organizations such as Google, Bing, and other agencies that

23   process data.

24   **Q.**   Okay.  And what is a cell site?

25   **A.**   So a cell site, in simple terms, is one half of a

1  communication between a cell phone and another party.  So your
2  individual would have a cell phone.  It talks to a cell site,
3  which is a tower or a set of antennas on a building somewhere
4  that received that signal, and then transferred either to
5  another cell tower or to a landline phone.
6  **Q.**   Okay.  And then -- so, as far as cell sites on the tower,
7  explain to the jury a little more about that.  We've heard a
8  little bit already about sectors.  If you could explain to the
9  jury what that means.
10 **A.**   So a cell site generally can have either a single sector
11 or multiple sectors.  The sectors are basically the direction
12 that the antennas are facing.  So, if a tower has three
13 sectors, they would have three sets of antennas.  One facing at
14 30 degrees, one facing at 120 degrees, and another facing at
15 240 degrees that would give you the whole coverage of the
16 tower.
17 **Q.**   And do certain towers have different sectors?
18 **A.**   Yes.  Towers can have what they call omni pole towers,
19 which are single sector 360-degree coverage.  They can have
20 three sectors, six sectors, nine sectors, depending on the
21 volume and location of the tower.
22 **Q.**   Okay.  What is the best way to describe what a cell phone
23 does?
24 **A.**   So the simplest way to -- a cell phone is like an old
25 school walkie-talkie.  It's a radio transceiver --

Moody - Direct (Continuing)

1  transmitter/receiver that sends a signal to the tower, and the

2  tower sees that, forwards it through a switch to the phone

3  company, and then sends that which is received on the cell

4  phone itself.

5  **Q.**    And who -- who collects or stores that data after that

6  phone call is made?

7  **A.**    So that data is collected and stored by the service

8  provider, whether it be T-Mobile, AT&T, Verizon, or any other

9  service provider.

10 **Q.**    Does each provider have its own tower?

11 **A.**    Yes.  Most providers have towers, but there are providers

12 that are called MVNOs or mobile virtual network operators that

13 lease towers from the major providers.

14 **Q.**    You said lease towers?

15 **A.**    Yes.  So they use someone else's -- like, an AT&T

16 tower -- Cricket, which is an MVNO, uses AT&T towers.  Consumer

17 Cellular, which is another MVNO, uses Verizon towers.

18 **Q.**    How does the phone know which tower to communicate with?

19 **A.**    So the phones are programmed to their provider, to talk

20 to their towers first, and then if their tower is not

21 available, they would do what's called roaming, where they

22 would talk to an available tower on another provider that they

23 have contracts with.

24 **Q.**    And why would a tower not be available?

25 **A.**    So towers could not be available for many reasons, one of

Moody - Direct (Continuing)

1  which could be service.  If a tower got hit by lightning or a

2  phone company disruption on the landline handling it, then that

3  tower may not work.  So it may go to the next nearest tower.

4  Or --

5  **Q.**    What about tall buildings?

6  **A.**    -- it could be overcrowded.

7  **Q.**    Okay.  So you said overcrowding.  What about tall

8  buildings, could that -- or elevations such as mountains?

9  **A.**    A mountain could block a signal, or you could be too

10  close to a tower to get a signal from a given tower.

11  **Q.**    What about a rural flat area?  Would it be easier to

12  get --

13  **A.**    Rural flat area?

14  **Q.**    Would it be easier to get a cell signal --

15  **A.**    They're going to give you --

16  **Q.**    I'm sorry.

17  **A.**    They're going to give you an -- easier to get a signal in

18  a straight area in a straight line, but you could be too close

19  to the tower.  So that's why another tower may pick you up.

20  **Q.**    Okay.  What does azimuth mean?

21  **A.**    Azimuth is the direction that the tower is pointing.  As

22  I mentioned earlier, my example of 30 degrees, 120 degrees,

23  240.  So it's the direction that the antennas are facing center

24  line.  And then the antennas generally go out 60 degrees on

25  each side, for a total of 120 degrees.

Moody - Direct (Continuing)

1  **Q.**    So could you hit on all -- could you technically hit on

2  all cell sectors in one tower?

3  **A.**    Only at different points in time.  Not simultaneously,

4  unless it's an omni pole sector, which is 360-degree coverage.

5            **THE COURT:**  Is that loud enough for you?

6            **JURORS:**  (Nod heads up and down.)

7  **BY MR. McGEE:**

8  **Q.**    Explain to the jury how -- how phone companies keep cell

9  site location information.

10  **A.**    So the phone companies have a master database that they

11  keep of their individual towers and locations that they update

12  regularly, and they provide that not only internally to their

13  customers but also to law enforcement and Government agencies

14  through the NDCAC or the National Domestic Communications

15  Assistance Center in Washington, D.C., for use for analysis for

16  cases.

17  **Q.**    Okay.  So service of process has to be sent to the phone

18  company in order to get phone records or especially phone

19  geolocation records; correct?

20  **A.**    Geolocation records have to be done with a search

21  warrant.

22  **Q.**    Okay.  Let's talk about Google.  Does Google store

23  location data?

24  **A.**    Yes, Google does store location data.

25  **Q.**    Is Google -- are they storing that data for law

Moody - Direct (Continuing)

1    enforcement?

2    **A.**   No, not particularly.

3    **Q.**   Okay.  Why would they store that data?

4    **A.**   They store that data because they use it to analyze for

5    their customers their travel patterns, their history patterns,

6    to make recommendations and sell advertising.

7    **Q.**   Okay.  And so let's be clear about what we're talking

8    about.  Earlier we talked about phone cell site location

9    records; right?

10   **A.**   Correct.

11   **Q.**   And that was with phone companies?

12   **A.**   Correct.

13   **Q.**   And now we're talking about Google location records.

14   Could those also be through the use of a phone?

15   **A.**   Yes.  If they're using a Google application on a phone,

16   then the data would correlate with the phone.

17   **Q.**   And they would also have to have their location services

18   on; correct?

19   **A.**   That is correct.

20   **Q.**   Do you have to be making a call or sending a text message

21   when Google stores location data on you?

22   **A.**   No, you do not.

23   **Q.**   What type of location data is Google storing?

24   **A.**   So Google is storing a location on the phone based on one

25   of three types of location input.  They will either have a GPS

1  location, a Wi-Fi location, or a cell tower location.  GPS

2  being the most accurate and then moving backward through Wi-Fi

3  or cell site location.

4  **Q.**   Okay.  So let's talk first about GPS location data.  So

5  if I am riding down the road and I've got my location services

6  turned on and I pull up Google Maps or e-mail or have e-mail

7  running in the background, then how is -- how could Google get

8  GPS on us -- on my phone?

9  **A.**   So your phone has -- your phone has GPS antennas in the

10  phone, and the phone is looking to sky -- and it needs to see

11  clear sky.  So you can't be in a parking deck or an obstructed

12  view.  And it has to see one of three -- or three of sixteen

13  geostational (sic) satellites that are in orbit.  And with

14  three satellites, it can pinpoint your location anywhere in the

15  world.

16  **Q.**   So, just to be clear, that's coming from a satellite, not

17  from a cell tower?

18  **A.**   That is correct.

19  **Q.**   So two totally different things?

20  **A.**   Yes.

21  **Q.**   Tell me about sci-fi because -- I mean -- not sci-fi --

22  Wi-Fi, because this was -- this was fascinating to me.  I learn

23  something every day.  Please tell me how Google -- for example,

24  in these records I'll show you later, it shows Wi-Fi is a way

25  that Google collected location information on a customer.  How

1  does that -- how does that work?

2  **A.**   So the way the Wi-Fi works, initially when Google set out

3  to google street maps and street view, they sent cars around

4  the country with cameras and radio receivers on the cars, and

5  those radio receivers captured the Wi-Fi access points as they

6  were driving along.  So they had the location of the access

7  point relative to anyplace that they drove.  They then used

8  that to create their maps.  Nowadays, it's used via Android

9  devices.  The Android phones collect the data and report it

10  back.

11  **Q.**   Okay.  So let me make sure I understand that.  If I have

12  my phone and I'm looking at the -- and I turn it on Wi-Fi, what

13  can I see?

14  **A.**   You're going to see the access points that are available

15  to you to connect to.  They're being broadcast at all times out

16  in the open.

17  **Q.**   Okay.  So, if, for example, you live next door to me and

18  I open up my phone, I may see the name of your Wi-Fi; is that

19  correct?

20  **A.**   That is correct.

21  **Q.**   Okay.  And so I -- again, I may have to explain just to

22  make sure I understand.  So you're saying that -- you're saying

23  that Google rode around and collected these Wi-Fi points or

24  open -- open Wi-Fi?

25  **A.**   Correct.

1  **Q.**    Is that right?

2  **A.**    Correct.  So the actual SSID or ID is broadcast openly.

3  It could be a closed or a restricted Wi-Fi where you need a

4  password to access it, but you could see that it was there

5  unless it was hidden.

6  **Q.**    So Google knows the location of that SSID number.  Is

7  that what you're saying?

8  **A.**    Yes.  They know the location of where they picked it up.

9  Their vehicle captured GPS location information when they saw

10  those IDs and where they were.

11  **Q.**    Okay.  So, if Google sends us records through a search

12  warrant that says the data was collected via Wi-Fi, that's how

13  they did it?

14  **A.**    That's how they knew that the Wi-Fi was there, and their

15  report showed that that Wi-Fi was available to be connected to

16  when they sort the location data.

17  **Q.**    And then you mentioned a third way.  I think you said

18  cell or cell towers?

19  **A.**    Cell sites.  Cell sites.

20  **Q.**    Cell sites?

21  **A.**    Yeah.  Cell sites.

22  **Q.**    Okay.  So third completely separate way.  Explain that to

23  the jury, please.

24  **A.**    So, at that point, their software could see the cell site

25  that they were connected to, and that would correlate to a cell

Moody - Direct (Continuing)

1   site that was belonging to a provider, and they know where

2   those cell sites are located.

3   **Q.**   And that's all through the cell phone?

4   **A.**   It's all through the cell phone.

5   **Q.**   And their database?

6   **A.**   Yes.

7   **Q.**   So, just to be clear, if I pull -- if I pull out my phone

8   right now and I pull up Google Maps -- or why don't we say

9   this.  If I'm in my car and I'm riding down the road and I pull

10  up Google Maps and it drops a blue dot on top of me, is that

11  going to be accurate?

12  **A.**   Google has the idea in their company -- they want that to

13  be accurate 68 percent of the time.

14  **Q.**   Okay.  And -- okay.  What tools -- what tools did you use

15  in this case, in other words, software tools, to interpret and

16  analyze -- let's start with the phone location data?

17  **A.**   So, with the phone location data, we used primarily PLX,

18  which is an analytical software provided by PenLink.

19  **Q.**   And in layman's terms, explain to the jury what that

20  does.  Like, how does it work?

21  **A.**   So the records that we receive from phone providers come

22  in many different formats.  Some of them come as Excel CSV

23  files.  Some of them are PDF documents.  And what PLX does is

24  basically takes those different forms and puts them into a

25  database and standardizes the columns so that they can be

Moody - Direct (Continuing)

1   analyzed --

2   **Q.**   And what -- what --

3   **A.**   -- so that everything is the same --

4   **Q.**   Everything is what?  Could you repeat that last part?

5   **A.**   Everything is in the same -- in order.

6   **Q.**   Okay.  So what you're saying is you could put multiple

7   records into this PLX program, and then what would you do with

8   those records?

9   **A.**   So the analysis would then be depending on the case

10  specific, whether you're looking to see maybe a time-fixed

11  analysis, what phones were active during any given point or who

12  was talking to who at some point in the investigation, or

13  mapping the devices, where were the phones during an existing

14  time frame.

15  **Q.**   Okay.  So, just to be clear, making sure I understand

16  what you said, you said you could take -- you could take cell

17  phone records, put it in PLX, and it would spit out a map that

18  would show where the phones were?

19  **A.**   You can create a map from PLX, yes.

20  **Q.**   Okay.  What is CellHawk?

21  **A.**   CellHawk is another tool that we use, sometimes with

22  phone records and with Google records for mapping location

23  information.

24  **Q.**   And does it -- is it similar to PLX?

25  **A.**   It's more to the mapping side than the analytical side of

1  investigations.

2  **Q.**   Okay.  And can it create animated maps?

3  **A.**   Yes.

4  **Q.**   Were you asked to do some analysis on T-Mobile, AT&T,

5  C Spire, and Google records in this case?

6  **A.**   Yes, I was.

7       **MR. McGEE:**  I'm showing the witness what's been

8  previously marked G-5A.

9  **BY MR. McGEE:**

10 **Q.**   And this is Government's Exhibit G-5A.  Do you recall

11 doing some analysis on these T-Mobile records?

12 **A.**   Yes, I do.

13 **Q.**   Okay.  And what is the number there on these T-Mobile

14 records?  Can you see that well?  Okay.

15 **A.**   No.  It needs to be zoomed in on this side.  Yes.

16 662-360-6029.

17 **Q.**   Okay.  And we've -- we've talked about this a bunch, but

18 I just want you to briefly touch on UTC time.  What exactly is

19 that?

20 **A.**   Okay.  UTC time is what you call Universal Time

21 Coordinated.  It basically aligns with Greenwich Mean Time, and

22 it's an international standard for time.  And that time is then

23 added or subtracted to based on where you are with reference to

24 Greenwich, England.  So, if you are in Central Time, you are

25 minus six hours from UTC --

1  **Q.**    Okay.

2  **A.**    -- for local time.

3  **Q.**    So, again, in February, you're going to be -- you're

4  going to be minus six; correct?

5  **A.**    I'd have to look and see how you handle daylight savings

6  time to give an accurate answer.

7  **Q.**    Okay.  So let's look at this.  This is Government's

8  Exhibit 7E.  And did you -- well, did you receive these AT&T

9  records also and use them in your analysis?

10 **A.**    I'm waiting for it to come up.  Can you move it up to

11 the -- oh, there it is.  Yep.

12 **Q.**    Okay.  So you did --

13 **A.**    Those are mobility records.

14 **Q.**    You did analysis on 228-596-4000; is that correct?

15 **A.**    That's correct.

16 **Q.**    This is Government's Exhibit G-6A.  This is -- we'll just

17 speed this up.  This is 662-710-7511, a C Spire phone.  Do you

18 recall that one?

19 **A.**    Yes, I do.

20 **Q.**    And did you use these records in your analysis?

21 **A.**    Yes, I did.

22 **Q.**    C Spire phone 662-209-0205 -- did you use these in your

23 analysis?

24 **A.**    Yes.

25 **Q.**    And you received those from -- you received those from

Moody - Direct (Continuing)

1  another postal inspector in this case; is that correct?

2  **A.**  That is correct.

3  **Q.**  And did you manipulate them or do anything to change them

4  before you put it into those programs you previously spoke of?

5  **A.**  No.

6  **Q.**  And so are those the accurate records from the phone

7  companies?

8  **A.**  Yes.

9  **Q.**  Okay.  Switching gears to Google, what was asked for in

10  the Google geofence historical location warrant?

11  **A.**  So, in the first part of the warrant, we asked for

12  obfuscated or hidden IDs for any users that were within a box

13  that was drawn around the post office in Lake Cormorant,

14  Mississippi.

15  **Q.**  Okay.  And did they respond?

16  **A.**  They did respond.

17  **Q.**  Okay.  And have you also put -- that data that Google

18  held, have you also put it into your program -- or I guess

19  which program did you put it in?

20  **A.**  So we put that into CellHawk and mapped the data that

21  they responded with.

22  **Q.**  And is this what we're talking about?  This is

23  Government's Exhibit --

24  **A.**  Yes.  That's their initial obfuscated response.

25  **Q.**  When you say "obfuscated," you just mean they've been

Moody - Direct (Continuing)

1   anonymized by Google; is that right?

2   **A.**   Yes.

3   **Q.**   Okay.  And then later they gave the subscriber to those

4   people; is that correct?

5   **A.**   That is correct.  Under a search warrant returned to

6   them, they did provide the subscriber information.

7   **Q.**   Okay.  And this -- the source here is -- looks like about

8   seven hits or eight hits.  The source is Wi-Fi, and then the

9   other one is GPS.  Is that what you were talking about earlier?

10  **A.**   That's what I was talking about earlier.

11  **Q.**   What is that display radius?  What does that mean?

