1      UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF MISSISSIPPI
2              OXFORD DIVISION

3
   UNITED STATES OF AMERICA                    PLAINTIFF
4

5
   VS.                                    NO. 3:21CR107
6

7
   JAMARR SMITH, THOMAS IROKO AYODELE,
8  AND GILBERT McTHUNEL, II                    DEFENDANTS

9

10
                TRANSCRIPT OF JURY TRIAL
11                   VOLUME 5 OF 5

12
              BEFORE HONORABLE SHARION AYCOCK
13            UNITED STATES DISTRICT JUDGE

14
                 Oxford, Mississippi
15                February 24, 2023

16

17
              (APPEARANCES NOTED HEREIN)
18

19

20

21

22
   Court Reporter:    PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
23                    Federal Official Court Reporter
                      911 Jackson Avenue East
24                    Oxford, MS  38655

25

 1 | APPEARANCES:

 2 | For the Government:  ROBERT J. MIMS, Esquire
   |   CLYDE McGEE, IV, Esquire
 3 |   U.S. Attorney's Office
   |   900 Jefferson Avenue
 4 |   Oxford, MS  38655

 5 | For the Defendant
   |   Smith:  GOODLOE T. LEWIS, Esquire
 6 |   Hickman, Goza & Spragins, PLLC
   |   P.O. Drawer 668
 7 |   Oxford, MS  38655-0668

 8 | For the Defendant
   |   Ayodele:  WILLIAM F. TRAVIS, Esquire
 9 |   8619 Highway 51 North
   |   Southaven, MS  38671

10 | For the Defendant
11 |   McThunel:  PAUL A. CHINICHE, Esquire
   |   Chiniche Law Firm, PLLC
12 |   P.O. Box 1202
   |   Oxford, MS  38655-1202

13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

1    (CALL TO ORDER OF THE COURT AT 9:35 A.M.)

2    **THE COURT:**  Before we bring the jury in, a couple of

3    things.  I thought about the issue that we raised, and the

4    clerks have done some research.  So my gut feeling is kind of

5    confirmed by this case law, and that is this, is that the

6    defendant should be entitled to make the defense and to argue

7    the defense they want to argue.

8    We did find a case.  That's *United States of America*

9    *versus Mary Ann Lara*, L-a-r-a.  It is a Fifth Circuit 2022

10   case.  This was in reference to some comments that the

11   prosecutor had made during opening statements, but it says, "An

12   attorney is entitled to urge the conclusions which the attorney

13   thinks the jury should draw from the evidence."  And it goes on

14   to state that, "In doing so" -- and in this case, it was the

15   Government -- "the Government has some -- asked some rhetorical

16   questions in opening that are inferential in substance."  And

17   that was permissible.

18   So we have some evidence in this case that the jury

19   might infer regarding Brown and -- I'm sorry.  The other name I

20   don't recall right now.

21   **MR. MIMS:**  Hines, Your Honor.

22   **THE COURT:**  Thank you.  So, yes, we -- you will be

23   allowed to argue that.  Now --

24   **MR. CHINICHE:**  Your Honor, there -- there may be

25   others other than those two.

1　　　　　　　　　　**THE COURT:**  It may be.

2　　　　　　　**MR. CHINICHE:**  Okay.  Thank you, Your Honor.

3　　　　　　　**THE COURT:**  Uh-huh.  I didn't mean to limit it to

4　that, but those are the two that I think we touched on the

5　most.

6　　　　　　　I'm going to attempt to read these jury instructions

7　this morning.  Last week I did not.  I asked the attorneys'

8　permission to allow a law clerk to read them.  If I start

9　coughing a lot, it's more distracting for them to hear me

10　coughing.  Then they don't hear the instruction.

11　　　　　　　**MR. MIMS:**  Your Honor, I'll tell you on the front end

12　for the Government, we have no objection to that.

13　　　　　　　**THE COURT:**  Okay.  Is that okay with y'all?

14　　　　　　　**MR. CHINICHE:**  No objection.

15　　　　　　　**MR. LEWIS:**  No objection.

16　　　　　　　**MR. TRAVIS:**  No objection, Your Honor.

17　　　　　　　**THE COURT:**  This has been Ms. Natalie's case, and

18　she's prepared.  And I'm going to start, and I hope I get

19　through it, but I don't want to be distracting.

20　　　　　　　Okay.  Let's bring in the jury.

21　　　　　　　**MR. LEWIS:**  We need to rest.

22　　　　　　　**THE COURT:**  Oh, thank you.  Just one second.  Just one

23　second.  Do you want to do that in the presence of the jury?

24　　　　　　　**MR. CHINICHE:**  Yes, Your Honor.

25　　　　　　　**MR. LEWIS:**  Yes, Your Honor.

1          **THE COURT:**   Okay.  Go ahead.

2      (JURY IN.)

3          **THE COURT:**   You may have a seat.

4          Good morning, ladies and gentlemen, and welcome back

5      to Friday morning, and I hope that you had a good night's rest

6      and are now ready to listen to jury instructions and closing

7      arguments.  Again, I anticipate you'll get this case today

8      around noon.

9          Okay.  So I've cleared this with the lawyers.  I'm

10     about to read to you the jury instructions.

11         **MR. CHINICHE:**   Your Honor --

12         **THE COURT:**   Yes.  Thank you.

13         **MR. CHINICHE:**   -- if I may, on behalf of Mr. McThunel,

14     Mr. McThunel would rest his case.

15         **THE COURT:**   Thank you.

16         **MR. LEWIS:**   Jamarr Smith rests.

17         **THE COURT:**   Thank you.

18         **MR. TRAVIS:**   May it please the Court.  Your Honor, on

19     behalf of Mr. Ayodele, defense rests.

20         **THE COURT:**   Thank you.  Thank you.

21         Confirming what I told you yesterday, no further

22     testimony.

23         I'm going to attempt to read you these jury

24     instructions.  I've been coughing.  I don't want my cough to

25     distract you from being able to hear this.  So if I start

1  coughing -- I've already got preclearance from them -- I'm
2  going to hand it off to a clerk, Ms. Natalie Lowry, who's been
3  working on this case.  And she's simply going to go to the
4  podium and read them to you as if they were my instructions.
5  Okay?

6          Members of the jury:  In any jury trial, there are, in
7  effect, two judges.  I am one of the judges.  The other is the
8  jury.  It is my duty to preside over the trial and to decide
9  what evidence is proper for your consideration.  It is also my
10  duty at the end of the trial to explain to you the rules of law
11  that you must follow in applying -- in arriving at your
12  verdict.

13          First, I will give you some general instructions which
14  apply in every case, for example, instructions about the burden
15  of proof and how a judge -- how to judge the believability of
16  witnesses.  Then I will give you some specific rules of law
17  about this particular case, and, finally, I will explain to you
18  the procedures that you'll use in your deliberations.

19          You, as jurors, are the judges of the facts.  But in
20  determining what actually happened, that is, in reaching your
21  decisions as to the facts, it is your sworn duty to follow all
22  of the rules of law as I have explained them to you.

23          You have no right to disregard or give special
24  attention to any one instruction or to question the wisdom or
25  the correctness of any rule that I state to you.  You must not

1  substitute or follow your own notion or opinion as to what the
2  law ought to be.  It is your duty to apply the law as I explain
3  it to you regardless of the consequences.

4          It is also your duty to base your verdict solely upon
5  the evidence without prejudice or sympathy.  That was the
6  promise you made and the oath you took before being accepted by
7  the parties as jurors, and they have the right to expect
8  nothing less.

9          The indictment or formal charge against the defendant
10  is not evidence of guilt.  Indeed, all defendants are presumed
11  by the law to be innocent.  The defendants begin with a clean
12  slate.  The law does not require the defendants to prove their
13  innocence or to produce any evidence at all, and no inference
14  whatsoever may be drawn from the election of the defendants not
15  to testify.

16          The Government has the burden of proving the
17  defendants guilty beyond a reasonable doubt.  And if it fails
18  to do so as to any defendant, you must acquit that defendant.
19  While the Government's burden of proof is a strict or heavy
20  burden, it is not necessary that the defendants' guilt be
21  proved beyond all possible doubt.  It is only required that the
22  Government's proof exclude any reasonable doubt concerning the
23  defendants' guilt.

24          A reasonable doubt is a doubt based upon reason and
25  common sense after careful and impartial consideration of all

1  of the evidence in the case.  Proof beyond a reasonable doubt,

2  therefore, is proof to such a convincing character that you

3  would be willing to rely and act upon it without hesitation in

4  making some of the most important decisions of your own

5  affairs.

6          In considering the evidence, you are permitted to draw

7  such reasonable inferences from the testimony and exhibits as

8  you feel are justified in the light of common experience.  In

9  other words, you may make deductions and reach conclusions that

10  reason and common sense lead you to draw from the facts which

11  have been established by the evidence.

12          Do not be concerned about whether evidence is direct

13  evidence or circumstantial evidence.  You should consider and

14  weigh the evidence that was presented to you.

15          Direct evidence is the testimony of one who asserts

16  actual knowledge of a fact, such as an eyewitness.

17  Circumstantial evidence is proof of a chain of events and

18  circumstances indicating that something is or is not a fact.

19          The law makes no distinction between the weight to be

20  given either direct or circumstantial evidence.  But the law

21  requires that you have to weigh all of the evidence, whether

22  direct or circumstantial, be convinced of the guilt of the

23  defendants beyond a reasonable doubt before you can find them

24  guilty.

25          As I told you earlier, it is my duty to determine --

it is your duty to determine the facts.  To do so, you must
consider only the evidence presented during the trial.
Evidence is a sworn -- evidence is the sworn testimony of the
witnesses, including stipulations, and exhibits.  The
questions, statements, objections, and arguments made by the
lawyers are not evidence.

The function of the lawyers is to point out those
things that are most significant or most helpful to their side
of the case and, in doing so, to call your attention to certain
facts or inferences that may otherwise escape your notice.  In
the final analysis, however, it is your own recollection and
interpretation of the evidence that controls the case.  What
the lawyers say is not binding upon you.

During the trial, I sustained objections to certain
questions and exhibits.  You must disregard those questions
entirely.  Do not speculate as to what the witness would have
said if permitted to answer the question.  Also, certain
testimony or other evidence has been ordered stricken from the
record, and you have been instructed to disregard that
evidence.  Do not consider any testimony or other evidence
which has been removed from your consideration in reaching your
decision.  Your verdict must be based solely upon the legally
admissible evidence and testimony.

Also, do not assume anything I have said or done
during the trial or -- that I have -- don't assume that I have

any opinion concerning any of the issues in this case.  Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own verdict.

I remind you that it is your job to decide whether the Government has proved -- has proved the guilt of the defendants beyond a reasonable doubt.  In so doing, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to that witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.  You should decide whether you believe all, some part of, or none of each person -- what each person had to say and how important that testimony was.

In making the decision, I suggest that you ask yourself a few questions.  Did the witness impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with either the Government or the defense?  Did the witness seem to have a good memory?  Did the witness clearly see or hear the things about which he or she testified?  Did the witness have an opportunity and ability to understand the

1  questions clearly and answer them directly?  Did the witness's
2  testimony differ from the witness's of other -- testimony of
3  other witnesses?  These are just a few of the considerations
4  that might help you in determining the accuracy.

5       Your job is to think about the testimony of each
6  witness you have heard and decide how much you believe of what
7  that witness had to say.  In making up your mind and in
8  reaching a verdict, do not make any decisions simply because
9  there were more witnesses on one side than on the other side.
10  Do not reach a conclusion on a particular point just because
11  there were more witnesses testifying about that point.  You
12  will always keep -- always bear in mind that the law never
13  imposes upon the defendant in a criminal case the burden or
14  duty of calling any witnesses or producing any evidence.

15       You are here to decide whether the Government has
16  proved beyond a reasonable doubt that the defendants are guilty
17  of the charge -- of the crimes charged.  The defendants are not
18  on trial for any act, conduct, or offense not alleged in the
19  indictment.  Neither are you called upon to return a verdict as
20  to the guilt of any other person or persons not on trial as
21  defendants in this case.

22       The defendants have an absolute right not to testify.
23  The fact that the defendants did not testify cannot be
24  considered by you in any way or even discussed in your
25  deliberations.

1   I remind you that it is up to the Government to prove
2   each defendant's guilt beyond a reasonable doubt.  It is not up
3   to the defendants to prove their innocence.

4   A separate crime is charged against each of the
5   defendants in each count of the indictment.  Each count and the
6   evidence pertaining to it should be considered separately.  The
7   case of each defendant should be considered separately and
8   individually.  The fact that you may find one or more of the
9   accused guilty or not guilty of any of the crimes charged
10  should not control your verdict as to any other crime or any
11  other defendant.  You must give separate consideration to the
12  evidence to each defendant.

13  In any criminal case, the Government must prove not
14  only the essential elements of the offense or offenses charged
15  but must also prove, beyond a reasonable doubt, the identity of
16  the defendants as the perpetrators of the alleged offense.  In
17  evaluating the identification testimony of a witness, you
18  should consider all of the factors already mentioned concerning
19  your assessment of the credibility of each witness in general,
20  and you should also consider whether the witness had an
21  adequate opportunity to observe the person in question at the
22  time or times upon which the witness testified.

23  You may consider all matters, including the length of
24  time the witness had to observe the person in question, the
25  prevailing conditions at the time in terms of visibility or

1  distance and the like, and whether the witness had known or

2  observed the person in earlier times.  You may also consider

3  the circumstances surrounding the identification itself,

4  including, for example, the manner in which the defendants were

5  presented to the witness for identification and the length of

6  time that lapsed between the incident in question and the next

7  opportunity the witness had to observe the defendants.

8  If, after examining all of the testimony and evidence

9  in the case, you have a reasonable doubt as to the identity of

10  the defendants as the perpetrators of the offense charged, you

11  must find the defendants not guilty.

12  The indictment charges the defendants with robbery of

13  a person having lawful charge, custody, or control of any mail

14  matter or money and, in doing so, putting that person's life in

15  jeopardy by use of a dangerous weapon.  In order for you to

16  find the defendants guilty of this charge, the Government must

17  prove each of the following elements beyond a reasonable doubt:

18  Number one, the defendants took mail matter, money, or

19  property of the United States from the person or presence of

20  Sylvester Cobbs, having lawful charge, custody, or control of

21  such property; number two, the defendants took such property by

22  means of force and violence or by means of intimidation; and,

23  number three, the defendants put the life of Sylvester Cobbs in

24  jeopardy by using the dangerous weapon.

25  If you find from your consideration of all of the

1  evidence that the Government has proved each of these elements
2  beyond a reasonable doubt, then you should find the defendants
3  guilty of that charge.

4          If, on the other hand, you find from your
5  consideration of all of the evidence that the Government has
6  failed to prove any one of these elements beyond a reasonable
7  doubt, then you should find the defendants not guilty of the
8  charge.