12  **A.**   So the display radius is what they're considering -- how

13  accurate they believe that location to be.  So we're not saying

14  that the person or individual was exactly at 34.90403 degrees

15  or -- and negative 90.  We're saying they were within 11 meters

16  of that point.

17  **Q.**   Okay.  What's the best way to display those in your maps?

18  **A.**   So the way that those are generally displayed is a center

19  point with a shaded circle around the outside of that center

20  point, the shaded circle being the radius or area of accuracy.

21  **Q.**   So would that mean that Google is saying you're somewhere

22  in that dot -- I mean, in that circle?  Excuse me.  Not dot.

23  Circle.

24  **A.**   In that shaded -- somewhere in that shaded circle.

25  **Q.**   And, again, this is for the Google records?

1  **A.**    This is for the Google records.

2          **THE COURT:**  Would you identify that exhibit?

3          **MR. McGEE:**  Yes.  Thank you, Your Honor.  G-3A.  I

4  almost forgot.

5  **BY MR. McGEE:**

6  **Q.**    And then these are the two subscribers in question.

7  These have already been entered into evidence as G-4A.  Is this

8  what you were talking about earlier when you learned the

9  subscriber information?

10 **A.**    Yes.  This is the secondary return with subscriber

11 information.

12 **Q.**    That's G-4A.  Now, that's not all of the Google location

13 information that you received, was it?

14 **A.**    No, it's not.

15 **Q.**    What other Google historical location information did you

16 receive?

17 **A.**    So, after the subscribers were identified as persons of

18 interest, the inspector went back and got historical location

19 information prior to the robbery as well as some further post

20 information which we analyzed.

21 **Q.**    So, just to put it in layman's term, this was only for an

22 hour time period; is that correct?

23 **A.**    That is correct.

24 **Q.**    And what you're saying is you received more records with

25 a greater scope after a search warrant, a greater scope of

Moody - Direct (Continuing)

1   Google records on these two accounts; is that right?

2   **A.**   That is correct.

3       **MR. McGEE:**  Ms. Bailey, can you pull up Government's

4   Exhibit 4, the bleek.location.history.csv, please?  This has

5   already been entered into evidence under Government's

6   Exhibit 4.

7   **BY MR. McGEE:**

8   **Q.**   Is this the records we were just talking about?  Can you

9   see that?

10   **A.**   One second.  Yes.  That's one set of the records we were

11   just talking about.

12   **Q.**   Okay.  And it's got -- it lists the device tag there that

13   we just talked about, the anonymous -- the anonymized number;

14   correct?

15   **A.**   If you'd zoom in on the device tag.

16   **Q.**   Yeah.  Is that better?

17   **A.**   That's better.  Device tag -- I'd have to look to see if

18   that was -- have to cross-anonymize, but, yeah, that is --

19   appears to be the same.

20   **Q.**   And I can show you that in a moment.

21       **MR. McGEE:**  All right.  So if you don't mind pulling

22   up the --

23   **BY MR. McGEE:**

24   **Q.**   And up here -- if we look at the top here, it says

25   bleek.location.history.csv.

1    **THE COURT:**  Not so fast.

2    **MR. McGEE:**  Sorry, Your Honor.

3    **BY MR. McGEE:**

4    **Q.**    Bleek.location.history.csv.  And this is the data that

5    was received from Google; correct?

6    **A.**    That is correct.

7    **Q.**    So I'm about to pull up Government's Exhibit 4.  Okay.

8    Mr. Moody, can you see that device tag?

9    **A.**    Yes.

10   **Q.**    And since I can't show you the ELMO at the same time, I'm

11   just going to read it out from the Government's Exhibit 3A.

12   1577088768.  Is that what that says there on the Excel

13   spreadsheet?

14   **A.**    Yes, that is.

15   **Q.**    Okay.  And up top, it says

16   jamarrsmith33@gmail.locationhistory.csv?

17   **A.**    Correct.

18   **Q.**    And that's what was received from Google?

19   **A.**    Correct.

20   **Q.**    And, again, that's Government's Exhibit 4.  So did you

21   rely on the records produced by the phone companies and Google

22   in your -- in your analysis?

23   **A.**    Yes, I did.

24   **Q.**    And when you received those records, how did you go about

25   your analysis?

Moody - Direct (Continuing)

1  **A.**   So, when I received the records, I put the records into

2  CellHawk for the Google location information and PLX for the

3  phone record information and then, based on information about

4  the case, filtered to dates and time relevant to the case to

5  see what, if any, actions the phones were taking, whether they

6  corresponded with the information we have about the case or

7  whether it ruled them out from being involved.

8  **Q.**   And can Google location data be even more accurate than a

9  cell site or tower data?

10 **A.**   Yes, most definitely.

11 **Q.**   So, again, you mentioned this earlier, but we're talking

12 about February 5th of 2018; is that correct?

13 **A.**   That is correct.

14 **Q.**   And were you provided data from the towers near the Lake

15 Cormorant area?  Are you familiar with that area now?

16 **A.**   I am now familiar with that area, yes.  And I was

17 provided with data from cell phones that hit on towers in and

18 around the Lake Cormorant area.

19 **Q.**   Okay.  And I'm not going to -- I'm not going to pull

20 these up one by one because I think it would be too hard, but

21 you have made a -- you have made a -- three videos and a

22 PowerPoint, and that encompasses all of your data that you've

23 analyzed in this case; is that correct?

24 **A.**   That is correct.

25 **Q.**   Mr. Moody, I'm now going to pull up the slideshow first.

1  This is Government's Exhibit 25 that's been admitted into
2  evidence.

3      MR. McGEE:  Go ahead to Slide 2, please.
4  BY MR. McGEE:

5  Q.    I think I already asked you this, but this slideshow is
6  based on the data that was provided to you from the phone
7  companies and Google; correct?

8  A.    That is correct.

9  Q.    Okay.  Can you see that okay?

10  A.    Yes, sir.

11      MR. McGEE:  Just to be sure, can the jury see that?
12      JURORS:  Yes, sir.

13      MR. McGEE:  Okay.  Thank you.

14  BY MR. McGEE:

15  Q.    What are we looking at here, Mr. Moody?  What are we
16  looking at here?

17  A.    So these are the phase one returns for Jamarr Smith's
18  phone at the post office in Lake Cormorant.  If you look at the
19  big white building that is center and north in the map, that is
20  a farm right behind the post office.  Just below that, you see
21  a little black roof.  That is the actual post office.

22  Q.    Okay.  So would it be fair to state it's right above that
23  big yellow circle?

24  A.    Yes, that would be fair to say.

25  Q.    And this is in Lake Cormorant, Mississippi?

Moody - Direct (Continuing)

1   **A.**    It's in Lake Cormorant, Mississippi.

2   **Q.**    And whose Google locations are these?

3   **A.**    These are Jamarr Smith's Google locations.

4   **Q.**    Okay.  And what are the dates and time of these hits?

5   **A.**    So this was the one-hour period on the date of the

6  robbery.  This was the initial return from Google.

7   **Q.**    Okay.  And what are the -- what are the --

8   **A.**    17:22, 17:24, 17:25.

9   **Q.**    And so it looks like that the six UTC has already been

10  taken off.  So these are Central times; is that correct?

11   **A.**    That is correct.

12   **Q.**    So that would be 5:22 through 5:25; is that right?

13   **A.**    That is correct.

14   **Q.**    And what were the types of hits -- how did Google collect

15  this information?  What did they use?

16   **A.**    So these were hits on GPS.  So these are the most

17  accurate.  And they range anywhere from 11 meters to 37 meters

18  in accuracy.

19   **Q.**    And that leads to my next question.  Why are the circles

20  identified different sizes here?

21   **A.**    Because that, as we talked about earlier, shows the area

22  of accuracy for each hit.  The smaller circles are the 11 and

23  18 meters.  The larger is the 37 meters.

24         MR. McGEE:  Okay.  Next slide, please.

25  BY MR. McGEE:

Moody - Direct (Continuing)

 1  **Q.**   Mr. Moody, I'm on now Slide 3.  The previous one was

 2  Slide 2.  On Slide 3 of Government's Exhibit 25, what am I

 3  looking at here?

 4  **A.**   So these are that same one-hour time period return on

 5  Gilbert McThunel's phone.

 6  **Q.**   Okay.  I see there's -- this is from the geofence just to

 7  be clear; is that correct?

 8  **A.**   This is from the stage one geofence warrant.

 9  **Q.**   Okay.  And, again, do these circles accurately represent

10  the map's display radius in meters on the map?

11  **A.**   Yes.  Yes.

12  **Q.**   On the day in question?

13  **A.**   On the day in question.

14  **Q.**   And, just to be clear, these times are in military time,

15  and UTC -- has UTC already been taken out as it appears?

16  **A.**   UTC has already been taken out.

17  **Q.**   Okay.

18         **MR. McGEE:**  Okay.  Next slide.

19  **BY MR. McGEE:**

20  **Q.**   And this -- what slide is this?

21  **A.**   This is a combined with both of them being mapped at the

22  same time.

23  **Q.**   All right.  So it kind of covers up the yellow circles;

24  is that right?

25  **A.**   That is correct.

1    MR. McGEE:  Okay.  Next slide, please.

2    BY MR. McGEE:

3    Q.    Mr. Moody, what are we looking at here?

4    A.    So now we're looking at an overview of Gilbert McThunel's

5    Google history from -- I believe it was 3:30 through 6:30 on

6    the date of the robbery.

7    Q.    On the left hand in that -- in that box, is that where

8    you're reading the times from?

9    A.    Yes.

10   Q.    Okay.  And what's down here -- is that Batesville,

11   Mississippi?

12   A.    Yes.

13   Q.    And where did you get those -- the residence, did you get

14   that from Mr. Moody (sic) also?

15   A.    So those were provided by the inspector that was working

16   the case.

17   Q.    Okay.  And, again, where did you get these records?

18   A.    So these are Google records.

19   Q.    So this is not from the geofence; is that right?

20   A.    This is from the historical that was provided at stage

21   three or the third go-back to Google.

22   Q.    I think earlier Mr. Moody (sic) testified he followed up

23   with another search warrant sometime later.  Does that sound

24   right?

25   A.    The inspector went back to Google.  So they were -- they

1   approached Google three times during this process.  The first

2   time was for the anonymized data to see who touched the box;

3   the second time was to identify the subscribers; and the third

4   time was for historical of the suspects.

5   **Q.**    Okay.  I see what you're saying.  We just get confused

6   because we've talked a lot about three steps, but that's with

7   the geofence.  This is for more expansive records with a

8   separate search warrant; correct?

9   **A.**    So this would be the third step of the geofence, is the

10  more expansive warrant or the more expansive time frame.

11  **Q.**    Okay.  So let me ask you this.  And, again, you weren't

12  involved in that warrant process, were you?

13  **A.**    No, I was not.

14  **Q.**    Okay.  So -- but you got more expansive records from

15  Google that we just looked at in Government's Exhibit 4, which

16  is a more expansive time frame; is that correct?

17  **A.**    That is correct.

18  **Q.**    Okay.  And so you plotted or essentially used this

19  program; is that right?

20  **A.**    Yes.

21  **Q.**    And what program was that?

22  **A.**    So this was CellHawk.

23  **Q.**    Okay.  And so is this an accurate representation of what

24  was in those Google records that we looked at earlier,

25  Government's Exhibit 4?

Moody - Direct (Continuing)

1  **A.**   Yes.

2         **MR. McGEE:**  And that was Slide 5, Your Honor.

3  **BY MR. McGEE:**

4  **Q.**   Oh, and let me ask one more question about Slide 5.  What

5  is that red pin up there by Lake Cormorant?

6  **A.**   So that is the location of the Lake Cormorant post

7  office.

8  **Q.**   Okay.

9         **MR. McGEE:**  Okay.  Next slide.

10  **BY MR. McGEE:**

11  **Q.**   Okay.  What am I looking at here?

12  **A.**   So this is Jamarr Smith's phone -- or excuse me -- Google

13  history location for that same 3:30 to 6:30 time frame on the

14  date in question.

15  **Q.**   And what date is that?

16  **A.**   That was March 5th, 2018, I believe.

17  **Q.**   February 5th?

18  **A.**   February 5th.  Yes, I'm sorry.  February 5th, 2018.

19  **Q.**   And, again, what do the circles represent?

20  **A.**   So the circles are the point and area of accuracy for

21  each response from Google for location.

22  **Q.**   Okay.

23         **MR. McGEE:**  Next slide, please.

24  **BY MR. McGEE:**

25  **Q.**   This is Slide 7.  What am I looking at here?

Moody - Direct (Continuing)

1   **A.**    So this is an overlay of both Smith and McThunel's

2   geolocation information shown in the same map.

3   **Q.**    Okay.  And, again, this is accurate data; is that right?

4   **A.**    That is correct.

5   **Q.**    And it's received from Google?

6   **A.**    Yes.

7         MR. McGEE:  Okay.  Slide 8, please.

8   BY MR. McGEE:

9   **Q.**    Okay.  Little different map here.  What are we looking

10  at?

11  **A.**    So this is Jamarr Smith's cell phone record from T-Mobile

12  for that February 5th, 2018, time frame from 3:00 to 6:30.

13  **Q.**    And -- okay.  Yeah.  So what -- tell me the color

14  coordinations that you've used here.

15  **A.**    So, on all of the phone records, Jamarr Smith's are

16  green; Gilbert McThunel's are yellow; and then Ayodele's are

17  purple for the cell site sectors.  That way when they're

18  showing you can identify which individual was using the tower.

19  **Q.**    And what is that red pin there?

20  **A.**    That red pin is the Lake Cormorant post office.

21         MR. McGEE:  Okay.  Slide down, please.

22  BY MR. McGEE:

23  **Q.**    Okay.  And what am I looking at here?

24  **A.**    So this is the cell towers used by Thomas Ayodele on

25  February 5th, 2018, from 3:00 to 6:30 p.m.

Moody - Direct (Continuing)

1 **Q.** And the red pin is also the Lake Cormorant post office;
2 is that correct?

3 **A.** That is also the Lake Cormorant post office.

4 **Q.** Now, we're going to talk about the shaded areas --
5 because it may be a little confusing to the jury now, but we're
6 going to talk about it in about two slides in detail.

7 **MR. McGEE:** If you could go to the next slide, please.
8 **BY MR. McGEE:**

9 **Q.** Okay. And what is this?

10 **A.** So this is Gilbert McThunel's cell phone tower activity
11 from the same February 5th, 2018, from 3:00 to 6:30 p.m.

12 **Q.** Okay. That's in orange there. And the pin is also the
13 Lake Cormorant post office?

14 **A.** That is correct.

15 **MR. McGEE:** Okay. Next slide, please.
16 **BY MR. McGEE:**

17 **Q.** Okay. And what are we --

18 **A.** This is an overlay of --

19 **Q.** -- looking at?

20 **A.** This is an overlay of all three of the phones together in
21 one map. So Jamarr Smith, Ayodele, and McThunel's phones.
22 And, if you look, there's a definite pattern where they all
23 tend to follow the same areas of usage.

24 **Q.** And that's Slide 11.

25 **MR. McGEE:** Okay. Let's go to the last slide, 12.

Moody - Direct (Continuing)

1   BY MR. McGEE:

2   **Q.**   Okay.  What's the time frame on this one?  Is this also

3   3:00 to 6:30?

4   **A.**   Actually, this slide is more condensed.  This is more

5   around the 5:00 time frame.  We zoomed in, and we actually

6   highlighted some times on the towers that were being used.

7   **Q.**   Okay.  We'll get to those in a second, but let's talk

8   about -- let's talk about these wedges, or I think you call

9   them sectors; is that right?

10   **A.**   Yes.  Those would be representation of sectors.  So those

11   are the direction that the tower is pointing, and they're

12   showing who is using the tower.

13   **Q.**   Okay.  Are you saying -- are you telling the jury that

14   one of the defendants was in the shaded area, in other words,

15   in the wedge or cone?

16   **A.**   I am not saying that they are within the cone, but they

17   are in that direction.  So the cone includes an area where they

18   could be, but it also extends straight out.  If you take the

19   lines on each side of the cone or wedge and draw a line

20   straight out, that area that would be arced between out further

21   is still within the coverage area of the tower.

22   **Q.**   Okay.  And it looks like the wedges are different sizes;

23   is that correct?

24   **A.**   Yes.  The wedges are different sizes based on the antenna

25   width or beamwidth of the particular tower.

Moody - Direct (Continuing)

1 **Q.**    Okay.