9          Title 18, United States Code, Section 371, makes it a
10  crime for two or more persons to conspire to commit an offense
11  against the laws of the United States.

12          The defendants are charged with conspiring to rob a
13  person having lawful charge, control, or custody of any mail
14  matter or money by use of a dangerous weapon.

15          A conspiracy is an agreement between two or more
16  persons to join together to accomplish some unlawful purpose.
17  It is kind of a "partnership in crime" in which each member of
18  the conspiracy becomes the agent of every other member.

19          For you to find the defendants guilty of this crime,
20  you must be convinced that the Government has proved each of
21  the following beyond a reasonable doubt:  Number one, that a
22  defendant and at least one other person agreed to commit the
23  robbery of a person having lawful charge, custody, or control
24  of any mail matter or money by use of a dangerous weapon, as
25  it's charged in the indictment; and, number two, that the

1    defendants knew the unlawful purpose of the agreement and
2    joined in it willfully, that is, with intent to further the
3    unlawful purpose; and, number three, that at least one of the
4    conspirators during the evidence -- existence of the conspiracy
5    knowingly committed at least one of the overt acts described in
6    the indictment in order to accomplish such object or purpose of
7    the conspiracy.
8          The overt act need not be of a criminal nature as long
9    as it is done in furtherance of the conspiracy.
10         One may become a member of a conspiracy without
11   knowing all of the details of the unlawful scheme or the
12   identities of all of the other alleged conspirators.  If a
13   particular defendant understands the unlawful nature of a plan
14   or scheme and knowingly and intentionally joins in that plan or
15   scheme on one occasion, that is sufficient to convict them for
16   conspiracy even though that particular defendant had not
17   participated before or even after through the particular
18   defendant -- though the defendant -- let me reread that,
19   please -- even though the particular defendant had not
20   participated before and even though that particular defendant
21   played only a minor part.
22         The Government does not need to prove that the alleged
23   conspirators entered into any formal agreement or that they
24   directly stated between themselves all of the details of the
25   scheme.  Likewise, the Government does not need to prove that

all of the details of the scheme alleged in the indictment were actually agreed upon or carried out, nor must it prove that all of the persons alleged to have been members of the conspiracy were such or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy.  Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purposes of the conspiracy does not thereby become a coconspirator.

The guilt of any defendant in a criminal case may be established without proof that the defendant personally did every act constituting the alleged offense.  The act -- the law recognizes that ordinarily anything a person can do for himself may also be accomplished by him through the direction of another person as his agent or by acting in concert with or under the direction of another person or persons in a joint effort or enterprise.

If another person is acting under the direction of a defendant or if a defendant joins another person and performs acts with the intent to commit a crime, then the law holds that

1 defendant responsible for the acts and conduct of each -- of
2 such other persons just as though the defendants had committed
3 the acts or engaged in such conduct.

4      Before any defendant may be held criminally
5 responsible for the acts of others, it is necessary that the
6 accused deliberately associate himself in some way with the
7 crime and participate in it with the intent to bring about the
8 crime.

9      Mere presence at the scene of a crime and knowledge
10 that a crime is being committed are not sufficient to establish
11 that the defendant either directed or aided and abetted the
12 crime unless you find beyond a reasonable doubt that the
13 defendants were participants and not merely a knowing
14 spectator.

15      In other words, you may not find any defendant guilty
16 unless you find beyond a reasonable doubt that every element of
17 the offense as defined in these instructions was committed by
18 some person or persons and that particular defendant
19 voluntarily participated in its commission with the intent to
20 violate the law.

21      For you to find any defendant guilty of this crime,
22 you must be convinced that the Government has proved each of
23 the following beyond a reasonable doubt:  Number one, that the
24 offense of robbery of a person having lawful charge, control,
25 or custody of any mail matter or money by the use of a

1   dangerous weapon was committed by some person; that the

2   defendant associated with the criminal venture; that the

3   defendant purposefully participated in the criminal venture;

4   and, fourth, that the defendant sought by action to make the

5   venture successful.

6          "To associate with the criminal venture" means that

7   the defendants shared the criminal intent of the principal.

8   This element cannot be established if the defendants had no

9   knowledge of the principal's criminal venture.

10          "To participate in the criminal venture" means that

11   the defendants engaged in some affirmative action -- conduct

12   designed to aid the venture or assist the principal of the

13   crime.

14          The word "knowingly," as that term has been used from

15   time to time in these instructions, means that the act was done

16   voluntarily and intentionally, not by mistake or accident.

17          During the trial, you have heard the testimony of

18   Christopher Moody, who expressed opinions concerning cell site

19   and geolocation historical location services.  If scientific,

20   technical, or other specialized knowledge might assist the jury

21   in understanding the evidence or in determining a fact in

22   issue, a witness qualified by knowledge, skill, experience,

23   training, or education may testify and state an opinion

24   concerning such matters.

25          Merely because a witness has expressed an opinion does

not mean, however, that you must accept this opinion.  You
should judge such testimony like any other testimony.  You may
accept it or reject it and give it such weight -- or give it
such weight as you think it deserves considering the witness's
experience and education, the soundness of the reasons given
for the opinion, and all other evidence in the case.

If the defendants are found guilty, it will be my duty
to decide what the punishment should be.  You should not be
concerned about the punishment in any way.  It should not enter
your discussions or your deliberations.

To reach a verdict, whether guilty or not guilty, all
of you must agree.  Your verdict must be unanimous on each
count of the indictment.  Your deliberations will be in secret.
You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to
deliberate in an effort to reach agreement if you can do so.
Each of you must decide the case for yourself but only after an
impartial consideration of the evidence with your fellow
jurors.  During your deliberations, do not hesitate to
reexamine your own opinions and change your mind if convinced
you were wrong.  But do not give up your honest beliefs as to
the weight or effect of the evidence solely because of the
opinions of your fellow jurors or for the mere purpose of
returning a verdict.

Remember at all times, you are judges -- judges of the

1    facts.  Your duty is to decide whether the Government has

2    proved the defendants guilty beyond a reasonable doubt.

3         So when you go to the jury room, the first thing that

4    you're going to do is decide among yourselves who will serve as

5    the foreperson.  That person will help you guide your

6    deliberations and will speak for you, if necessary, here in the

7    courtroom.

8         A verdict form has been prepared for your convenience.

9    And for that matter, all of these instructions will go back

10   with you; so you may read them -- reread them at your

11   convenience.

12        The foreperson will write the unanimous answer of the

13   jury in the space provided for each count of the indictment,

14   whether guilty or not guilty.  At the conclusion of your

15   deliberations, the foreperson should date and sign the verdict.

16        If you need to communicate with me at anytime during

17   your deliberations, the foreperson should write the message,

18   give it to the court security officer.  I'll either, one, reply

19   in writing to you, or I will bring you back here in the

20   courtroom to speak to your message.

21        Bear in mind that you are never to reveal to any

22   person, not even this Court, how the jury stands numerically or

23   otherwise on any count of the indictment until after you have

24   reached a unanimous verdict.

25        I know you can't see the jury form from this distance

1   probably, but let me tell you it lays out for you each
2   defendant and then each count.  It's very easy to follow.  So
3   you're just going to simply take, for instance, Count 1 as to
4   Mr. Smith and write guilty or not guilty, and then Count 2,
5   guilty or not guilty.  And you have a form for each of the
6   defendants.

7          As I indicated, a copy of the indictment will be
8   included in the instructions and will go back with you to the
9   jury room.

10         So I'm going to allow them to start their closing
11  statements.  And just for the record, it's probably going to be
12  about -- you know, it's 10:10.  It's going to be about 10:15
13  when they get started.  These closing statements are a little
14  lengthy.  I'm not -- because they need to be.  There's a lot of
15  testimony in this case.  It's going to take a while for them to
16  summarize that for you.

17         I just want to let you know that, if you need to take
18  a break during this time, raise your hand, let me know.
19  Otherwise, just for continuity, I'm going to go through all of
20  the closing statements this morning and try to complete them.
21  But I don't want you to sit there uncomfortable if you do need
22  to take a break.

23         I'm going to go ahead and speak to you just a moment
24  about the exhibits that will go back with you.  We will make
25  arrangements for you to have access to any of the videos or any

1  of the documents -- all of the documents you'll have, but IT

2  can assist you in the jury room, if necessary.

3      So I would invite you to listen very carefully now to

4  the closing -- closing arguments.

5      Mr. Mims.

6      Because the Government has the burden in the case,

7  what you're going to find procedurally here is we'll start with

8  the Government.  Then I'll call upon each of the defendants to

9  make their closing, and then Mr. McGee for the Government will

10  summarize and have the last word because the Government has the

11  burden.

12      **MR. MIMS**:  Good morning.

13      **JURORS**:  Morning.

14      **MR. MIMS**:  On February 5th, 2018, Gilbert McThunel,

15  acting together with Jamarr Smith and Roko Ayodele, beat

16  Sylvester Cobbs with a pistol and stole $60,000 from the U.S.

17  Postal Service.

18      Now, earlier this week when Mr. Lewis was making his

19  opening statement, he made a comment to you that the Government

20  cannot produce any real evidence in this case.  Let's talk

21  about the real evidence the Government has produced.

22      First, we have a video that shows the entire robbery.

23  From that video, you can see that there are three people of

24  interest that were actually at the scene committing this

25  robbery.  You have the assailant.  You have the person driving

1  the white SUV who dropped off the assailant and later appeared
2  to come back after the robbery to pick up the assailant.  And
3  you have the person driving the red Hyundai who followed the
4  postal truck to the scene and hung around appearing to act as a
5  lookout.

6      You have Google location information from the first
7  search warrant, the geofence warrant, which places Gilbert
8  McThunel and Jamarr Smith at the scene of the crime at the Lake
9  Cormorant post office at the time of the robbery.

10     You have additional Google location information from
11 the second Google search warrant, which shows an expanded view
12 of McThunel's and Smith's location.  And it shows them
13 traveling from their homes in Batesville middle of the
14 afternoon, up the interstate, and across from Hernando over to
15 Lake Cormorant, hanging out in the Lake Cormorant/Robinsonville
16 area for a couple of hours before and during the time of the
17 robbery, and then returning back to Batesville after the
18 robbery.

19     You have cell tower location data separate from Google
20 location data on both McThunel and Smith that corroborates what
21 you see from the Google location information.  You can follow
22 the cell towers and see them traveling up the interstate,
23 across to Lake Cormorant, and back to Batesville.

24     You have additional cell tower location data on Roko
25 Ayodele's phone.  It shows the same thing you see with

1    McThunel's and Smith's phones, and that is traveling from

2    Batesville, up the interstate, across to Lake Cormorant, and

3    back.

4         We have evidence that all of these defendants are

5    connected to each other.  In fact, I think -- at some point

6    during the questioning of some of the witnesses, I think

7    defense counsel admitted these guys are all friends.  But you

8    know from the evidence -- we have Facebook evidence connecting

9    Jamarr Smith and Roko Ayodele.  We also have the evidence from

10   the Kirk Auto Company records where Mr. McThunel traded in his

11   car, his red Hyundai, three days after this, and he lists on

12   there Roko Ayodele as one of his references, as a friend.  So

13   you have the defendants connected to each other.

14        You have multiple phone calls between the defendants

15   on the day of the robbery -- before the robbery, during the

16   robbery, afterwards.  When I say multiple, it's an abnormal

17   amount of phone calls.  There are literally dozens of phone

18   calls.

19        You've got phone calls between Jamarr Smith and Roko

20   Ayodele.  You have phone calls between Jamarr Smith and Gilbert

21   McThunel.  You have phone calls between Jamarr Smith and

22   Chevella Hines.  And we'll get to her later.  And you have a

23   few phone calls between McThunel and Ayodele.  Only a few

24   because they were riding together in the white SUV.  No point

25   in them calling each other.

1    We have the white SUV that we see in the video, and
2  we've connected that to Roko Ayodele.  It's very clear that he
3  had a white SUV that looks identical to the one we see in the
4  video.  You have the red Hyundai in the video, and we have that
5  connected to Gilbert McThunel.  You have an eyewitness, Forest
6  Coffman, who places Jamarr Smith at the scene of the robbery in
7  the red Hyundai at the time of the robbery.

8    We have the fact that Gilbert McThunel traded in his
9  red Hyundai three days after this robbery.  Three days after.
10 Why trade in the Hyundai?  Because that's the vehicle that an
11 eyewitness saw and spoke to someone at the scene of the crime.

12   They're not thinking they need to trade in the white
13 SUV because they don't realize that we know the white SUV is
14 there.  They don't realize we have the security camera video.
15 But they know Forest Coffman spoke to Smith in the red Hyundai.
16 So, naturally, one of the defendants is wanting to get rid of
17 part of the evidence, part of the tools of the crime.

18   You also have the fact that on that day he spent
19 $3,000 cash on trading in for his new used car.  You also have
20 the fact that Jamarr Smith opened his business Twin's Shift
21 Shop literally a month after this robbery.

22   If any of you have ever opened up a business before,
23 you know it takes money to open up a new business.  You've got
24 to pay rent.  You've got to buy equipment.  You have bills and
25 expenses coming in long before the money starts coming in.

1  $60,000 or 20,000, being a third of the money taken, would be a
2  nice start to opening a new business.

3            You have Patra Malone, who testified yesterday that
4  she knows Roko Ayodele.  If you look at the phone records, we
5  see that there were text messages between Ms. Malone and
6  Mr. Ayodele right about the time of the robbery.  And I believe
7  what she said was, if she ever was texting with Mr. Ayodele,
8  the number she knew to be his in her phone, it was him she was
9  texting.  She wasn't texting anybody else.  She wasn't texting
10 Little Bo.  Doesn't even know Little Bo.  She's texting
11 Ayodele.

12           And, finally, you have Chevella Hines.  Chevella Hines
13 had some sort of relationship with Jamarr Smith at that time.
14 Chevella Hines is the postmaster at Robinsonville.  Chevella
15 Hines knows the postal procedures.  She knows what the post
16 office does with the money they collect.  She knows how much
17 money they collect.  And it's a surprising amount.  She knows
18 Sylvester Cobbs's route and when he runs that route.  She knows
19 that the money is put in the registered mailbags.

20           This is information that's not known to the general
21 public and isn't even known to all of the postal employees.
22 Only the people who need to know, only the people that handle
23 the money or the postmasters are the ones that know the money
24 is in the registered mailbags.

25           And what did the assailant take when he robbed the

truck?  He didn't take the regular mail.  He didn't take the
wallet from Mr. Cobbs.  He took only the registered mailbags
because he knew that's where the money was.  And you have
Chevella Hines tied in with Jamarr Smith and multiple phone
calls between them on the day of and particularly right after
the robbery.