2 **A.**    So maybe a 90-degree beamwidth.  So it will be a little

3 bit narrower, or if it's a 120, a little bit wider.

4 **Q.**    And what are the -- what are the color coding of each of

5 these -- on each of these maps -- or on this map?  Excuse me.

6 **A.**    So color coding is the same.  Purple is Thomas Ayodele;

7 Jamarr Smith is in green; and Gilbert McThunel is in yellow.

8 **Q.**    Okay.  And what is the red pin there?

9 **A.**    The red pin is the Lake Cormorant post office.

10 **Q.**    So what are the specific times here?

11 **A.**    So those specific times are times that each of those

12 individuals connected with calls on the highlight or pointed to

13 sector of the tower.  So, starting at the left-hand side at

14 5:26 p.m., there is a green shaded sector just south of the

15 Lake Cormorant post office pointing roughly southwest that

16 Jamarr Smith connected a phone call on.

17          **MR. LEWIS:**  Excuse me, Your Honor.  Can I state an

18 objection?  He keeps saying these people or these individuals

19 are connecting.  More accurately, a device is connecting.

20          **THE COURT:**  Yes, sir.

21          **MR. LEWIS:**  These people are here, that's not

22 accurate, Your Honor.

23          **THE COURT:**  That's -- it is a device.  Thank you.

24 It's sustained.

25 **BY MR. McGEE:**

1  **Q.**   So, Mr. Moody, if you could -- from here forward, if you

2  could just state Smith's device or McThunel's device, I think

3  it would help.  That would help the jury.

4  **A.**   Okay.

5  **Q.**   Thank you.  Okay.  So let's talk about -- you mentioned

6  at 5:26 p.m. Jamarr Smith's device.  That's the -- where the

7  tower is pointing southwest; is that right?

8  **A.**   That is correct.

9  **Q.**   And, again --

10  **A.**   And then --

11  **Q.**   Well, let me just --

12  **A.**   -- moving up -- yeah.

13  **Q.**   Well, I was just going to say, we didn't -- obviously, as

14  you can see from the slideshow, we're not going over every

15  single time that was hit on these towers; correct?

16  **A.**   No.  We just took a representative sample.

17  **Q.**   Okay.  And we're going to look at the -- we're going to

18  look at the base records next, but keep going.  So what about

19  Mr. Ayodele's device?

20  **A.**   So Mr. Ayodele's device, which is the next one up, at

21  5:18 and 5:27 p.m., that device connected on a tower that was

22  pointing roughly west/northwest right there at the post office.

23  **Q.**   Okay.

24  **A.**   I'm not saying that the device was at the post office,

25  but the tower is just south of the post office pointing

1    west/northwest.

2    **Q.**    What about -- all right.  What are the next ones?

3    **A.**    So the next one is 5:16 p.m., and McThunel's phone is

4    hitting the yellow shaded -- or device -- McThunel's device is

5    in the yellow shaded tower that is pointed in just about the

6    same direction as the previous tower we discussed.

7    **Q.**    Okay.

8    **A.**    And then coming over to the right, at 5:28 p.m., we have

9    McThunel's device pointing at a tower that is north of the post

10   office and pointing south.

11   **Q.**    Okay.  So, now, I'm going to show you Government's

12   Exhibit 5A.  Just to be clear, the program does this -- what

13   I'm about to do -- for you; is that correct?

14   **A.**    Correct.  It basically will filter out records for a date

15   and time frame.

16   **Q.**    Mr. Moody, I know you have a copy of some excerpts that I

17   e-mailed you.  It may be easier for you to refer to those than

18   to read the screen, but I will zoom as best I can.

19       I'm first looking at the T-Mobile records, Mr. Moody, and

20   I'm looking at the time 2326 or 5:26 p.m.  Are you with me?

21   **A.**    I'm with you.  I'm looking at the records here.

22   **Q.**    Okay.  So there's a call at 2326, an outgoing call;

23   correct?

24   **A.**    Correct.

25   **Q.**    And it's from 662-360-6029 to 662-710-7511; correct?

Moody - Direct (Continuing)

1  **A.**  Correct.

2  **Q.**  And if I scroll over, you can double-check you, can't

3  you?  You can double-check your slideshow, can't you?

4  **A.**  Yep.

5  **Q.**  And what -- what tower is that?

6  **A.**  One second.  I'm sorry.  I looked up at the other screen

7  and lost my place on my --

8  **Q.**  Sorry.

9  **A.**  -- hard copy.  34.889013 degrees and a negative 90.206 --

10 **Q.**  And that's pointing to --

11 **A.**  -- Nesbit Road, Lake Cormorant -- Lake Cormorant -- or

12 Nesbit Road; Lake Cormorant, Mississippi.

13 **Q.**  And that's pointing 230 degrees; is that right?

14 **A.**  Yes, that is correct.

15 **Q.**  All right.  I'm just going to do it for two more.  We're

16 not going to do it for every one of them.  Everybody is getting

17 hungry.  I am.

18        I'm going to next show the witness AT&T G-7E.  That's the

19 AT&T records, and I'm going to 5:13 and 5:27, which is 2313 and

20 2327.

21 **A.**  Okay.  I've got those.

22 **Q.**  Okay.  So, again, we're double-checking your slideshow;

23 right?

24 **A.**  Yes.

25 **Q.**  We've got calls right here from 662-360-6029 to

Moody - Direct (Continuing)

1  228-859-85 -- excuse me -- 596-4000?

2  **A.**   Correct.

3  **Q.**   And if I put in these GPS coordinates, it's going to put

4  me on the tower in your slideshow; right?

5  **A.**   Yes.

6  **Q.**   AT&T doesn't have addresses on their records, do they?

7  **A.**   No, they do not.  They give the lat and longitude, and

8  then they give the azimuth.

9  **Q.**   Okay.  Lastly, these are the C Spire records, G-6A, 5:16

10  and 5:28.  There's 5:16.  Are you with me?

11  **A.**   I'm with you.

12  **Q.**   And what tower is that at 5:16?

13  **A.**   Lake Cormorant.

14  **Q.**   Okay.  Now, the direction is 350, and the azimuth is

15  300 degrees; is that right?

16  **A.**   That's correct.

17  **Q.**   Okay.  So, again, your -- your program does this where we

18  don't have to go through every single one; is that right?

19  **A.**   That is correct.

20        **MR. McGEE:**  Your Honor, may we approach?

21        **THE COURT:**  You may.

22     (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

23        **MR. McGEE:**  I know it gets dicey around lunch.  I

24  think I probably have 20 minutes left.  If you want to keep

25  going through it or --

Moody - Direct (Continuing)

1    **THE COURT:**  I think you finish, if we can, and then

2    I'll give them a break, and we'll come back with

3    cross-examination.

4    **MR. McGEE:**  Sounds good.  Thank you, Your Honor.

5    (END OF BENCH CONFERENCE.)

6    **BY MR. McGEE:**

7    **Q.**   So you've analyzed the Google, the T-Mobile, the C Spire,

8    and the AT&T records; correct?

9    **A.**   Correct.

10   **Q.**   And for Smith and McThunel, the Google and the -- and

11   their phone records appear to be consistent with being in the

12   same place; correct?

13   **A.**   Yes.  They tend to follow the same pattern.  If you were

14   to overlay the two maps, they're very similar in pattern.

15   **Q.**   And that's Smith and McThunel.  And then -- and you also

16   looked at Mr. Ayodele's phone location records too; correct?

17   **A.**   Correct.

18   **Q.**   And does it follow a similar pattern?

19   **A.**   Yes, it does.

20   **MR. McGEE:**  Okay.  Your Honor, I'm showing the witness

21   Government's Exhibit 25, and it's going to -- we're going to

22   play a video titled "Lake Cormorant 2.MP4."  And let me --

23   before you play it, Robin --

24   **BY MR. McGEE:**

25   **Q.**   Did you create animations/videos of this evidence?

Moody - Direct (Continuing)

1  **A.**   Yes, I did.

2  **Q.**   And do those involve screen recordings?  Is that what

3  we're going to be looking at?

4  **A.**   Yes, they are.

5  **Q.**   Okay.

6        **MR. McGEE:**  Go ahead and pull it up.  Okay.  Pause it

7  real quick.

8  **BY MR. McGEE:**

9  **Q.**   Okay.  This is a screenshot from what program?

10 **A.**   This is a screenshot from CellHawk.

11 **Q.**   And we're looking at 2:30 to 11:59 p.m.; is that right?

12 **A.**   I'd have to get in closer on the right-hand side, but I

13 believe that sounds about right.

14 **Q.**   Okay.  I'm just going to read this side just to speed it

15 up, if that's okay.  So I'm going to read your legend you've

16 got here just to make it easier on you.  You tell me if

17 something doesn't sound right.  It says AT&T.  It's got --

18 228-596-4000 is in green.  Does that sound right?

19 **A.**   That sounds right.

20 **Q.**   Okay.

21 **A.**   That's the top one.

22 **Q.**   Then provider 662-209-0205, that's going to be Chevella

23 Hines's phone in blue.  Do you recognize that?

24 **A.**   Yes.

25 **Q.**   Okay.  And then we've got the two Google device tags

Moody - Direct (Continuing)

1  representing Jamarr Smith and Gilbert McThunel; correct?

2  **A.**  Correct.

3  **Q.**  Okay.

4      **MR. McGEE:**  Ms. Bailey, if you don't mind playing the

5  video.

6      (PLAYING VIDEO, EXHIBIT G-25.)

7      **MR. McGEE:**  Okay.  Stop it there.

8      (STOPPED VIDEO.)

9  **BY MR. McGEE:**

10 **Q.**  So that's -- that's a video that you created from these

11 phone records that we previously went over.  I forgot -- I may

12 have forgotten to show you Chevella Hines, but I think I did.

13 This includes her records too; is that correct?

14 **A.**  That is correct.

15 **Q.**  Okay.

16 **A.**  Phone and Google records.

17 **Q.**  Phone and Google.  Thank you.

18     Okay.  I believe, if I'm looking at it correctly, this

19 is -- this is called animated map, 1530 to 1830.MP4, and this

20 also contains the same color codings that I previously went

21 over, being the 4000 number in green, 0205 in blue, and the two

22 device tags from Google; correct?

23 **A.**  Correct.

24 **Q.**  And this is a smaller time frame of 3:30 p.m. to 6:30

25 p.m.?

Moody - Direct (Continuing)

1   **A.**    That is correct.

2   **Q.**    And you created this map --

3   **A.**    Yes.

4   **Q.**    -- from the information received from Google and the

5   phone companies?

6   **A.**    Correct.

7            MR. McGEE:  Hit play, please.

8        (PLAYING VIDEO, EXHIBIT NO. G-25.)

9   BY MR. McGEE:

10  **Q.**    So we're at 4:25.  Okay.  We're at 5:10.

11           MR. McGEE:  Pause it, please.  Go back just a hair.

12  Go back just a hair.  Okay.  A little bit more.  All right.  Go

13  forward a little bit.  A little more.  A little more.

14  BY MR. McGEE:

15  **Q.**    All right.  So there's a blue -- and it's happened a few

16  times that I haven't pointed out, but there's a blue tower, and

17  that's going to be Ms. Chevella Hines's phone; is that right,

18  Mr. Moody?

19  **A.**    That is correct.

20           MR. McGEE:  Okay.  So let's hit play.

21  BY MR. McGEE:

22  **Q.**    That's going to be right around Robinsonville post

23  office; correct?

24  **A.**    Correct.

25  **Q.**    Right there.  5:41.

Moody - Direct (Continuing)

1     MR. McGEE:  You can keep it playing, Robin.  Thank

2   you.

3   BY MR. McGEE:

4   Q.   Okay.  And that's around 6:02 p.m.

5     (STOPPED VIDEO.)

6     MR. McGEE:  Okay.  And then let's play the last video.

7   BY MR. McGEE:

8   Q.   So all of that -- just to be clear, all of that is

9   information that you received from the phone companies and

10  Google; correct?

11  A.   That is correct.

12  Q.   Okay.  And this is from 2:30 to 12:00.  It's the whole

13  time frame.  And it looks like we have the same table of

14  contents on this one as the last two videos?

15  A.   That is correct.

16    MR. McGEE:  All right.  Go ahead.

17    (PLAYING VIDEO, EXHIBIT NO. G-25.)

18  BY MR. McGEE:

19  Q.   And, just to be clear, is that you moving the screen --

20  like, not right now, but when you recorded the screen, is that

21  what you're doing there?

22  A.   That's the software itself adjusting to -- as the hits

23  come, it moves to center the screen.

24  Q.   Got you.  This is 5:15.

25    MR. McGEE:  Okay.  Pause it.

Moody - Direct (Continuing)

1   (STOPPED VIDEO.)

2        **MR. McGEE:**  Court's indulgence.

3        **THE COURT:**  Yes.

4   (CONFERRING OFF THE RECORD.)

5        **MR. McGEE:**  Tender the witness, Your Honor.  Thank

6   y'all.  I'm sorry.

7        **THE COURT:**  Okay.  This would be a good time to take a

8   break.  Do not discuss this testimony with anyone, and do not

9   attempt to google anything.

10       So we're going to come back -- going to come back at

11  2:00.  So I'm going to excuse you to the jury room.  I will see

12  you at 2:00 for us to continue with this witness.

13       Mr. Moody, I need to make -- can you make yourself

14  available at 2:00 for the Court?

15       **THE WITNESS:**  Yes, Your Honor.

16       **THE COURT:**  Thank you.  Do not speak with anyone about

17  your testimony until you resume your testimony later this

18  evening -- afternoon.  Thank you.

19       You may take them out.  Be careful with those wires,

20  ladies and gentlemen.

21  (JURY OUT.)

22       **THE COURT:**  Okay.  We'll be in recess until 2:00.

23  (LUNCH RECESS TAKEN.)

24       **THE COURT:**  You may bring back in the jury.

25  (JURY IN.)

1    **THE COURT:**  Let the record reflect that the jury has

2    returned to the courtroom.  We'll pick up with

3    cross-examination, Mr. Lewis.

4          **MR. LEWIS:**  Thank you, Your Honor.

5                       **CROSS-EXAMINATION**

6    BY MR. LEWIS:

7    **Q.**    Mr. Moody, can you hear me okay?

8    **A.**    Yes, sir.

9    **Q.**    So, to be clear, in explaining to the jury what you did

10   in this case is you took information from others, Google,

11   T-Mobile, C Spire, AT&T, and you plugged that information into

12   a program which produced these animations you showed?

13   **A.**    For the animations, yes, but also in the software that

14   analyzes records for content and communications.

15   **Q.**    Okay.  You did not design this program that created this

16   animation?

17   **A.**    No.

18   **Q.**    You just plugged the data in and the animations came out?

19   **A.**    Correct.

20   **Q.**    You cannot vouch for the accuracy or reliability of the

21   Google records?

22   **A.**    I can say that they are the records that were provided by

23   Google.

24   **Q.**    Okay.  I'll accept that, but you didn't compile them

25   yourself?

1   **A.**   Google compiled them from their records.

2   **Q.**   Right.  And you did not verify they were correct?

3   **A.**   That would be Google's responsibility to verify that they
4   are correct.

5   **Q.**   So same question as to the telephone records.  You did
6   not compile them?

7   **A.**   They were compiled and certified by the phone company.

8   **Q.**   Okay.  And you did not verify they were correct?

9   **A.**   They were certified by the phone company as being
10   accurate.

11   **Q.**   Okay.  Mr. Moody, my question was -- I'm asking you what
12   you did or didn't do to verify whether they were correct.  You
13   did not --

14   **A.**   I don't maintain -- as I don't maintain their standard of
15   records or their file keeping, that would be on the phone
16   company to verify their correctness.  I can only take what they
17   give me as being accurate.

18   **Q.**   Okay.  So the answer to my question is, yes, I did not
19   verify they were correct; right?

20   **A.**   I verified they were certified by a statement of record
21   from the provider.

22   **Q.**   Okay.  So, under the trash in/trash out theory, if the
23   underlying information provided you by Google and the phone
24   companies is incorrect, then your opinions here are incorrect?

25   **A.**   I don't see any evidence of that in fact, that the

Moody - Cross by Mr. Lewis

1    evidence -- that the evidence given to me from the provider is

2    incorrect.

3    **Q.**   Well, I know you don't agree with that, but I'm asking,

4    hypothetically, if it was incorrect, that would cause problems

5    with your -- with your conclusions; correct?