          That is real evidence.  It's real evidence.  Now, some
of that evidence is circumstantial.  Some of it is direct
evidence.  But as you can see from the Court's instructions,
direct -- you should not be concerned about whether evidence is
direct or circumstantial.  Consider and weigh all of the
evidence because the law makes no distinction between the
weight to be given either direct or circumstantial evidence.

          Ladies and gentlemen, I often say that trying a case
is like putting together a jigsaw puzzle.  I occasionally work
a jigsaw puzzle.  If I do, I normally -- when I get started, I
separate the edges and the corners, put them over here.  Then I
look at my picture.

          If I've got a picture that has something large and red
in it, all of the pieces with red I put in a pile together.  If
I've got a blue sky, I take all of the pieces with a blue sky
and put them together and try to separate them into piles.
Now, I can't take all of the red pieces and put them together
and complete the puzzle.  That's just a small part of it.  But
when you take the red pieces and the blue pieces and the edges

1   and you put them all together, you get the complete picture.

2   Trying a case is the same thing.

3        For example, the phone records by themselves don't

4   prove the defendant is guilty of a crime.  But when you combine

5   the phone records and the Google location information and the

6   cell tower data and the phone calls -- I think I already said

7   phone calls -- the links to the various vehicles, the

8   eyewitness testimony putting Jamarr Smith at the scene, and the

9   other evidence, when you put it all together, you get a clear

10  picture of what happened.

11       Now, one other thing that Mr. Lewis told you in

12  opening statement the other day is he made the comment that

13  this is the first case in the country to ever be tried with

14  Google location information.  I'm not sure if that's true or

15  not.  Maybe it is.  Maybe it isn't.  I agree that in 2018

16  geofence warrants were kind of a newfangled tool, a new device

17  that police could use to help solve a crime.

18       Mr. Lewis made a comment, though, that Google location

19  information is not very precise.  I take the exact opposite

20  view.  I think it's very precise.

21       We all think about Google Maps.  I've got Google Maps

22  on my phone.  If I have location services turned on and I'm in

23  a strange place, when I hit Google Maps, in a couple of seconds

24  a little blue dot comes up there and shows me exactly where I

25  am.

1    If I walk out this courthouse door right now and open
2  up Google Maps, in a couple of seconds it's going to show me
3  I'm at the intersection of Jackson Avenue and -- I believe this
4  is Ninth Street, and it's going to pinpoint exactly where I am.
5  If I'm not familiar with Oxford and I'm trying to figure out
6  where do I want to go eat lunch today, I can look and see
7  exactly where all of the restaurants are around me.

8    I don't ever use -- rarely ever use these apps that
9  give you directions someplace because, frankly, I'm a dinosaur.
10  I'm one that wants to get out a map and plot my route before I
11  go.  But I've traveled before with people that are using these
12  apps, and these apps are so precise.  They don't just tell you
13  go down the road and exit on Oak Street.  They literally say,
14  in 500 feet, turn right.  In one mile, take a left at the
15  light.  It is very, very precise.

16    In fact, in his opening statement, Chiniche told you
17  that he was concerned that you might convict his client because
18  Google location information puts him in the box, puts him
19  inside that geofence box at the post office at the time of the
20  robbery.  Of course, he's concerned about it because he knows
21  just how precise this Google location information is.

22    So I'm going to take a closer look at the evidence for
23  a few minutes, but before I do, I want to digress for a second.
24  I love magic.  I've been to two or three big magic shows, and
25  occasionally I see some magic shows on TV, and I like to watch

1  them.

2       If you've ever watched a magic show, you'll see that

3  the magician -- he's always trying to get you focused over here

4  (indicating) on what he's doing with his left hand.  He wants

5  to distract your attention and get you looking at something

6  over here that's irrelevant.  It's not important.  But he wants

7  you to focus on this (indicating) so you don't see what he's

8  doing with his right hand.

9       Defense attorneys in trials are often like magicians,

10 in that they want to get you focused on something that's not

11 important, not relevant, because they don't want you to focus

12 on the evidence.  For example, in this case -- in this case,

13 you may hear from defense counsel about the Google geofence,

14 and why didn't it pick up Sylvester Cobbs?  And why didn't it

15 pick up Rico Ayodele?  Why didn't it pick up Forest Coffman?

16 Why didn't it pick up the occasional car that we see briefly

17 driving through the scene?

18      There's a number of reasons why it might not.  For

19 one, you've heard that, unless you have location services on,

20 it's not going to pick up your location.  And, apparently,

21 there's many, many people that don't ever turn on location

22 services.

23      Or you can see -- from the records in G-4 where we

24 have all of the location information on McThunel and Smith, you

25 can see that while Google is frequently checking your location,

1    it's not literally marking your location every single second.

2    It's every two or three minutes.  So if you're just a car

3    passing through, unless Google is checking location at that

4    precise moment that you pass through the box, it's not going to

5    pick you up.

6              But, more importantly, that's one of those

7    distractions.  They want you focusing and asking questions

8    about why didn't the geofence pick up other people so you're

9    not focused on the important thing, which is the fact that the

10   geofence picked up Gilbert McThunel and Jamarr Smith.

11             Now, when we got the information -- the first

12   information back -- this is step one of the geofence, and it

13   shows three devices.  It shows the device that -- number 479

14   that only hit at 5:58 p.m.  That's almost 30 minutes after the

15   robbery.  The devices of real interest is Gilbert McThunel's

16   device, which hit, I believe, seven times between 5:22 and

17   5:30, and Jamarr Smith's device that hit three times between

18   5:22 and 5:25.

19             But that's just the start of the case.  That

20   identified potential suspects.  Up till that time, the

21   Government couldn't identify who was in that video, but that

22   gives us names to start looking and start now trying to see can

23   we corroborate that, can we prove that those guys actually were

24   involved in the crime.  We've got them at the scene.  We've got

25   them at the scene for an extended period during the time of the

1  robbery.

2       But what else can we do to put that together?  We've
3  got phone records.  We've got quite a bit of phone records.
4  All of the phone records are on the wallet drives, but to make
5  it a little easier for you to read in the jury room, we have
6  pulled excerpts, and we've highlighted in the excerpts all of
7  the phone calls between -- between the defendants here and
8  other interested parties.

9       I'm not going to focus on all of these this morning.
10 I don't have time to go through all of that.  But I would just
11 note -- this is from Exhibit G-6A.  These are Gilbert
12 McThunel's phone records.  And if you look -- and keep in mind,
13 on the C Spire records, they're in straight military time.  On
14 the T-Mobile and AT&T records, they're in UTC time; so you
15 first have to subtract six hours and then convert the military
16 time to civilian time.

17      On Gilbert McThunel's records, we see at 5:16 p.m. --
18 right about the time -- right before this robbery begins, we
19 have a phone call from Jamarr Smith's number to Gilbert
20 McThunel's number, and it lasts 350 seconds.  And you can see
21 the tower it's pinging off is the Lake Cormorant tower.

22      Now, I don't know what was said during that phone
23 call, but I would suggest to you -- you know Jamarr Smith is
24 following the truck to the location.  He's calling Gilbert
25 McThunel saying, "Hey, get ready.  He's coming.  He's on his

1  way.  Are you there?  Are you in place?"

2  And then at 5:30 p.m., you have a call from McThunel
3  and Ayodele that lasts 245 seconds.  That's approximately four
4  minutes.  I suspect then he was calling Ayodele, the guy that
5  dropped him off in the white SUV saying, "Hey.  Hey, man.
6  Where are you?  Come get me."

7  Because you remember from the video, after the robbery
8  occurred and Mr. Cobbs pulls around to the front, the assailant
9  is running around the back not knowing what to do, and his
10  ride's not back.  And then there's the train over here.  His
11  ride is somewhere across the tracks.  Maybe Mr. Ayodele just
12  got too far away or maybe he got slowed down by the train and
13  couldn't get back, but there's a phone call to McThunel and
14  Ayodele probably asking for him to come get him.

15  Then we have the phone records in evidence as G-5A.
16  The full set is on G-5.  I'm going to try to hit these very
17  briefly.  These are the T-Mobile records.  And not only do they
18  have the specific latitude and longitude of the towers, but
19  they actually have the names of the towers over here on the
20  side.

21  And if you look at the records, Jamarr Smith travels
22  around noon that day up to the Robinsonville/Tunica area.  Then
23  he comes back, and he's in Batesville by about 1:45.  And
24  between 2:54 and 3:07 p.m., there's three phone calls between
25  Mr. Smith and Mr. Ayodele.  They're still pinging off the tower

1   in Batesville.  I suspect at that time Smith's calling Ayodele

2   saying, "Hey, man.  You about ready?  Is McThunel with you?

3   Let's go."

4          Shortly after that, if you look over here in the right

5   column, you can see his phone leaves and goes to Sardis,

6   Hernando, Nesbit, Robinsonville, Lake Cormorant.  And for a

7   period of time between 4:17 and 5:49 p.m., Mr. Smith's phone is

8   making multiple calls pinging off the towers in either

9   Tunica -- I'm sorry -- in either Robinsonville or Lake

10  Cormorant with one time when it hits the tower in Tunica, all

11  while making calls with Ayodele and McThunel and Hines.  And

12  then you can literally follow his phone back to Batesville

13  afterwards, going from Crenshaw to Senatobia, and arriving back

14  to Batesville at approximately 6:21 p.m.

15         You heard from Chris Moody, the expert witness who

16  works in the technical services unit of the postal service.  He

17  has plotted all of this information on a map for you.  And it's

18  really not that complicated.  There are programs that if you

19  take this information from Google and from the phone companies

20  and put it in this program, it will plot all of the points on

21  the map.

22         And what you see -- you see several things.  You see,

23  first of all, from the geofence location, Jamarr Smith.  It put

24  him at the scene three times between -- I believe it was 5:22

25  and 5:25.  And where's he at?  He's right here in front of the

1   old store right where Forest Coffman saw him.  It puts Gilbert

2   McThunel there at the post office seven times.  It puts him

3   right there at the post office during the time of the robbery.

4          And he's put together -- this is just kind of -- it

5   doesn't show the times, but it shows the movement of the

6   phones.  I believe the red one is Mr. McThunel, and the yellow

7   one is Mr. Smith, and it shows them traveling up here to Lake

8   Cormorant before the robbery and then back down 3 and cutting

9   across the interstate and back to Batesville.  And if you watch

10   the animated videos that are in evidence on the wallet drive on

11   G-25, you can literally watch the phones travel from

12   Batesville, across to Lake Cormorant, and back.

13          The other thing that Mr. Moody showed you is that all

14   three phones -- all three of them were at the Lake Cormorant

15   post office at the time of the robbery.

16          Now, I look for you to hear some argument about the

17   cell tower information reliability, the Google reliability.

18   For example, the cell towers -- the phone company rep said the

19   phones are always looking for the strongest signal, and usually

20   that's going to be the closest tower.  Now, yes, there are a

21   number of things that the phone looks for to connect, and there

22   are reasons why occasionally it might not hit the closest

23   tower, but usually it's going to find the closest tower.

24          If we had a case where we had one phone call, one

25   phone call where one time one defendant the tower was at Lake

Cormorant, maybe you might have an argument. Hey, maybe that was the one time when other towers were down and there was a football game going on and the closest available tower was an hour from home. We have dozens, dozens, dozens of phone calls. Do you really believe that on all of those dozens of calls it's just picking out some random tower far away from the phone?

We're not relying on one phone call or one location from Google. It's dozens of phone calls. It's dozens, if not hundreds, of Google location points for both McThunel and Smith, which I believe clearly shows that these phones traveled from Batesville to Lake Cormorant and back.

Now, let's talk about Sylvester Cobbs for a minute. You heard his testimony. He was struck with a weapon multiple times, left a scar on his face. He testified that he was threatened by the assailant. Said that the assailant first said -- threatened to shoot him. Later, when they were struggling, said, "I ought to just kill you."

When Mr. Chiniche was cross-examining Stephen Mathews a couple of days (sic), he suggested that perhaps Sylvester Cobbs was involved in this. You've heard the 911 call. It's in evidence as G-8. I don't have time to play it for you this morning, but I would encourage you to play G-8 again when you're in the jury room. Listen to Mr. Cobbs on that 911 call made shortly after the robbery.

He describes in great detail how the man attacked him

1    with a gun.  Said the gun ended up on the ground.  He thought

2    maybe he could get to it, but he couldn't.  The assailant got

3    to it, continued to beat him.

4           You can see in the video -- looks like the assailant

5    is pointing a gun at him.  You can't see the gun, but you can

6    see him doing this (indicating) while Cobbs is on the ground.

7    You heard the shakiness of his voice on that 911 call.  Does he

8    sound like somebody that was involved in this crime?

9           You also heard from Forest Coffman.  Forest Coffman

10    has nothing to gain from being here.  He testified that on the

11    day of the robbery he had been walking back and forth from his

12    uncle's shop behind his trailer right there across the street

13    from the post office.  He sees a red car.  It's not familiar to

14    him.  It's a small rural community.  You recognize everybody's

15    car and know everybody's car around there.

16           He doesn't recognize it, and he's acting funny, and he

17    goes up and approaches the gentleman.  He says, "Hey, can I

18    help you?  What's going on?"  Of course, he doesn't know who

19    that guy is.  It's a stranger from Batesville, as it turns out.

20    He doesn't know who he is.

21           It took a while for the postal service to identify

22    potential suspects.  So when they did, they came back to

23    Mr. Coffman 17 months later and showed him three photo lineups

24    and asked him, "Can you identify anybody?  You don't have to

25    circle anybody at all, but do you see anybody in these

1   pictures?"  Forest Coffman circled Jamarr Smith.

2        Now, you may hear from the defendants that was
3   17 months later.  How can you remember something 17 months
4   later?  That's -- that's impossible.  I would argue just the
5   opposite.  If 17 months later you can look at 18 strangers in a
6   photo lineup and pick one specifically and it be the one, I'd
7   say it's very good memory.

8        **COURTROOM DEPUTY:**  Five minutes.

9        **MR. MIMS:**  Let's talk about jury instructions for just
10  a minute.

11       Tracy, how am I doing on time?  Five-minute warning?

12       **COURTROOM DEPUTY:**  Uh-huh.

13       **MR. MIMS:**  Thank you.

14       Let's talk about jury instructions for just a minute.
15  One of the first instructions I want to look at, where the
16  Court tells you you are only concerned with the guilt of these
17  three gentlemen on trial here today.  You're not concerned with
18  the guilt of anybody else not on trial.  As my friend Bob
19  Norman reminded me this morning, we fry one fish at a time or,
20  in this case, maybe three fish at a time.