6    **A.**   If it wasn't certified data, then I would say yes, but

7    they certified their data is correct based on their record

8    keeping.

9    **Q.**   For example, the phone companies could have given

10   incorrect location data for the cell towers?

11   **A.**   No.

12   **Q.**   You don't agree with that?

13   **A.**   I don't agree that they give incorrect location because

14   they keep that as a fairly tight course of records on where

15   their cell towers are, where they're located, what is active at

16   any given time.

17   **Q.**   Okay.  So, if the jury thinks that there are problems

18   with the data or the Government has not shown it's reliable,

19   then they are free to reject your opinions?

20   **A.**   The jury is free to reject opinions of anyone.

21   **Q.**   Yeah.  They don't have to agree with you?

22   **A.**   They don't have to agree with you either, sir.

23   **Q.**   Okay.  You want to argue with me about this?

24            **THE COURT:**  No.

25            **MR. McGEE:**  Objection, Your Honor.

1    **THE COURT:** Neither one of you are going to argue
2    about this.

3    **MR. LEWIS:** Okay.

4    **BY MR. LEWIS:**

5    **Q.** The jury does not have to agree with you, do they?

6    **A.** They don't have to agree with us.

7    **Q.** Okay. And you're not saying that the -- your

8    testimony -- excuse me. I'm not saying that your testimony had

9    anything to do with it, but you testified about historical cell

10   data in a case where the defendant was acquitted, which was in

11   *U.S. versus Standard*?

12   **A.** That is correct.

13   **Q.** You don't get to decide what the jury believes. The jury

14   gets to decide what they believe?

15   **A.** Is that a question, sir?

16   **Q.** Yes. Am I right?

17   **A.** The jury decides what they believe.

18   **Q.** Okay. So I'm going to break down the subjects that I'm

19   going to ask you about into two separate categories, and I'm

20   first going to talk about what we talked about earlier when we

21   were talking, which is historical cell site data. You with me?

22   **A.** I'm with you so far.

23   **Q.** And then the second topic I'm going to talk about is the

24   Google data. You with me?

25   **A.** With you so far.

1  **Q.**   Okay.  So historical cell tower data is not an exact
2  science?

3  **A.**   The historical cell site data is data maintained by the
4  phone carrier on the cell sites that were used and the sectors
5  that were used.  That is data that is fact.

6  **Q.**   Okay.  It has not been tested by the greater scientific
7  community?

8  **A.**   It is data that is fact.  There's nothing to test.  It's
9  what was actually used by the phone to make a call.  So I don't
10  know what you're wanting the scientific community to test.

11  **Q.**   Well, has the -- I think you testified earlier that
12  you're not aware that the greater general scientific community
13  has studied this.  You have no knowledge of that?

14  **A.**   Well, studying the fact that providers maintain a record
15  of calls and the cell towers that they're used with the sectors
16  is not something that would be studied.  That is a record --
17  system of records for the phone company that they maintain and
18  they're saying were used.

19  **Q.**   Okay.  But this -- this data has only been studied and
20  tested by law enforcement to your knowledge?

21  **A.**   The data -- so now that you bring this up, the data --
22  for instance, if that's what you're qualifying for, because
23  you're very ambiguous in what you're talking about, the
24  propagation of towers and radio propagation is a scientific and
25  studied thing.  So, if we want to get into propagation of

1   towers, that is scientifically studied.  It's a general

2   subsidiary of science, and there are specialty people out there

3   that do that.

4   **Q.**   To your knowledge --

5   **A.**   If we're talking about --

6   **Q.**   Excuse me.  Go ahead.

7   **A.**   If we're talking about just the records themselves, they

8   are historical records of actions that took place and do not

9   have any exact location information that would be studied.

10  **Q.**   Okay.  The only entity that's --

11  **A.**   It is a --

12  **Q.**   Sorry.  Go ahead.

13  **A.**   That it's a -- it is a sector that was used and the

14  direction it's pointing.

15  **Q.**   Okay.  The only entity that's using this technology at

16  trials, to your -- to your knowledge, is the Government?

17  **A.**   No.  I believe defenses have also used cell phone

18  technology to prove innocence of suspects in cases.

19  **Q.**   Okay.  Well, those are -- those are criminal cases;

20  right?

21  **A.**   They were defense attorneys that were using the data.  So

22  it's not just the Government using the data.

23  **Q.**   Okay.  There is controversy about cell tower analysis?

24  There's controversy about cell tower analysis; right?

25  **A.**   That wasn't a question.  Is there controversy?  I'm sure

Moody - Cross by Mr. Lewis

1  defenses have controversy, yes.

2  **Q.**  Okay.  In fact, some people call it junk science.  You

3  heard of that?

4  **A.**  I have not heard it called junk science personally.

5  **Q.**  Okay.  But you're testifying about something that at

6  least some people out in the community think is unreliable?

7  **A.**  You may be saying some people.  I have not heard people

8  say it personally.

9  **Q.**  Okay.  Because -- and you're in law enforcement, and you

10 talk to law enforcement people; right?

11 **A.**  I am -- I work for a law enforcement agency.

12 **Q.**  And you talk to people --

13 **A.**  I do talk to -- I talk to people with phone providers.  I

14 talk to people with other companies.  So I do know that -- the

15 information regarding the location of calls that's used by the

16 phone companies themselves.  I wouldn't think they call it junk

17 science.

18 **Q.**  Now, not even law enforcement considers this to be the

19 best way to find somebody; right?

20 **A.**  It is a way.  It's not the most accurate way, but it is a

21 way.

22 **Q.**  So what I said was correct.  Law enforcement does not

23 consider this the best way to find somebody?

24 **A.**  I'm not saying they don't consider it the best way

25 because it may be the only way you have at some point.

1 **Q.** Okay. Well, let's say -- use this example. Let's say
2 somebody is in trouble and dials 911 but does not know where
3 they are. Okay? You're with me so far; right?
4 **A.** Yeah. So you're talking --
5 **Q.** Okay. Excuse me.
6 **A.** -- about --
7 **Q.** Excuse me. Sir -- Mr. Moody, my question is do you
8 follow me? I haven't asked the next question yet.
9 **A.** Okay. Well, I'm telling you where I'm following you and
10 where I believe you're at. You're at a real world event on a
11 live phone call.
12 **Q.** Yes. Somebody is -- if you'll let me ask my question.
13 So somebody is in trouble, and they dial 911, but they don't
14 know where they are. Do you understand what I've asked you to
15 this point?
16 **A.** Okay.
17 **Q.** Okay. Law enforcement does not use historical cell site
18 data to find this person; correct?
19 **A.** Correct, because they're on a live call.
20 **Q.** It's too inaccurate?
21 **A.** No, because they're on a live call.
22 **Q.** It might get them to only within miles of the person they
23 need to find; right?
24 **A.** We're talking about an apple and an orange here, sir.
25 You're talking about a live call versus something that happened

Moody - Cross by Mr. Lewis

1   in the past.  The live call can get triangulation from existing

2   towers.  You cannot go back and triangulate a historical call.

3   **Q.**    Okay.  So at least my concept is correct that law

4   enforcement does not use this kind of information to find

5   somebody who's dialed 911 but don't know where they are;

6   correct?

7   **A.**    Correct.

8   **Q.**    They use GPS to locate that person?

9   **A.**    Not necessarily.

10  **Q.**    Well, they can use GPS to locate that person?

11  **A.**    If the system on the phone that they're on will allow

12  them to access GPS, yes.

13  **Q.**    Okay.  But that's not what you're talking about here.

14  You're not -- you're not using GPS data?

15  **A.**    We are using GPS on the Google data.

16  **Q.**    Okay.  I haven't gotten there yet.  You're not using that

17  on the cell site data; correct?

18  **A.**    Correct.

19  **Q.**    Okay.  GPS data is more accurate?

20  **A.**    Correct.

21  **Q.**    Okay.  Another way to find people -- I think you've

22  already mentioned it -- is to triangulate amongst towers?

23  **A.**    Correct.

24  **Q.**    You've not done that here?

25  **A.**    Cannot do it here because we're not doing a live

1   intercept on these individuals on the date in question.

2   **Q.**   And let me make sure the jury understands what we're

3   talking about when I say triangulate.  I'll just draw it on the

4   ELMO.  So, if you've got, you know, three cell towers and they

5   have all got a radius, this area right here is the

6   triangulation of location; correct?

7   **A.**   That is incorrect, sir.  That is incorrect.

8   **Q.**   Okay.  That's not triangulation?

9   **A.**   That is not triangulation.

10  **Q.**   Okay.

11  **A.**   Triangulation is all three towers must send out a signal

12  in the time that the tower return is measured, and the three

13  points are then aligned based on that for triangulation.

14  **Q.**   Okay.  But at any rate, you did not do triangulation in

15  this particular case?

16  **A.**   No, because that can only be done on a live collection or

17  a ping order, and it has to be done at the time that the

18  incident is going on.

19  **Q.**   Okay.  What you're doing here, these towers have about a

20  20-mile range?

21  **A.**   The range -- I'd have to refer to the phone companies on

22  the exact range.

23  **Q.**   Okay.  Well --

24  **A.**   You have to know where the next nearest tower is.

25  **Q.**   You wouldn't dispute that a 20-mile range of these towers

1   is reasonable?

2   **A.** Not knowing where the next nearest tower is, I would not

3   say either way.

4   **Q.** Okay. The data that you're using is actually for billing

5   purposes, right, by these phone companies?

6   **A.** Tower data itself is not necessary for billing. The call

7   record history is for billing.

8   **Q.** Okay. But you use the call record history to get this

9   information that you're giving us here today; right?

10  **A.** Yes.

11  **Q.** It's not for -- this -- this information that these phone

12  companies keep is not for the purpose of tracking people;

13  correct?

14  **A.** Right. It's for their internal system use for network

15  availability, network uptime, calls on network.

16  **Q.** Okay. You talked a little bit about tower sectors

17  earlier, and you talked about four-sector towers and

18  three-sector towers; correct?

19  **A.** I talked about one-sector, three-sector, and

20  multiple-sector.

21  **Q.** Right. But there's such thing as a four-sector tower?

22  **A.** Yes. They can be any combination of sectors based on how

23  the phone company chooses to build them.

24  **Q.** Okay. So, if somebody from AT&T testified yesterday that

25  AT&T had four-sector towers in this area, would you dispute

Moody - Cross by Mr. Lewis

1  that?

2  **A.**   No, because they're their towers.

3  **Q.**   Okay.  And so, if you depicted on your map AT&T having a

4  three-sector tower, that would be an inaccurate depiction;

5  correct?

6  **A.**   My maps don't depict the number of sectors that are on

7  the tower, only the sectors that were used.

8  **Q.**   Well, but you can look at your map, and you can decide --

9  I mean, you can make a determination of whether you're calling

10  this a three-sector tower or a two-sector tower -- or a

11  four-sector tower; right?

12  **A.**   No, you can't, because you're only seeing the sectors

13  that were used for phone calls.  You're not seeing every sector

14  on a tower.

15  **Q.**   Okay.  Now, one of your opinions about the location of

16  these phones is based on the assumption that the cell phone is

17  connecting with the nearest tower?

18  **A.**   No, that's not an assumption on my part.  I'm only using

19  the data provided by the carrier to show the towers that the

20  phone connected to.

21  **Q.**   Okay.  So -- so let's --

22  **A.**   I'm making no assumption about whether it's the nearest

23  tower or not.

24  **Q.**   So let's make sure that's crystal clear because this was

25  something I was concerned about off the record, but -- because

Moody - Cross by Mr. Lewis

1  when you show these shaded pie slices on the -- on your map

2  here -- I'll use the blowup.

3          **THE COURT:**  Can you identify the exhibit?

4          **MR. LEWIS:**  G-25.

5  **BY MR. LEWIS:**

6  **Q.**   I'll use the blowup.  You're not saying that -- that the

7  person is necessarily close to any one of these towers;

8  correct?

9  **A.**   I'm only saying that they -- and like I brought up in my

10  testimony, that the individual -- if you take that sector line

11  and draw it out -- like, I'm going to use the yellow one that's

12  right there in the middle.  If you take your highlighter and

13  draw a line straight out north -- yeah, you can do that one.

14  That's fine -- and draw the other side straight out, they are

15  out in that cone at some point within 80 percent of the

16  distance to the next nearest tower.

17  **Q.**   Okay.  And so you're not pinpointing where a person is

18  within that area; correct?

19  **A.**   No, we're not.

20  **Q.**   What I said -- what I said was correct.  Okay.  Thank

21  you.

22          Okay.  And so, to be clear, so the jury is not confused,

23  this shading doesn't mean that's just the limit of the range of

24  the tower; correct?

25  **A.**   That is correct.  That shading is just there to show you

Moody - Cross by Mr. Lewis

1    the identity of who was using that sector of tower.

2    **Q.**   Okay.  And there's something like 20 different factors

3    that decide which tower picks up a device; right?

4    **A.**   Now, I know there are multiple factors.  I won't say

5    there are 20 factors, but there are multiple factors.

6    **Q.**   Well, let me give you some.  Where the antenna is pointed

7    is a factor; correct?

8    **A.**   Correct.

9    **Q.**   You did not research any of the -- where the antennas

10   were pointed in this case; correct?

11   **A.**   Correct.

12   **Q.**   You really can't even do that because the phone company

13   doesn't tell you that?  I have a bad habit when I ask

14   questions.  Sometimes I don't say correct or right at the end.

15   When I stop talking, that's the end of a question.  Okay?

16   **A.**   Okay.  So the -- okay.  So the phone company does not in

17   their records say the direction that the antenna is facing.

18   **Q.**   Okay.  Sometimes when the closest tower is too busy due

19   to call volume or traffic the device will connect with another

20   tower somewhere else; right?

21   **A.**   Correct.

22   **Q.**   Or the tower is down because of weather or storm or

23   lightning strike?

24   **A.**   Correct.

25   **Q.**   And you did not research weather conditions to see if any

1  towers were down because of weather during the time in

2  question?

3  **A.**   I do know that the weather conditions that day were not

4  stormy and not raining.

5  **Q.**   Okay.  But you didn't research it.  That's just what one

6  of the prosecutors told you.

7  **A.**   No.  That's because I have seen personally video of the

8  day in question.

9  **Q.**   Okay.  Well, the question is you did not research

10  anything that happened with the weather before or after the

11  video?

12  **A.**   Not before or after the video.

13  **Q.**   Okay.  Another reason that a device would not connect

14  with a nearby tower is because the tower is down for repairs,

15  maintenance, or updates?

16  **A.**   Yes.

17  **Q.**   You didn't research that either?

18  **A.**   Because the data that I was analyzing was the records of

19  towers used during the event in question.  That's what the --

20  **Q.**   Mr. Moody --

21  **A.**   -- analysis was based on.

22  **Q.**   I'm sorry.  Can you say the last part of your answer

23  again?

24  **A.**   The data that I analyzed was based on the towers that

25  were used provided by the phone company, and that's what the

Moody - Cross by Mr. Lewis

1  analysis was based on.

2  **Q.**   Okay.  Another reason that a phone might not connect with

3  a nearby tower is that the closer tower is shorter than the

4  tower -- than a taller tower that was nearby?  Let me ask a

5  better question.  The height of the tower could affect whether

6  a phone connects with that tower or some tower at a more

7  distant location; correct?

8  **A.**   Correct.  When put into effect with terrain or

9  geographical things that would block a signal.

10  **Q.**   Okay.  I'm getting there.  All right.  So, other than

11  that, cars or buildings could be blocking a closer tower;

12  correct?

13  **A.**   Potentially.

14  **Q.**   And then that would be true even in a flat area, as we

15  heard; right?

16  **A.**   Depending on -- yes, the cars would be a little bit less.

17  Buildings could be more.

18  **Q.**   Okay.  And you could have done a topographic analysis to

19  determine whether anything might be blocking devices in the

20  northwest part of Mississippi, but you did not do that?

21  **A.**   I'm sorry.  It sounds like a statement.  I didn't hear a

22  question.  Sorry.

23  **Q.**   Okay.

24  **A.**   So --

25  **Q.**   Mr. Moody, once again, I'm not going to say correct or

Moody - Cross by Mr. Lewis

1   right every time I ask you a question.  So just, if I stop

2   talking, you can go ahead and answer.

3          **MR. McGEE:**  Your Honor, can he just -- can he just ask

4   a question?

5          **THE COURT:**  Don't talk over him either.  Give him an

6   opportunity to finish that answer.

7          **MR. LEWIS:**  Okay.