21       You may hear from them about other potential people
22  that may have been involved.  And I don't dispute that there
23  may have been other people involved.  In fact, if you look at
24  our indictment, in the very first paragraph, we state that
25  Smith, Ayodele, and McThunel conspired with each other and

1  other persons known and unknown to the grand jury to commit
2  this crime.  There may have been others involved, but today
3  we're concerned about whether these three defendants were
4  involved or not.  Are they guilty or not?

5  Another instruction I want to look at -- it's always
6  one of my favorite instructions.  It says, "In considering the
7  evidence, you are permitted to draw such reasonable inferences
8  from the testimony and exhibits as you feel are justified in
9  the light of common experience."  In other words, use reason
10  and common sense.

11  Let's think about that for a minute.  One of the
12  arguments you're going to hear from the defendants is, hey, the
13  devices may have been in Lake Cormorant, but that doesn't mean
14  the defendants were in Lake Cormorant.  That defies all logic.
15  Everybody in this room has a cell phone.  Some people may have
16  more than one cell phone.  We always keep our cell phones with
17  us all of the time.

18  When I leave the house in the morning, my phone is
19  with me until I get back to the house that night.  And when I
20  walk in the door, usually I sit my phone down on the desk by
21  the back door where I come in.  And so I may be down the hall
22  and not near my phone, but the phone is at home with me.  It's
23  not off somewhere else.

24  And, yes, every once in a blue moon, I've left in the
25  morning and left my phone sitting on the desk and had to go

1  back and get it, or I've left work at lunch and realize when I
2  get home, oh, I left my phone at the office.  But my phone
3  doesn't go out and get in somebody else's car and drive off an
4  hour from home.  Really, my phone doesn't get out -- doesn't
5  walk out and get in my own car and go an hour from home and I'm
6  not there.  That defies common sense.

7  And if you think about the argument the defendants are
8  making in this case, that somehow they lost their phone or left
9  their phone in their car, it's almost impossible to believe
10 that that would happen for one person, but in this case, if you
11 follow that, they're saying that all three people -- three of
12 them all left their phones -- lost their phones on the same
13 day; that their phones just grew legs and walked out and hopped
14 in their own cars and drove off an hour away with three
15 completely different people, three people who knew each other
16 and were calling each other constantly during the time of the
17 crime, three people who apparently had a connection maybe to
18 Chevella Hines to know how to pull this off.  It just defies
19 common sense that that would happen.

20 Also, a couple of other things just on the topic of
21 common sense.  We've already talked about the fact that phones
22 generally connect to the closest tower.  You can -- we know
23 that -- that's the case.  You've heard the testimony from the
24 phone reps.  We know that to be true.  You can literally watch
25 the towers and see where people travel.

1    And the tower information is confirmed by Google

2  location information, which is completely separate.  You even

3  heard from -- I believe Mr. Lewis acknowledged this, and the

4  expert, Chris Moody, said the same thing.  The Google location

5  data is even more accurate.

6    I want to touch briefly on the -- on the charges and

7  the elements to prove them.  We have two counts in the

8  indictment.  We have a substantive count, and we have the

9  conspiracy count.  The substantive count is Number 2, and

10  that's just the one -- that's just the one that says these

11  defendants committed this robbery.  Keep in mind that you don't

12  have to be the person holding the gun to commit the crime.  If

13  you assist, that's called aiding and abetting, and you're also

14  just as guilty of the crime.

15    The Government would have to prove the defendants took

16  money belonging to the United States that was in Cobbs's lawful

17  custody; the defendants took the property by means of force and

18  violence or intimidation; and the defendants put his life in

19  danger -- Cobbs's life in danger by the use of a dangerous

20  weapon.  I believe the Government has proven all of that.

21    Again, I would just encourage you to remember that

22  whether it's aiding and abetting or conspiracy -- by the way,

23  on conspiracy, one of the things the Government has to prove is

24  one of the substantive counts.  These are listed as A, B, and C

25  at the bottom of Count 1.  We don't have to prove each and

1  every one of those.  If we prove any one of those substantive

2  counts, you can convict on the conspiracy, but I would assert

3  to you we've proven all three beyond a reasonable doubt.

4          The important thing about aiding and abetting in a

5  conspiracy, again, is you don't have to hold the gun to be

6  guilty.  If you drive the drop-off or getaway car or if you

7  drive the lookout car, you're guilty.  You're just as guilty as

8  the man who beat Sylvester Cobbs with the gun.

9          Ladies and gentlemen, I've taken up enough of your

10  time this morning.  I would just ask you to -- when you return

11  to the jury room, don't get in a rush.  This is an important

12  case, and there's a lot of evidence to go through.  I would

13  encourage you to watch the video, listen to the 911 calls, look

14  over the animated maps in G-25 from Chris Moody, look over the

15  phone records with voluminous phone calls back and forth

16  between the defendants at the time of the robbery and also

17  showing the location of the cell towers, and return a verdict

18  of guilty on both counts for each defendant.

19          Thank you.

20          **THE COURT:**  Thank you, Mr. Mims.

21          Mr. Chiniche.

22          **MR. CHINICHE:**  Yes, Your Honor.

23          **MR. MIMS:**  Your Honor, if I may for just one second.

24  I've got some exhibits.  I need to put them back up here in

25  case they need them, and I'm a little disorganized.

1          **THE COURT:**  Okay.

2          **MR. MIMS:**  Thank you, Your Honor.

3          **THE COURT:**  Thank you.

4          **MR. CHINICHE:**  May I begin?

5          **THE COURT:**  You may.

6          **MR. CHINICHE:**  May it please the Court.  Opposing

7    counsel.

8          Ladies and gentlemen of the jury, I disagree with

9    Mr. Mims's puzzle analogy, put the pieces together and it gives

10   you a full picture.  I like to say they take a square peg and

11   hammered it into a circle.

12         I recently had a bad experience with Google Map, such

13   though that when my daughter wanted to drive to Memphis, I

14   didn't want her to use Google Map because I -- I had a bad

15   experience with it on the way to the beach.

16         This case against Mr. McThunel is based on pure

17   speculation.  There's no witness that identified Mr. McThunel

18   as the assailant.  There's no prosecution witness that

19   identified Mr. McThunel in this courtroom.  The video doesn't

20   show Mr. McThunel, Mr. Smith, or Mr. Ayodele.  There's no car

21   tag to identify that -- this sedan the Government says was

22   Mr. McThunel's, there's no car tag to identify it to

23   Mr. McThunel.

24         Forest Coffman, the white gentleman from the Delta

25   that lived at that intersection, he was interviewed on the day

1   of the robbery.  He gave a lot of information about a driver,

2   but he only told law enforcement it was a red car.  He couldn't

3   identify the tag.  He couldn't identify if that car was from

4   Mississippi, Tennessee, Arkansas, or somewhere else.

5          There's also no motive for Mr. McThunel to commit this

6   crime.  No motive.  I'll talk about that in a minute.  There's

7   no physical evidence or direct evidence linking Mr. McThunel to

8   this crime.

9          You heard information about other suspects where

10  Investigator Mathews either didn't follow up or didn't --

11  didn't result in a case.  Edwin T. Brown.  We heard about him.

12  We didn't see him, but we heard about him.  Edwin T. Brown was

13  so important to law enforcement they got his phone records, and

14  they learned that he cancelled his cell phone on the day of

15  this crime.

16         Remember Edwin T. Brown?  He's the one that had a

17  serious felon -- serious criminal record.  He's a convicted

18  felon with an armed robbery charge of a grocery store, meaning

19  he went into a grocery store with a firearm.

20         We have Chevella Hines.  We heard about her.  We

21  didn't see her.  She also cancelled her cell phone on the day

22  of the crime.  Government's Exhibit Number 9 shows you that.

23  Got G-9C.  This is the -- this is the phone that belongs to

24  Chevella Hines.  It's her phone number that was in some of the

25  records.  Mobile deactivation date, 2/5/2018, the day of this

1  crime.  When was it terminated?  2/5/2018.

2  Chevella Hines was the postmaster at the Robinsonville
3  post office.  She's also the supervisor of the Lake Cormorant
4  post office that -- Inspector Mathews told us that, so did
5  Mr. Cobbs, the -- the driver.  Chevella Hines knew the route,
6  the time, and she's the one that knows about this registered
7  mail.

8  You also heard the name -- I asked Inspector Mathews
9  about the employee Latorian Clark.  I asked Mr. Mathews why he
10  showed up in a law enforcement report because he's a gentleman
11  that Chevella Hines let off that day, postal employee allowed
12  to leave that day.  No follow-up investigation.  No information
13  on him.  But it was important enough to be in a law enforcement
14  report.

15  Travonya Nash was a C Spire account holder.  They
16  subpoenaed C Spire records on 662-710-7511.  The account holder
17  was Travonya Nash.  The C Spire employee that testified said
18  that was not a prepaid account.  That was an account -- an
19  arrears account where you had to produce a photo ID, social
20  security number, credit check.

21  Then Mr. Cobbs described a suspicious interaction he
22  had with somebody in Robinsonville earlier that day.  Somebody
23  he thought was suspicious walked up to him -- it's before he's
24  robbed -- asked him about how you apply for a job.  I asked
25  Inspector Mathews about that.  Did you locate that gentleman?

1  He was in a tan two-toned vehicle.  No information there.

2          Forest Coffman, the white gentleman that lived in the

3  Delta at that intersection, when he was interviewed that day,

4  he told DeSoto County Sheriff's Department he had a video, and

5  they took that video.  We didn't see it.  I'd like to know what

6  was on that video.

7          We have -- in the geofence, we have this -- three

8  devices -- three accounts that were returned, one of which was

9  ruled out by law enforcement.

10         Ladies and gentlemen, the timeline you heard --

11  February 5th, 2018, was the date of the incident.  That day

12  Mr. Cobbs was interviewed, and Mr. Coffman was interviewed,

13  Forest Coffman.  That's the day that Mr. Coffman identified a

14  red vehicle.  We go a year later, February 2019.  Inspector

15  Mathews said no leads.  Haven't solved the crime yet.

16         And then in May 2019, they learned about a new

17  technique to law enforcement, something law enforcement was

18  getting into.  Let's send a subpoena, a search warrant to

19  Google.  Let's use their data.  Let's draw a box around the

20  crime scene, and let's get a warrant to see what kind of

21  information they'll give us.  Google calls that a geofence.

22         And remember it came back with three accounts, three

23  results, I'll call it, two of which the Government said were

24  Mr. Smith -- one was Mr. Smith, one was Mr. McThunel, and there

25  was a third one they ruled out.  They have to do further

investigations because all it does is give you the e-mail
address.  But that's where we had that permanentwavesrecords
account that was not investigated.

So they keep digging.  They've got a square peg.
They've got to get it in this round hole.  And in June and
July 2019 -- what is that?  15 months later -- they get cell
tower/cell phone information, and they start naming McThunel,
Smith, and Ayodele.

So then federal -- the investigators go back to
Mr. Coffman.  Remember, this time he's living in Memphis, and
they meet in some building in Memphis.  This is in July 2019.
Mr. Coffman sits down with an investigator who's working on the
suspects, shows him a lineup -- three different lineups.

Two of those lineups Coffman doesn't pick out either
of the defendants.  Nobody.  But it picked out one.  This is 15
months later.  He picked out a guy that he had a 30-second
interaction with.  And he described Mr. Smith as having a red
goatee while he's in an apartment -- in a Memphis building with
an investigator.  Mr. Smith doesn't have a red goatee.

And when Mr. Coffman was asked can you be 100 percent
sure about picking that gentleman out of the lineup, he said,
"I wouldn't say I was 100 percent sure.  I was confident, but I
wasn't 100 percent."  And that would mean -- if that story is
true, that would mean that Mr. Smith had to be driving the red
car, who they say was my client's car.

1          So we've got this new technology.  We've got a

2   geofence drawn with Google's data, obtained with Google's

3   information, and it produces three results, two of which the

4   Government says are relevant.  We'll talk about how reliable

5   that is later.  You heard it during the trial.  But there are

6   other people in that geofence that weren't returned on the

7   Google search warrant.

8          Mr. Coffman -- Forest Coffman, who lived next door, he

9   and his girlfriend -- I asked him, "Did you have an Android

10  phone?"  He did.  You're probably wondering why.  But that's

11  why.  Because if he had an Android phone, it should have shown

12  up in the geofence.  I asked him if he had a Gmail account.  He

13  did.  He didn't show up in the geofence.  I asked him if he had

14  a girlfriend.

15         I asked Mr. Cobbs, the victim, "Did you have a cell

16  phone?"  We know he did.  He called 91 -- he called his wife,

17  and then he called 911.  "Did you have a Gmail account?"  He

18  did.  He didn't show up.

19         Look at -- if you feel like you need to, look at that

20  video entirely.  It's 33 minutes' long.  Those are two

21  individuals with Google accounts not showing up in the

22  geofence.  How reliable is that?  We'll discuss that later.

23         We had Mr. Moody testify through Zoom.  Remember him?

24  He's the Government's witness who testified about the

25  geolocation, historical information.  He didn't like us, and he

1    didn't like Mr. Lewis's questions.  But even he had to admit
2    that Google strives for its historical location data to be 68
3    percent accurate.

4        Look at that video.  You will see that -- you already
5    know that Mr. Cobbs, the victim, Mr. Coffman were in that
6    geofence, but there were other vehicles and other people in
7    that geofence as well.  It's a 33-minute video.

8        I'll submit to you that at the 4:10 mark, there's a
9    dark SUV; at the 5:48 mark, there's a white SUV; at the 6:20
10   mark, there's a dark sedan.  Not the red one.  I'd submit at
11   9:40 -- that's when the mail truck shows up.  At 10:30, that's
12   when the red sedan shows up.  At 10:20, we have another dark
13   sedan.  I submit that that looks like a Nissan Altima to me.

14       At 12:40, we have a white or a silver-colored sedan.
15   At the 14:35 mark, we have a train that comes through.  At the
16   23:22 mark, there's a red pickup truck.  You'll notice that red
17   pickup truck because Mr. Cobbs backs his mail truck again back
18   to the back of the video -- back of the post office.

19       24:25, we see a newer white SUV coming over the
20   railroad tracks heading southbound, and then at 25:20, we see a
21   dark crossover, I'll call it, because I can't tell if it's an
22   SUV or a sedan -- a dark crossover pulls into the parking lot
23   of the post office.  And then, lastly, right before it ends,
24   31:40, there's a white pickup truck that passes by.  That's
25   about 10 or 11 vehicles in addition to the two the Government's

1  focused on.

2      Ladies and gentlemen, there is -- maybe you've heard
3  of something called the power of suggestion.  Power of
4  suggestion is a psychological process where an individual is
5  given an idea, and that idea then becomes that person's
6  reality.  The more that these investigators and these
7  prosecutors look at that video, the more they want it to be a
8  2013 Hyundai Sonata.  The more you look at it, the more you
9  want it to fit.