8          **THE COURT:**  Mr. McGee.

9          **MR. McGEE:**  I would ask that -- I would ask that he

10  would ask the witness a question.  I have a hard time, too,

11  understanding when he's asking questions because I -- he

12  doesn't want to interrupt him in the middle of a question.

13         **THE COURT:**  I understand.

14         **MR. McGEE:**  So if he would just please try.

15         **THE COURT:**  He can ask the question the way he wants

16  to, but it is sometimes sounding more like a statement than a

17  question.  So clarify it with the witness and then give him an

18  opportunity to respond.

19         **MR. LEWIS:**  Okay.

20  **BY MR. LEWIS:**

21  **Q.**   I think my --

22  **A.**   Topographic --

23  **Q.**   Thank you.  My question was that you could have done a

24  topographical analysis to determine if things were blocking

25  towers, et cetera, but you did not; correct?

1 **A.** Because I was not trying to determine what the phone

2 company would determine based on that information.

3 **Q.** Okay. So, therefore, the tower that was activated on

4 your map here may not be the closest tower to the device that

5 activated it; correct?

6 **A.** May not.

7 **Q.** Okay. So here's a universal experience for

8 Mississippians. I will be driving on I-55, and I will not have

9 a good signal for some reason. Okay? That means there's

10 probably an issue with a cell tower; right?

11 **A.** I can't say that for certain just on those few facts that

12 you just gave me.

13 **Q.** Well, I mean, I-55 is the main artery in the state of

14 Mississippi that runs from Memphis to Jackson and beyond.

15 Sometimes people drive on I-55, and, for whatever reason, they

16 have trouble getting a cell signal. One explanation for that

17 would be they're having trouble getting connected to a tower;

18 right? One possible explanation?

19 **A.** That is a possible explanation.

20 **Q.** Okay. Sometimes you dial your phone and nothing happens

21 or it takes a while to start ringing. That could mean there's

22 a cell tower issue. That's a possible explanation for that?

23 **A.** That is also congestion on the phone network is a

24 possible answer.

25 **Q.** Okay. And that's what we talked about earlier, that

1  sometimes traffic or congestion would cause a phone not to

2  connect with a nearby tower; right?

3  **A.**    But it's not just the tower that can cause that lag.

4  It's also the landline network that can cause the lag based on

5  the example.

6  **Q.**    Okay.  Another thing -- let's go back to our pie slices.

7  Again, this is G-25.  This coverage area in the pie slice is

8  not a perfect -- does not have perfect lines; correct?

9  **A.**    So, in general, the radio signals can bleed, if that's

10  what you're asking.

11  **Q.**    Well, I don't know what that means --

12  **A.**    So it doesn't --

13  **Q.**    -- so I'm not sure I'm asking that.

14  **A.**    -- it doesn't --

15        **THE COURT:**  Stop.  Re-ask the question.

16        Mr. Moody, give him a chance to finish it.

17  **BY MR. LEWIS:**

18  **Q.**    Okay.  Let me just ask this again, and maybe you --

19  again, I'm sorry.  You're showing these pie slices as very

20  regular, are you not, I mean, with straight lines on each side?

21  That's fair to say; correct?

22  **A.**    That's fair to say we're showing them out at a number of

23  degrees provided by the provider.  So they give us an azimuth,

24  and they give us a beamwidth that they're saying that their

25  coverage is.

Moody - Cross by Mr. Lewis

1  **Q.**    Okay.  But you know that the coverage is not that regular

2  and exact; correct?

3  **A.**    It can vary to the left or right a little -- a few

4  degrees, yes.

5  **Q.**    Right.  And I don't mean to make this too crazy, but, I

6  mean, it could look like -- something like that; correct?  It

7  could be very irregular.  Can we --

8  **A.**    Not the sector --

9  **Q.**    -- zoom in?

10  **A.**    It's not going to be that irregular.  Now, if you were

11  looking at an overall propagation chart for the radio waves,

12  it's going to have an ill-defined look, but it's going to be

13  generally within the number of degrees.

14      So, if they say the azimuth is 90 degrees and their

15  beamwidth is 60, it may go 63 degrees out, it may go 62 degrees

16  on the other side of each, but the outer bands would definitely

17  have an irregular opinion for propagation.  And that's

18  generally going to be about 80 percent of the next nearest

19  tower.

20  **Q.**    And so -- I think you've already said this, but there's

21  no way that you could accurately depict the coverage of the

22  sector because it's based upon a lot of factors that you don't

23  know; right?

24  **A.**    Now, all we said was that the tower itself was being used

25  and that sector in that direction was being used.

Moody - Cross by Mr. Lewis

1   **Q.**   Okay.  So what I'm saying is, the -- how the actual

2   sector coverage looks relies on a lot of factors.  Orientation

3   of the tower, power settings, tilt angles, things of that

4   nature; correct?

5   **A.**   Right, which -- none of which I testified to.

6   **Q.**   Because you don't know; right?

7   **A.**   Okay.

8   **Q.**   All right.  The sector coverage could be much smaller

9   than that due to the lay of the land, buildings, topography,

10  other factors; correct?

11  **A.**   Could be.

12  **Q.**   You could attempt to establish what the sector coverage

13  looked like by doing something called a drive test; correct?

14  **A.**   That is something that is used in time.

15  **Q.**   And a drive test -- and I'll let you tell me, but it's

16  basically where somebody drives around and does very specific

17  calculations on what the sector coverage looks like; correct?

18  **A.**   Correct.

19  **Q.**   You've done those before?

20  **A.**   No.

21  **Q.**   Okay.  And you didn't do it here; correct?

22  **A.**   No.

23  **Q.**   Okay.  These data calculations that the cell companies

24  did, you could not repeat them.  You could not make these

25  calculations yourself; right?

1  **A.**   The cell companies didn't do a calculation.  They stored
2  a historical record of the tower that was used, the sector that
3  was used.

4  **Q.**   Okay.  That determination was done in-house with them.
5  You didn't do that; correct?

6  **A.**   Right.  That was done at the time of the call.  They
7  recorded that information.

8  **Q.**   Okay.  Two people can be standing beside each other with
9  a cell phone, and they do not always connect to the same tower?

10  **A.**   Yes, that is possible.

11  **Q.**   So this technology cannot pinpoint exact location;
12  correct?

13  **A.**   That is correct.

14  **Q.**   And you cannot say where these phones were within the
15  radius of the tower when it picked them up; correct?

16  **A.**   Correct.

17  **Q.**   And you cannot say that these devices were at the post
18  office when it picked them up?

19  **A.**   Correct.

20  **Q.**   And you cannot say that any of these defendants
21  individually were at the post office at anytime using this
22  information?

23  **A.**   Correct.

24  **Q.**   Okay.  All right.  I'm finished talking about historical
25  cell site data.  I'm going to move to Google now.  You with me?

Moody - Cross by Mr. Lewis

1   **A.**   I'm with you.

2   **Q.**   Okay.  The purpose of Google location data is not to

3   solve crimes; correct?

4   **A.**   Correct.

5   **Q.**   It's allowing Google to run its apps like Google Maps;

6   right?

7   **A.**   Well, it's collected by its -- the app.  It's allowing

8   Google to sell location data for ad purposes to make money for

9   their business.

10  **Q.**   Okay.  But, I mean, they -- like, on Google Maps, it will

11  tell you if there's a lot of traffic in a certain place;

12  correct?

13  **A.**   Correct.

14  **Q.**   And so they use location data to, for example, chart

15  traffic; right?

16  **A.**   Yes.

17  **Q.**   And you said earlier they use it to sell ads; correct?

18  **A.**   Correct.

19  **Q.**   So here's an example.  I like tacos.  If I've got

20  location services on my phone and am in Memphis, Google might

21  send me an ad for a taco place that is near where I am;

22  correct?

23  **A.**   Correct.

24  **Q.**   Okay.  And by the way, I would like to talk to you about

25  whether science has been -- has validated this or done any kind

1   of testing about Google data, but your answer to those

2   questions would be you are unaware of any of that; correct?

3   **A.**   Correct.

4   **Q.**   Okay.  Because this is very cutting-edge stuff; correct?

5   **A.**   It's very new, yes.

6   **Q.**   Okay.  I'll accept that.  Back to talking about Google

7   wanting to sell me a taco.  So it's not designed to be

8   perfectly accurate by Google; right?

9   **A.**   Just to clarify, is that a question?

10  **Q.**   It is.  I'm sorry.

11  **A.**   Okay.

12  **Q.**   You're training me now.  Right?  It's not designed to

13  be --

14  **A.**   They want --

15  **Q.**   -- perfectly --

16  **A.**   They want their location accuracy to be at least

17  68 percent of the time.

18  **Q.**   Okay.  And in this particular case, you're familiar with

19  the -- the fence -- the geofence that was used to obtain this

20  data; correct?

21  **A.**   Correct.

22  **Q.**   Somebody outside of that fence could actually have been

23  caught in it; correct?

24  **A.**   Correct.

25  **Q.**   Okay.  Somebody just merely driving by on the highway,

1    maybe just outside the fence, they could be -- their phone

2    could be captured in that; correct?

3    **A.**    If their accuracy overlapped the fence, then, yes.

4    **Q.**    Okay. So, in other words, there can be false positives

5    where somebody is reported inside the fence but they're not

6    actually there; correct?

7    **A.**    Correct.

8    **Q.**    And then there can be false negatives where -- and this

9    is maybe more common -- where somebody is not in the fence --

10    sorry -- that somebody is in the fence but Google doesn't pick

11    it up; right?

12    **A.**    That is usually more extremely rare that they don't pick

13    up somebody within the fence.

14    **Q.**    Okay. All right.

15    **A.**    Usually, there would be more false positives than false

16    negatives.

17    **Q.**    Okay. So, in order for Google to capture this location

18    history, somebody has to have either an Android phone; right?

19    **A.**    iPhone or Android.

20    **Q.**    Okay. Well, on an iPhone, you have to have a Google app

21    that's running; right?

22    **A.**    Correct.

23    **Q.**    Okay. And in any given area, everybody with a phone is

24    not going to have location services activated; right?

25    **A.**    It's possible.

1   **Q.**   Well, Google says that only about one-third of their

2   users have location services activated at any given time;

3   correct?

4   **A.**   Okay.

5   **Q.**   Well, okay.  Do you want me to show it to you, or will

6   you -- do you accept that as true?

7   **A.**   If you have a statement from Google saying that, I will

8   accept it as true.

9   **Q.**   Okay.  All right.  I'll leave it.  So not everybody

10  inside that geofence -- not every -- let me be more accurate.

11  Not every device inside that geofence that the Government drew

12  and sent to Google is going to show up in what Google sends

13  back; right?  You want me to ask that again?

14  **A.**   If you could clarify it.  It was a little confusing.

15  **Q.**   It was.  I'm going to ask another one.  Because Google

16  only tracks people with location services activated inside the

17  fence, right, that not everybody who's inside the fence is

18  going to be returned from Google as having an account in there;

19  right?

20  **A.**   Correct.

21  **Q.**   Okay.  Because not everybody has location services

22  activated on their phone; correct?

23  **A.**   Correct.

24  **Q.**   Okay.  Now, the records sent to you by Google that you

25  plugged into your program, you did not do anything to validate

Moody - Cross by Mr. Lewis

1   them; correct?

2   **A.**   I accepted the records that were provided by Google that

3   they say came from their customer and certified to and loaded

4   them.

5   **Q.**   Okay.  Google itself only validates that data; correct?

6   **A.**   That's correct.

7   **Q.**   Google does not validate that data for the purpose of

8   trying criminal defendants, does it?

9   **A.**   They do to the effect that they certify the data

10  collected by warrant or court order as being accurate.

11  **Q.**   Accurate to their own standards; correct?

12  **A.**   Correct.

13  **Q.**   Okay.  And you -- well, keep going.  In your experience,

14  how accurate is the data provided by Google?

15  **A.**   In general, in the cases that we provided data for, the

16  data has been relevant and shown that the people were at or

17  near the vicinities most of the time.

18  **Q.**   You testified that it showed that people were at or near

19  the vicinity, and that's a little misleading, isn't it?

20  **A.**   No, because a device cannot walk itself.  A person

21  carries a device.

22  **Q.**   Right.  But -- I totally agree with that, but you can't

23  say that a specific person is carrying a device.  You're just

24  saying that there's a device somewhere?

25  **A.**   In the other cases, there were other evidence, to include

Moody - Cross by Mr. Lewis

1    video and other things, that put that person on the scene.

2  **Q.**   Okay.  But you haven't testified in any of those cases?

3  **A.**   No.  In several of those cases, my testimony was

4    stipulated to prior to trial or the defendants pled guilty.

5  **Q.**   Okay.  Well, what we do know about Google is that they

6    searched a lot of accounts to get this information; correct?

7  **A.**   Correct.

8  **Q.**   Google, in fact, says that they searched 592 million

9    accounts to get the information that they produced in this very

10   case; right?

11 **A.**   Okay.

12 **Q.**   They could have even searched some of the jurors'

13   accounts to get the information that they provided in this

14   case; correct?  It's possible?

15 **A.**   Correct.

16 **Q.**   Okay.  And we know that Google -- the Google warrant did

17   not return all of the devices that were known to be inside the

18   fence at relevant times; correct?

19 **A.**   That I am not correct on because I know that it returned

20   three devices --

21 **Q.**   Okay.  But --

22 **A.**   -- during the --

23 **Q.**   Well, you said earlier that you watched the video.  So

24   you know that the driver of the mail truck, Mr. Cobbs, was

25   there; right?

1  **A.**   So the driver of the mail truck was there on the scene.

2  **Q.**   Okay.  And you know he made a 911 call; correct?

3  **A.**   I do believe he made a 911 call at some point.

4  **Q.**   Okay.  We finally got there.  So his phone was not

5  returned by Google; right?

6  **A.**   That I do not know because I do not know the number or

7  the subscriber information of the third party that was returned

8  by Google.

9  **Q.**   Okay.  Well, that makes --

10  **A.**   It was deemed not to be --

11  **Q.**   I'm sorry.  My fault.  Continue.

12  **A.**   It was deemed not to be relevant by the inspectors

13  involved in investigating the case.

14  **Q.**   Right.  I was going to say that that makes two of us who

15  don't know what this third account -- who owned this third

16  account; right?  Nobody knows who owned that account; correct?

17  **A.**   The inspector does.

18  **Q.**   He does?  He knows the name of the -- of the subscriber

19  to that account?

20  **A.**   Well, he identified that that account was not valid for

21  investigative purposes.

22  **Q.**   I thought you said the inspector --

23  **A.**   So --

24  **Q.**   I thought you said the inspector knew the owner of that

25  account.

1   **A.**   Well, if he doesn't know whose it was, how did he

2   identify it wasn't valid for the investigation?

3   **Q.**   Good point. All right. So you watched the video. There

4   was an individual that was walking around the scene of the --

5   of the post office. Do you recall seeing that?

6   **A.**   The video in particular I watched started as the truck

7   pulled in and then through the armed robbery and the pistol

8   whipping.

9   **Q.**   Okay. So assume for me that that man's name was

10   Mr. Coffman, and he testified here earlier this morning that he

11   had an Android phone. Okay. Assume that for me. Okay? You

12   with me?

13   **A.**   I'm assuming with you.

14   **Q.**   Okay. That phone -- or that account was not returned by

15   the Google geofence warrant; correct?

16   **A.**   You said he was there that morning or --

17   **Q.**   If I said that morning, I didn't mean to. That

18   afternoon.

19   **A.**   Without knowing who that third device was, then I cannot

20   say either way.

21   **Q.**   All right. Mr. Coffman testified earlier that he had a

22   girlfriend who was in the house right there at the scene. I

23   believe he testified that she had an Android phone as well.

24   That phone was not returned by the Google geofence; right?

25   **A.**   Only three phones were returned by the Google geofence.

Moody - Cross by Mr. Lewis

1  **Q.**   We also saw a train go by.  Did you see that?

2  **A.**   No, I did not see a train.

3  **Q.**   Okay.  Well, if you'll take my word for it, that train

4  probably had a conductor -- conductors and engineers in it

5  who -- no phones came back for those people, did it?

6  **A.**   No.  Only three devices were returned.

7  **Q.**   Okay.  There were cars that drove through the scene that

8  I think the Government has clearly excluded as having anything

9  to do with the robbery.  You agree with that?  Let me ask it

10  again.