10     Prosecution says the only reason McThunel sold that
11 car was to get rid of it.  Why can't there be other
12 explanations?  Why can't it be maybe there was a nationwide
13 recall on the 2013 Hyundai Sonata engine?  Why can't it be --
14 excuse me, Your Honor.  Why can't it be because it had
15 133,000 miles on it?  Why can't it be maybe it wasn't running
16 right?  Why can't it be maybe it had too many recent repairs?
17 Why can't it be maybe he didn't want to drive it anymore?  Why
18 does he have to be a criminal?  And why does the $3,000 he put
19 down have to come from a robbery?  What if he had just won
20 something at the casino with his buddies in Robinsonville?
21 Mr. McThunel got a loan for the trade-in for the car?

22     I went over this with the witness.  He's got college
23 experience.  He's -- he listed his job.  He listed how much
24 money he makes monthly.  He pays $300 of rent living with
25 relatives.  He's got a bank account at BancorpSouth.  He had

1  auto insurance with Allstate.  He had a credit score.  And he
2  listed his pay stub.  He's got no motive to commit a crime.

3      We have Government Exhibit 19.  I want to show you
4  this, and I don't want you to be confused.  This is the red
5  Hyundai.  This is a snapshot from the video you'll notice from
6  the green lines.  This right here where my pen is (indicating),
7  that's a stock photo.  That's not Mr. McThunel's car.

8      Ladies and gentlemen, if you have questions that are
9  unanswered about this case, that's called reasonable doubt.
10 It's the prosecutor's job to answer those questions for you.

11     The judge read to you an instruction that I want to
12 highlight.  And it says, "If, after examining all of the
13 testimony and evidence in this case, you have reasonable doubt
14 as to the identity of the defendants as the perpetrators of the
15 offense charged, you must find the defendants not guilty."
16 That's what I'm asking you to do.  Mr. McThunel is not guilty.

17     First day we were here we had the whole venire out
18 there.  I explained the three types of burden of proof.  Two
19 are in a civil case.  One is in this case.  Civil case, by a
20 preponderance of the evidence, more likely true than not true.
21 Not here.  Another kind of civil case, fraud, clear and
22 convincing.  That's not even here.  But beyond a reasonable
23 doubt?  I submit to you no.

24     Thank you, Your Honor.

25     **THE COURT**:  Thank you.  You still comfortable?

1          Mr. Lewis.

2          **MR. LEWIS:** I'm going to let --

3          **MR. TRAVIS:** I think I'm going to go before, Your

4    Honor.

5          **THE COURT:** Excuse me. Thank you.

6          **MR. TRAVIS:** Thank you, Judge.

7          Thank you, Your Honor. May it please the Court.

8          **THE COURT:** Yes, you may proceed.

9          **MR. TRAVIS:** Good morning, ladies and gentlemen.

10         **JURORS:** Good morning.

11         **MR. TRAVIS:** As you know, I represent Mr. Ayodele.

12   Stand up again, please, sir.

13         (DEFENDANT COMPLIES.)

14         **MR. TRAVIS:** Thank you very much.

15         I'll start at the back end of the presumption of

16   innocence. You're going to hear it when I finish my remarks.

17   Y'all all heard that in voir dire and what the Court has said.

18   But as he stood there, he's presumed innocent. And every

19   person on that wall, all of you, this judge, these reporters,

20   these lawyers, young and older, these people in the audience --

21   they all have the presumption of innocence. Put a lot of

22   weight on that because you've got a lot of weight to lift when

23   you get back there in that room. It's a heavy barbell, the

24   presumption of innocence.

25         When the prosecutors -- who are also presumed

1 innocent.  This fine agent is.  These fine prosecutors.  This
2 lovely lady.  But they want to say, based on circumstances and
3 speculation in regards to Mr. Ayodele -- when I'm talking to
4 you, I'm just talking about Mr. Ayodele.  Okay? -- and they
5 want to say that that's enough to convict him on this two-count
6 indictment.

7        And I'm saying to you, ladies and gentlemen, that, as
8 I said to you earlier in the week, I'm asking you for a verdict
9 on behalf of Mr. Ayodele of not guilty.  Not guilty.  Not
10 guilty.  I'm saying to you that the prosecutors have not proven
11 their circumstantial case to show you -- with the evidence that
12 you've heard on Mr. Ayodele, they have not been able to show
13 you proof, evidence, beyond a reasonable doubt.  Okay?  They
14 haven't shown that.  Circumstances are not enough with
15 Mr. Ayodele.  Not on this case.

16        I asked you when we picked you for this jury -- the
17 judge first said we wanted to trust you.  We trust you.  You're
18 on this jury.  All of the lawyers, prosecutors, defense
19 lawyers, we chose you.  We trust you.

20        During my questioning on the voir dire when we were
21 trying to decide who to put on the jury, we trusted you, and we
22 chose you.  And I asked you then -- you can recall -- at the
23 end of this, at the end of the day, to trust yourself.  I don't
24 know if you recall, but I ask you all, all 12 of you now, to
25 trust yourself.  And I think I said to stand on your own two

1  feet, if you recall.

2       Mr. Mims, the prosecution, has this circumstantial
3  case, but as a mutual friend of ours, Honorable Bob Norman with
4  the U.S. Attorney's Office -- Mr. Mims noted what Mr. Norman
5  said.  He's also said, "As you know, you never know,"
6  quote/unquote.  Honorable Bob Norman.  "As you know, you never
7  know."

8       And if, at the end of this case, you just don't know
9  beyond a reasonable doubt that Mr. Ayodele is in any fray here
10 with anybody, then that is reasonable doubt, and you can
11 honorably and -- walk as tall as any man or lady ever walked
12 through those doors out and say, "It was a heavy lift, a lot of
13 circumstances, but I vote not guilty for Mr. Ayodele," my
14 client, whether he's friends with anybody.

15      We do know from the evidence from former Agent
16 Mathews, who testified truthfully -- on the stand, he played no
17 games, but he's not able to give you enough on this case to
18 prove beyond a reasonable doubt that my client is guilty of any
19 wrongdoing whatsoever.  When I say that, I'm not saying that he
20 lied.  It's not his fault that he doesn't have that.  He did
21 his job.

22      He's been honest on everything, including this
23 business about Mr. Ayodele's phone.  Let's call it the 4000, if
24 you'll stay with me on all of that.  That's never been burned.
25 Never destroyed the phone.  And also that he had another

1   telephone, the 228 number -- find it in a minute.  You're all

2   aware that he testified that there were -- he had a second

3   telephone.  And I think Mr. Mims has told you that some people,

4   many people, have more than one phone.  I don't want one phone,

5   but a lot of people have more than one phone.

6          The testimony of Mr. Mathews, again, no phones were

7   ever cancelled.  It's been proven into evidence that

8   Mr. Ayodele has another phone number.  At a minimum, it was

9   228-223-7879.  Do you recall seeing that in the exhibits?  That

10  phone does not show up on all of the videos, photographs, all

11  of the technology that is about to rob our souls that shows

12  these colored photographs so we can all watch television again

13  and let our brain go dead -- showing that -- they want to say

14  Ayodele and other named persons in here.  That's a device, as

15  Mr. Goodloe so well pointed out, in this case.  That is not

16  proof beyond a reasonable doubt that that is Mr. Ayodele.

17  Okay?

18         I asked Mr. Mathews this, if I can read my own

19  writing, about the white SUV.  "Your evidence on the date of

20  the crime of February 5th, 2018, does not, by video or any

21  other form of identification, show Mr. Ayodele physically in a

22  white SUV at the Lake Cormorant post office where Mr. Cobbs was

23  assaulted?"  He said, "No."  That's Mr. Chiniche.

24         There's no video or photo showing him in a white SUV,

25  whether it be his or anybody else's.  Male or female in the

1     car -- we don't know -- in the truck?  We don't know.  We don't

2     know.  This agent didn't know and still does not know.  These

3     prosecutors do not know.  That's not their fault.  I'm not

4     beating up on them.  But they don't know.  Several phones.

5            Let's talk about -- Mr. Mathews spoke to my client on

6     two occasions.  Mr. Ayodele was asked to talk to them, and he

7     voluntarily did that on two occasions.  He didn't have to do

8     that.  I hope y'all realize that.

9            But on October the 20th of 2019, the first time, he

10    met with them, and that's when the information that he had

11    multiple phones -- okay.  Friends, fair enough.  We all have

12    friends.  I'm sure all of you have friends.  On that occasion,

13    they asked him whether he was involved in any wrongdoing on

14    February the 5th of 2018 at Lake Cormorant, and he denied that

15    he had.  That was his honest answer.

16           The December 19th meeting, which is all some months

17    after the event of February 5th of 2018, again, he denied any

18    involvement in any wrongdoing.  He answered them.

19           On both occasions, he mentioned, as the prosecutor

20    brought up, Little Bo.  Two times in the October 2019, if I got

21    that right, and December, Little Bo -- he told him that he

22    sometimes loans his white SUV to Little Bo.  I hope I made the

23    point on cross from that stand that we all loan our vehicles

24    from time to time.

25           It's not beyond comprehension, possibilities, that if

someone has more than one phone and they loan their vehicles to Little Bo from time to time -- we don't know if Little Bo should be sitting at that table.  I don't know.  They don't know.  They don't know.  But Little Bo has gone to that land from which no man ever returns -- I believe it was in May of 2019 he passed away, with all due respect.  We don't know anything about him, other than this agent -- this fine agent, former agent -- he didn't -- Little Bo is not made up.  That was a person.  That was a person.

Again, nobody here at my table with Mr. Ayodele has gotten rid of any phones or any vehicles, and he talked to these people two times.  Two times.  They asked him to talk, and he's talked to them two times.

I'm with Mr. Chiniche on the puzzle part because I know this is going to be work and a lot of heavy lifting, but I don't think, with the information that has come out on my client, talking about my client, that the puzzle fits perfectly for these prosecutors.

Again, Mr. Mims, some people have more than one phone. It defies common sense.  It doesn't defy common sense.  I'm asking you to use your common sense.  Please use all of your life experiences when -- from the time you were able as a young person going through your teenage years, your younger years, when under whatever random circumstances it looked to you like you may had done something wrong, wrong place, wrong time.

1      Look at your friends.  Look at your future and
2   somebody -- whether it's your daddy or your mama or the
3   principal who's pointing their finger at you, you, you, or you
4   and saying you did it, but you didn't do it.  And if you've
5   worked with a lot of people in your civilian careers, military
6   careers, you know things like that happen.  That is common
7   sense.  Common sense does not exclude it.  It pulls it in.  Use
8   it all.

9      The judge asked you to keep an open mind.  And I am
10  asking you on my client there to keep an open mind on these
11  facts.  Several phones.  A phone.  Again, they want you to
12  watch these numbers and attach a device to a flesh and blood
13  human being.  That's not enough.

14     With Mr. Ayodele, you know, there's no, that I heard
15  of, influx of moneys or high-end purchases.  Nothing.  That's
16  not his fault.  That's not the agent's fault.  I'm just saying
17  I don't hear that.  That would tell me something.  Large amount
18  of money, well, I -- again, nothing to show that my client is
19  out there with moneys playing around.

20     My heart goes out to Mr. Cobbs, but, again, nothing
21  ever showed -- and nobody -- by anything other than this phone
22  number -- although I respect the technology.  I've learned a
23  lot about it on this case.  Trust me.  I'm of that generation
24  where I didn't grow up with it like a lot of people do.

25     But I've -- many legal scholars will argue that

circumstantial evidence should never be sufficient to convict someone, but I don't know that I'm on that page.  But when you've got openings in the proof like on Mr. Ayodele with multiple phones, no phones have been disposed of, no vehicles have been disposed of, not picked out from anybody on the scene, not on the video, that's when it comes in and weighs on you that this judge gave you it has to be proof beyond a reasonable doubt, that there is that presumption of innocence.

The prosecutors on a circumstantial case, to some degree, are shooting dice.  Because with all due respect, they just don't know.  That's not their fault.  They're shooting dice.  And they're wanting you -- there's been no lies here.  None.  They want -- they think it or they wouldn't be here.  They don't want an innocent person to get in trouble.  But they think it.  They've got blinders on.  They're professional prosecutors.  That's their job.

You are now the judge.  You are now the decider.  I would say to you, don't play the percentages or the probabilities the way the prosecutors are having to do on this case or we wouldn't be in this courtroom.  He maintains his innocence, Mr. Ayodele, or we would not be here.  But don't shoot dice on anybody's liberty here.  That's what is at stake.  When it comes to liberty, err on the side of liberty.

On this one, maybe it's for God to know and man to wonder, but don't let anyone take anything away from you.

1    There's a great poem, a quote by Rudyard Kipling.  "If you can
2    keep your head when all about you are losing theirs and blaming
3    it on you, but if you can trust yourself when all men doubt
4    you."

5         I go back to that word "trust" that the judge brought
6    up, that I brought up.  Trust yourself when you go back there.
7    Please trust yourself.  Stand your ground.  Be stronger than
8    you've ever been.  It's an important day.  You're involved
9    here, and you are the final judge.  And I'm respectfully asking
10   you to return a verdict of not guilty on Counts 1 and 2 --

11        Stand up one more time, young man.  Mr. Ayodele --
12   thank you, sir --

13        (DEFENDANT COMPLIES.)

14        **MR. TRAVIS:**  -- who has that armor of that presumption
15   of innocence.  And there are reasons on this case where you can
16   render a verdict of not guilty on this case.

17        **THE COURT:**  Thank you, Mr. Travis.

18        **MR. LEWIS:**  May we approach, Your Honor?

19        **THE COURT:**  You may.

20        (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

21        **THE LEWIS:**  Can we have a short break?

22        **THE COURT:**  Yes.

23        **MR. LEWIS:**  Five minutes.

24        **THE COURT:**  Okay.  We're good.

25        (END OF BENCH CONFERENCE.)

1       **THE COURT:**  Ladies and gentlemen, it may be a good

2   time to take a short break.  So I'm going to let you take a

3   break for about 15 minutes.  Do not discuss this case.  We'll

4   be back in in 15 minutes.

5       (JURY OUT.)

6       **THE COURT:**  We'll be in recess for 15 minutes.

7       (RECESS TAKEN.)

8       (JURY IN.)

9       **THE COURT:**  You may have a seat.

10       Mr. Lewis.

11       **MR. LEWIS:**  Thank you, Your Honor.

12       So, ladies and gentlemen, I'm going to go ahead and

13   tell y'all I am scared to death right now.  I am scared that I

14   have not made the right arguments, I've not asked the right

15   questions, I've not done what I need to do, and this is my last

16   chance to be heard in this case.  So I'm going to do the best I

17   can.

18       Remember -- and y'all have heard it plenty up to this

19   point -- the Government has got to prove their case beyond a

20   reasonable doubt and must prove every element of their case.