11  **A.**   I'm not knowing which -- not knowing which cars you're

12  referring to in the video because there was at least one

13  vehicle in there that I know has not been excluded.

14  **Q.**   I understand.  There was some cars -- some cars that the

15  Government has certainly excluded as being relevant to the

16  incident; correct?

17  **A.**   Okay.

18  **Q.**   The -- there were no Google accounts returned for those

19  people either, were there?

20  **A.**   No.  Only three devices.

21  **Q.**   Okay.  But Google did return an account, as you said

22  earlier, that the Government decided was not relevant; correct?

23  **A.**   Correct.

24  **Q.**   And, in fact, we heard yesterday that Mr. Mathews

25  testified that he didn't think the Government had probable

Moody - Cross by Mr. Lewis

1  cause to get information on that person; right?  Or, no -- do
2  you -- you don't know that; correct?
3  **A.**    I don't know that because I did not hear the testimony
4  yesterday.
5  **Q.**    Okay.  Fair enough.  But the Government went and got that
6  person's account data anyway, didn't it?
7  **A.**    That would be on Mr. Mathews if he served that part of
8  the warrant.
9  **Q.**    Okay.  Because, just to be clear, when Google returned
10  the anonymous data, right, we didn't know that person's
11  account?  I'm looking at Exhibit G-3A.  It's just anonymous;
12  right?
13  **A.**    That's correct.
14  **Q.**    I'm showing you Exhibit G-3A.  This is the anonymous data
15  that Google returned; right?
16  **A.**    The itemized data; correct.
17  **Q.**    Okay.  And Mr. Mathews testified that he didn't think
18  they had probable cause to get any information about that
19  person because the call was so late.  Does that sound familiar?
20  Does that sound like something you heard before?  Not the call
21  but --
22  **A.**    No, it does not.
23  **Q.**    Sorry?  Let me ask it again.  He testified, because of
24  the timing that the return came back, he didn't think they had
25  probable cause to get that information.  Does that sound

1 familiar?

2 **A.** That personally is not familiar to me because I was not

3 involved in that step of getting the data.

4 **Q.** Okay. But at any rate, the Government went and got that

5 person's account data anyway. They got the name of the account

6 anyway; right?

7 **A.** I did not get the name of the account. So I don't know.

8 **Q.** Well, you know the name of it, which is permanentwaves;

9 right?

10 **A.** No. I did not know the name until you just brought it to

11 my attention.

12 **Q.** I'm looking at Exhibit G-36. Is it your testimony that

13 you've never seen this before?

14 **A.** I've seen the information on the top two. I have not

15 seen the information on the bottom one.

16 **Q.** Okay. So -- but you do know that there was a third

17 account returned, which is now you know named

18 permanentwavesrecords; correct?

19 **A.** Correct.

20 **Q.** And as we sit here today, we know no more information

21 about that account -- or you know no more information about

22 that account; correct?

23 **A.** That is correct.

24 **Q.** You are not testifying that these devices were involved

25 in the robbery in any way; correct?

1 **A.** Correct.

2 **Q.** You're only saying that they were somewhere within the
3 fence between 5:00 and 6:00 p.m. on February 5, 2018; correct?
4 **A.** Correct.

5 **Q.** Or maybe somewhere outside the fence during that
6 particular time if we're using the 68 percent factor; correct?
7 **A.** Somewhere within the area of accuracy provided by the
8 provider.

9 **Q.** Okay. Let me show you one more thing -- or a couple more
10 things. In your PowerPoint, which is G-25, you've got headings
11 on these documents; right? Google Locations - Geofence -
12 Jamarr Smith?

13 **A.** Yes.

14 **Q.** Okay. Did you type that in?

15 **A.** It was prepared and typed for me.

16 **Q.** Okay. At any rate -- well, was it done at your office?
17 Was it done under your direction?

18 **A.** Yes. Because that was after we had identified all of the
19 providers that the slide was made, all of the anonymized data
20 brought over to an actual user.

21 **Q.** Right. So that's where I'm headed. It is misleading for
22 you to tell the jury that Google Locations - Geofence -- that
23 this is representing where Jamarr Smith is. That's not what
24 you're saying?

25 **A.** That is represented Jamarr Smith's geofence identified.

1   If you take that anonymized number as brought up in the -- my

2   original testimony earlier today and look at the spreadsheet

3   for Jamarr Smith, they are the identical number that is the

4   device that was Jamarr Smith's.

5   **Q.**   I understand.  I'm talking about a human being named

6   Jamarr Smith.  It is misleading for you to tell the jury that

7   Jamarr Smith is located in these places right here.  Jamarr

8   Smith, the human being.

9   **A.**   Okay.  So the device owned by Jamarr Smith --

10  **Q.**   Did you finish your answer?

11  **A.**   That would be the device -- that would be the device

12  owned by Jamarr Smith.

13  **Q.**   Okay.  Thank you.  So if we go to page -- I believe this

14  is page 8 or 9 of your thing.  You've got Cell Site Data From

15  T-Mobile - Jamarr Smith.  It is misleading for you to say that

16  Jamarr Smith, the human being, is located anywhere around these

17  cell sites; right?

18  **A.**   Those are Jamarr Smith's T-Mobile records and the device

19  belonging to Jamarr Smith.

20  **Q.**   You are not saying that Jamarr Smith, the human being,

21  was located in any of those places; correct?

22  **A.**   I'm saying the device used those cell towers belonging to

23  Jamarr Smith.

24  **Q.**   Okay.

25          **MR. LEWIS:**  Excuse me, Your Honor.

Moody - Cross by Mr. Chiniche

1    (CONFERRING OFF THE RECORD.)

2        **MR. LEWIS:**  I don't have any further questions, Your

3    Honor.

4        **THE COURT:**  Thank you.

5        Mr. Chiniche.

6        **MR. CHINICHE:**  Yes, Your Honor.

7    (CONFERRING OFF THE RECORD.)

8        **MR. CHINICHE:**  Your Honor, Mr. Lewis asked many of the

9    questions I was going to address.  I'm just looking for one

10   exhibit.

11       **THE COURT:**  Okay.  That's fine.

12   (CONFERRING OFF THE RECORD.)

13       **MR. CHINICHE:**  Thank you, Your Honor.  We're straight.

14       **THE COURT:**  Okay.

15                    **CROSS-EXAMINATION**

16   BY MR. CHINICHE:

17   **Q.**    Mr. Moody, can you hear me?

18   **A.**    I can hear you, sir.

19   **Q.**    Okay.  My name is Paul Chiniche.  I represent

20   Mr. McThunel.  In your PowerPoint presentation, you listed a

21   cell phone number 662-710-7511; right?  That cell number --

22   **A.**    Okay.

23   **Q.**    And that is used in your -- in your PowerPoint

24   presentation; is that right?

25   **A.**    Correct.

Moody - Cross by Mr. Chiniche

1  **Q.**   Okay.  And in your PowerPoint presentation, you indicate

2  that that phone number belongs to Gilbert McThunel; right?  You

3  have McThunel on your PowerPoint; is that right?

4  **A.**   That's correct.

5  **Q.**   Okay.  If you could see Government Exhibit 6 -- G-6, this

6  is -- I'm representing to you -- have you ever seen this

7  document?  This is the C Spire accountholder information.  Have

8  you ever seen this document?

9  **A.**   I have not personally.

10 **Q.**   Okay.  And it indicates, does it not, that the subscriber

11 is Travonya Nash.  Can you see that?

12 **A.**   Can you zoom in -- can you zoom in a little bit on the

13 document so I can --

14 **Q.**   That the user account subscriber is Travonya Nash.  Do

15 you understand that?  Do you see that, sir?

16 **A.**   I see that, uh-huh.

17 **Q.**   All right.  Thank you, Mr. Moody.

18         **MR. CHINICHE:**  No further questions.

19         **THE COURT:**  Mr. Travis?

20         **MR. TRAVIS:**  No cross-examination.  Thank you, Judge.

21         **THE COURT:**  And redirect?

22         **MR. McGEE:**  Court's indulgence one moment.

23         **THE COURT:**  Yes.

24      (PAUSE IN PROCEEDINGS.)

25         **MR. McGEE:**  May I proceed, Your Honor?

Moody - Redirect

1        **THE COURT:** You may.

2               **REDIRECT EXAMINATION**

3 **BY MR. McGEE:**

4 **Q.**   Mr. Moody, if someone was in the geofence or near the

5 post office and they did not have their location services

6 turned on, would Google be collecting producible records on

7 them that they would produce?

8 **A.**   No.

9 **Q.**   Thank you. So I'm not going to ask you any more about

10 other co-conspirators. I'm not going to ask about victims, and

11 I'm not going to ask about eyewitnesses. I'm going to ask you

12 about the three defendants sitting over here. Is that fair?

13 **A.**   Yes.

14 **Q.**   Google sent certifications with all of these records; is

15 that correct?

16 **A.**   That is correct.

17 **Q.**   And certifying that they are accurate from their business

18 records that they collect?

19 **A.**   Correct.

20 **Q.**   Is that -- do they collect that without our interference?

21 **A.**   Yes.

22 **Q.**   So we have nothing to do with collecting their records;

23 is that correct?

24 **A.**   That is correct.

25 **Q.**   Now, you touched on this briefly, but I want to make sure

1    I understand it before we move forward. I don't want to

2    belabor this, but Mr. Lewis asked you about the -- how close it

3    could be to the tower, and you mentioned 80 percent. Can you

4    see that document in front of you, which is your slideshow?

5    **A.**    Yes, I can.

6    **Q.**    Explain to the jury what you mean by 80 percent, and

7    obviously in as much layman's terms as possible so we can all

8    understand it.

9    **A.**    All right. So the easiest way to represent this is if we

10    look at the two yellow-coded sectors and the towers that

11    they're connected to. So McThunel's phone call at 5:26 and the

12    one below that, those two points are towers that have the white

13    dot and the red circle.

14    **Q.**    Just to -- just to clarify, that is 5:28; correct?

15    **A.**    Yes, 5:28.

16    **Q.**    Okay.

17    **A.**    5:28 and 5:26.

18    **Q.**    Okay. Continue.

19    **A.**    So the 80 percent would be -- if we look at the top tower

20    to the right and we measure the distance to the bottom tower on

21    the left, that top tower's general best signal is going to be

22    within 80 percent of the distance.

23    **Q.**    Okay. So to make sure I understand --

24    **A.**    So if --

25    **Q.**    Go ahead.

Moody - Redirect

1   **A.**   So, if you were to look at, say, the bottom 20 percent or

2   the area from -- or just rough eyeballing it where it says

3   U.S. 51 down to the next tower, that would probably be about

4   20 percent, maybe a little bit more, and that would connect to

5   the lower tower.

6   **Q.**   I see.  That makes sense.  And, again, that doesn't

7   change the way the tower is pointing, which is the middle of

8   this arc; is that correct?

9   **A.**   Does not -- does not change the way the towers point.

10  **Q.**   Right.

11              **THE COURT:**   That was G-25?

12              **MR. McGEE:**   That is G-25.  Thank you, Your Honor.  And

13  that's the last slide, which I believe is 12.

14  **BY MR. McGEE:**

15  **Q.**   So, again, let me make sure I understand.  So what you're

16  saying is he wouldn't jump over this tower and be down here.

17  Is that what you're saying?

18  **A.**   Correct.

19  **Q.**   Okay.

20  **A.**   That next tower would then pick up the call in most

21  situations, unless that tower was not in service.  Which based

22  on the records, it was in service.

23  **Q.**   Okay.  Thank you.  Were any of these towers used in this

24  diagram -- were any of these disabled?

25  **A.**   None of the towers that were in the diagram were disabled

1    because they were all handling phone calls.

2    **Q.**   Thank you.  Pulling up Government's -- pulling up

3    Government's Exhibit 4.  Now, I appreciate what Mr. Lewis said

4    about GPS is more accurate.  That is a true statement; correct?

5    **A.**   That is correct.

6    **Q.**   There was a lot of talk about geofence, geofence,

7    geofence during your cross-examination.  Do you recall that?

8    **A.**   Yes, I do.

9    **Q.**   Did they ever talk to you about the rest of the records?

10   **A.**   No.

11            **MR. McGEE:**  I'm going to switch back.  I'm sorry.

12   **BY MR. McGEE:**

13   **Q.**   This is Government's Exhibit 25.  This is Slide 7 of

14   Government's Exhibit 25.  Did we talk about all of these other

15   GPS hits?

16            **MR. LEWIS:**  Well, Your Honor, my objection would be --

17   **A.**   No, we did not.

18            **MR. LEWIS:**  -- if I didn't --

19            **THE COURT:**  Excuse me.

20            **MR. LEWIS:**  -- talk about it on cross, then it would

21   be improper redirect to ask him about it now.

22            **MR. McGEE:**  Well, Your Honor, he talked about geofence

23   records, and there's more expansive records than just the ones

24   he talked about in the box of the defendant.

25            **THE COURT:**  I think that's right.  It will be -- it

Moody - Redirect

1   will be overruled.

2   **BY MR. McGEE:**

3   **Q.**   Again, Mr. Lewis said GPS is more accurate in his

4   cross-examination.

5   **A.**   That is correct.

6        **MR. McGEE:**  Can you zoom in to where it has -- just

7   shows the date, GPS coordinates, and that "Type" where it says

8   GPS, cell, et cetera?

9   **BY MR. McGEE:**

10  **Q.**   So, obviously, I'm not going to go through these

11  thousands of hits here.  We're just looking at a short time

12  frame, just to be clear, which is not a thousand hits, and this

13  is essentially the time frame of the robbery.  And what type of

14  hits did Google produce during this time frame?

15  **A.**   GPS hits.

16  **Q.**   What else did it produce?  Can you read that?

17  **A.**   I see -- it needs to be zoomed in a little bit more on

18  this end.

19  **Q.**   Okay.

20  **A.**   So GPS, GPS, GPS, cell, and Wi-Fi right above it.

21  **Q.**   So all three?

22  **A.**   Correct.

23  **Q.**   And for Mr. McThunel's Google account, did they produce

24  the same thing?

25       **MR. McGEE:**  Let's pull it up.

Moody - Redirect

1    **A.**   I believe they had all -- they had all three also.

2    **BY MR. McGEE:**

3    **Q.**   I'm just showing on here -- looks like cell and Wi-Fi

4    during that time; is that correct?

5    **A.**   Cell and Wi-Fi, yes.

6    **Q.**   And Wi-Fi are the ones we talked about earlier; right?

7    **A.**   Correct.

8    **Q.**   So we don't just have the, what, nine hits in the

9    geofence; correct?  The jury also has Government's Exhibit 4,

10   which is an extensive -- extensive amount of hits from Google;

11   is that correct?

12   **A.**   That is correct.

13   **Q.**   Now, there was some talk of maybe you misleading the jury

14   with -- saying that it was Jamarr Smith or Gilbert McThunel's

15   phone.

16         **MR. McGEE:**  I'm showing the witness what's been marked

17   G-11.

18   **BY MR. McGEE:**

19   **Q.**   What phone number does that say under Gilbert McThunel?

20         **MR. McGEE:**  You may have to --

21   **A.**   I'm waiting for it to --

22         **MR. McGEE:**  Actually, I can do that.  I'm sorry.

23   **A.**   It's not up on my screen.

24         **MR. CHINICHE:**  Your Honor, I'm going to voice an

25   objection.  This document was not shown to this witness on

Moody - Redirect

1  cross-examination.

2          **MR. McGEE:**  I agree that it wasn't, Your Honor.

3          **THE COURT:**  No, it wasn't.

4          **MR. McGEE:**  And he showed him the subscriber

5  information, but that's not the whole story.

6          **THE COURT:**  This -- no, it's sustained.

7          **MR. McGEE:**  Okay.  No further questions, Your Honor.

8          **MR. MIMS:**  Your Honor, can I have one second?

9          **MR. McGEE:**  One second.  I'm sorry.

10      (CONFERRING OFF THE RECORD.)

11         **MR. McGEE:**  Your Honor, at this time, we would move to

12  admit 25A, which is just a print-off of the slideshow for the

13  jury.

14         **THE COURT:**  Any objection?

15         **MR. LEWIS:**  I thought it was already in.

16         **THE COURT:**  Okay.  25A will be admitted.

17      (EXHIBIT NO. G-25A ADMITTED INTO EVIDENCE.)

18         **MR. McGEE:**  That's all I have, Your Honor.  Thank you.

19         **THE COURT:**  So have we finished with Mr. Moody?