21   So when they're talking about the puzzle, you've got to filter

22   every piece of the puzzle through this reasonable doubt

23   calculation.

24       And as I told you in opening, the proof is going to

25   show that what the prosecutors have been told and what they

1    have told you is not the whole story.  The whole story is a lot

2    more contradictory and confusing than they think it is.  And I

3    told you that they were not going to bring real evidence, real

4    evidence that these guys committed this crime.  And when they

5    make the point of defining circumstantial evidence here before

6    you today, you know that they have got problems with lack of

7    direct evidence of the crime.

8            So let's talk about Mr. Coffman for a minute.  He is

9    assuredly a nice person.  He wants to help the Government.  He

10   is understandably upset that a crime has been committed in his

11   town.  He did not identify Jamarr on the date of the incident.

12   He did not.  There's just no question about it.  He identified

13   somebody completely different.  He identified somebody that had

14   a reddish goatee and had light skin.

15           Now, Mr. Coffman is familiar with African Americans

16   who have reddish hair.  He knows that they tend to be very

17   light-skinned people.  He did not mess that up.  He identified

18   the person that is light-skinned with reddish hair, and that is

19   not Jamarr.  There's no way.  Okay?

20           He also identified somebody who's sitting in the car

21   with a hat and a hoodie that's six feet tall, 170 to

22   180 pounds.  It seems entirely unlikely that he can make that

23   kind of determination under the circumstances, but let's assume

24   he did.  That is not Jamarr.  Okay?

25           So what happened?  Well, we don't know.  We do know

1    that the Government was sure enough after Jamarr in June -- or

2    around June of 2019 when the Google stuff came back.  Inspector

3    Martin, who is part of the investigation, he put the lineup

4    sheets together, I guess.

5        The Government knew at that point, when these lineup

6    sheets were put together, that -- that Coffman identified

7    somebody with light skin and a reddish goatee.  And I don't

8    know a lot about their procedures.  I'm not sure Inspector

9    Martin did either, but wouldn't it make sense for them to put

10    somebody in that lineup that had reddish hair and light skin?

11        So y'all can look at Exhibit G-21 when you get back

12    there.  You're not going to see anybody in here with reddish

13    hair and light skin.  So if they had done that, would

14    Mr. Coffman had picked that person?  Something to think about.

15        But there's no doubt that Coffman identified somebody

16    other than Jamarr on the date of the incident.  There's no

17    question about it.  And then he supposedly identified Jamarr a

18    year and a half later.  And he's been living all of his life

19    not thinking about this for that period of time, and he said he

20    was not 100 percent sure, and that just doesn't add up.

21        And don't get me started on this in court

22    identification.  Okay?  You saw Mr. Coffman kind of chuckling

23    about it, and I guess I would have too if it didn't bother me

24    so much.  But he had been shown a picture of the person that he

25    identified in the lineup four years ago, and then, God bless

1 him, he was asked to identify that person again in court.  He
2 knew he was looking -- he knew who he was looking for.  And,
3 ladies and gentlemen, you cannot put a lot of -- a lot of
4 weight in that.

5 So let's look at the -- the jury instruction on
6 identification.  And Mr. Chiniche showed you this, and I'm
7 going to try not to repeat a lot of things that have already
8 been done, but I do need to show you this.  It says down here
9 what -- and this is what -- this is the law.  Okay?  This is
10 what the Court has told you you must do.

11 "You may also consider the circumstances surrounding
12 the identification itself, including, for example, the manner
13 in which the defendants were presented to the witness for
14 identification and the length of time that elapsed between the
15 incident in question and the next opportunity the witness had
16 to observe the defendants."  All of those factors are here, and
17 all of those -- I went over all of that just now.

18 And here's the -- here's some really strong language.
19 This is strong coming up right now.  If, after examining all of
20 the testimony and evidence in this case, you have a reasonable
21 doubt as to the identity of the defendants as the perpetrators
22 of the offense charged, you must, must find the defendants not
23 guilty.  That's pretty strong right there.  Okay?  That's the
24 law.  Why is that language so strong?  Because of what I said
25 earlier, reasonable doubt.  Okay?

1       All right.  Let's talk about technology and Mr. Moody.

2   And I was the one who cross-examined him; so I'm the one here

3   today who is going to talk about this a little bit here with

4   y'all on closing.  But I'm going to -- I'm not going to get

5   into the weeds because I really don't have time, but as y'all

6   know, he was testifying about two separate things.  Okay?

7       He was talking about what he calls historical cell

8   site data.  Okay.  That's commonly called pinging off of

9   towers, phones connecting with towers.  You remember that.  And

10  then he talked about Google location services.

11      So I think if we've heard anything through this trial,

12  we have heard that that stuff is not precise.  In fact, Google

13  and these phone companies do not collect that information, do

14  not have that information for the purpose of solving crimes;

15  right?

16      It's designed to -- as far as the cell phone companies

17  are concerned, it's designed to bill people, figure out if

18  they're making calls.  It's so the phone companies can make

19  money.  And in the case of Google, it's designed to sell ads.

20  It's designed to help people use their apps.  It is by

21  definition not designed to support criminal prosecutions.

22      And, of course, the Government is going to tell you

23  this stuff is good as gold because they have a vested interest

24  in it being reliable.  What else would they say; right?

25  They're prosecuting people with it.

1        But I think you heard from Mr. Moody that none of this
2   stuff is generally accepted in the scientific community in this
3   country.  Nobody other than law enforcement is using this to,
4   you know, prosecute people.  Okay?  There are no studies about
5   it.  It's not -- you know, there are not scientists at
6   universities who study this stuff.  The data is not verified.
7   It's not tested.  And it's nowhere near as clean and clear and
8   cut and dry as the Government wants you to think.

9        Now, historical cell site data -- that's the pinging
10  off the towers -- is not -- and the Government admits this --
11  is not a precise indicator of where anybody is at any given
12  time.  The Government showed you these wedges.  Here's one I
13  was writing on with Mr. Moody.  This is G-25.

14       They are not saying that anybody was within this
15  colored wedge here.  They are saying that if you draw the lines
16  from a point all the way out -- not into infinity but a long
17  way -- if you drew them all the way out, more than likely,
18  somebody was somewhere in that area.  Okay?  That does not put
19  anybody at the post office.  It's just not that precise.  It's
20  not designed to do that.  That's not why cell companies keep
21  this information.

22       And the other significance is these towers don't
23  indicate that somebody is close to them at all.  The
24  significance is the device -- that the device could be near
25  some other tower somewhere else that's overloaded, that's down

1   because of maintenance, that's down because of weather, that's

2   obscured because of cars and buildings, topography, other

3   towers, a myriad of factors.

4         And the point is Mr. Moody did not check one single

5   thing to say that none of that was present.  All right?  He

6   just relied on what the phone company told him.  Well, the

7   phone company is not telling him this, is not providing this

8   information to prosecute these guys.

9         He could have.  He could have verified all of that

10  stuff.  He could have done a lot of work on this thing, but he

11  didn't.  So don't you think in a case like this where people's

12  liberty is at stake the Government could do a little more work

13  on something like this?

14        Another thing -- and I didn't think this was a huge

15  point, but I pointed out to Mr. Moody -- this is still G-25 --

16  that, for example, in his -- in his map, he says up here Cell

17  Site Data from T-Mobile, Jamarr Smith.  I said, "Mr. Moody,

18  that's misleading."  And he gave a really strange answer.

19  "Okay."  Which I intend -- I interpreted to be yes.  This is

20  not saying Jamarr Smith is at these locations, as this

21  indicates.  It's saying a device is at these locations.  Okay?

22  Weak.  Weak.  It's weak evidence.

23        All right.  Let's talk about Google very quickly.

24  This is very new stuff.  Moody had never testified before.  He

25  didn't know anybody who's testified about it before to a jury.

1    There are a lot of people with eyes on this case.  Nobody in

2    the scientific community has studied it or validated it.  Moody

3    said there can be false positives.  The device shows up in the

4    fence when, in fact, it is not, way more than there are false

5    negatives.

6         But we do know -- and here's the point.  We're not

7    misdirecting anybody by pointing this out.  We're pointing

8    out -- we're pointing what I'm about to tell you out because it

9    shows that this technology is not reliable.  It's not accurate

10   because we know that there were tons of people inside the fence

11   whose device did not show up on -- in this Google data.

12   Mr. Cobbs, Mr. Coffman, Mr. Coffman's girlfriend, conductors of

13   the train, occupants of the numerous vehicles that were driving

14   around.  You can watch the vehicle and see all of this.  Okay?

15        We're not misdirecting you.  We're pointing out that

16   it just doesn't add up.  It doesn't make sense.  Something's

17   not right.  That data is not reliable.  Why did it not show

18   that?

19        So let's look at the instruction about expert

20   witnesses.  "Merely because such a witness has expressed an

21   opinion does not mean, however, that you must accept this

22   opinion.  You should judge such testimony like any other

23   testimony.  You may accept it or reject it and give it as much

24   weight as you think it deserves, considering the witness's

25   education and experience, the soundness of the reasons given

1   for the opinion, and all other evidence in this case." You do
2   not have to accept Mr. Moody's opinions in this matter. And I
3   told you why you should not.

4           People talking to each other is not enough evidence.
5   I find it odd that the Government thinks that Mr. McThunel
6   and -- I think it's Mr. Ayodele made a four-minute call in the
7   middle of this robbery. Does that sound reasonable after what
8   you saw in the video? Does that make any sense? People talk
9   to each other a lot. Friends talk to each other a lot. A
10  four-minute call in the middle of this whole thing?

11          **COURTROOM DEPUTY:** Five minutes.

12          **MR. LEWIS:** Thank you.

13          I'm just going to throw out some things, and then I'm
14  going to close. The Government thought shutting down your
15  phone on February 5 was important. They say Chevella Hines
16  shut down her phone on February 5. She's not over there.
17  Mr. Brown shut down his phone on February 5. He's not over
18  there. They thought that was important. They clearly think
19  Ms. Hines is involved in this thing.

20          Okay. Jamarr works. He rebuilds transmissions. He
21  works with his hands. He goes to DeSoto County to get his
22  transmissions. You can look in Exhibit G-24, and he talks
23  about it. This is on February 20. "I'm headed to pick one up
24  from Horn Lake. I'll hit you when I get back."

25          Oh, and, by the way, he was clearly in business before

1  this incident.  It's in G-24.  On January 10 of 2018, "What's
2  up, Little Twin?  I have an '05 Kia Sorento.  Do you work on
3  Kia?  It ran hot twice.  I was just going to get another motor,
4  but can you put one in?  How much you charge?"  "I got you."
5  So the -- the idea that he opened up his business after this
6  incident is just not accurate.

7          There's a salvage yard in Walls.  You can see from the
8  Government's map here Walls -- here's Lake Cormorant
9  (indicating).  There's Walls (indicating).  There are cell
10 phone hits in Walls.

11         So think about this.  The presumption of innocence
12 protects us all.  It protects Jamarr, obviously, but also
13 consider this.  It protects the prosecutors from getting
14 wrongful convictions.  It protects me, because if he's
15 convicted and I go home, I will go home with guilt and
16 nightmares that I didn't do a good enough job to avoid that.
17 All of the defense lawyers will.

18         But it protects you too.  The presumption of innocence
19 and the burden of proof protects you too because it keeps you
20 from going home tonight and staring at the ceiling and
21 wondering have we convicted an innocent man today.  Right?

22         The evidence must be so clear that you will never
23 worry that you've convicted an innocent person.  Your not
24 guilty vote is your power.  Any one of you can decide not to
25 convict.  Each one of you individually has the power.  Do not

1     give up your honest convictions.

2            Jamarr works with his hands.  I'm going to tell you

3     another story about hands.  There's an old wise man, and

4     there's a young smart-aleck boy.  And the young boy goes to the

5     wise man all of the time and the wise man -- and asks him

6     questions, and the wise man always has the right answer, and it

7     bothers the young boy.

8            So he says, I've got an idea.  I'm going to go out in

9     the woods, and I'm going to find a bird.  I'm going to put it

10    in my hands.  I'm going to go to the wise man, and I'm going to

11    say, "Is the bird in my hands alive or is it dead?"  And if the

12    old man says the bird is dead, I'm going to open my hands, and

13    the bird is going to fly away.  But if he says the bird is

14    alive, I'm going to crush the bird and open my hands and say,

15    "No, you're wrong.  The bird is dead."  And I'm going -- I'm

16    going to get him.

17           So he did that.  He went out in the woods, and he got

18    a bird, and he came to the old man.  He said, "Old Man, I have

19    a bird in my hands.  Is it alive or is it dead?"  And the old

20    man said, "The bird is in your hands."  I'm going to leave

21    Jamarr in your hands.

22           Thank you, Your Honor.

23           **THE COURT:**  Thank you, Mr. Lewis.

24           Mr. McGee.

25           **MR. McGEE:**  May it please the Court.

1    They almost got away with it, didn't they?  It was
2  close.  They almost did.  What they didn't realize is there was
3  a camera pointed at them.  There was a camera pointed at them.
4  It picked up two of three of the vehicles.

5    They didn't leave a glove on the scene.  Mr. McThunel
6  didn't leave his mask on the scene.  He didn't leave his DNA on
7  the scene.  He didn't leave a footprint on the scene.  But you
8  know what they forgot about?  They forgot about these
9  (indicating).  Jamarr Smith.  Gilbert McThunel.  Thomas
10  Ayodele.

11    What do these do?  We've learned this.  What do these
12  do?  Y'all probably already knew it.  They keep track of us.
13  They follow every move.  It's almost like dropping -- it's
14  almost like they dropped a map.  They dropped a map that this
15  agent right here -- Alabama and Mississippi agents used
16  cutting-edge technology, cutting-edge technology -- we're in
17  2018 here -- they used cutting-edge technology to bring you all
18  of this evidence I'm about to show you that you've already
19  seen.  I submit to you that's impressive.

20    Let's talk about what -- what the -- what the
21  defendant said in their -- in their closing arguments.
22  Hopefully, my clicker will work or I might have to get you to
23  assist.  I did try it before.  I apologize.

24    And I'll start.  Just like Mr. Smith (sic) just
25  said -- let's start with Mr. McThunel.  A cancelled cell

1    phone -- a cancelled cell phone is important.  That's what
2    they -- that's what Mr. McThunel's attorney said.  It's
3    important.  But selling your car three days after the robbery
4    is not important.

5    Subscriber information, now, that's important.
6    Travonya Nash, that's important, that's important.  But Google
7    subscriber information, not important.  And the number given to
8    buy his car -- to buy the new car three days after the robbery,
9    that's not important.  Don't look at that, y'all.  Don't look.