20         **MR. McGEE:**  Yes, Your Honor.

21         **THE COURT:**  Okay.  Mr. Moody, thank you for your

22  testimony.  We're going to conclude your testimony at this

23  time.  Thank you.

24         **THE WITNESS:**  Yes, Your Honor.  Thank you.

25         **THE COURT:**  Okay.

1      **MR. MIMS**:  Your Honor, if I may, before we take a

2   break, I would like to make an announcement.  Might be

3   appropriate at this time.

4      **THE COURT**:  Okay.

5      **MR. MIMS**:  First of all, I'd like to ask the Court to

6   take judicial notice for venue purposes that DeSoto County is

7   in the Northern District of Mississippi.

8      **THE COURT**:  And I take notice.

9      **MR. MIMS**:  And, Your Honor, with that, the Government

10   rests.

11      **THE COURT**:  Okay.  So let me get you out for a few

12   minutes.  It would be a good time to take a break for me to

13   take up a couple of matters with them.  So go to the jury room,

14   and I think I will see you in about 15 minutes.

15   (JURY OUT.)

16      **THE COURT**:  We'll be in recess for 15 minutes.

17   (RECESS TAKEN.)

18      **THE COURT**:  Okay.  We're outside the presence of the

19   jury.  And I've heard the announcement that the Government

20   rests.  Do I hear anything from the defendants?

21      **MR. CHINICHE**:  Yes, Your Honor.  At this time, the

22   defendants would move under Rule 29 for a motion or a judgment

23   of acquittal, indicating to the -- and arguing to the Court

24   that the Government has failed to prove beyond a reasonable

25   doubt the elements in both Count 1 and Count 2.  Furthermore,

1 as to Mr. McThunel, no Government witness has identified

2 Mr. McThunel.  For those reasons, Your Honor -- and I suspect

3 cocounsel for codefendants have similar motions, but we ask the

4 Court for a judgment of acquittal.  Thank you.

5 **MR. LEWIS:**  Your Honor, Mr. Smith would simply adopt

6 Mr. Chiniche's argument.

7 **THE COURT:**  Thank you.

8 **MR. TRAVIS:**  If it please the Court, Your Honor.

9 On behalf of Mr. Ayodele, we would also move for a judgment of

10 acquittal, submitting that the Government has not met the

11 elements of conspiracy, Count 1, or aiding and abetting,

12 Count 2.  Thank you for the Court's time.

13 **THE COURT:**  Thank you.  And I'll hear response from

14 the Government.

15 **MR. MIMS:**  Your Honor, as this Court knows, this case

16 is largely based on circumstantial evidence -- not all of it

17 but some of it.  But as the Court's well aware, circumstantial

18 evidence is certainly appropriate and certainly is every bit as

19 good as direct evidence.

20 We have a video from the robbery, which shows three

21 potential suspects.  We have an assailant.  We have somebody

22 dropping off and picking up the assailant -- or presumably

23 picking up the assailant driving a white SUV.  And we have a

24 red Hyundai, which appears to be the lookout.  We have Google

25 location information that places the devices of Gilbert

1   McThunel and Jamarr Smith at this location in the immediate
2   vicinity of the post office at the time of the robbery.

3       We have additional Google location information for
4   Gilbert McThunel and Jamarr Smith that shows them traveling
5   from their home area in Batesville midafternoon up the
6   interstate and across to Lake Cormorant to the vicinity of the
7   Lake Cormorant post office where they remain until after the
8   time of this robbery.  And it shows them returning back to
9   Batesville, first down Highway 3 and then cutting across in the
10  Sardis/Senatobia area to the interstate where they returned to
11  Batesville.

12      We have cell tower data on Gilbert McThunel and Jamarr
13  Smith that is consistent with the Google location data; which,
14  likewise, if you follow their phones as they ping off the
15  various cell towers, shows the same path of travel at the same
16  time.  We have cell tower data on Roko Ayodele showing, similar
17  to Gilbert McThunel and Jamarr Smith, leaving Batesville middle
18  of the afternoon, traveling up the interstate, across to Lake
19  Cormorant at the time of the robbery, and back home.

20      We have multiple phone calls -- an abnormal number of
21  phone calls between all of the defendants before, during, and
22  after the time of the robbery showing that they are obviously
23  in a significant amount of communication about something.

24      We have evidence to tie the white SUV to Roko Ayodele.
25  We have evidence to tie the red Hyundai to Gilbert McThunel.

1  We have an eyewitness that places Jamarr Smith at the scene of
2  the robbery at the time of the robbery.  We have some other
3  circumstantial evidence, but that would include Gilbert
4  McThunel ditching his red Hyundai three days after this.

5      And it should be noted that that's the vehicle that
6  they knew someone had seen and observed because we had Forest
7  Coffman seeing Jamarr Smith in the red Hyundai.  That's the car
8  that you would be -- most likely to want to get rid of, get rid
9  of the evidence.  He trades it in three days later and also
10  puts down a $3,000 cash payment on a -- on a new used car.

11      We have Jamarr Smith opening a business a month later.
12  Opening a business takes money.  He's just pulled off a
13  robbery.  He has money to open a business.

14      We also have Chevella Hines.  The evidence is that she
15  was in a relationship of some sort with Jamarr Smith at this
16  time.  She's the postmaster at the Robinsonville post office.
17  Very few people know how the post office handles their money
18  and how they send it through the registered mailbags every day.
19  Even within the U.S. Postal Service not everybody knows that.

20      This appears to be an inside job.  We have shown a
21  connection -- a close connection to someone who could be
22  providing the information to Jamarr Smith.  And, in fact,
23  before, during, and after the robbery, there is an exorbitant
24  amount of phone calls between Mr. Smith and Ms. Hines.  Now, I
25  would note that we certainly don't have to prove it was an

1  inside job.  That's not an element of the crime, but it
2  certainly is corroborating evidence that we have the correct
3  and proper defendants.
4          Your Honor, for all of those reasons -- I know the
5  Court notes that the standard is to take the evidence in the
6  light most favorable to the Government -- we believe we've met
7  our burden to overcome the Rule 29 motion.
8          **THE COURT:**  Thank you.
9          Any rebuttal?
10         **MR. CHINICHE:**  No, Your Honor.
11         **THE COURT:**  Thank you.
12         **MR. TRAVIS:**  No thank you, Your Honor.
13         **THE COURT:**  Your motion for acquittal is overruled.
14         And what says you about witnesses?
15         **MR. CHINICHE:**  Your Honor, with the Government having
16  rested, it would be the defendants' ability to put on
17  witnesses, including Mr. McThunel would have the ability to
18  testify.  I have advised Mr. McThunel that it is in my
19  professional opinion that he not testify.  And I would ask the
20  Court, if it didn't mind, to voir dire Mr. McThunel.
21         If Mr. McThunel -- and he understands he has the
22  ability to overrule my advice, and if he chooses to take the
23  witness stand in his own defense, I will assist him in that
24  examination.  But I would like for the Court to question him,
25  if you didn't mind, about --

1   **THE COURT:** Thank you. Mr. McThunel, if you'll stand
2   up for me, please, sir.

3   (DEFENDANT COMPLIES.)

4   **THE COURT:** So you've heard the explanation that
5   Mr. Chiniche has given. Apparently, y'all have had some
6   conversation about whether or not you desire to testify, and --

7   **DEFENDANT McTHUNEL:** Yes, ma'am.

8   **THE COURT:** -- sounds like he has given you some
9   advice, that he must always advise you that there are times,
10  places, and occasions that it's the wrong thing to do to take
11  the stand.

12  That is your decision. It's nobody else's. It's not
13  mine. It's not your lawyer's. It's just that I have to make
14  sure that you know what you're doing and the risks that you're
15  taking when you take the stand. Okay?

16  So have you had a conversation with Mr. Chiniche about
17  the pros and cons of you testifying in your own defense?

18  **DEFENDANT McTHUNEL:** Yes, ma'am.

19  **THE COURT:** Do you understand those conversations and
20  the risks that you would be assuming by taking the stand?

21  **DEFENDANT McTHUNEL:** Yes, ma'am.

22  **THE COURT:** So have you given some thought in your
23  mind as to whether or not taking the stand may outweigh the
24  disadvantage of not taking the stand?

25  **DEFENDANT McTHUNEL:** (Nods head up and down.)

1     **THE COURT:**  So you heard me the first day advise the

2     jury that there were three fundamental rules in a criminal

3     case.  And one was -- is that the defendant does not need to

4     testify -- does not have to testify, I should say.  He cannot

5     be forced to testify, can't be forced to testify against

6     himself.  And so all of these rules apply.  Do you understand?

7          **DEFENDANT McTHUNEL:**  Yes, ma'am.

8          **THE COURT:**  Has anyone tried to coerce you or force

9     you into taking this position that you desire to testify?

10         **DEFENDANT McTHUNEL:**  No, ma'am.

11         **THE COURT:**  Do you understand when you testify that on

12    cross-examination it can certainly open you to some

13    cross-examination of subject matter that may be broader than

14    what your attorney may ask you?

15         **DEFENDANT McTHUNEL:**  Yes, ma'am.

16         **THE COURT:**  Okay.  Do you have any questions of the

17    Court so that you can fully understand your right to not take

18    the stand and testify and your election to do so?

19         **DEFENDANT McTHUNEL:**  Yes, ma'am, I understand.  And

20    I'm going to go with my lawyer and not testify.

21         **THE COURT:**  Thank you.

22         **MR. CHINICHE:**  Thank you, Your Honor.

23         **MR. LEWIS:**  And, Your Honor, I would ask the same of

24    Mr. Smith.

25         **THE COURT:**  Mr. Smith, would you stand for me, please.

1    (DEFENDANT COMPLIES.)

2    **THE COURT:** And so you have heard the questions that I

3    posed to Mr. McThunel. My questions to you would be the same.

4    I want to ask you to just -- you know, we're at that stage in

5    this trial where you have to make that decision. I assume,

6    based upon the comments that have been made, that Mr. Lewis has

7    advised you not to take the stand and testify. Would that be

8    correct?

9    **DEFENDANT SMITH:** Yes, ma'am.

10   **THE COURT:** Have you given some consideration to

11   testifying?

12   **DEFENDANT SMITH:** No, ma'am, I haven't.

13   **THE COURT:** Do you wish to testify?

14   **DEFENDANT SMITH:** No, ma'am.

15   **THE COURT:** Do you understand you would have the right

16   to testify in your own defense if you elected to do so?

17   **DEFENDANT SMITH:** Yes, ma'am, I do.

18   **THE COURT:** You're representing to me that you're

19   taking your lawyer's advice?

20   **DEFENDANT SMITH:** Yes, ma'am.

21   **THE COURT:** You are not going to take the stand and

22   testify in your own defense?

23   **DEFENDANT SMITH:** No, ma'am, I'm not.

24   **THE COURT:** Satisfied?

25   **MR. LEWIS:** And I have one more item that I just

1   wanted to put on the record with Mr. Smith.

2          As the Court is aware, we have identified an alibi
3   witness.  We have discussed the pros and cons of calling this
4   alibi witness, and I just wanted to confirm on the record that
5   Mr. -- we've decided not to call this alibi witness, and I
6   wanted to confirm on the record that Mr. Smith is in agreement
7   with that decision.

8          **DEFENDANT SMITH:**  Yes, I am.

9          **THE COURT:**  Mr. Smith, alibi defense is certainly one
10   of the defenses that your attorneys can raise, and you've had
11   that discussion to where there is potentially an alibi in this
12   case.  So have you had the discussion specifically with
13   Mr. Lewis about whether or not you believe it's in your best
14   interest in the outcome of this case to call the alibi witness?

15          **DEFENDANT SMITH:**  Yes, ma'am.  We talked about it.
16   We're not.

17          **THE COURT:**  Are you comfortable not calling the alibi
18   witness?

19          **DEFENDANT SMITH:**  Yes, ma'am.

20          **THE COURT:**  And that is a decision that you have made
21   for yourself and communicated to Mr. Lewis?

22          **DEFENDANT SMITH:**  Yes, ma'am, it is.

23          **THE COURT:**  Okay.  Thank you.

24          **MR. TRAVIS:**  If it please the Court.  Thank you, Your
25   Honor.  I'd also submit Mr. Ayodele for the Court's identical

1  questioning, please.

2  **THE COURT:** Mr. Ayodele, if you'll stand up for me.

3  **(**DEFENDANT COMPLIES.)

4  **THE COURT:** Now, you've had the benefit of hearing

5  this twice so I know that you understand. These are important,

6  crucial constitutional rights. You have the right to take the

7  stand and testify in your own defense.

8  **DEFENDANT AYODELE:** Yes, Your Honor.

9  **THE COURT:** You have the right to not take the stand.

10  **DEFENDANT AYODELE:** Yes, ma'am.

11  **THE COURT:** And so it typically comes down to really

12  listening to your attorney about the pros and the cons of you

13  testifying. You've sat through the entire trial. Have you had

14  a conversation with Mr. -- Mr. Travis as to whether or not you

15  think it's in your best interest?

16  **DEFENDANT AYODELE:** Yes, Your Honor. I have spoken

17  with him about it.

18  **THE COURT:** Okay. Have you made a decision to

19  testify?

20  **DEFENDANT AYODELE:** He just told me it was my

21  decision.

22  **THE COURT:** And let's address that. It is 100 percent

23  your decision. It is not my decision. It is not Mr. Travis's

24  decision. He certainly is your lawyer, and he should advise

25  you of all of the rights and the possibilities pro and con, but

1    it is your decision.  So have you made a decision?

2              **DEFENDANT AYODELE:**  I mean, I just -- I haven't made a

3    decision, but I guess I'm not.

4              **THE COURT:**  Would you benefit by speaking with counsel

5    a little further before you make that final decision?

6              **DEFENDANT AYODELE:**  Yes, ma'am.

7              **MR. TRAVIS:**  May I make the record?

8              **THE COURT:**  Yes.

9              **MR. TRAVIS:**  Mr. Ayodele, I've done this both ways

10   with the Court and myself.  You've been with me the last three

11   days?

12             **DEFENDANT AYODELE:**  Exactly.

13             **MR. TRAVIS:**  And you've heard all of the testimony?

14             **DEFENDANT AYODELE:**  Right.

15             **MR. TRAVIS:**  You've heard what they think your

16   position is in the case; correct?

17             **DEFENDANT AYODELE:**  Right.

18             **MR. TRAVIS:**  And we've been working on your case for a

19   few years now.

20             **DEFENDANT AYODELE:**  Exactly.

21             **MR. TRAVIS:**  And you've been in my office numerous

22   times with myself and my investigator?

23             **DEFENDANT AYODELE:**  Exactly.

24             **MR. TRAVIS:**  And I've also -- I told you about -- all

25   along that at some point in time you could testify if you

1    wanted to?

2         **DEFENDANT AYODELE:** Exactly.

3         **MR. TRAVIS:** Now, we've also discussed what we -- our

4    development of our defenses on this case; correct?

5         **DEFENDANT AYODELE:** Right.

6         **MR. TRAVIS:** And I've talked to you about that many

7    times during the last three days; correct?

8         **DEFENDANT AYODELE:** You did.

9         **MR. TRAVIS:** And I've advised you that I think you've

10   got a situation here where it might be better for you not to

11   take the stand; correct?

12        **DEFENDANT AYODELE:** Yes, sir.

13        **MR. TRAVIS:** I made it really clear to you that that's

14   your decision, not mine; right?

15        **DEFENDANT AYODELE:** Right.

16        **MR. TRAVIS:** And you told me that you would follow my

17   advice; is that right?

18        **DEFENDANT AYODELE:** Right.

19        **MR. TRAVIS:** Am I making you follow my advice?

20        **DEFENDANT AYODELE:** No.

21        **MR. TRAVIS:** Okay. If you'll answer the Court now.

22        **THE COURT:** Has anyone tried to threaten you, coerce

23   you, or promise you anything?

24        **DEFENDANT AYODELE:** No one. Not at all.

25        **THE COURT:** Okay. So I'm asking you as you stand here

1    right now, having heard my speaking to you and now Mr. Travis,

2    do you wish to take the stand and testify?

3              **DEFENDANT AYODELE:**  No.

4              **THE COURT:**  Thank you.

5              **MR. TRAVIS:**  Thank you, Your Honor.

6              **THE COURT:**  So what I'm going to do, if it's in

7    agreement, is bring everybody back in.  And I'm going to simply

8    advise them that off the record I have inquired of the

9    defendants whether or not they have any witnesses and the

10   defendants will be calling no witnesses.  Okay?  And then, of

11   course, that will mean no rebuttal.