10   Permanentwavesrecords going through the geofence at
11   5:58 p.m., that's important.  But my clients going through the
12   geofence, that's not important.  Let's look at why Cobbs's is
13   not in there, Coffman.  Let's look at everybody else.  There's
14   a dark SUV, a dark sedan, a red pickup that crossed through the
15   geofence.  That's important.  What about my clients' vehicles?
16   That's not important.

17   What about Smith's Facebook records that he showed you
18   to open a business?  He was already in business is what he
19   said, and he used the Facebook records to corroborate that.
20   Well, guess what else is in those Facebook records?  That 6029
21   number we've been looking at, it says, "This is my number."
22   You can't have it both ways.

23   So what you have to believe to acquit -- and this is
24   all based on their arguments -- that three people borrowed
25   three of their phones, and they all talked to each other, and

1    they were all at the scene of the robbery, and they took two
2    out of the three of the defendants' cars.  And Cobbs was not
3    right that it was a red Hyundai.  Coffman wasn't right about
4    the red Hyundai.

5         And out of 18 people, Coffman, with a one in eighteen
6    shot, he picked the person who just so happened his GPS put him
7    at the scene by satellite -- his phone records, the cell tower
8    put him at the scene, whose girlfriend was the postmaster at
9    Robinsonville and Lake Cormorant, who has a picture in front of
10   the white SUV you see.

11        Now, we talked about phone communications.  And,
12   again, you can go count these to back me up, but this was my
13   rough counting.  I just counted each line.  And this is what we
14   have, that these people were talking this much between 4:00
15   and 6:45 p.m. on the day of the robbery.

16        Jamarr Smith, 19 times with Gilbert McThunel; 18 times
17   with Thomas Ayodele; Chevella Hines, 16 times; Gilbert
18   McThunel, 4 times.  Remember -- you see this picture on the
19   right where the white SUV has got -- where he's dropping off?
20   Remember, they were riding together, McThunel and Ayodele.
21   Does this look like a conspiracy to y'all?  Talking, same
22   place.

23        I want you to focus on these times real quick, 5:20 to
24   5:32.  That's when you heard -- that's when the actual robbery
25   occurred.  Now, obviously, it was planned way in advance;

1    right?  But this is when the robbery occurred.  Twelve minutes.
2    That's pretty good.  As we talked about earlier, pretty good.

3         I want you to watch this video.  This is one of the
4    animations.  Jamarr Smith in yellow, Gilbert McThunel in red,
5    Thomas Ayodele in green.  5:20, 5:22, 5:24, 5:25, 5:26, 5:27,
6    5:29.  And that's it.

7         Jamarr Smith.  Let's talk about Jamarr real quick.
8    We've already heard -- this is a picture of him and Chevella
9    Hines.  Who's that again?  Y'all know it.  Postmaster,
10   Robinsonville/Lake Cormorant.  This is him in the picture I was
11   talking about earlier in front of the vehicle.  This is him
12   with Mr. Thomas Ayodele.

13        This is Jamarr Smith.  This is his Facebook records.
14   "Tried calling you at your other number; so I need to replace
15   it with this one."  That's on 2/7/2018.  Look at those dates.
16   2/1, before the robbery -- you've got before and after right
17   there.  "What's your number?"  "662-360-6029."  Who's
18   misleading?  Who is misleading y'all?  That's -- that's Jamarr
19   Smith's words right there in his records that were just relied
20   on by his attorney.

21        Next slide, please.  Keep going.

22        Okay.  Jamarr Smith right here.  This is what we got
23   back from Google right there on the locations.

24        Go ahead.

25        There's his four locations.

1          Next.

2          This is when -- this is right when he -- I screenshot

3    it.  This is right when he met Forest Coffman.  You can see

4    Forest Coffman right there on the corner.  You can see Jamarr

5    Smith.  Obviously, you can't see inside the car, but you can

6    see the same car that he talked about.

7          Next.

8          Okay.  These were the three Google hits that we got

9    from a satellite GPS.

10         Click it again.

11         Now, we talk about accuracy.  Now, counsel opposite

12   even said -- Mr. Smith's attorney said during his direct what

13   he said is not evidence, but he even said GPS is accurate.

14   This is the post office where the yellow arrow is.  And watch

15   this.  Mr. Mims pointed this out, but I really want you to

16   focus on this.

17         One more, Robin.

18         That is where Forest Coffman said they met, and it

19   says it on camera.  And Jamarr Smith is hitting in a circle

20   that's right there (indicating).  So, again, you have to

21   disbelieve that someone picked one out of 18 -- picked him,

22   circled him.  And, oh, by the way, his phone put him in a

23   circle right around the area where he said he met him right at

24   the time.  Look at these times.  5:22, 5:24, and 5:25.

25         Again, that's what we talked about, and there's the

1    lineup.  This is Thomas Ayodele.  There's the SUV right there.

2    This is leaving -- or on the left side of the screen, this is

3    dropping off Mr. McThunel, and then this is after he picked him

4    up leaving the scene.  Now, you tell me if that vehicle looks

5    like the same vehicle.

6           And, again --

7           Next slide.

8           -- whose phone was there?  Oh, I forgot to tell you

9    this.  You see Mr. Jamarr Smith standing in front of the Yukon.

10          Next.

11          This is Mr. Ayodele's phone records.  Now, it's

12    subscribed in his name.  It puts him going with them to the

13    scene.  Do y'all remember what Patra Malone said?  She said she

14    doesn't know anybody in Batesville.  So Little Bo?  She didn't

15    know who Little Bo was.

16          So you would have to believe that a phone subscribed

17    in his name was taken by someone and texted with Patra Malone

18    during the time of the robbery, like, right after.  It just

19    doesn't -- I'm trying to even think of what you would have to

20    believe, and I can't even do it because it doesn't make sense.

21          Next.

22          Gilbert McThunel.  Seven hits.  Seven hits between --

23    remember what I told you -- 5:20 to 5:30.  Look at these times.

24    5:22, 5:24, 5:27, 5:27, 5:28, 5:28, 5:30.  There's your circles

25    that they're supposed to be.  There's his travel.  Subscribed

1 in his name.  Got his cell phone right there.

2          Next.

3          There's the post office.

4          Next.

5          This is -- we don't even have to just believe Google.

6 You also got cell towers; right?  This is the number he also

7 provided to Kirk.  We don't have to just rely on Google, but we

8 can rely on Kirk too.  These are his towers -- Lake Cormorant,

9 Walls, and Walls -- pointed down towards Lake Cormorant, if you

10 can see just north of that red flag.

11          Next.

12          Last, the red Hyundai Sonata.  Now, it may have been

13 an accident, but Mr. Chiniche even said red Hyundai.  He said

14 it when he was describing it in the video.  Sylvester Cobbs

15 said on the 911 call it's a red Hyundai.  Forest Coffman said

16 red Hyundai.  Three days later, McThunel sells it, buys another

17 car.

18          Next.

19          **COURTROOM DEPUTY:**  Two minutes.

20          **MR. McGEE:**  Thank you.

21          So, ladies and gentlemen, this thing -- this thing

22 provides a lot of evidence on you.  It does.  And there's a lot

23 of evidence in this case that you've seen and you've got on the

24 screen.  Y'all are smart.  I'm not going to pressure you.  I'm

25 not going to make you feel guilty and tell you to go -- when

1  you go to sleep tonight, are you going to feel -- are you going

2  to look up at the ceiling and feel guilty about this or that.

3  I'm not going to do that to you.

4          I'm just going to submit to you that I have presented

5  the evidence.  I've presented all of the evidence we have.  And

6  I would submit that the Government has proved that it connects

7  the dots.  But you're a smart jury, and I leave it with you.

8          Thank you.

9          **THE COURT:**  Thank you, Mr. McGee.

10         So at this time, I'll tell you, Mr. Xxxxx, you have

11 been our alternate.  So it's my pleasure -- and probably yours

12 as well -- to excuse you at this time.

13         Thank you very much for your service.  Thank you for

14 being attentive throughout the trial and listening and prepared

15 to step in.  And you see why we pick alternates.  We lost that

16 alternate the first day; so that's the reason.  So we don't

17 have to stop the trial and start all over.  Thank you for your

18 service, sir.

19         (ALTERNATE JUROR NUMBER 2 EXCUSED.)

20         **THE COURT:**  So what I'm about to do is send you to the

21 jury room to deliberate.  Let's talk about some steps between

22 here and there.

23         First thing is, as soon as I get you out, I'll get the

24 lawyers to come to the table and document by document go

25 through it to make sure all of the exhibits are there and

1  accounted for.  Ms. Tracy will bring you the exhibits, the
2  instructions, a copy of the indictment.  You'll have that.

3      It is typical that, when you first get back there,
4  some may need to go to the restroom, others pick a snack or
5  something; so don't start deliberating until all 12 of you are
6  seated at the table.  If during the course of the day you need
7  to take a break, take a break.  That's on you.

8      I've already instructed you you'll pick a foreperson,
9  and that foreperson will be who kind of guides you through your
10  process back there and then speaks for you if need to come back
11  in here.

12      Because you are now charged with this case, we bring
13  lunch to you so that you don't have to go out and get lunch.
14  That would not be -- in other words, I'm going to keep you in
15  the jury room until we have a decision.  So what will happen
16  next when you get back there is a lady will come back and --
17  with a menu, get your lunch, and that will be ordered for you
18  and brought in.

19      You certainly don't have to wait on that.  You can
20  start deliberating and then take a lunch break, or you can work
21  through lunch.  All of this is left up to your discretion once
22  you get in the jury room.  It's just important that all 12 of
23  you are participating.  Okay?

24      So I'm going to dismiss you at this time, send you to
25  the jury room.  We'll do our business right here and then start

1   bringing you those documents.  I've already indicated to you
2   that if you get ready to see a video or hear an audio and wish
3   some assistance with that, I can make arrangements to get you
4   some assistance to listen.

5        You're discharged.  You are welcome to go to the jury
6   room and start your deliberations.

7        (JURY OUT AT 12:14 P.M.)

8        **THE COURT:**  Counselors, if I could get you to come on
9   up with Tracy and start going through those exhibits, make sure
10  they're all accounted for.

11       (RECESSED AT 12:14 P.M.)

12       (NOTE FROM THE JURY, 3:37 P.M.)

13       **THE COURT:**  Okay.  Let the record reflect that we're
14  back in the courtroom without the jury with all of the
15  attorneys and the parties.  We have a question that has been
16  presented by the jury, and for the record, I'll read it into
17  the record.  Copies have been provided to you.

18       It reads, "Confusion on Count 1 between indictment and
19  jury instructions.

20       "Indictment is a conspiracy charge showing involvement
21  between the defendants.  This is not a charge of robbery;
22  correct?

23       "Conviction of Count 1 is just showing involvement of
24  the count.  This is not just the person physically performing
25  the act of robbery.  Is our understanding correct?"  Signed and

1    dated by, I assume, the foreperson.

2         So I'll hear first from the Government. We're going

3    to take this kind of in paragraph form. It's a little unusual

4    the way it's being presented to us here between -- Mr. Lewis,

5    I'll pick on you -- whether or not it's a statement or a

6    question.

7         So that first two lines, "Confusion on Count 1 between

8    indictment and jury instructions," I think is nothing more than

9    him saying this is our problem. Okay? No response needed

10    there.

11         Next, "Indictment is a conspiracy charge showing

12    involvement between the defendants. This is not a charge for

13    robbery; correct?"

14         What says the Government as to whether or not to

15    respond and, if so, how?

16    **MR. MIMS:** Your Honor, I think we need to respond

17    because they have questions, and I think we need to try to give

18    them some guidance and direction. And in looking at that, I

19    think the appropriate answer or response would be "They are

20    charged with conspiring to commit a robbery." I think that's

21    consistent with Count 1 in the indictment, and it clarifies --

22    well, I think it clarifies. Who knows? But they're charged

23    with conspiring to commit a robbery.

24    **THE COURT:** I want to write your words down.

25         Okay. You suggest they are charged with conspiracy to

 1   commit a robbery, and I'm going to add -- for discussion
 2   purposes, I'm going to preface that by saying "in Count 1."
 3        **MR. MIMS**:  Yes, Your Honor.  And, really, to be more
 4   specific, I guess I should say "the defendants are charged
 5   with" instead of "they."
 6        **THE COURT**:  Okay.  So, Counselors, it would read as
 7   follows:  In Count 1, the defendants are charged with
 8   conspiracy to commit a robbery.
 9        **MR. CHINICHE**:  Yes, Your Honor.
10        **MR. TRAVIS**:  I have no objection, Your Honor.
11        **MR. CHINICHE**:  Well, I mean, my position is that we
12   don't need a response to the jury and -- other than a note from
13   Your Honor saying the jury instructions and the indictment are
14   there for your benefit.  And we -- we would object to
15   responding in anything other than what they've already got.
16   And so --
17        **THE COURT**:  Okay.
18        **MR. CHINICHE**:  -- I think we ought to attach the note
19   that we got from the jury to the trial transcript as well.
20        **THE COURT**:  It will be.  It will be part of the
21   transcript.
22        **MR. CHINICHE**:  Yes, Your Honor.
23        And so I think just -- I think the jury has everything
24   that they need because it's pattern jury instructions, and it's
25   the indictment that presumably tracks the statute.  And so,

1    therefore, no -- no additional instruction is needed; instead,

2    a directive to read what they've already got in front of them.

3         Thank you.

4         **THE COURT:** Okay. That's your opinion.

5         Mr. Lewis.

6         **MR. LEWIS:** Yeah. I agree with that, Your Honor.

7    I'm -- I'm scared to speculate about what they're really asking

8    here. I don't think I understand the question, I'm sorry to

9    say. But if their question is does the indictment contain a

10   conspiracy to rob a post office count -- and it's late in the

11   afternoon. I'm going to go ahead and say this -- Ray Charles

12   could read this and see that it contains a conspiracy to rob a

13   post office count. I don't think the indictment is confusing

14   on that; so I don't know why we would need to send that

15   information back in there.

16        **MR. McGEE:** Your Honor, may we have a moment to --

17        **THE COURT:** Hang on just one second. I also need to

18   hear from Mr. Travis.

19        **MR. TRAVIS:** May it please the Court. For the sake of

20   continuity, Your Honor, I will join in with Mr. Lewis's and

21   Mr. Chiniche's position on behalf of Mr. Ayodele.

22        **THE COURT:** Okay.

23        **MR. McGEE:** Your Honor, this may be a -- let me know

24   when you're ready for me.

25        **THE COURT:** Okay. I'm ready.

 1          **MR. McGEE:**  So I -- this -- maybe everybody will

 2     agree.  I don't know.  I read it as, they've looked at the jury

 3     instruction that defines robbery, and it gives those elements,

 4     and they're getting confused because the indictment says

 5     conspiracy.

 6          **THE COURT:**  I think you're right.

 7          **MR. McGEE:**  The next instruction says conspiracy

 8     within the conspiracy instruction.