12             I'm going to dismiss them and send them home.  And do

13   y'all want to stay 30, 45 minutes and knock out the jury

14   instructions?

15             **MR. MIMS:**  Yes, Your Honor.

16             **MR. CHINICHE:**  Yes, Your Honor.

17             **THE COURT:**  Okay.  Let's do that.  Bring them in.

18        (JURY IN.)

19             **THE COURT:**  Thank you.  And you may have a seat.

20             Ladies and gentlemen, thank you for that time.

21             So let me tell you where we are.  You heard after

22   Mr. Moody testified that the Government rested, which means

23   that they have put on all of the proof in this case by calling

24   witnesses that they intend to put on.

25             During the break, I inquired of each of the defendants

1    if they had any witnesses to call, and they've indicated that

2    they do not.  So I'm telling you that today the testimony is

3    finished.  Now, that doesn't mean the case is over.  And you

4    must definitely keep an open mind.

5         What we are about to do is remain in the courtroom and

6    work on the jury instructions, the law that I will read to you

7    in the morning; so that when you return here in the morning at

8    9:30, we'll have it packaged up, ready to read to you.  After

9    you hear the jury instructions, counselors will make their

10   closing arguments, and I would anticipate that you would have

11   this case around noon to start your deliberations.

12        So we will commence again in the morning at 9:30.

13   This is real important again that I say don't talk to anybody.

14   Just because you think you've heard all of the witnesses's

15   testimony, the jury instructions are important, and the closing

16   argument is important.  So don't make your mind up until you've

17   heard it all.

18        I will see you in the morning at 9:30.  Just wait and

19   we'll bring you out as soon as we're ready, but have a safe

20   trip home.

21        (JURY OUT.)

22        **THE COURT:**  Y'all can have a seat.  I'm going to leave

23   it with you.  We're going to be in recess.  Natalie has done

24   some jury instructions, some pattern instructions.  Give you a

25   chance to kind of talk and discuss among yourselves.

1           If it's possible, we'll come back on the record 10,

2  15, 20 minutes and just finalize it so Ms. Phyllis can leave at

3  4:30.  If we're pushing 4:30, we're going to do it first thing

4  in the morning.  Okay?

5      (RECESS TAKEN.)

6      **THE COURT:**  We're back on the record.  It's 4:00.

7           Let the record reflect that the jury has been sent

8  home.  The defendants presumably have been sent home so that

9  they don't have to sit through jury instructions?

10      **MR. CHINICHE:**  Yes, Your Honor.

11      **THE COURT:**  So what I propose to do is just go through

12  these first asking the Government if they agree with the

13  instruction, and then -- could I do this?  Could I just --

14  Mr. Chiniche, just because I'm looking at you, you speak up --

15      **MR. CHINICHE:**  Yes, Your Honor.

16      **THE COURT:**  -- defendants are in agreement.  And I'll

17  assume it is for all three defendants unless you tell me

18  otherwise.  Okay?

19           The first instruction, Jury Instruction Number 1, is

20  the standard court instruction.

21      **MR. MIMS:**  Your Honor, I apologize.  One second.  Can

22  I have just one more minute?  I haven't quite made it.  I'm

23  close.  Just one second.

24      (PAUSE IN PROCEEDINGS.)

25      **MR. MIMS:**  Thank you, Your Honor.  I appreciate it.

1   I'm ready.  And if I could just announce to the Court, I've

2   reviewed all of the proposed instructions, and the Government

3   has no objection to any of them.

4   **THE COURT:**  Okay.  Thank you.

5   **MR. CHINICHE:**  Similarly, Your Honor, the defense has

6   reviewed all instructions.  It looks like there are 12

7   instructions, including the jury verdict form, and we have no

8   objection to the Court's jury instructions.

9   **THE COURT:**  Y'all have made this impossibly easy.

10   Thank you very much.

11   Okay.  So in the morning Natalie will get them

12   reprinted to where they do not have the numbers on them, and

13   you'll be provided a good, clean set of all of the

14   instructions.  You know that I sometimes shuffle them and don't

15   read them in the same order.

16   Okay.  So what are we going to do in the morning,

17   Mr. Mims?

18   **MR. MIMS:**  Well, in the morning, we do closing

19   arguments, Your Honor.

20   **THE COURT:**  How much time you need?

21   **MR. MIMS:**  I hate to ask for this much time, but I

22   have a lot of things I want to say, and I need to save some

23   time for Mr. McGee.  So I'd like to ask for 45 minutes total

24   for the Government.

25   **THE COURT:**  Okay.  You want it 40 and 5?

1            **MR. MIMS:**  How about 30 and 15.

2            **THE COURT:**  30 and 15.  Okay.  30 minutes.  Okay.

3     Mr. Chiniche?

4            **MR. CHINICHE:**  I would like 30 minutes as well.

5            **THE COURT:**  Mr. Lewis?

6            **MR. LEWIS:**  That's more than enough.

7            **THE COURT:**  Okay.

8            **MR. TRAVIS:**  Be more than enough for me.

9            **THE COURT:**  So what I'm going to do is I'm just going

10    to say I'll give Mr. Chiniche 30 and 20 and 20.

11           **MR. TRAVIS:**  That's fine.

12           **THE COURT:**  And we'll try to make that work.  Okay?

13    And then come back to Mr. McGee at the end for 15?

14           **MR. MIMS:**  Yes, ma'am.

15           **THE COURT:**  Okay.

16           **MR. MIMS:**  Your Honor, can I address a couple of other

17    brief issues regarding closing?

18           **THE COURT:**  Yes.

19           **MR. MIMS:**  First issue, I'm not even certain this is

20    going to be an issue or how to address it, but there's been a

21    lot of questions from the defense in this case about why isn't

22    somebody else here.  There's other people that could have been

23    involved like Chevella Hines or like other potential people,

24    Edwin Brown, for example, and why aren't they here in front of

25    us.

1          **THE COURT:**  Uh-huh.

2          **MR. MIMS:**  There's a jury instruction, of course, that

3     instructs the jury you're not to consider the guilt of anybody

4     except the defendants.  My concern is this:  If the defendants

5     stand up tomorrow and argue why isn't Chevella Hines here, why

6     isn't Edwin Brown here, or whoever else, I -- I don't know that

7     that's appropriate.

8          And it puts me in a terrible position because I can

9     answer those questions.  I don't think it's appropriate for me

10    to answer those questions in front of the jury, but it puts me

11    behind the eight ball if they get to make those -- raise those

12    questions that I can't answer.

13         **THE COURT:**  It is a little bit of a dilemma.  I cut

14    you off and didn't let you ask some follow-up questions that

15    would have gotten into other documents and records about the

16    extent of the investigation against Hines and Brown for the

17    very reason that, you know, it's -- the issue we've got to

18    discuss right now is they're not before the Court.  They're

19    not -- this jury doesn't have anything to decide relative to

20    those two people.

21         So -- but part of your investigation -- I mean, part

22    of your defense, I'm sure, kind of lies in you didn't do

23    everything you could have done and how do you know that these

24    three people are the sole defendants and that kind of thing --

25    or even are defendants.  Excuse me.

1           So how do you perceive you will handle that?

2        **MR. LEWIS:**  Your Honor, yeah.  I just wanted to say

3 there are facts before the jury that have to do with things

4 that these two people did and did not do.  Some of that was

5 prompted by the Government.  We believe this was an inside job

6 and Ms. Hines was the insider.  We have -- we should be allowed

7 to comment on that, Your Honor.

8        **THE COURT:**  So --

9        **MR. LEWIS:**  And it goes to the -- to the -- to the

10 investigation by the Government.  They decided that these three

11 guys should be tried for it, but other people with, what we

12 would suggest, similar facts are not getting tried for it.  I

13 think that's a proper comment on the evidence, on the facts.

14        **THE COURT:**  Yeah.  So let me -- I want to talk about

15 the facts just a second, about what's in the record against

16 Brown and Hines.  Remind me.  Because I thought that's where I

17 sustained the objection and did not let you get into the

18 record.

19        **MR. CHINICHE:**  My recollection is where you sustained

20 the objection was on redirect.  It's where the Government had

21 an --

22        **THE COURT:**  That's right.

23        **MR. CHINICHE:**  -- had an opportunity to get into it

24 however they wished --

25        **THE COURT:**  That's right.

1     **MR. CHINICHE**:  -- was cross-examined and was sustained
2     on redirect, Your Honor.

3        **THE COURT**:  You're right.  You are correct.

4        **MR. MIMS**:  May I weigh in a little bit, Your Honor?

5        **THE COURT**:  Yeah, you can.

6        **MR. MIMS**:  Regardless of all the -- whether you
7     sustained the objection and whatnot, the issue is this.  The
8     question is -- the question is whether or not these three
9     defendants participated -- yes or no -- not whether there were
10    others the Government could have prosecuted or not.

11       The problem we have is this.  I don't doubt for one
12    second Chevella Hines was involved, to some extent, at least
13    provided information.  Edwin Brown was very suspicious, very
14    possibly might have provided information to help these guys.  I
15    can't prove it beyond a reasonable doubt.

16       It would not have been appropriate for me as an
17    officer of this court to try to seek an indictment on people
18    that I don't believe I have enough evidence on.  But I did have
19    enough evidence to believe they did it, but that's not proper
20    for me to tell the jury that.  And yet if they want to say why
21    isn't Chevella here, why isn't Brown here, I've got to be able
22    to explain it.

23       **THE COURT**:  Let me ask you this.  Is there another
24    pattern instruction?  Is there another instruction that might
25    speak more specifically to this that we could either, one,

1  craft or y'all agree to?

2      **MR. MIMS**:  I don't think there is.  I mean, the

3  instruction is correct.  The instruction is you're only to be

4  concerned with these folks.  What they're saying, if they make

5  this argument, is not our guys didn't do it.  It's just why are

6  you picking on us?  Why did I get the speeding ticket when this

7  person was also speeding?  That's the argument they're making.

8      **THE COURT**:  Which is not an uncommon closing argument

9  when others are involved and they can point to potential

10  fallacies of an investigation.

11      In this circumstance, my concern is the lack of

12  prosecution, not the lack of investigation.  The lack of

13  prosecution, like Mr. Mims says, kind of puts that jury

14  wondering why these people were not prosecuted, but I can't let

15  you say I didn't have enough evidence to believe that I could

16  prove it beyond a reasonable doubt because, I mean, that

17  statement in and of itself has some prejudice.

18      So I -- I've been concerned.  I knew we were coming

19  down to the defense of it wasn't me.

20      **MR. CHINICHE**:  And I commend Mr. Mims for not

21  prosecuting someone he doesn't have probable cause to

22  prosecute.  However, that's independent of our clients.  And

23  our clients should not be prejudiced by a typical defense in

24  cases like this and particularly in a circumstantial case.

25  These are things that are just inherent in a circumstantial

1   evidence case, and our clients should not be prejudiced by our
2   inability to mention other people.

3        **MR. MIMS**:  I don't dispute there's other people
4   involved.  They could certainly say there's other people
5   possibly involved.  It's just the issue of can they say why
6   aren't they here and not our guys.  We'll agree there's other
7   people involved.  We're going to talk about Chevella Hines
8   being involved.

9        **MR. LEWIS**:  Well, Your Honor, if she's involved, why
10  can't we comment on that?

11       **MR. MIMS**:  Because the answer to why isn't she
12  prosecuted is because I don't -- I can't prove it.  I can't put
13  her there.  It's my suspicion, but I can't prove it, and I
14  can't go indicting people just because I think they're guilty.
15  I have to have evidence.  That's the problem.

16       **MR. LEWIS**:  And I appreciate that, but they've set up
17  this defense for us, and then they say we can't comment on it,
18  Your Honor.

19       **THE COURT**:  I hear you very plainly.  I mean, I have
20  struggled with this already before your arguments right now, is
21  exactly where that balancing act is.  Because the other day I
22  wanted you, Mr. Mims, to be able to tell this jury why because
23  we might not be having the same conversation we're having right
24  now, but it was improper.  So they're left a little bit
25  hanging.

1        And, you know, just a comment is -- if there is one

2   thing I know, it is a jury hates to think that y'all are hiding

3   something from them.  I mean, they hate it.  First question I

4   got last week when I walked back to the jury room, there's

5   something more to this story y'all have not told us out there.

6        **MR. CHINICHE**:  I feel the same way about this case.

7        **THE COURT**:  I want to go to the instruction and read

8   it.  So let me find it, see how strong it is.

9        **MR. MIMS**:  I believe you're looking for Instruction 2.

10       **THE COURT**:  Does it help y'all at all in the first

11  sentence if I add after the word "defendants" in this trial?

12       **MR. MIMS**:  It matters not to the Government, Your

13  Honor.

14       **MR. TRAVIS**:  Which one is she on, Paul?

15       **THE COURT**:  Number 2.

16       **MR. TRAVIS**:  What was the Court going to add, Your

17  Honor?

18       **MR. CHINICHE**:  Your Honor, I would object to that.

19       **THE COURT**:  Okay.  So the thought was after

20  "defendants," that I add "at this trial."

21       **MR. TRAVIS**:  I don't have trouble with it.

22       **THE COURT**:  Okay.  Let me do this.  I take it nobody

23  has any guidance from rules or case law or how to deal with the

24  absent chair in a criminal case.  Let us look.  Let me tell you

25  in the morning.  Okay?

1    **MR. MIMS**:  The only other thing, which I think will be

2    a lot simpler -- and Mr. Lewis may cut me off on this real

3    quick and say it's not going to even be an issue at all.

4    Jamarr Smith is a twin.  He's known as Little Twin.  The

5    gentleman you've seen in the courtroom earlier today is known

6    as Big Twin.

7        I hope Mr. Lewis won't stand up and say, "Well,

8    Mr. Coffman -- he's got a twin.  Mr. Coffman may have

9    identified the other person," because there's no evidence in

10   this case that's been presented that Jamarr Smith is a twin or

11   has a twin.

12          **THE COURT**:  I know.

13          **MR. MIMS**:  And if you look at the two of them, they

14   look -- they have some similar features, but one's real slender

15   and one's a lot larger.

16          **THE COURT**:  I will not let him point to anybody in the

17   gallery and say, "That's the guy that did it."

18          **MR. LEWIS**:  The Fareses have been waiting all of their

19   lives to have a case their client has a twin.  And I've

20   wrestled with it throughout the trial, but I did not introduce

21   any evidence.

22          **THE COURT**:  As an officer of the court, you thought

23   twice about it.

24          **MR. LEWIS**:  And I don't think I can make reference to

25   it in closing if there's no evidence of that.

1          **MR. MIMS:**  Okay.  We're in agreement then, Your Honor.
2    Thank you.

3          **MR. LEWIS:**  But the Fareses would have had the twin
4    sitting at counsel table.

5          **THE COURT:**  And the jury question would be which one's
6    guilty.

7          Okay.  Anything else?

8          Let us do a little bit of digging on this here.

9          (CONFERRING OFF THE RECORD.)

10         **THE COURT:**  Ms. Tracy has reminded me.  Do you
11   withdraw -- Mr. Mims, does the Government withdraw all jury
12   instructions tendered with the acceptance of the Court's
13   instructions?

14         **MR. MIMS:**  Yes, I do, Your Honor.

15         **THE COURT:**  Is that true with the defense as well?

16         **MR. CHINICHE:**  It is, Your Honor.

17         **THE COURT:**  Okay.  With respect to all three
18   defendants.

19         **MR. CHINICHE:**  Do we need to rest?

20         **COURTROOM DEPUTY:**  Yeah.  We didn't do that on the
21   record.

22         **MR. LEWIS:**  We'll rest right before closing.

23         **THE COURT:**  Okay.  You can do that.

24         Okay.  Are we ready?

25         **MR. MIMS:**  And, Your Honor, you do always let us -- I

1    know I ask this every time, but just to make sure for the

2    record, I can display the jury instructions?

3         **THE COURT:**  I'm going to read them first so that you

4    have them so that you can show them on the projector.

5         Okay.  I do send a copy of the indictment back.

6         Okay.  Ms. Natalie will have you a clean copy in the

7    morning, and I'll sleep on how we're going to handle this in

8    closing.  Thank you.

9         **MR. CHINICHE:**  Thank you, Judge.

10        **MR. TRAVIS:**  Thank you, Judge.

11        (RECESSED At 4:15 P.M.)