 9          **THE COURT:**  I could say, "You are correct.  You're

10     smarter than everybody else in the courtroom, detected this

11     discrepancy."

12          **MR. McGEE:**  So I -- what I would propose -- and would

13     love to hear from the other side, but what I would propose is

14     that we point them to the conspiracy jury instruction, and I

15     think where they're confused is it says the crime of robbery

16     here, but what I don't think they understand -- I'm sorry.

17          So I would direct them to this because the conspiracy

18     is the charge, and then the definition of robbery is in the

19     instruction before.  And I personally think where they're

20     getting confused is they're looking at this instruction saying,

21     "Wait a minute.  This says he's charged -- they're charged with

22     robbery.  Do each one of these people have to do this?"  But

23     really this is just the definition of robbery with the

24     conspiracy that's -- that's stated in the conspiracy element.

25          **THE COURT:**  You know what?  I mean, that's -- that

1  first paragraph is misleading.  The indictment charges the

2  defendants with robbery, and yet we're telling them it's

3  conspiring to commit robbery.

4       **MR. MIMS**:  Actually, Your Honor, I don't think the

5  first paragraph is misleading because that's Count 2.

6       **THE COURT**:  Yeah, but it is probably the way I read

7  it.  I'm concerned now that I got them confused in reading 7 --

8  and then your other instruction is 8, isn't it, Mr. McGee?  The

9  one you first put on the screen is Number 8?

10      **MR. McGEE**:  It's Number 8, yes, ma'am.  This is the

11 conspiracy.  Now, it does say they are charged with conspiring

12 to rob, but it also doesn't talk about which count is which.  I

13 think maybe say in Count 1.  I don't -- I don't know how adding

14 to a jury instruction -- but that may clear it up.  In Count 1,

15 they are charged with conspiring to rob.

16      **MR. CHINICHE**:  Count 1 is conspiracy to rob.  Count 2

17 is aiding and abetting in the robbery.

18      **THE COURT**:  Yeah.

19      **MR. CHINICHE**:  And all we're doing in jury instruction

20 Number 8 on the screen here is defining what a conspiracy is,

21 and Jury Instruction Number 7 previously defines what robbery

22 is, I believe.

23      **THE COURT**:  Okay.  I hear your position, defendants,

24 and that was with respect that -- what I'm going to call the

25 second paragraph.  Hold on a minute with me, and let's go to

1 | the second paragraph because we're all in agreement they're
2 | still talking about Count 1; right?
3 |       **MR. MIMS:** Yes.
4 |       **THE COURT:** Yes?
5 |       **MR. McGEE:** Yes.
6 |       **THE COURT:** Okay. I think I understand what they're
7 | asking, and it's a fair concern between the indictment and the
8 | instructions. I am inclined to respond, in large part, because
9 | I have found over the years that jurors do not like the fact
10 | that you tell them they can ask you a question but then you
11 | refuse to respond to their question.
12 |       I can -- may I suggest that I take Jury Instruction
13 | Number 8, highlight the second paragraph, respond no further,
14 | and send it back?
15 |       **MR. CHINICHE:** We're okay with that, Your Honor.
16 |       **MR. LEWIS:** Yes, Your Honor.
17 |       **MR. TRAVIS:** That's fine, Your Honor.
18 |       **MR. MIMS:** I'm sorry. I'm a little bit confused.
19 |       **THE COURT:** Take Instruction Number 8 --
20 |       **MR. MIMS:** Okay. Go ahead.
21 |       **THE COURT:** -- allow me to highlight the second
22 | paragraph.
23 |       **MR. MIMS:** This one right here (indicating)?
24 |       **THE COURT:** Yes, sir.
25 |       **MR. MIMS:** Okay.

1    **THE COURT:**  Say nothing more and send it back.

2    **MR. MIMS:**  I certainly don't have any objection if

3    that's what the Court wants to do.  I have one more suggestion

4    to throw out.  And that might be to bring them in, read them

5    Count 1 of the indictment, and then read them the jury

6    instruction that corresponds with conspiracy and then read them

7    Count 2 of the indictment, and read them the jury instruction

8    that corresponds to Count 2 for substantive, plus perhaps

9    aiding and abetting, because those two go to Count 2 and

10   conspiracy goes to Count 1.  Or just do it for Count 1 since

11   Count 1 is the one they have questions on.  Just read them

12   Count 1 and read them the conspiracy charge in its entirety.

13   **MR. LEWIS:**  Your Honor, with all due respect to

14   Mr. Mims, I've never heard of a jury be reinstructed on the

15   law.  I would object to that.

16   **THE COURT:**  I may have erred, but I've done it before.

17   **MR. LEWIS:**  Okay.  Okay.

18   **THE COURT:**  Simply by doing essentially what I'm

19   suggesting, not adding a thing.  Simply resubmitting to their

20   attention a paragraph.

21   **MR. LEWIS:**  Well, we don't have any objection to you

22   highlighting and sending it back into the jury room.  I think

23   what Mr. Mims is asking is something much --

24   **THE COURT:**  It is.  It is.  I understand, but I'm

25   going to try that first.  Okay?

1           Okay.  Here's your question.  You go print me

2  something I can highlight.

3           And I'll let you see it before I send it back, and

4  then we will wait.

5      (PAUSE IN PROCEEDINGS.)

6          **THE COURT:**  Okay.  Tracy, pass that around.  Let

7  everybody glance at it and see if it is okay.

8          **MR. McGEE:**  I'm good with this.

9          **MR. TRAVIS:**  Mr. Ayodele approves.

10         **MR. LEWIS:**  No objection, Your Honor.

11         **MR. CHINICHE:**  That's good.  Thank you.

12         **THE COURT:**  Okay.  We'll be in recess.  Tracy, you may

13  deliver that to the jury with no comment.

14      (RECESSED AT 3:51 P.M.)

15      (OPEN COURT AT 4:00 P.M.)

16         **THE COURT:**  It's 4:00.  I'm advised that we have a

17  verdict.  So you may bring in the jury.

18      (JURY IN AT 4:01 P.M.)

19         **THE COURT:**  You may have a seat.  Ladies and

20  gentlemen, I see a -- a young gentleman that has a notebook --

21  piece of paper in his hand or paper.  So I assume we have a

22  verdict.

23         **JURY FOREPERSON:**  Yes, ma'am.  Your Honor, we do.

24         **THE COURT:**  You may hand it to the court security

25  officer.

1     So I shall read the verdict as to each defendant.  And

2   the Court sees that the form is correct.  It has been signed as

3   indicated in the blanks, and it has been -- it has the

4   signature of the foreperson and the date.

5     I read you as follows:  As to Count 1 of the

6   indictment, we, the jury, find the Defendant Jamarr Smith

7   guilty.  As to Count 2 of the indictment, we, the jury, find

8   the Defendant Jamarr Smith guilty.

9     As to Count 1 of the indictment, we, the jury, find

10   the Defendant Thomas Ayodele guilty.  As to Count 2, we find

11   the defendant guilty.

12     As to Count 1 of the indictment, we, the jury, find

13   Gilbert McThunel guilty.  As to Count 2 of the indictment, we,

14   the jury, find the Defendant McThunel guilty.

15     Do any of the defendants desire to poll the jury?

16     **MR. LEWIS:**  Yes, Your Honor.

17     **MR. TRAVIS:**  Thank you, Your Honor.

18     **THE COURT:**  So, ladies and gentlemen of the jury, you

19   remember that one of your instructions was that the verdict had

20   to be unanimous.  So how I determine that is simply asking you,

21   when I call your name, to stand and say -- because there's

22   three defendants, I'm going to make it simple and just say,

23   "Yes, that's my verdict."  You heard me read the verdict guilty

24   on both counts to all three.  So you don't have to do them one

25   by one.  Okay?

1          So, Mr. Xxxx, I'll start with you.  Is this your

2   verdict?

3          **JUROR:**  Yes.

4          **THE COURT:**  Mr. Xxxxx?

5          **JUROR:**  Yes, Your Honor.

6          **THE COURT:**  Ms. Xxxxxxxxx?

7          **JUROR:**  Yes, Your Honor.

8          **THE COURT:**  Ms. Xxxxxxx?

9          **JUROR:**  Yes, Your Honor.

10         **THE COURT:**  Mr. -- excuse me.  Ms. Xxxxxxxxx?

11         **JUROR:**  Yes, Your Honor.

12         **THE COURT:**  And Mr. Xxxxxxx?

13         **JUROR:**  Yes, Your Honor.

14         **THE COURT:**  Mr. Xxxxxx?

15         **JUROR:**  Yes, Your Honor.

16         **THE COURT:**  Ms. Xxxxxx?

17         **JUROR:**  Yes, Your Honor.

18         **THE COURT:**  Ms. Xxxxxxx?

19         **JUROR:**  Yes, Your Honor.

20         **THE COURT:**  Ms. Xxxxxxxxx?

21         **JUROR:**  Yes, Your Honor.

22         **THE COURT:**  Mr. Xxx?

23         **JUROR:**  Yes, Your Honor.

24         **THE COURT:**  And Ms. Xxxxxxxx?

25         **JUROR:**  Yes, Your Honor.

1         **THE COURT:** Very well. Are you satisfied, Counselors?

2         **MR. CHINICHE:** Yes, Your Honor.

3         **MR. TRAVIS:** Yes. Thank you, Your Honor.

4         **THE COURT:** Okay. So, ladies and gentlemen, at this

5 time what I'd like to do is thank you publicly in the presence

6 of the lawyers because they're not in a position to do that,

7 but I can assure you that I know they're very, very

8 appreciative of your willingness to listen. You've been very

9 attentive. You've heard a lot of testimony. So thank you.

10 Thank you for your jury service, and thank you for your service

11 in this particular case.

12         I am going to excuse you back to the jury room, and

13 I'll actually come back there. It's my practice to come back,

14 and you can ask me anything you want to ask me at this point

15 because it's over. You get to even go home and talk about it

16 tonight if you want to. So I'll come back and answer your

17 questions.

18         I do have some matters I have to take up very briefly

19 with the defendants in the courtroom before I can come back

20 there. So be back there shortly. Thank you.

21         (JURY OUT AT 4:05 P.M.)

22         **THE COURT:** Y'all may have a seat. Consider yourself

23 in recess for just a moment. She's going to get the bond

24 reports.

25         (PAUSE IN PROCEEDINGS.)

1     **THE COURT:**  Okay.  So I assume that the defendants

2  want to make bond or continue to make bond?

3     **MR. LEWIS:**  That's correct, Your Honor.

4     **THE COURT:**  So I've just briefly here reviewed all

5  three bond reports, and as to all three, it's recommended that

6  the defendant be released on the same bond with conditions of

7  release continued as to all three.

8     Does the Government have any objection?

9     **MR. MIMS:**  I do, Your Honor.

10  Your Honor, under 18 U.S.C. Code, Section 3143, the

11  standard changes, and it talks about release or detention

12  pending sentencing.  It says, "The judicial officer shall order

13  that a person who has been found guilty of an offense be

14  detained, unless the Court finds -- I think it's by clear and

15  convincing evidence, is not likely to flee or pose a danger to

16  the safety of any other person or the community if released."

17  The standard changes once they are convicted at trial.

18  We have three defendants convicted of an armed robbery, and

19  despite the fact they may have been on good behavior during

20  their pretrial detention, I believe at this point the burden

21  has shifted, things have changed, and they should be detained.

22     **THE COURT:**  Can I see your rule book a minute?  Or

23  tell me the number.  I can do it right here.

24     What number was it, Mr. Mims?

25     **MR. MIMS:**  Your Honor, it was 3143.  And I was reading

1    it a minute ago, and it's got a Subsection A and a Subsection

2    B -- or I'm sorry -- Subsection A, and then it talks about

3    Paragraph 1 and Paragraph 2, and I actually think Paragraph 2

4    applies, but I can't necessarily figure out what the real

5    difference is in the two of them.

6         **THE COURT:**  Okay.  Mr. Mims, I believe you are

7    correct.  Under 3143, it says, "The judicial officer shall

8    order that a person who has been found of an offense and who is

9    awaiting sentence," dah, dah, dah, "be detained, unless the

10   officer finds by clear and convincing evidence that the person

11   is not likely to flee or pose a danger to the community."

12        And then it appears also that 2 may apply -- not

13   apply, I should say.  (A)(i), I am not finding at this juncture

14   that a substantial likelihood that a motion for acquittal or

15   new trial will be granted.  Neither am I finding that an

16   attorney for the Government has recommended that no sentence of

17   imprisonment be imposed.

18        Because all of you -- Government, you contend this is

19   one year or more?  Mr. Mims?

20        **MR. MIMS:**  Oh, I'm sorry.

21        **THE COURT:**  I mean, you're not asking for no

22   sentence --

23        **MR. MIMS:**  I'm not.  No, ma'am.

24        **THE COURT:**  -- or incarceration?  And then (B) is

25   where I could find by clear and convincing evidence that the

1 person is not likely to flee or pose a danger to any other

2 persons.  So under that condition, I could release.

3      I'm not going to today.  I'm going to take them into

4 custody.  But I am going to tell you that I think it is

5 probably appropriate at some point to have a hearing under (B).

6 I'm just not doing that today, determining by clear and

7 convincing evidence that they're not likely to flee.

8      So they will be taken into custody.  You need to make

9 contact with the marshal service.

10      The tentative sentencing date in this case is

11 May 30th, 2023.

12      Okay.  Are there any other matters from the Government

13 for the record?

14      **MR. MIMS:**  No, Your Honor.

15      **THE COURT:**  Any other matters for defense counsel for

16 the record?

17      **MR. LEWIS:**  Your Honor, I would just state, as to

18 Jamarr Smith, we are prepared to go forward with a hearing

19 today -- his mother is here -- on this bond issue.  In other

20 words, I can call a witness.  Is there some indication of how

21 long they would be confined before hearing?

22      **THE COURT:**  I bet you might file your motion next

23 week, and we will set it as soon as possible.  Okay?

24      **MR. LEWIS:**  That's all I have.

25      **THE COURT:**  Any others?

1    **MR. TRAVIS**:  Nothing else, Your Honor.  Thank you.

2    **THE COURT**:  Okay.  Thank you, Counselors.

3    (CONCLUDED AT 4:13 P.M.)

1                             CERTIFICATE

2

3        I, Phyllis K. McLarty, Federal Official Realtime Court

4 Reporter, in and for the United States District Court for the

5 Northern District of Mississippi, do hereby certify that

6 pursuant to Section 753, Title 28, United States Code, that the

7 foregoing 1-707 pages, Volumes 1 through 5, are a true and

8 correct transcript of the stenographically reported proceedings

9 held in the above-entitled matter and that the transcript page

10 format is in conformance with the regulations of the Judicial

11 Conference of the United States.

12        Witness my hand, this 31st day of August, 2023

13

14                    /s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25